**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS
EARPLUG PRODUCTS
LIABILITY LITIGATION

This Document Relates to:
*Ronnie LaChappelle v. 3M Company*
Case No. 7:20-cv-06901

Case No. 3:19-md-2885

Judge M. Casey Rodgers
Magistrate Judge Gary R. Jones

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants seek summary judgment on all of Plaintiff's claims. Dkt. 12. In

response, Plaintiff voluntarily dismisses his claims for Design Defect–Negligence

(Count I); Breach of Express Warranty (Count V); Breach of Implied Warranty

(Count VI); Negligent Misrepresentation (Count VII); Fraudulent Misrepresentation

(Count VIII); Fraudulent Concealment (Count IX); Fraud and Deceit (Count X);

Gross Negligence (Count XI); Negligence Per Se (Count XII); Consumer Fraud

and/or Unfair Trade (Count XIII); and Unjust Enrichment (Count XV).[1]  Regarding

---

[1] After moving for Summary Judgment, Aearo and other 3M subsidiaries filed for
chapter 11 bankruptcy and are currently subject to an automatic stay; 3M Company,
however, "is not a debtor" and thus not subject to the stay. MDL Dkt. 3329, 3356.
For the purpose of Plaintiff's opposition, "Defendants" means only whichever
Defendant(s) may properly be subject to an order of this Court when the motion is
adjudicated.

Plaintiff's remaining claims, triable issues of fact exist, and Defendants' motion should be denied.[2]

## BACKGROUND

1.      Plaintiff served in the Arkansas Army National Guard from 1994 until 2016. Ex. 1, LaChappelle Dep. 37:8–15.

2.      Plaintiff served in Iraq from 2003 to 2004 and Kuwait from 2006 until 2007. *Id.* at 37:18-19; 38:3-10.

3.      Plaintiff attended basic training at Fort McClellan, Arkansas, where he was exposed to various weapons and explosions. *Id.* at 39:15-16, 21. There was never a situation in basic training that Plaintiff did not use a hearing protection device ("HPD") when exposed to loud noises. *Id.* at 43:25; 44:1-3.

4.      Plaintiff initially received two pairs of CAEv2s at Fort Polk, Louisiana, in February 2003, and he received one pair of CAEv2s about every 30 days during deployment in Iraq and Kuwait. *Id.* at 83:16-25; 84:1-8. Plaintiff exclusively wore the CAEv2 from 2003 until returning from deployment in 2007. *Id.* at 86:6-8.

_____

[2] Defendants' reservation of rights regarding the government contractor defense and Noise Control Act has no basis in law or fact. No issues currently on appeal in the Eleventh Circuit would warrant dismissal of all of Plaintiff's claims. *See, e.g.*, MDL Dkt. 1280 at 55 ("Defendants concede that the [government contractor] defense applies only to design defect and failure-to-warn claims."); *Estes*, Dkt. 53 at 21-22 (adjudicating combat-use exception as to negligence-per-se claim only).

5.      Plaintiff was never in a combat situation with a nearby enemy when he was not wearing the CAEv2s. *Id.* at 98:2-7.  Plaintiff was exposed to multiple hazardous noises while wearing the CAEv2 during deployments in Iraq and Kuwait, including exposures to steady-state noise, such as vehicles and aircraft and impulse noise, such as artillery and gunfire. *Id.* at 46:11-25; 47:1-6; 48:6-25; 49:1-25, 50:1-25, 51:1-25; 52:1-8; 53:10-25; 60:8-23; 64:23-25; 65:1-22; 70:1-10; 71:13-16; 72:3-4; 77:20-25; 78:1-8.

6.      Plaintiff does not recall whether he received any written instructions regarding the CAEv2. *Id.* at 89:10–22.

7.      Plaintiff understood the yellow ends and green ends of the CAEv2s were designed for use around different noises such as combat noise versus generators. *Id.* at 92:23-25; 93:1-4.  He was informed about the different uses of the yellow end of the CAEv2 by military personnel but did not remember who. *Id.* at 93:20-25; 94:1-2.

8.      Plaintiff believed the CAEv2 worked well and protected him and was told by military personnel that the CAEv2 was the best HPD available, stating "[t]hey're supposed to be the best earplugs." *Id.* at 104:10-24; 105:2.

9.      Plaintiff had perfect hearing and no tinnitus before he entered the military. *Id.* at 111:22-25; 112:1-2, 10-12.

3

10.    Plaintiff first noticed his hearing loss and tinnitus after his deployment to Iraq but before his deployment to Kuwait. *Id.* at 112:23-25; 113:1-105.

11.    Plaintiff was diagnosed with hearing loss and tinnitus in 2018. *Id.* at 113:21-25; 114:1-2.

12.    Plaintiff noticed a humming in his ears in 2008, after returning from deployment in Kuwait, which he reported to the VA. *Id.* at 118:5–8; 139:13-16.

13.    Plaintiff did not discover that the CAEv2s may have caused his hearing loss and tinnitus until February 2019. Ex. 20, LaChappelle Affidavit at ¶¶ 2-5.

14.    Dr. Rivera opined that the CAEv2 is defective and flawed, and that the CAEv2 does not seal and remain sealed because the stem is too short, too wide and made of Delrin, which is too hard or stiff; Dr. Rivera opined that the CAEv2 imperceptibly loosened in users' ears, and these defects resulted in users, such as Plaintiff, being exposed to toxic levels of noise. Ex. 2, Dr. Rivera, Case Specific Amended Expert Report at 1-3, 9-10, 22-23.

15.    Dr. Rivera performed a differential diagnosis and review of Plaintiff's medical and noise exposure history before concluding that the defects in the CAEv2s were the cause and substantial contributing factor in Plaintiff's hearing loss and tinnitus. Ex. 2 at 1-3, 9-23. Ex. 3, Dr. Arnaldo Rivera, Dep. 74:17-20; 75:8-11.

16.    Dr. Rivera also relied on Plaintiff's General Experts Reports and opinions that there were safer alternatively designed products available and could

4

have been worn by Mr. LaChappelle that would have prevented his hearing injuries. Ex. 2 at 1-3, 22-23, and Ex. A to Report; Ex. 3 at 67:12-25; 68:1-25; 69:1-25; 70:1-4.

17.     Dr. Rivera identified a number of safer alternatively designed products that Mr. LaChappelle could have worn during his service instead of the CAEv2. Ex. 2 at 22-23.

18.     Dr. Rivera opined that had Mr. LaChappelle worn these safer alternative HPDs instead of the CAEv2, he would not suffer from his hearing injuries. *Id.* at 23. Dr. Rivera reviewed photographs of Plaintiff with the CAEv2's inserted and opined that the flanges on the outside of the CAEv2s were touching his tragus and outer portions of his antitragus, which was consistent with Delrin study that concluded that the CAEv2s were too short and will loosen easily and not provide the protection they were intended to provide. Ex. 3 at 41:9-25; 42:1-25; 43:1-15; Ex. 2 at Ex. D.

19.     Plaintiff never folded back the flanges of the CAEv2s and did not know of anyone who ever folded back the CAEv2s flanges. Ex. 1 at 90:2-11.

20.     The parties agreed that Louisiana law applies to Plaintiff's case. Dkt. 11at 1.

5

## LEGAL STANDARD

Summary judgment is appropriate where there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of demonstrating the absence of a genuine dispute of material fact rests with the moving party. *Celotex*, 477 U.S. at 323. In determining whether the moving party has carried its burden, a court must view the evidence and factual inferences drawn therefrom in the light most favorable to the non-moving party. *Liberty Lobby*, 477 U.S. at 255.

## I.   Plaintiff timely filed his lawsuit.

Plaintiff's claims were timely filed within Louisiana's limitations period. In Louisiana, product liability claims should be filed within one year from when the injury is sustained, unless an exception applies tolling the prescriptive period. La. Civ. Code Ann. Art. 3492. *Morgan v. Energy New Orleans, Inc.*, 234 So.3d 113, 116 (La. App. 4th Cir. 12/6/17). The doctrine of *contra non valentem* is a judicially created exception to Louisiana's rules of prescription that suspends the prescriptive

6

period when plaintiff is prevented from acting in four circumstances, two of which

apply here:

> (3) where the defendant has done some act effectually to prevent the
> plaintiff from availing himself of his cause of action; and (4) where the
> cause of action is not known or reasonably knowable by the plaintiff,
> even though this ignorance is not induced by the defendant.

*Morgan,* 234 So.3d at 116-17 citing *Bayou Fleet, Inc. v. Bollinger Shipyards, Inc.,*

197 So.3d 797, 806 (La. App. 4 Cir. 7/21/16).

The third category of *contra non valentem* applies "where the defendant has

done some act effectually to prevent the plaintiff from availing himself of his cause

of action." *Bayou Fleet,* 197 So.3d at 806. The reasoning for applying the third

category of *contra non valentem* was stated in the seminal case of *Hyman v. Hibernia*

*Bank & Trust Co.,* 71 So. 508, 600 (1916) (preventing a defendant from "profiting

by their wrong – a thing inadmissible in law"); *Wimberly v. Gatch,* 635 So.2d 206,

217 (La. 04/11/94); *see also Singleton v. Cannizzaro,* 327 F.Supp.3d 389, 430, note

196 (E.D. La. 2019) .

The fourth category of *contra non valentem,* known as the "discovery

rule," applies when "the plaintiff's ignorance of his cause of action cannot be

attributable to his own willfulness or neglect, as a plaintiff is deemed to know what

he could have learned by reasonable diligence." *Morgan,* 234 So.3d at 117-18

(citation omitted). In these circumstances, "the one-year prescriptive period does

not begin to run against a plaintiff who is unaware of the facts upon which her cause

7

of action rests unless her ignorance is willful, negligent or unreasonable." *Hoerner v. Wesley-Jensen, Inc.,* 684 So.2d 508, 510 (La. App. 4th Cir. 11/20/1996) citing *In re Howard*, 573 So. 2d 472, 474-75 (La. 1991).

Regarding Defendants' statute of limitations defense, it is Defendants' burden to show there is no genuine issue of material fact. This Court's prior orders have ruled that "this is a fact intensive inquiry, [so] determining the timeliness of [plaintiff's] claims is more appropriately considered once the relevant facts have been presented at trial." *E.g., Beal,* Dkt. 145 at 21. The record is clear that Plaintiff filed suit within Louisiana's limitations period because the prescriptive period was tolled under the third and fourth categories of the doctrine *contra non valentem.*

With respect to the fourth category of the doctrine of *contra non valentem* (cause of action not known or reasonably knowable by plaintiff), Defendants' citations to cases involving constructive knowledge are inapposite. As this Court has previously concluded, the earliest that an ordinary plaintiff could have reasonably discovered the basis for claims relating to 3M's design, testing, manufacture, and sale of the CAEv2 was in 2018 when relevant records from the government's investigation of the CAEv2 became public. *Adkins*, Dkt. 110 at 4-5; *Sloan*, Dkt. 96 at 6-7; *see also* Dkt 22-5 (*Sloan/Wayman* 1/26/22 Trial Tr.) at 450:1-451:13, 456:12-457:10 (granting plaintiffs' motions for directed verdict on statute

8

of limitations). *See Hoerner,* 684 So.2d at 510 citing *In re Howard,* 573 So. 2d at 474-75.

Regarding the third category of the doctrine of *contra non valentem* (inability of plaintiff to act caused by defendant's conduct), Defendants' arguments likewise fail. Due to Defendants' concerted actions to conceal the CAEv2's defects, it was not until at least July 26, 2018—when the Flange Memo became public after an unrelated *qui tam* case was unsealed—that Plaintiff could have reasonably discovered that the CAEv2 was the cause of Plaintiff's injury. *See* MDL Dkt. 1280 at 14-16 ("[The Flange Memo] was not made available to *anyone* outside of Aearo until it was produced by 3M in a lawsuit . . . in 2014," and its contents were not shared with the general public until July 2018, at the earliest); *Sloan,* Dkt. 96 at 6. *See Wimberly v. Gatch,* 635 So.2d 206, 217 (La. 04/11/94). *See Hibernia Bank,* 71 So. at 600; *see also Singleton,* 327 F.Supp.3d at 430, note 196.

As a result of Defendant's actions, "even with the exercise of due diligence, [Plaintiff] would never have uncovered the cause of his hearing injuries because the relevant information detailing the CAEv2's defects was not made public until July 2018, years after [Plaintiff] stopped using the plug." *Sloan,* Dkt. 96 at 6-7; *Adkins,* Dkt. 110 at 5 ("Consequently . . . no diligent inquiry would have uncovered the possibility that the CAEv2 caused [Plaintiff's] alleged injuries until 2018.").

Plaintiff did not discover that the CAEv2s may have caused his hearing injuries until February 2019. LaChappelle SOF ¶ 13. Therefore, Plaintiff's claims were timely filed well within the applicable statute of limitations as his claim was filed in 2019.

## II. Plaintiff has offered reliable expert testimony that the CAEv2 caused his injuries.

Defendants argue that Plaintiff failed to proffer competent expert testimony of a causal connection between Plaintiff's alleged injury and CAEv2 use. Dkt. 12 at 9. This argument is based on Defendant's parallel Daubert motion to exclude Plaintiff's case-specific expert, Dr. Arnaldo Rivera. For the reasons set forth in Plaintiff's Opposition to Defendant's Motion to Exclude Dr. Rivera, this argument fails.

## III. Louisiana's Product Liability Act ("LPLA") does not extinguish most of Plaintiff's claims.

Under Louisiana law, design-defect, manufacturing-defect, failure-to-warn, post-sale failure to warn, and express warranty claims remain actionable. La. Stat. Ann. § 9:2800.54(B). The parties do not dispute that the LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products." La. Stat. Ann. § 9:2800.52. Plaintiff, therefore, withdraws those claims set forth on page one of this Response.[3]

---

[3] For other reasons, Plaintiff dismisses his breach of express warranty claim.

Plaintiff's MDL short-form complaint endorsed multiple theories of liability recognized under the LPLA. Dkt. 4. The MDL short-form complaint does not permit plaintiffs to distinguish between a given state's statutory and common-law claims; nor does it permit plaintiffs to specify which of their product-liability claims fall within any state-law mandated "causes of action." *Id.* In Pretrial Order No. 17 adopting the Master and Short-Form Complaints, this Court required all MDL Plaintiffs to file complaints using the short-form template. *See* MDL Dkt. 763 ¶ 9. To achieve efficiency and economy, MDL Plaintiffs "present[ed] certain common allegations and common questions of fact and law," and they "plead[ed] all Counts . . . in the broadest sense and pursuant to all applicable laws and choice of law principles." MDL Dkt. 704 at 2.

The Court should construe Plaintiff's negligence and strict-liability claims for design defect and failure to warn claims, as multiple theories of liability under a single LPLA cause of action. *See* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). Other courts have done so under similar circumstances. *Porogi v. Ethicon*, 2020 WL 4676571, *3 (N.D. Ind. 2020) (ruling it made sense to incorporate separate counts as claims under the IPLA); *Hall v. Ethicon*, 2020 WL 6826489, *3 (N.D. Ind. 2020) (rejecting argument that failure-to-warn and design-defect claims should be dismissed because they were pleaded under a strict-liability label when the case was filed as part of an MDL); *Bailey v. Medtronic*, 2017

11

6035329, *6 (S.D. Ind. 2017) (whether product-liability counts in a short-form
complaint are merged into a single IPLA count or maintained as separate counts "is
largely a distinction without a difference"); *Adams v. BRG Sports, Inc.*, No. 17
C8544, 2018 WL 4853130, at *4 (N.D. Ill. Oct. 5, 2018) (ruling plaintiffs' failure to
cite the LPLA in their MDL short-form complaint was "not fatal" and defendants
were "taking an unduly formulaic approach to pleading").

In *Baker v. 3M et. al.,*, 7:20-cv-39, Dkt. 87, this Court analyzed a similar
statute, the Washington Product Liability Act, ("WPLA") and construed Counts II
(design defect – strict liability); III (failure to warn – negligence); IV (failure to warn
– strict liability); and V (express warranty) of Baker's Short Form Complaint as
raising discrete theories of liability under a single WPLA cause of action rather than
separately alleged common-law product liability claims. *Id.* at 2-5. Like *Baker*, this
Court should construe Plaintiff's Design Defect–Strict Liability (Count II); Failure
to Warn–Negligence (Count III); and Failure to Warn–Strict Liability (Count IV) as
discrete theories of liability under the LPLA.

IV.  **Plaintiff offered reliable expert testimony that the CAEv2 caused his
injuries.**

A.  **Feasible alternative designs existed capable of preventing
Plaintiff's injuries.**

Defendants argue that Plaintiff failed to provide competent expert proof
demonstrating that an alternative design for the CAEv2 existed that would have

prevented his injuries. Dkt. 12 at 11. Plaintiff has proffered sufficient expert testimony to raise a triable issues of fact regarding whether an alternative design existed for the CAEv2 at the time of Plaintiff's exposures and the defect in CAEv2 caused his injuries.

Under the LPLA, a product is unreasonably dangerous in design if "[t]here existed an alternative design for the product that was capable of preventing the claimant's damage," and "[t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." La. Stat. Ann. § 98:2800.56; *Johnson v. T.L. James & Co.*, 809 So. 2d 287, 290-91(La. App. 1 Cir. 2001).

Plaintiff has satisfied his burden of showing a safer alternative design existed. Plaintiff produced both general and case-specific evidence of safer alternative designs. Plaintiff's general experts opine that the CAEv2 was defectively designed and that there were feasible safer alternative designs. *See, e.g.*, Ex. 4, Plaintiff's Expert Disclosures; Ex. 5 (McKinley Report) at 90-110; Ex. 6 (Joseph General Report) at 37-40; Ex. 7 (Lustig General Report) at 54-55; Ex 8 (Packer General Report) at 105-06. The Court has found these experts are qualified to testify as to safer alternative designs. MDL Dkt. 1680 at 95-96 (Packer) and at 92-93 (McKinley).

13

Plaintiff's case-specific expert, Dr. Rivera opines that the defects or flaws in the CAEv2s were the substantial contributing factor in Plaintiff's hearing injuries. SOF ¶ 14. Dr. Rivera reviewed photos of Plaintiff with the CAEv2's inserted and opined that the flanges on the outside of the CAEv2s were touching Plaintiff's tragus and outer portions of his antitragus, which was consistent with that Delrin study that concluded the CAEv2s were too short and will loosen easily and not provide the protection they were intended to provide. SOF at ¶18. Dr. Rivera relied on Plaintiff's General Experts Reports and opinions and his own education, training and experience in opining there were safer alternatively designed products that were available and could have been worn by Mr. LaChappelle that would have prevented his hearing injuries. SOF ¶¶ 14-18. Dr. Rivera identified a number of safer alternative products and designs. SOF ¶ 17. For these reasons and as set forth in Plaintiff's Opposition to Defendants' Motion to Exclude Dr. Rivera, Defendants' motion should be denied.

**B. Plaintiff has offered reliable expert evidence that the CAEv2's unsafe design CAEv2 caused his injuries.**

Essentially repeating their first argument, Defendants claim Plaintiff failed to set forth sufficient evidence that the CAEv2's defective design caused his injuries. Dkt. 12 at 14. Plaintiff offered reliable expert evidence that the CAEv2s were unreasonably dangerous and caused Plaintiff's injuries.

14

"The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage resulted from a reasonably anticipated use of the product[.]" La. Rev. Stat. Ann. § 9:2800:54(A). "In a products liability action, whether a defect is unreasonably dangerous in design is a question of fact." *Marable v. Empire Truck Sales of La., LLC*, 221 So. 3d 880, 891 (La. App. 4 Cir. 06/23/17). Proximate cause is defined as "'any cause which, in natural and continuous sequence, unbroken by an efficient, intervening cause, produces the result complained of without which the result would not have occurred.'" *Id.* at 901 (citation omitted).

In this case, it was foreseeable that the CAEv2s defective design rendered them unreasonably dangerous when used as reasonably anticipated. Plaintiff has identified experts who opine the CAEv2 was defectively designed and its design defects present an unreasonable risk of auditory injury to users. *See* LaChappelle SOF ¶¶ 14-18; Ex. 4, Plaintiff's Expert Disclosure; Ex. 5, McKinley Report at 5–9; Ex. 8, General Expert Report of Dr. Mark Packer. Plaintiff's case-specific expert Dr. Rivera also offers general opinions that the CAEv2 is unreasonably dangerous and provides inadequate protection against auditory injury. LaChappelle SOF ¶¶ 14-18. Dr. Rivera performed a reliable differential diagnosis before concluding that the defects in the CAEv2s were the cause and substantial contributing factor in

Plaintiff's hearing loss, tinnitus and hearing injuries and had the CAEv2s attenuated sound as intended, Plaintiff would not have suffered hearing injuries. LaChappelle SOF ¶ 15. Accordingly, and for many of the same reasons set forth in Plaintiff's Opposition to Defendants' Motion to Exclude Dr. Rivera, Defendants' motion should be denied. *See, e.g.*, *Wayman*, 7:20-cv-149, Dkt. 179 at 3; *McCombs*, 7:20-cv-94, Dkt. 64 at 3-6.

## V.   Plaintiff has produced substantial evidence from which a jury could find that Defendants' failure to warn caused of Plaintiff's injuries.

Defendants argue that Plaintiff's warnings claims should be dismissed because Plaintiff did not set forth sufficient evidence of causation. Dkt. 12 at 17. This argument is meritless.

In failure to warn cases, plaintiffs must establish that "at the time the product left the manufacturer's control, the product possessed a characteristic that may cause damage, and the manufacturer failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users [.]" *Jack v. Alberto-Culver USA, Inc.*, 949 So.2d 1256, 1258-59 (La. 02/22/07) quoting La.  Rev. Stat. § 9:2800.57. The adequacy of a warning is a question for the trier of fact. *Jack*, 949 So.2d at 1259.

Louisiana courts have recognized the so-called "heeding presumption" in products liability cases. *Gauthier v. McDonough Power Equip., Inc.*, 608 So.2d 1086, 1089 (La. App. 3 Cir. 1992) (Once a plaintiff proves the lack of an adequate

16

warning rendered the product unreasonably dangerous, a presumption arises that the user would have read and heeded such admonitions). This Court has previously held that no intermediary defense applies to Defendants' design, manufacture, and sale of the CAEv2—Defendants' owed the duty to warn to the Plaintiff. *See Wayman*, 7:20-cv-149, Dkt. 98 at 4. Further, this Court has ruled it is undisputed that "there is no evidence—none—that the Army prohibited Aearo from warning of alleged dangers inherent in the use of the CAEv2." MDL Dkt. 1280 at 53.

Here, there is substantial evidence that the CAEv2's inadequate warnings caused Plaintiff's injuries. Defendants owed Plaintiff a duty to provide adequate warnings such that the CAEv2 was not unsafe. Plaintiff proffered expert evidence that the CAEv2 is unsafe due to a lack of warnings, including with regard to the CAEv2's tendency to imperceptibly loosen; its high-variability, low attenuation, and true NRR; and the yellow-end's inadequate protection from weapons fire. *See* Ex. 4, Plaintiff's Expert Disclosure listing *inter alia* Mr. McKinley, Dr. Packer, and Dr. Arriaga; *e.g.*, Ex. 8 at 93-106. Plaintiff has proffered case-specific expert evidence that the CAEv2 caused his injuries. *See* LaChappelle SOF ¶¶ 14-18.

Defendants argue there is no evidence additional warnings would have avoided Plaintiff's injury. But Defendants' own documents and employees show a host of risks Defendants failed to communicate but were necessary for the CAEv2 to not be unreasonably unsafe. *See* Ex. 9 (P-GEN-1); Ex. 10, Hamer 2015 Tr. at

17

87:5-24, 164:5-8, 165:12-166:1; *see also, e.g.*, Ex. 11 (P-GEN-122) (email exchange explaining that the CAEv2 "will not reduce 190 db explosions to a safe level" and that "the CAE is not the optimal choice for the gun range"); Ex. 12 (P-GEN-2294) (email explaining that "[a] shooter should not go to the range and fire a box of shells with the yellow side"); Ex. 13 (*Sloan/Wayman* 1/12/22 Trial Tr.) at 52:13-16 ("most variable earplug" Defendants ever tested). None of these risks were ever communicated to Plaintiff or the military. *See* Ex. 13 at 154:4-11 (213015 and Flange Report never shared with military); Ex. 12 (P-GEN-9).

Defendants claim there is no evidence that an improved warning would have been read by Plaintiff or changed Plaintiff's decision to use the CAEv2. But it is presumed that had Defendants included warnings about the CAEv2's risks—which they undisputedly did not—Plaintiff would have read and heeded those warnings. Plaintiff received the CAEv2s in February 2003, and while he did not specifically remember if he received any written instructions regarding their use, he was informed about the different uses of the yellow and green ends of the CAEv2s by military personnel and understood that each end was designed for use around different types of noise. LaChappelle SOF at ¶¶ 4, 6-7. Plaintiff believed the CAEv2 worked and protected him and was told by military personnel that the CAEv2 earplug was the best HPD available, stating "[t]hey're supposed to be the best earplugs." LaChappelle SOF at ¶ 8; *see* also Ex. 14 (McNamara Tr.) at 145:23-

147:7 (marketing materials were "designed to get the attention of the combat soldier"); *see also id.* at 84:17-85:5 (noting that the military trusted and relied on the information provided with the CAEv2). At a bare minimum, there is sufficient evidence that had Defendants told Plaintiff about the need to fold back that flanges (and the risks of not doing so) that he would have either folded the flanges or used a more protective earplug. *See* Ex. 15 (S-GEN-19) ("It looks like the existing product has problems unless the user instructions are revised."); LaChappelle SOF ¶ 19 (never knew folding back the flanges of the CAEv2s was an option).

Furthermore, there is ample evidence that the military would have never purchased the CAEv2 had Defendants provided the adequate warnings and instructions the law requires. *See, e.g.*, Ex. 10 at 174:11-15; Ex. 16 (Warren Tr.) at 213:24-214:17 (NRR of 11 would make it impossible to sell CAEv2); Ex. 17 (P-GEN-9); Ex. 18. (MPID); Ex. 19 (P-GEN-2602) (orders to "verify . . . that any 3M dual-ended Combat Arms Earplugs are not being used for hearing protection purposes.").

Plaintiff has raised a triable issue of fact regarding whether Defendants' failure to warn caused his injuries.

## VI.   Plaintiff's punitive damages claim survives summary judgment.

Because Plaintiff's substantive causes of action survive summary judgment, so does his demand for punitive damages.

## CONCLUSION

For the aforementioned reasons, Defendants' motion should be denied.

DATED: August 9, 2022                          Respectfully submitted,

                                               By:    */s/ Evan Buxner*
                                               Evan Buxner, #6221006-IL
                                               **The Gori Law Firm, P.C.**
                                               156 N. Main Street
                                               Edwardsville, IL 62025
                                               (618) 659-9833 - Telephone
                                               (618) 659-9834 – Facsimile
                                               evan@gorilaw.com
                                               *Attorney(s) for Plaintiff*

20

## CERTIFICATE OF COMPLIANCE WITH STIPULATED WORD LIMIT

Pursuant to Local Rule 7.1(F) and MDL Dkt. 3241, I hereby certify that this motion complies with the stipulated word limit and contains 4,349 words.

*/s/ Evan Buxner*

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2022, I caused a copy of the foregoing to be served on all counsel of record via ECF.

/s/ Evan Buxner