# EXHIBIT 3

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF FLORIDA
 2                       PENSACOLA DIVISION
 3
     IN RE:  3M COMBAT ARMS    )Case No. 3:19-md-02885
 4   EARPLUG PRODUCTS LIABILITY)
     LITIGATION                )
 5                             )Judge M. Casey Rodgers
     This Document Relates to  )Magistrate Judge Gary Jones
 6                             )
     Ronnie LaChappelle        )
 7   No. 7:20cv06901           )
 8
 9
10
11
                       Remote Oral Deposition of
12                         ARNALDO RIVERA, MD
                     taken on behalf of the Defendants
13                          June 4, 2022
14                          * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

```
 1    testing to determine whether the CAEv2s would loosen in

 2    Mr. LaChappelle's ears?

 3         A.   I'm sorry, can you repeat that?

 4         Q.   Certainly.  Thank you for letting me know that

 5    you didn't hear it.

 6              Did you do any testing to determine whether

 7    the CAEv2s would loosen in Mr. LaChappelle's ears?

 8         A.   No, I did not.

 9         Q.   Do you have any opinions relative to

10    Mr. LaChappelle's case based on the pictures that are

11    included in Exhibit D?

12         A.   It appears the flanges on the outside is

13    touching his tragus and other portions of his pinna

14    consistent with the Delrin study that concluded that

15    these devices were too short and will loosen easily,

16    therefore, not provide the protection that they were

17    intended to protect.

18         Q.   Is there a particular picture in -- we have

19    four pages in Exhibit D, two of the right and two of the

20    left -- is there a specific picture that provides the

21    basis for that opinion, or are you saying --

22         A.   It's this one in front of us.  As you can see

23    there, the yellow flange, it's touching the tragus --

24    ma'am, I don't know how much you know about ear anatomy.

25    Pardon me.  I'm sure you're an extremely competent
```

```
 1   lawyer.
 2            The tragus is this cartilage portion of your
 3   ear canal in the front, and it's touching it.  It's also
 4   touching portions of the pinna, the antitragus, which is
 5   a portion posteriorly.  So it's touching two portions on
 6   the outside.
 7        Q.   That's the left ear with the yellow end of the
 8   Combat Arms exposed; correct?
 9        A.   That is correct.
10        Q.   Let's look at the next one.  So now we have
11   the left ear with the green end of the Combat Arms
12   version 2.  Would you tell me what's significant about
13   that picture, in your opinion?
14        A.   So it appears to me that it's touching
15   portions of the outside.  It appears to me it's maybe
16   too short.  Again, those are exactly the conclusion of
17   the testing done by 3M before they deployed the device.
18        Q.   Let's look at the next picture which shows
19   Mr. LaChappelle wearing the Combat Arms in his right ear
20   with the yellow end exposed.  What is significant to you
21   about that picture?
22        A.   You can see there that maybe the outside of
23   the yellow flange, the interface between the yellow
24   flange and the white portion of the device -- and I have
25   mine right here.  Maybe I can use this one for
```

1  demonstration, if I may.

2          So I don't know if you can see this. You see
3  that white portion there and then you see this portion
4  of the flange. It seems to me this is touching his
5  tragus. So it's not a very secure fitting, from what I
6  can see.

7      Q.   And then we look at the fourth picture in
8  Exhibit D which shows Mr. LaChappelle wearing the Combat
9  Arms earplug with the green end sticking out of his ear.
10 What is significant to you --

11     A.   See how it's pointing posteriorly? That's
12 probably because none of our ear canals is straight.
13 That's extremely rare. So this thing don't bend. They
14 are stiff. Again, those were their conclusions. So
15 they knew this.

16     Q.   Did Mr. LaChappelle bring any other hearing
17 protection device with him to your Zoom interview?

18     A.   Ma'am, he did not.

19     Q.   So I'm correct, then, that you've never
20 personally observed in video him inserting any other
21 type of hearing protection device; correct?

22     A.   You are absolutely correct.

23     Q.   So you don't know one way or the other whether
24 his other hearing protection devices that he used were a
25 good fit, do you?

 1        A.    DoD had other options, yes.
 2        Q.    I'm going to share the screen and pull up a
 3   page of your report, sir.  Can you see that on the
 4   screen?
 5        A.    No.
 6        Q.    Hold on a minute.
 7              (Whereupon discussion was had of the
 8               record, after which the following
 9               proceedings were held:)
10        Q.    Now do you see page 21 of your report?
11        A.    Yes, ma'am, I do.
12        Q.    Good.  Good.  All right.  The question before
13   I attempted to share my screen and made a mistake and
14   now I have the correct one up, the question related to
15   whether you're offering an opinion about alternative
16   earplug designs, and I think your answer was yes, there
17   were other options; is that correct?
18        A.    That is true.
19        Q.    I'm looking -- beginning at this last
20   paragraph on the bottom of page 21, and I'm going to
21   turn the page and I'll come back.  But at the top of
22   page 22, is this the portion of your report where you
23   talk about alternative designs?
24        A.    It is.
25        Q.    And do I understand that your opinions

1  relating to alternative designs are really just based on
2  your reliance on the general expert reports that you've
3  already mentioned during this deposition?
4      A.   In part.  Let me remind you, I have been in
5  the military for a long time.  I had seen and used some
6  of those hearing protections through my military and
7  civilian career.
8      Q.   Other than your personal experience, which
9  particular reports are you relying on for your opinions
10 based on alternative design?
11     A.   Well, the expert report.  But also, ma'am, so
12 I did my residency between Walter Reed and the Naval
13 hospital in Washington, DC.  So our neurotology
14 departments had all of these devices and we gave them to
15 service members as needed as well, and we had posters
16 with available options.  Okay?  That was standard then.
17 So I'm also leaning on my military experience as an ear
18 subspecialist at the premiere center of military
19 medicine.
20     Q.   In addition to your personal education,
21 training and experience, which specific report, expert
22 reports are you relying on as well?
23     A.   The ones provided to me by the plaintiff
24 attorneys.  Some of those reports were also available to
25 us at the Hearing Excellence Center that I was part of

 1   with Dr. Packer and others.
 2        Q.   Let's look at Exhibit A of your report.  I'm
 3   simply asking which reports.  The general reports are
 4   listed at the bottom.  It's McKinley, Packer, Spankovich
 5   and Joseph.  Are you relying on any of those for your
 6   opinions that alternative designs were available?
 7        A.   From where specifically I pull those names,
 8   ma'am, I draw from all the data I was writing this.
 9   Okay?  I would have to start opening all of those until
10   I find it.
11        Q.   Let's talk about the list of alternative
12   designs.  Your report says it is your opinion that the
13   safer alternatively designed products include the
14   CAEv4.1, the SureFire EP7, the Moldex Battleplug, the
15   CAEv4, the SureFire EP4, the CAEv3, the SureFire EP3,
16   the CAEv1, paired with a 3M Ultrafit or foamies and
17   improvements to the CAEv2 design flaws, thinner and less
18   rigid stem that you say is available in the 1990s.
19             Is that the complete list of all the hearing
20   protection devices that you contend were safer
21   alternatives?
22        A.   Yes, ma'am.
23        Q.   And is it your opinion Mr. LaChappelle could
24   have avoided hearing damage altogether, or that his
25   hearing damage would be reduced based on -- had he had

```
 1   one of these other devices available?
 2        A.   It's my opinion and personal experience that
 3   when you use quality hearing protection, you may prevent
 4   hearing loss.
 5        Q.   And I think I'm correct, but I'm going to ask
 6   you:  You did not have any of these alternatives
 7   available for you to inspect, you know, fit for
 8   Mr. LaChappelle during your Zoom meeting; is that
 9   correct?
10        A.   You're absolutely correct.
11        Q.   I think we established before Mr. LaChappelle
12   wore his CAEv2s between 2003 and 2007; correct?  That is
13   his Iraq and Kuwait deployment.  Is that correct, sir?
14        A.   That's my recollection.
15        Q.   In your review of his case materials, have you
16   seen any documents or evidence to support that he wore
17   the CAEv2 at any time after 2007?
18        A.   Not that I can remember.
19        Q.   And we took a look at the pictures in Exhibit
20   D a few minutes ago, but have you seen any other
21   pictures of Mr. LaChappelle wearing his CAEv2s from any
22   other time during his military service?
23        A.   I have not.
24        Q.   And am I correct, in your review of the
25   records and the audiograms that Mr. LaChappelle's
```

 1      A.   So the tones continued to drop as time passed
 2   by, yes.
 3      Q.   And they did continue to drop after the 2007
 4   time frame; correct?
 5      A.   They have.
 6      Q.   Have you determined what proportion of
 7   Mr. LaChappelle's hearing loss is related to his
 8   post-military noise exposures as opposed to hearing loss
 9   that you allege he experienced while using the CAEv2?
10      A.   So in my interview, on review of his medical
11   records, he endorse use of hearing protection when
12   exposed to impulse noise.  I have no reason to believe
13   that any of those hearing protections were faulty and
14   weren't performing up to standard.  So therefore, I
15   don't have any concerns of any of those events adding to
16   his hearing loss as we see it.
17      Q.   Okay.  So is it your opinion that 100 percent
18   of Mr. LaChappelle's hearing loss is a result of his use
19   of the CAEv2 between 2003 and 2007?
20      A.   I think that's extremely likely, yes.
21      Q.   Do you have any consideration that there's
22   even any percentage of his hearing loss that's not
23   related to the CAEv2?
24      A.   No, with the history he gave me.
25      Q.   And I'm going to ask you the same question but

 1   related to his tinnitus.  Have you determined what
 2   proportion of Mr. LaChappelle's tinnitus is related to
 3   his post-military noise exposures as opposed to the
 4   hearing loss that he alleged he experiences as a result
 5   of wearing the CAEv2s?
 6        A.   My opinion is it's related to the faulty
 7   hearing protection device he used.
 8        Q.   So am I hearing you say that you believe
 9   Mr. LaChappelle's tinnitus is 100 percent related to his
10   use of the CAEv2s between 2003 and 2007?
11        A.   That's the most likely scenario, yes.
12        Q.   You're not allowing any room in your opinion
13   for any other cause of Mr. LaChappelle's tinnitus?
14        A.   Not that he gave me, ma'am, no.
15        Q.   I'm going to share the screen again.  I hope
16   you're seeing Mr. LaChappelle's audiogram chart.
17             MR. MAYFIELD:  We are.
18        A.   Yes, ma'am.
19        Q.   (By Ms. Hodge)  Okay.  Have you ruled out the
20   possibility that some of Mr. LaChappelle's present day
21   hearing loss is caused by factors other than noise?
22        A.   Yes.
23        Q.   Take a look at his -- like at the bottom of
24   the screen we see 2/23/22, February 23, '22, audiogram
25   that was done with his defense military examination.

```
 1                CERTIFICATE OF REPORTER
 2
   STATE OF MISSOURI   )
 3                     ) ss
   CITY OF ST. LOUIS   )
 4
 5          I, MARY JOY SPRINGER, a Certified Shorthand
 6   Reporter and a Notary Public within and for the State of
 7   Missouri, do hereby certify that the witness whose
 8   testimony appears in the foregoing deposition was duly
 9   sworn by me; that the testimony of said witness was
10   taken by me to the best of my ability and thereafter
11   reduced to typewriting under my direction; that I am
12   neither counsel for, related to, nor employed by any of
13   the parties to the action in which this deposition was
14   taken, and further that I am not a relative or employee
15   of any attorney or counsel employed by the parties
16   thereto, nor financially or otherwise interested in the
17   outcome of the action.
18
19
                     _____
20                   MARY JOY SPRINGER
                     Certified Shorthand Reporter.
21
22   My commission expires October 24, 2025.
23
24
25
```