# EXHIBIT 17

P1079.1



**DEPARTMENT OF THE ARMY**
US Army Criminal Investigation Command
Atlanta Fraud Resident Agency
MPFU,USACIDC 1465 Hood Avenue, Building 838
Forest Park, Georgia, 30297-5111

CISA-MSE-A                                                                                        2018/12/13

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Law Enforcement Report - SIR (Category 3)/Final/Joint - 00019-2016-
CID133-014635-8C5/ 9L

1. Offense: 31 USC 3729: Civil False Claims Act (Federal (USC/CFR))

2. Dates/Times/Locations of Occurrences: 0800, 02 Jan 00 - 1700, 30 Dec 15; 700
Robbins St, Philadelphia, PA, 19111

3. Date/Time Reported: 1400, 17 May 16

4. Investigated By:        Mrs. MYONG S. CAPE; SA JENNIFER L. COLEMAN

5. Subjects/Suspects: 3M Defense; 3M Center, St Paul, MN, 55144; [31 USC 3729:
Civil False Claims Act]

6. Victims: U.S. Government; Defense Logistics Agency; Defense Supply Center -
Philadelphia, 700 Robbins Avenue, Philadelphia, PA, 19111; [31 USC 3729: Civil False
Claims Act]

7. Report Summary:
This investigation was developed from information received under Raw Data File 0017-
16-CID133. On 17 May 2016, this office received Qui Tam, 3:16-01533-MBS, alleging
that 3M Company/Defense (formerly Aearo Technologies) on or around January –
February 2000 commenced testing on the Combat Arms Earplugs (CAE), National
Stock Number (NSN) 6515-01-466-2710. The Qui Tam alleged that during the tests,
3M did not comply with the American National Standards Institute (ANSI) testing
requirements and as such the CAE failed to meet the required specifications under the
Medical Procurement Item Description (MPID) 2, a requirement for all US Government
contracts awarded to 3M.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE
CID File0001

**PLAINTIFFS'
TRIAL EXHIBIT
P-GEN-00009**


UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

CISA-MSE-A
SUBJECT: Law Enforcement Report - SIR (Category 3)/Final/Joint - 00019-2016-
CID133-014635-8C5/ 9L

During the course of this investigation, numerous interviews and record reviews were
conducted reference the testing results and contracting process. Interviews of US
Government personnel confirmed that had they known about the February 2000 test
results (i.e. that the CAE was too short for proper insertion in the users' ears and,
therefore, did not perform well in certain individuals) on the CAE they may not have
purchased the items.

On 23 July 2018, 3M entered into a settlement agreement with the US Department of
Justice. As part of their agreement 3M agreed to pay back $9,100,000; of which
$4,560,000 is restitution. 3M expressly denies the allegations in the Covered Conduct
and all of the allegations in the Qui Tam complaint. This Settlement Agreement is
neither an admission of liability by 3M, nor a concession by the United States that its
claims are not well founded.

Legal Coordination: This investigation was conducted under Department of Justice
(DOJ) guidelines pursuant to the DOJ/DoD Memorandum of Understanding and was
coordinated with Trial Attorney Brandie Weddle, Civil Frauds Section, US Department of
Justice, Washington, DC and Assistant United States Attorney (AUSA) Stan Ragsdale,
District of South Carolina, US Attorney's Office.

Attached:

1. Agent's Investigation Report (AIR) of SA Coleman, 3 Aug 2016, detailing the Basis
For Investigation.

2. AIR of SA Coleman, 20 Jun 2016, detailing the review of Defense Logistics Agency
(DLA) contract documents.

3. AIR of SA Coleman, 3 Aug 2016, detailing the interview of Mr. James Hornstein, Vice
President/General Counsel of Moldex-Metric, Inc. (Moldex), Culver City, CA and Dr.
Jeffrey Birkner, Vice President of Technical Services, Moldex.

4. AIR of SA Coleman, 13 Sep 2016, detailing the interview of Mr. David Zarenkiewicz,
Contracting Officer, DLA, Philadelphia, PA.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

CISA-MSE-A
SUBJECT: Law Enforcement Report - SIR (Category 3)/Final/Joint - 00019-2016-
CID133-014635-8C5/ 9L


5. AIR of SA Coleman, 13 Sep 2016, detailing the interview of Mr. James Johanson, Quality Assurance Engineer, DLA, Philadelphia, PA.

6. AIR of SA Coleman, 14 Sep 2016, detailing the interview of Mr. Brian Schott, Chief for Medical Surgical Manufacturer/Distributor, DLA, Philadelphia, PA.

7. AIR of SA Coleman, 14 Sep 2016, detailing the interview of Mr. Thomas Sidor, Retired Contracting Officer, DLA, Philadelphia, PA.

8. AIR of SA Coleman, 21 Sep 2016, detailing the review of documents provided by 3M.

9. Copy of DCIS Form 1 of SA Rosen, 26 Sep 2016, detailing the interview of Mr. Albert Gatica, Supervisor of the Medical Division, DLA Philadelphia, PA.

10. Copy of DCIS Form 1 of SA Rosen, 27 Sep 2016, detailing the interview of Mr. Mark Anthony, Contracting Officer, DLA, Philadelphia, PA.

11. Copy of DCIS Form 1 of SA Rosen, 28 Sep 2016, detailing the interview of Mr. John Komada, Jr., Chemical Engineer, DLA, Philadelphia, PA.

12. AIR of SA Coleman, 29 Nov 2016, detailing the interviews of personnel at Aberdeen Proving Ground, MD.

13. AIR of SA Coleman, 3 May 2017, detailing the interview of Commander Joel Bealer, Deputy Director of Safety and Occupational Health, Bureau of Medicine, Falls Church, VA.

14. AIR of SA Coleman, 3 May 2017, detailing the interview of Mr. Brian Hobbs, Supervisory Audiologist, Occupational Audiology Division, Navy and Marine Corps Public Health Center, Portsmouth, VA.

15. AIR of SA Coleman, 17 Nov 2017, detailing the interview of Ms. Leeann Domanico, US Public Health Center, Army Hearing Program, Aberdeen Proving Ground, MD.


UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

CID File0003

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

CISA-MSE-A
SUBJECT: Law Enforcement Report - SIR (Category 3)/Final/Joint - 00019-2016-
CID133-014635-8C5/ 9L

16. AIR of SA Coleman, 17 Nov 2017, detailing the interview of Ms. Eileen Resta,
Health Information Specialist, US Army Public Health Center, Army Hearing Program,
Aberdeen Proving Ground, MD.

17. Copy of the Settlement Agreement, 23 Jul 2018, detailing the settlement agreement
between 3M and the US Government.

18. Copy of the Order of Dismissal and unsealing of the Qui Tam, 26 July 2018.

19. AIR of SA Coleman, 29 Nov 2018, detailing coordination with MAJ Cameron
Edlefson, Attorney-Advisor, Procurement Fraud Division, Office of the Judge Advocate
detailing their decision not to any further action against 3M.

20. CID Form 118 E-R, Disclosure Accounting Record.

Not Attached:

None.

STATUS: This is a Final Report. This investigation was conducted jointly with the
Defense Criminal Investigative Service, case control number 2016001951.

On 23 July 2018, 3M entered into a settlement agreement with the US Department of
Justice.  As part of their agreement 3M agreed to pay back $9,100,000; of which
$4,560,000 is restitution.

On 24 July 2018, 3M remitted payment in full ($9,100,000) to the US Attorney's Office,
District of South Carolina, Columbia, SC.

On 26 July 2018, the US District Court, District of South Carolina ordered the dismissal
of the Qui Tam and lifted the seal.

On 29 Nov 2018, the Procurement Fraud Division, Office of the Judge Advocate
advised they would take no further action against 3M.

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE
CID File0004

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

CISA-MSE-A
SUBJECT: Law Enforcement Report - SIR (Category 3)/Final/Joint - 00019-2016-CID133-014635-8C5/ 9L

8. Unique Circumstances:
    Qui Tam Investigation [9L]

    Possible Safety issue

Status:  This is a Final Report. Commander's Report of Disciplinary or Administrative Action (DA Form 4833) is pending.

Commanders are reminded of the provisions of AR 600-8-2 pertaining to suspension of favorable personnel actions and AR 380-67 for the suspension of security clearances of persons under investigation. Army Law Enforcement reports are exempt from automatic termination of protective markings IAW Chapter 3, AR 25-55.  IAW AR 25-22, AR190–45, and DODM 5400.07, information contained in this report is law enforcement sensitive, confidential and private in nature, and any further distribution (forwarding to unauthorized personnel) without the authorization of the Provost Marshal General will be in violation of the UCMJ and USC.

| Report Prepared By | Report Approved By |
|---|---|
| COLEMAN.JENNIFER.L YNN.1117271788  *Digitally signed by COLEMAN.JENNIFER.LYNN.1117271788 Date: 2018.12.13 14:40:11 -05'00'* | OUTLAW.DAVID.TODD. 1110669905  *Digitally signed by OUTLAW.DAVID.TODD.1110669905 Date: 2018.12.13 14:37:01 -05'00'* |
| Special Agent Jennifer Coleman | Resident Agent in Charge D. Todd Outlaw |

Signature Authority

OUTLAW.DAVID.TODD. 1110669905   *Digitally signed by OUTLAW.DAVID.TODD.1110669905 Date: 2018.12.13 14:37:14 -05'00'*

Resident Agent in Charge D. Todd Outlaw

DISTRIBUTION:

Chief, Procurement Fraud Branch, USALSA:  Attn:  M

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE
CID File0005

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

CISA-MSE-A

SUBJECT: Law Enforcement Report - SIR (Category 3)/Final/Joint - 00019-2016-CID133-014635-8C5/ 9L

DCS OPS - SSI Commander, USACIDC, ATTN: CIOP-ZA, 27130 Telegraph Road, VA 22134

LNO USACIDC AMC  REDSTONE ARSENAL, AL LNO USACIDC AMC  REDSTONE ARSENAL, AL

SEFFO: Evidence Custodian

PFA, DLA Troop Support, Philadelphia PFA, DLA Troop Support, Philadelphia, PA

RAC, Detroit FRA, USACIDC, Troy, MI

RAC, Philadelphia FRA, Media, PA

Southeastern Fraud Field Office: SAC

RAC USACIDC ATLANTA FRAUD RA

Major Procurement Fraud Unit: Deputy Director, OPS

SEFFO: Criminal Intelligence Analyst

Major Procurement Fraud Unit: AOPS

701ST MP GROUP (CID): OPS


CASE HISTORY:

00019-2016-CID133-014635

UNCLASSIFIED // FOR OFFICIAL USE ONLY // LAW ENFORCEMENT SENSITIVE

CID File0006

| AGENT'S INVESTIGATION REPORT<br>CID Regulation 195-1<br>FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | ROI NUMBER<br>0019-16-CID133-014635 |
|---|---|
| | PAGE 1 OF 1 PAGES |

DETAILS

## BASIS FOR INVESTIGATION:

This investigation was developed from information received under Raw Data File 0017-16-CID133. On 17 May 2016, this office received Qui Tam, 3:16-01533-MBS, alleging that 3M Company/Defense (formerly Aearo Technologies) on or around January – February 2000 commenced testing on the Combat Arms Earplugs (CAE), National Stock Number (NSN) 6515-01-466-2710. The Qui Tam alleged that during the tests, 3M did not comply with the American National Standards Institute (ANSI) testing requirements and as such the CAE failed to meet the required specifications under the Medical Procurement Item Description (MPID) 2, a requirement for all US Government contracts awarded to 3M.

The CAE are dual ended, selective attenuation earplugs, designed to provide service members with a single set of earplugs that offer two options for hearing when worn (i.e. impulse and continuous). The olive end of the earplugs protects against continuous noise while the yellow end protects against impulse sounds.

On 3 August 2016, interviews of the Relators were conducted with personnel from the US Attorney's Office, District of South Carolina, Columbia, SC and the Defense Criminal Investigative Service (DCIS). The Relators advised that testing was important for the CAE as the yellow end was designed to protect against Impulse noise (e.g. explosions) and still allow the user to hear commands and approaching personnel/vehicles; and the olive end provided protection against Continuous noise (e.g. helicopters). The testing was manipulated in order for 3M to obtain the correct Noise Reduction Rating (NRR) hearing protection. The Relators advised this was key as the ANSI standard required testing for the CAE to be conducted in the same manner for both the olive and yellow sides. However, 3M manipulated the testing with the olive end of the earplugs to obtain a higher NRR. The manipulation required users to pull back the yellow end of the earplugs in order to receive the rating required. However, according to the Relators, 3M did not provide the US Government with those particular instructions. Due to the manipulated testing and the failure to disclose the proper instructions, the CAE did not meet the US Government's contractual requirements.
///////////////////////////////////////////////LAST ENTRY///////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE<br>*Jennifer Coleman* | DATE<br>4 August 2016 | EXHIBIT<br>1 |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE    CID File0007
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0010-16-CID133-TAB 9 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 1 OF 3 PAGES |

DETAILS

Between 17 and 20 June 2016, the reporting agent reviewed documents provided by Ms. Lilian WEISS, Assistant Counsel, Defense Logistics Agency (DLA) Troop Support, Philadelphia, PA and noted the following information:

Contract Number SPE2DS-15-D-N001
- Award Amount ███████
- Awarded to New Dynamics
- NSN 6515-01-466-2710
- Criteria for Combat Earplugs: IAW Medical Procurement Item Description Number 2 (MPID #2), ANSI S3.19
- Contractor is responsible for Quality Assurance
- David ZARENKIEWICZ was the Contracting Officer

On 17 June 2016, the reporting agent conducted an online search of New Dynamics and noted that New Dynamics was working with 3M Constructions for hearing protection (see attached printout for details).

Contract Number ███████
- Award Amount ███████
- Awarded to New Dynamics
- Awarded for 3M Company Part Number 370-1030 (Generation IV)
- Contracting Officer – Brian SCHOTT

- Award Amount ███████
- Awarded to New Dynamics
- Contracting Officer – Brian SCHOTT
- Page 5 MPID #2
- Page 8 indicates the earplugs must be in accordance with (IAW) Drawing NR1JGR9 014662710

- Award Amount ███████
- Awarded to New Dynamics
- Contracting Officer Brian SCHOTT
- Page 5 indicates MPID #2 requirement
- Page 8 indicates Drawing ███████

- Award Amount ███████
- Awarded to New Dynamics
- Contracting Officer Brian SCHOTT

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| *Jennifer Coleman* | 20 June 2016 | 2 |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

CID File0008

| AGENT'S INVESTIGATION REPORT<br>CID Regulation 195-1<br>FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | ROI NUMBER<br>0010-16-CID133-TAB 9 |
|---|---|
| | PAGE 2 OF 3 PAGES |

DETAILS

- Page 4 indicates MPID#2
- Page 7 indicates Drawing ▮▮▮▮▮▮▮▮ .

▮▮▮▮▮▮▮▮ ..

- Contract ▮▮▮▮▮
- Award Amount ▮▮▮▮▮
- Contracting Officer David ZARENIEWICZ
- Page 2 indicates MPID#2
- Page 4 indicates drawing IAW ▮▮▮▮▮
- Page 13 requires certifications on quality

▮▮▮▮▮▮▮

- Contract ▮▮▮▮▮
- Contracting Officer Brian SCHOTT
- Award Amount $▮▮▮▮
- Awarded to New Dynamics
- Using 3M Hearing Protection

▮▮▮▮▮▮

- Contract ▮▮▮▮▮
- Award Amount ▮▮▮▮▮
- Awarded to New Dynamics
- Contracting Officer Brian SCHOTT
- Page 4 indicates MPID#2
- Page 5 indicates drawing IAW ▮▮▮▮▮
- Page 14 requires certifications on quality

▮▮▮▮▮▮

- Contract ▮▮▮▮▮
- Award Amount ▮▮▮▮▮
- Awarded to New Dynamics
- Page 4 indicates MPID #2
- Page 5 indicates drawing IAW ▮▮▮▮▮
- Page 14 requires certifications on quality

▮▮▮▮▮▮

- Contract ▮▮▮▮▮
- Award Amount ▮▮▮▮▮
- Page 4 indicates MPID#2
- Page 14 requires certifications on quality

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| *Jc* | 20 June 2016 | 2 |

CID FORM 94
(Automated)
FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)
CID File0009

| AGENT'S INVESTIGATION REPORT<br>*CID Regulation 195-1*<br>**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | ROI NUMBER<br>0010-16-CID133-TAB 9 |
|---|---|
| | PAGE 3 OF 3 PAGES |

DETAILS

A review of the documents and research from the internet determined that National Stock Number (NSN) 6515-01-466-2710 is the correct NSN for the Dual Ended Combat Arms Earplugs whereas NSN 6515-00-137-6345 pertains to the Foam Earplugs.

Contract SPO200-07-D-4103
- NSN 6515-01-466-2710
- Award Amount maximum $9,000,000
- Contracting Officer Thomas SIDOR
- Supervisor, Surgical Instruments Division, Albert S GATICA
- Branch Chief, Medical Surgical Program Group – Roslyn ROGERS
- Page 23 of the contract details the requirement for Certificate of Quality DLAD Compliance.
- Page 25 advised that the Contractor is responsible for testing
- Page 35 provides the item description and specification (MPID#2)
- Page 41 details MPID#2
- Page 42 details that testing shall be completed IAW ANSIS3.19 and the laboratory must be IAW the US Department of Commerce's National Voluntary Laboratory Accreditation Program (NVLAP).
- Page 43 details that all records of inspections for or by the Contractor shall be maintain by the contractor and made available to the Government upon request. Additionally, these records must be kept until 3 years after the supplies were delivered.
- Memorandum For Record, dated 6 July 2006 detailing that the engineer believed MPID#2 was sufficient for anyone else to design the Combat Arms Earplugs.
- Email from Dr Douglas OHLIN to Mr. Thomas SIDOR advising that the NSN 6515-01-466-2710 was evaluated by the Med R&D Command in 1995 and endorsed by the DOD Hearing Conservation Working Group in 1998. The testing determined that the earplugs were good for 100 shots at 190dBP and 3 shots at 193dBP. However, they were expecting prototypes with the following improvements: a cord and a reduced filter assembly to shorten the earplugs and facilitate comfort.
- See attached documents for details
/////////////////////////////////////////////LAST ENTRY/////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE | DATE<br>20 June 2016 | EXHIBIT |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

CID File0010

*00019-2016-CID133-014635*

Solicitation No.: SP0200-06-R-4202          FOR OFFICIAL USE ONLY          Page 23 of 63
                                            LAW ENFORCEMENT SENSITIVE

| **ADDENDUM TO 52.212-4 (continued)** |

### [ X ] 52.233-9001 DISPUTES: AGREEMENT TO USE ALTERNATIVE DISPUTE RESOLUTION (JUN 2001) DLAD

(a) The parties agree to negotiate with each other to try to resolve any disputes that may arise. If unassisted negotiations are unsuccessful, the parties will use alternative dispute resolution (ADR) techniques to try to resolve the dispute. Litigation will only be considered as a last resort when ADR is unsuccessful or has been documented by the party rejecting ADR to be inappropriate for resolving the dispute.

(b) Before either party determines ADR inappropriate, that party must discuss the use of ADR with the other party. The documentation rejecting ADR must be signed by an official authorized to bind the contractor (see FAR 52.233-1), or, for the Agency, by the contracting officer, and approved at a level above the contracting officer after consultation with the ADR Specialist and with legal counsel (see DLA Directive 5145.1). Contractor personnel are also encouraged to include the ADR Specialist in their discussions with the contracting officer before determining ADR to be inappropriate.

(c) If you wish to opt out of this clause, check here [ ]. Alternate wording may be negotiated with the contracting officer.

### [x] 52.246-9000 CERTIFICATE OF QUALITY (DEC 1994) DLAD COMPLIANCE

The Contractor shall prepare and furnish a Certificate of Quality Compliance (COQC) for all supplies delivered under this contract. If the supplies delivered under this contract are from more than one manufacturing lot, a separate COQC shall be prepared and furnished for each manufacturing lot represented by, manufactured or produced under a product specification, original equipment manufacturer (OEM)/manufacturer's part number, commercial, industry or military standard, or drawings, or other technical data.
    (a) This Certificate shall contain the following:
        (1) The Contractor's name, address, and commercial and Government entity (CAGE) code number (if assigned), the contract/order number, the applicable specification, drawing, or standard (including revision/amendment and date), identification of the specific supplies manufactured or produced (including National Stock Number, nomenclature, type, grade, and class, if applicable); for metal products, the COQC shall include the alloy designation and condition (finish and temper), if applicable. If the contractor is not a manufacturer, the Certificate shall include the name, address and CAGE Code (if assigned) for each of the entities through which the supplies or materials, components, subassemblies, assemblies or parts passed, so that traceability to the manufacturer will be readily discernible therefrom.
        (2) The identification of each parameter for which the contract, specification, drawing, or standard required inspection or testing;

EXHIBIT CID File001

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Solicitation No.. SP0200-06-R-4202                                    Page 24 of 63

---

## ADDENDUM TO 52.212-4 (continued)

**52.246-9000 (continued)**

      (3) The identification of the specific requirement for each of the parameters in (2), above, for the particular material being produced and covered by the certificate;

      (4) The actual results of inspections or tests conducted by the contractor to demonstrate conformance with each of the specific requirements of (3), above;

      (5) The marking requirement for the material and the source of this requirement (contract and specification or standard); and

      (6) A statement, signed by an authorized contractor representative responsible for quality assurance, that (i) the lot has been produced, sampled, tested, and inspected, and marked in accordance with all contract and specification requirements; and (ii) the material complies with all of the contract and specification requirements.

     (b) For contracts assigned for Government inspection at source, the Contractor shall have the completed certificate available for review by the Government representative when the material is presented for acceptance by the Government. In the case of destination –inspected material, the Contractor shall attach a copy of the completed certificate to the packing list sent with each shipment to each shipping point designated in the contract. For source inspected material, a copy may (but need not) accompany the shipment. If the Contractor offering the material to the Government is not the manufacturer of the material, the Contractor is responsible for obtaining a certified test report from the manufacturer, including it as part of this COQC, and for demonstrating that the specific material being offered under this certificate is covered by the certified test report.

     (c) Unless otherwise specified by the contract, the Contractor shall be responsible for retaining the certificate for a period of 4 years. When requested by the Contracting Officer, the Contractor shall make the certificate available for review by the Government at any time during the period the certificate is required to be retained.

**[X] 52.217-9P12     OPTION FOR INDEFINITE-DELIVERY, INDEFINITE-QUANTITY CONTRACT TERM EXTENSION (MAR 2004) DSCP**

   (a) Acceptance of the option provision(s)/clauses contained herein is mandatory. Failure to indicate acceptance of the option by annotating the offeror's option price in the Schedule or elsewhere in the solicitation will be deemed non-acceptance of the option and may result in rejection of the offeror's entire bid/proposal.

   (b) Offerors may offer options at unit prices which differ from the unit prices for the base ordering period. These prices may vary with the quantities actually ordered and the dates when ordered.

   (c) The contracting officer may extend the term of this contract for _____ one _____ additional _____ 1-year _____ period(s) by written notice to the contractor within the

(EXHIBIT___)
CID File0012

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Solicitation No.: SP0200-06-R-4202

Page 25 of 63

---

### ADDENDUM TO 52.212-4 (continued)

**52.217-9P12 (continued)**
timespecified in the Schedule; provided that the contracting officer shall give the contractor a preliminary written notice of intent to extend at least 60 days before expiration of the contract. The preliminary notice does not commit the Government to an extension.

(d) Performance under the option period shall continue at the same performance level specified for the basic contract.

(e) The option to extend the term of the contract shall be exercised not later than three (3) days before the expiration date of the contract.

(f) The option is deemed exercised when mailed or otherwise furnished to the contractor.

(g) If the contracting officer exercises this option, the extended contract shall be considered to include this option clause and the minimum and maximum quantities specified in the award for that option period will apply.

(h) The total duration of any options exercised under this clause, shall not exceed _one year._

(i) The following provisions apply only to negotiated acquisitions:

(1) If an option has been priced under this solicitation and is to be exercised at time of award of the basic contract, the submission of certified cost or pricing data shall be required prior to award where the combined dollar value of the basic contract and option exceeds $550,000, unless an exemption thereto is appropriate in accordance with FAR 15.403-1.

(2) Prior to the award of any contract which will contain one or more priced options totaling $550,000 or more, the submission of certified cost or pricing data covering the basic contract and the option(s) shall be required regardless of when the option(s) may be exercised, unless an exemption thereto is appropriate in accordance with FAR 15.403-1.

[x] 52.246-9P02  **SUPPLIER RESPONSIBILITY FOR TESTING OF  (JAN 1992) DSCP
MATERIALS AND COMPONENTS**

If the value of the entire quantity of a material/component used in the assembly/production of all end items under this contract does not exceed $3,000, the contractor need only furnish a Certificate of Compliance for that material/component. This authority supersedes any other contract requirement to the contrary. The Government, however, reserves the right to select sample units to verify that such materials/components are in strict compliance with the specification requirements. The Certificate of Compliance shall contain the following information:

EXHIBIT 2

CID File0013

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Solicitation No.: SP0200-06-R-4202

Page 35 of 63

| REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE   OF   PAGES |
| --- | --- |
| | |

6515014662710

## SECTION C - DESCRIPTION/SPECIFICATION

ITEM IDENTIFICATION

PLUG, EAR, COMBAT ARMS, DOUBLE-ENDED, 50 PAIR:
SWEPT-BACK TRIPLE-FLANGE STYLE. OLIVE DRAB END
PROTECTS USER FROM CONTINUOUS NOISE; YELLOW END
PROTECTS USER FROM MILITARY WEAPONS NOISE.

.

SHALL BE IN ACCORANCE WITH MEDICAL PROCUREMENT
ITEM DESCRIPTION NO. 2 DATED 16 JULY 2006.

.

PRESERVATION, PACKAGING, PACKING, LABELING AND
MARKING FOR 6515-01-466-2710 SHALL BE AS
SPECIFIED IN MEDICAL PROCUREMENT ITEM
DESCRIPTION NO. 2.

.

6515-01-466-2710  27 JULY 2006

## SECTION D - PACKAGING AND MARKING

PREPARATION FOR DELIVERY

```
=================================================
| CERTIFICATION REQUIREMENT FOR NON-            |
| MANUFACTURED WOOD PACKING MATERIAL (NMWPM)    |
| --   --   --   --   --   --   --   --   --    |
|   APPLICABLE TO ALL COMMERCIAL/GOVERNMENT     |
|   EXPORT SHIPMENTS OF SUPPLIES PACKED         |
|   IN/ON NMWPM AND DESTINED FOR DELIVERY TO    |
|   EUROPE ON/AFTER OCTOBER 1, 2001, EITHER     |
|   DIRECTLY TO THE CUSTOMER OR THROUGH A       |
|   DEFENSE DEPOT OR OTHER CONSOLIDATION        |
|   POINT.                                      |
| --   --   --   --   --   --   --   --   --    |
```

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

(EXHIBIT_____)

CID File0014

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**00019-2016-CID133-014635**

Solicitation No.: SP0200-06-R-4202

Page 36 of 63

| REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE | OF | PAGES |
|---|---|---|---|

6515014662710

ALL WOODEN PALLETS AND WOODEN CONTAINERS
PRODUCED ENTIRELY OR IN PART OF
NON-MANUFACTURED SOFTWOOD SPECIES SHALL
BE CONSTRUCTED FROM HEAT-TREATED (HT TO
56 DEGREES CENTIGRADE FOR 30 MINUTES)
CONIFEROUS MATERIAL AND CERTIFIED
ACCORDINGLY BY AN ACCREDITED AGENCY
RECOGNIZED BY THE AMERICAN LUMBER STANDARD
COMMITTEE, INCORPORATED (ALSC), IN
ACCORDANCE WITH THE LATEST REVISION OF THE
ALSC NON-MANUFACTURED WOOD PACKING POLICY
AND NON-MANUFACTURED WOOD PACKING
ENFORCEMENT REGULATIONS (SEE URL:
HTTP://WWW.ALSC.ORG/).

ALL WOODEN PALLETS AND WOODEN CONTAINERS
PRODUCED ENTIRELY OF NON-MANUFACTURED
HARDWOOD SPECIES SHALL BE IDENTIFIED BY A
PERMANENT MARKING OF "NC-US", 1.25 INCHES
OR GREATER IN HEIGHT, ACCOMPANIED BY THE
CAGE CODE OF THE PALLET/CONTAINER
MANUFACTURER AND THE MONTH AND YEAR OF THE
CONTRACT.  ON PALLETS, THE MARKING SHALL BE
APPLIED TO THE STRINGER OR BLOCK ON
DIAGONALLY OPPOSITE SIDES AND ENDS OF THE
PALLET AND SHALL BE CONTRASTING AND CLEARLY
VISIBLE.  ON CONTAINERS, THE MARKING SHALL
BE APPLIED ON A SIDE OTHER THAN THE TOP OR
BOTTOM, AND SHALL BE CONTRASTING AND CLEARLY
VISIBLE.

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0015

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Solicitation No.: SP0200-06-R-4202

| REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE  OF  PAGES |
|---|---|
|  |  |

6515014662710

```
|  --   --   --   --   --   --   --   --   --  |
|  FAILURE TO COMPLY WITH ALL THE REQUIREMENTS  |
|  OF THIS RESTRICTION MAY RESULT IN REFUSAL,   |
|  DESTRUCTION, OR TREATMENT OF MATERIALS AT    |
|  THE POINT OF ENTRY.                          |
|  --   --   --   --   --   --   --   --   --  |
|                                               |
|  DEFENSE CONSOLIDATION POINTS INCLUDE THE     |
|  FOLLOWING:                                   |
|    A.  DEFENSE DISTRIBUTION DEPOTS,           |
|  SUSQUEHANNA, PA, AND SAN JOAQUIN, CA         |
|    B.  CONTAINER FREIGHT STATION, NORFOLK, VA |
|    C.  ARMY PREPOSITIONED SHIP (APS 3)        |
|  UPLOAD SITE, CHARLESTON, SC (DODAAC W81X89   |
|  AND W81YUK)                                  |
|    D.  MARINE CORPS BLOUNT ISLAND COMMAND,    |
|  JACKSONVILLE, FL 32226-3404                  |
|    E.  AERIAL PORTS OF EMBARKATION,           |
|  DOVER, DE; TRAVIS AIR FORCE BASE, CA;        |
|  NAVAL AIR STATION, NORFOLK, VA; AND          |
|  CHARLESTON AIR FORCE BASE, SC.               |
=================================================
```

PACKAGING AND PACKING SHALL BE
.   PACKAGING - MILITARY
.   PACKING - LEVEL B
IN ACCORDANCE WITH APPLICABLE SPECIFICATION
CITED IN SECTION 'C'.


UNITIZED LOADS COMMENSURATE WITH THE LEVEL OF
PACKING SPECIFIED IN THE CONTRACT OR ORDER SHALL
BE USED WHENEVER TOTAL QUANTITY FOR SHIPMENT TO

CID File0016

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Solicitation No.: SP0200-06-R-4202                                          Page 38 of 63

| REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF PAGES |
|---|---|
| | |

6515014662710

ONE DESTINATION EXCEEDS 250 LBS (EXCLUDING THE
PALLET) OR 20 CU FT.  LOADS SHALL BE  UNITIZED
ON TYPE IV OR TYPE V 4-WAY ENTRY  PALLETS.
PALLET SHALL HAVE A LENGTH OF 40 INCHES AND A
WIDTH OF 48 INCHES.  PALLET LOADS, INCLUDING THE
PALLET, SHALL NOT EXCEED 54 INCHES IN HEIGHT, 43
INCHES IN LENGTH AND 52 INCHES IN WIDTH.
QUANTITY FOR SHIPMENT TO ONE DESTINATION OF LESS
THAN 250 LBS OR 20 CUBIC FEET NEED NOT BE
PALLETIZED.

APPLICABLE TO EQUIPMENT ITEMS HAVING A HEIGHT OF
48 INCHES OR GREATER:

IF A PROPERLY PALLETIZED LOAD (EQUIPMENT ITEM
AND PALLET) EXCEEDS 54 INCHES IN HEIGHT, HEIGHT
LIMITATION NEED NOT BE ADHERED TO.

NOTE:  THE PALLETIZATION STANDARD, MIL-STD-147D,
HAS BEEN REDESIGNATED AS A PALLETIZATION
HANDBOOK, MIL-HDBK-774 DATED 25 MARCH 1996.
THEREFORE, THIS DOCUMENT MAY NO LONGER BE CITED
AS A REQUIREMENT; IT IS NOW USED FOR GUIDANCE
PURPOSES ONLY.  THE ONLY PHYSICAL CHANGE TO THE
DOCUMENT IS THE COVER SHEET DESIGNATING IT
AS A HANDBOOK.  THEREFORE, IF YOU HAVE A COPY
OF MIL-STD-147D ON HAND, YOU MAY USE IT FOR
GUIDANCE WHEN PALLETIZING YOUR SHIPMENTS.
COPIES OF MIL-HDBK-774 MAY BE OBTAINED FROM THE
DEFENSE PRINTING SERVICE DETACHMENT OFFICE,BLDG
4D (NPM-DODSP), 700 ROBBINS AVENUE,
PHILADELPHIA, PA  19111-5094.

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

EXHIBIT

CID File0017

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Solicitation No.: SP0200-06-R-4202                                          Page 39 of 63

| REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF PAGES |
| --- | --- |
|  |  |

6650009736945

MARKING SHALL BE AS SPECIFIED IN MEDICAL
MARKING STANDARD NO. 1 DATED 19 JULY 1999,
EXCEPT, IN PARA. V.C.2., DELETE LAST SENTENCE
(WHEN LABELS ARE USED . . . SHIPMENT AND
STORAGE.) ENTIRELY AND SUBSTITUTE:
"APPLICABLE TO EXTERIOR (SHIPPING) CONTAINER
AND UNITIZED LOAD:  WHEN LABELS ARE USED, THEY
SHALL BE WEATHER-RESISTANT, REMAIN SECURELY
AFFIXED AND HAVE A FINISH CAPABLE OF
WITHSTANDING NORMAL HANDLING DURING SHIPMENT
AND STORAGE.".

MARKINGS SHALL INCLUDE BAR CODES, AS FOLLOWS:

UNIT - BAR CODES ARE NOT REQUIRED UNLESS THE
UNIT IS ALSO THE EXTERIOR (SHIPPING) CONTAINER.

INTERMEDIATE PACKAGE - BAR CODES ARE NOT
REQUIRED.

EXTERIOR (SHIPPING) CONTAINER - BAR CODES (NSN
AND PIIN) SHALL BE SUPPLIED ON THE
IDENTIFICATION-MARKED SIDE OF THE CONTAINER.

UNITIZED LOAD - BAR CODES (NSN AND PIIN) SHALL
BE SUPPLIED ON THE IDENTIFICATION MARKED SIDES
OF THE LOAD.

NOTES:

.  SEE MEDICAL MARKING STANDARD NO. 1 FOR
PLACEMENT OF ALL REQUIRED MARKINGS.

.  BAR CODES SHALL INCLUDE THE HUMAN READABLE
INTERPRETATION (HRI).

EXHIBIT 2

CID-File0008

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**00019-2016-CID133-014635**

Solicitation No.: SP0200-06-R-4202                                    Page 40 of 63

| REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF PAGES |
|---|---|
| | |

6515014662710

. PIIN REFERS TO THE CONTRACT OR ORDER NUMBER,
TOGETHER WITH DELIVERY ORDER NUMBER, WHEN
APPLICABLE.
.

.
MIL-STD-1189B (STANDARD DEPARTMENT OF DEFENSE
BAR CODE SYMBOLOGY) HAS BEEN CANCELLED AND
REPLACED BY COMMERCIAL BAR CODE STANDARD
ISO/IEC 16388 (INFORMATION TECHNOLOGY -
AUTOMATIC IDENTIFICATION AND DATA CAPTURE
TECHNIQUES - CODE SYMBOLOGY SPECIFICATION - CODE
39). COPIES OF ISO/IEC 16388 ARE AVAILABLE FROM
ANSI, 25 WEST 43RD STREET, NEW YORK, NY 10036,
WWW.ANSI.ORG.
.

COPIES OF MEDICAL MARKING STANDARD NO. 1 MAY BE
OBTAINED BY CONTACTING DEFENSE SUPPLY CENTER
PHILADELPHIA, ATTN: DSCP-MSBA (L. CONNORS),
BLDG 6A SOUTH, 700 ROBBINS AVENUE,
PHILADELPHIA, PA 19111-5092.
PHONE: (215)737-4189 / FAX: (215)737-8150
EMAIL: LCONNORS@DSCP.DLA.MIL

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

EXHIBIT 2
CID File 0019

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Solicitation No.: SP0200-06-R-4202

Page 41 of 63

PGC 46852

| MEDICAL PROCUREMENT ITEM DESCRIPTION | NUMBER 2 | DATE 16 July 2006 |
|---|---|---|

| NATIONAL STOCK NO. | ITEM IDENTIFICATION |
|---|---|
| 6515-01-466-2710 | PLUG, EAR, Combat Arms, Double-Ended, 50 pair |

1. SCOPE.

1.1  This Medical Procurement Item Description covers military-unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments.

1.2  Shall be Aearo Corporation's P/N 370-1000, or equal. "Equal" items shall possess the salient characteristics as specified herein.

2. SALIENT CHARACTERISTICS.

2.1  General.  Shall be double-ended, swept-back triple-flange style ear plugs.

2.1.1  Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.

2.1.2  The end designed for protection from chronic noises shall be camouflage green or another suitable dark color; the end designed for protection from impulse noises shall be yellow or another suitable bright color. The ear plugs shall meet all requirements as set forth herein.

2.2  Sound attenuation.  At each frequency listed below, each end of the ear plug shall provide the level of sound attenuation as specified.  Sound attenuation shall be measured in decibels (dB).

| SOUND ATTENUATION OF THE CAMOUFLAGE GREEN END OF THE EAR PLUG | | SOUND ATTENUATION OF THE YELLOW END OF THE EAR PLUG | |
|---|---|---|---|
| Sound Frequency, Hz | Minimum Mean Attenuation, dB | Sound Frequency, Hz | Minimum and Maximum Mean Attenuation, dB |
| 125 | 25 dB | 125 | 0 dB to 10 dB |
| 250 | 25 dB | 250 | 0 dB to 10 dB |
| 500 | 25 dB | 500 | 0 dB to 10 dB |
| 1000 | 25 dB | 1000 | 5 dB to 15 dB |
| 2000 | 30 dB | 2000 | 10 dB to 20 dB |
| 4000 | 35 dB | 4000 | 10 dB to 20 dB |
| 8000 | 40 dB | 8000 | 10 dB to 25 dB |

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

EXHIBIT 2

CID File0020

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**00019-2016-CID133-014635**
Page 42 of 63

Solicitation No.: SP0200-06-R-4202

MPID #2 (6515-01-466-2710)

2.2.1  The yellow end of the earplug shall incorporate a passive non-linear technology that has been empirically shown to provide a level-dependant increase in sound attenuation above a sound pressure level of 115 dBP(peak). It shall also provide this protection at sound-pressure levels up to 190 dBP(peak), even after the user has been exposed to 100 free-field noise impulses of 190 dBP(peak), minimum.

2.2.2  The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19. A laboratory accredited in accordance with the requirements of the U.S. Department of Commerce's National Voluntary Laboratory Accreditation Program (NVLAP) shall perform the sound attenuation testing.

2.3  Material.  The ear plugs shall be made of thermoplastic elastomeric polymer. This material shall be non-allergenic and non-toxic.

2.4  Workmanship.  The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.

2.5  Instructions.  Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit. Instructions shall be legible and easy to read. Instructions shall be printed in permanent black or navy blue ink on a suitable sheet of paper which shall be placed inside the unit package prior to sealing. As an alternate, instructions may be printed on a suitable, clearly visible location on the unit container in permanent black or navy blue ink.

3.  REGULATORY REQUIREMENTS.

3.1  Federal Food, Drug and Cosmetic Act.  If the product covered by this document has been determined by the U. S. Food and Drug Administration to be under its jurisdiction, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/suppliers, with the requirements of the Federal Food, Drug and Cosmetic Act, as amended, and regulations promulgated thereunder.  In addition, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/ suppliers, with the requirements of all other applicable Federal, State and local statutes, ordinances, and regulations.

3.2  Recovered materials.  The offeror/contractor is encouraged to use recovered material in accordance with Federal Acquisition Regulation Subpart 23.4 to the maximum extent practical.

4.  QUALITY ASSURANCE PROVISIONS.

4.1  Responsibility for inspection.  Unless otherwise specified in the contract or purchase order, the contractor is responsible for the performance of all inspection requirements as specified herein.  Except as otherwise specified in the contract or purchase order, the contractor may use his own or any facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government.  The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0021

and services conform to prescribed requirements.

4.2  Inspection.  Inspection, as used herein, shall be defined as the examination and testing of an item.  Examination shall be defined as unaided visual, auditory, tactile, or olfactory investigation.  Testing shall be defined as the use of laboratory equipment and procedures to determine various properties of an item.  Inspections shall be conducted to determine compliance with specification requirements.  Where feasible, the same sample shall be used for the determination of two or more inspection characteristics.  For inspection purposes, the unit of product shall be one pair of ear plugs.

4.3  Sampling for inspection.

4.3.1  For each specified salient characteristic, except "Sound Attenuation", sampling for inspection shall be conducted in accordance with ANSI/ASQ Z1.4. A sampling shall be performed for each salient characteristic.  Inspection level S-2 shall be used; acceptable quality level (AQL) shall be 1.0 percent.

4.3.2  Sound attenuation.  Sampling for inspection of sound attenuation of the level-dependent yellow end shall be 100 percent, and shall be verified using an acoustical impedance test.  Sampling for inspection of the sound attenuation of the camouflage green end shall be conducted in accordance with ANSI/ASQ Z1.4.  Inspection level S-2 shall be used;  the AQL shall be 1.0 percent.

4.4  Records.  Records of inspections performed by or for the contractor shall be maintained by the contractor and made available to the Government upon the Government's request, at any time, or from time to time, during the performance of the contract and for a period of three years after delivery of the supplies to which such records relate.

4.5  Contractor certification.  The contractor shall certify that the product offered meets the salient characteristics of this document and conforms to the producer's own drawings, specifications, standards, and quality assurance practices.  The Government reserves the right to require proof of such conformance prior to first delivery and thereafter as may be otherwise provided for under the provisions of the contract.

5.  PACKAGING.

5.1  Preservation.  Preservation shall be military.

5.1  Unit.  Package (PG).  One package containing 50 pairs of ear plugs, as specified, constitutes one unit.  Unit package shall be any suitable sealed commercial container capable of protecting the contents from damage, and shall be designed to permit easy dispensing of the ear plugs.  Illustrated instructions for use, as specified in para. 2.5, shall be supplied with each unit.

5.1.2  Intermediate package.  Intermediate package may be supplied at the option of the contractor.

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE


CID File0022

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

MEMORANDUM FOR RECORD

**SUBJECT: CCO-ARB MINUTES – July 6, 2006**
**RE: Medical - IAP & CMP   Plug, Ear, Combat Arms**

ATTENDEES:

| | | | | |
|---|---|---|---|---|
| DB | Mr. William Kenny | | P | Mr. Edward Tierney |
| T | Mr. Michael McCall | | G | Mr. Michael McGonigle, Esq |
| J-8 | Mr. Keith Ford | | MS | Mr. Allen Thomas |
| MD | Mr. Steve McManus | | MS | Mr. Thomas Sidor |
| MS | Ms.Geneva Polini | | MS | Mr. Albert Gatica |
| BP | Mr. Christos Cosfol | | | |
| P | Mr. Edward Tierney | | | |

**MINUTES – DISCUSSION & ISSUES**

1. Regarding the item specification, it was requested that we determine whether the triple flange tip style is a crucial salient characteristic for performance purposes.

2. Regarding the item specification, it was requested that we determine whether a plug can be produced that will perform as described with the specification as written by someone other than Aearo.

3. Regarding acquisitional approach, the issue was raised re LPTA vs Source Selection and the considerations involved.

**ACTION TAKEN**

A. Regarding acquisitional approach issue above (# 3), we are confident that alternate proposals can be adequately evaluated through in-house pre-award sample testing and an in-depth review of the proposer's capabilities, through a stringent pre-award inspection, to include an evaluation of their existing product line and technical capabilities.

B. Regarding the triple flange tip style relative to the item's performance, further inquirey with industry (Aearo) found that this feature is a crucial salient characteristic. The firm advised that the gradual type flanges make for a proper fit into the ear canal despite various anatomical size differences from person to person. Moreover, the flanges make for a good seal into the ear canal, which is essential to the items performance in achieving the desired noise reduction.

C. Regarding the specification issue of whether a plug can be produced that will perform as described from the specification document (DSCP Item Specification document) as written by a firm other than Aearo, an affirmative opinion has been rendered by our technical engineer. That is, our engineer has advised that an interested potential competitor would find the MPID to be sufficient to design an earplug that would meet our desired performance.

*Recorded by: Allen Thomas, Contract Specialist*

P1079.24

Message                                                                              Page 1 of 1

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## Sidor, Thomas (DSCP)

| | |
|---|---|
| **From:** | Ohlin, Douglas W Dr USACHPPM    [doug.ohlin@us.army.mil] |
| **Sent:** | Monday, January 30, 2006 2:56 PM |
| **To:** | Sidor, Thomas (DSCP) |
| **Subject:** | RE: NSN 6515-01-466-2710 Plug,    Ear, Combat Arms, Double-Ended, 50 Pair |
| **Attachments:** | combatearplugfinal.doc; Earplug.ppt; cmsep04.pdf; Combat Arms Earplug_Presentation_Artwork.ppt; Combat Arms Earplug.ppt |

Tom:

The Combat Arms Earplug was evaluated by Med R&D Command in 1995 and endorsed by the DOD Hearing Conservation Working Group 1998.

The combat arms earplug is the only passive earplug (without electronic amplification) that provides protection against impulse noise (weapons fire) with minimal interference for face-to-face communication and for maintaining situational awareness. The Army has tested this earplug in its level dependent mode and found it protective for 100 shots at 190 dBP and three shots at 193 dBP. In addition, the combat arms earplug has a mode that is protective against steady state noise as well. We have passed along soldier feedback to the vendor for improvements to include a cord and a reduced footprint of the filter assembly to shorten the earplug and to facilitate comfort. The earplug requires no batteries and is relatively inexpensive for all its capabilities. We are expecting prototypes with these improvements very shortly. I've attached some of our training materials to give you more background.

Doug

*Market Research*

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

EXHIBIT    CID File0024

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 1 OF 5 PAGES |

DETAILS

**James E. HORNSTEIN, Vice President/General Counsel, Moldex-Metric, Inc, 10111 W Jefferson Blvd, Culver City, CA**

**Dr. Jeffrey S BIRKNER, Vice President of Technical Services, Moldex-Metric, Inc, 10111 W Jefferson Blvd, Culver City, CA**

On 3 August 2016, the reporting agent; SA Gilad ROSEN, Defense Criminal Investigative Service (DCIS), Charleston Post of Duty, Charleston, SC; Brandie WEDDLE, Attorney, Civil Division, US Department of Justice (DOJ), Washington, DC; and Assistant United States Attorneys Fran TRAPP, Stan RAGSDALE, and Brook ANDREWS all with the Civil Division, US Attorney's Office, District of South Carolina, Columbia, SC interviewed Mr. HORNSTEIN and Dr. BIRKNER at the US Attorney's Office located at 1441 Main St Columbia, SC. Present with Mr. HORNSTEIN and Dr. BIRKNER were their attorneys' Mr. Harold A BARZA and Joseph PAUNOVICH, Attorneys with Quinn Emmanuel Urquhart & Sullivan, LLP, 865 South Figueroa St, Los Angeles, CA; and Mr. Sam SHELDON, Attorney, Quinn Emmanuel Urquhart & Sullivan, LLP, 777 6th St NW, Washington, DC. Mr. HORNSTEIN and Dr. BIRKNER provided the following information:

Moldex-Metric, Inc (Moldex) has been in two litigations with 3M Company, headquartered out of St Paul, MN (3M). The first litigation began in 2012 when 3M sued Moldex for patent infringement. This came about because of the Battle Plugs (hearing protection) Moldex developed for the military.

Moldex began developing the Battle Plugs with the help of the military's Aberdeen Proving Ground, Aberdeen, MD (APG) hearing program. While working with APG, Moldex learned that 3M's Combat Arms Earplugs (CAE) had several problems. As the CAE were dual ended (one olive side and one yellow side), soldiers did not know which end was for which purpose. Moldex learned from a news article that some soldiers would cut the CAE in half because of this. Some of the other issues were that the CAE's filter did not work; on the new versions that encompassed a switch, soldiers could not tell which way to switch the earplugs in order to actuate them; and there was only one size (which did not fit all of the soldiers).

There are two types of protection that the CAE's are supposed to protect against. Impulse noise (yellow end) which is supposed to stop things like explosions and gun fire while allowing the wearer to hear people talking or upcoming vehicles. The louder the noise the better the filter works. The other type (olive end) was used for continuous noises (e.g. helicopters).

Moldex worked with the head Audiologists at APG. Initially, it was COL Eric FALLON who has since retired and went to work for 3M. Then Moldex worked with COL Margery GRANTHAM who is now at Fort Hood, TX. They also worked with a Dr. HELFER (NFI) who is now retired and currently Moldex works with Neal NGUYEN at APG. Moldex provided the names of Mr. JONKEL (Scientist at APG) and Douglas BRUNGART, Head Audiologist at Walter Reed Army Medical Center, Bathesda, MD (WRAMC). Moldex advised that they began working with APG around 2007 or 2008.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| *Jennifer Coleman* | 3 August 2016 | 3 |

CID FORM 94
(Automated)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| *CID Regulation 195-1* | 0019-16-CID133-014635 |
| **FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | PAGE 2 OF 5 PAGES |

DETAILS

During Moldex's time with APG, Neither APG personnel nor Moldex personnel mentioned or saw 3M at APG.

After Moldex received approval for their Battle Plugs (around 2011), they began taking their Battle Plugs to Trade Shows. While at one of the trade shows 3M noticed Moldex's Earplugs and sued Moldex for patent infringement. Moldex advised that 3M suit was baseless as their earplugs were single ended while 3M's were dual ended. On the eve of the day the Judge was to rule on Summary Judgment 3M issued a Covenant Not to Sue. This meant that the Judge could not rule whether or not 3M's suit was baseless as Moldex had contested.

The second litigation was brought by Moldex who sued 3M on multiple counts regarding unfair competition, Anti-Trust violations, etc. Moldex filed for a summary judgment requesting that the Judge rule that 3M's patent infringement was baseless, while 3M filed a motion to dismiss. Moldex also advised that at the beginning of this litigation the Judge ruled on a Slap Motion in Moldex's favor. A Slap Motion showed that Moldex had clear and convincing evidence (without discovery) that 3M's patent infringement suit was baseless.

During the second litigation, discovery was provided. However, most of the documents are under a protective order. One ruling was published without restrictions, which allowed Moldex to come forward with the facts that the US Government has to date. Depositions were conducted on personnel such as Dr OHLIN (now deceased), Julie BUSHMAN (3M), and Elliot BERGER, Senior Manager at 3M (conducted all of the technical tests in 2000 for 3M, formerly Aearo). However, all information regarding those depositions are protected.

Moldex makes respiratory and hearing protections (e.g. respirators, earplugs and ear muffs) and 3M is its major competitor. However, 3M makes protection for body parts from head to toe.

The CAE was first designed in the around 1997 with a French inventor.

When asked about an evaluation that was conducted by the Military's Medical Research &Development Department. Moldex advised that any evaluation completed by the US Government prior to 2000 would pre-date the CAE generation 2.

At this point in the interview, Moldex was provided a copy of instructions on a pair of CAE that were obtained commercially. On page two of the instructions it states that "fitting is easier if ear is pulled upward and outward during insertion and is also improved if the sealing rings of the outward directed plug are rolled back upon themselves..." (see copy of the instructions for further details). Moldex advised that this was not explicit to the user and would not comply with the Environmental Protection Agency (EPA) standards. Moldex advised that the instructions need to be in a manner consistent with testing. If one has to look around to find the information then the instructions are inadequate. Moldex advised that the 2006 date may have had

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| Jc | 3 August 2016 | 3 |

CID FORM 94
(Automated)

**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** CID File0026
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 3 OF 5 PAGES |

DETAILS

something in there but later versions would not have had them. Different instructions for different dates for the same generation CAE.

Moldex suggested the US Government review S319 ANSI 1974 standard (testing) and 40 CFR 211 (instructions for use). Additionally. Moldex advised that the Peltor Brand was for the consumer market and would not be the same as what the US Government was issued.

Moldex went on to describe their process for providing instructions to the US Government. Moldex provided instructions to the US Government and then made a wallet card for soldiers use for the US Government to provide its soldiers. The wallet card are the instructions distributed to service members.

Additionally, Moldex advised that the yellow end of the testing documents was provided to them by 3M and was not protected by a court order. In the spreadsheet, 3M indicated that the yellow end of the CAE was -2 (which is equivalent to hearing amplification not protection). Moldex advised that this most likely was a mathematical aberration as the 3M's standard deviation in the testing was too large. The larger the deviation the lower the NRR.

Moldex advised that testing is generally conducted in a sound proof booth, where a baseline is obtained. Once the baseline is obtained data is then collected on each individual with and without the earplugs.

Moldex advised that there was a National Institute for Occupational Safety and Health (NIOSH) report that was issued about the CAE. However, they were unable to provide a copy of this document due to the protective order issued by the Minnesota Court.

Moldex advised that through various public reports they were able to determine that CAE was provided to every military member sent to Afghanistan and Iraq, specifically a news report out of Seattle, WA.

Moldex advised that CAE generation 2 design has not changed since 2000, nor has their NRR.

When asked if the National Stock Number (NSN) changed with the version of CAE's, Moldex replied that it did.

Moldex then provided the procurement process that companies had to go through in order to sell hearing protection:

First, companies must have approval through APG. Once companies obtain approval then there were sales channels that the companies could utilize.

   Distribution and Pricing Agreement (DAPA with the Defense Logistics Agency, DLA). DLA Prime Vendor (PV) was used to establish a DAPA. This was not a contract to supply but a way to put out products

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| _Je_ | 3 August 2016 | 3 |

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 4 OF 5 PAGES |

DETAILS

with pricing and quantities. The PV awardees are Cardinal Health and Owens & Minor. There is a distribution agreement with the PV with a fixed price and the PV add-on for distribution. Although the PV are the distributors, they do not go out and sell the product. That is still conducted by Moldex via trade shows.

Defense Medical Logistics Standard Support (DMLSS) is a medical logistical support for DLA Health System, where medical equipment can be purchased. This is generally for smaller amounts.

The General Service Administration (GSA) Schedule is another way that Moldex can sell its earplugs. The GSA Schedule is an Indefinite Delivery Indefinite Quantity (IDIQ) contract. For the GSA Schedule Moldex must go base to base and tell each base why their product should be utilized.

FedBizOpps is an online system that you can go onto to determine what solicitations the US Government has. This would be the general way the CAE are purchased through 3M.

Javits- Wagner O'Day (JWOD) is a set aside for disabled "or equivalent."

DLA Internet Bid Board Systems (DIBBS).

Moldex advised that right now there is about a 10% difference between their price and 3M's price. However, the difference used to be greater. 3M began utilizing New Dynamics (which is a company that meets JWOD requirements) and because of this 3M's price went up in 2012.

Moldex advised that there was a news article by BBC wherein a British soldier filed and settled a suit regarding earplugs in 2011. Moldex advised that while the new article did not mention 3M, they believed it was a 3M CAE (see attached article for details).

When asked, Moldex advised that they were not required to supply any certifications. Only their initial approval from APG.

Moldex stated that the testing in this case is key because 3M utilized two different methods which does not meet the ANSI requirements.

Moldex provided the following additional information:

March /June 2012 – Moldex sent a letter to 3M advising that their (3M) 0 NRR rating was a violation of the Noise Control Act. 3M then wrote a letter back to Moldex stating that it was not a violation as the Noise Control Act dealt with overstating the NRR ratings not understating them.

March 2012 – was when the first litigation began.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| | 3 August 2016 | 3 |

| AGENT'S INVESTIGATION REPORT<br>CID Regulation 195-1<br>**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | ROI NUMBER<br>0019-16-CID133-014635 |
|---|---|
| | PAGE 5 OF 5 PAGES |

DETAILS

Ronald KEEPER ran the tests.

Moldex could not provide any additional information at this time due to the protective order placed on them in Minnesota.
//////////////////////////////////////////////////LAST ENTRY//////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE | DATE<br>3 August 2016 | EXHIBIT |

CID FORM 94
(Automated)

**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** CID File0029
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

0019·16·CID133·014635

For Offical Use Only-Law Enforcement Sensitive

PELTOR®

**NSN NUMBER:**
6515-01-466-2710



## MORE THAN A HEARING PROTECTOR

The Combat Arms™ Earplugs not only provide hearing protection, they help provide situational awareness by protecting against concussive disorientation effects associated with impulse noise (i.e., weapons fire, improvised explosive devices, etc.).

The patented Hear-Through™ design allows wearers to hear low-level sounds critical to mission safety – conversation, footsteps, rifle bolts, approaching enemies. When needed, the plug's "filter" reacts to provide instant protection from high-level noises. It's that easy. It's that quick.

## DUAL-ENDED DESIGN
## MEETS CRITICAL PROTECTION NEEDS

**Yellow End**
Weapons Fire

Insert the YELLOW end to protect against loud impulse noises such as weapons fire. The yellow end has a built-in filter that allows you to hear commands, approaching vehicles and other low-level noises.

**Green End**
Steady Noises

Insert the GREEN end for situations with high, constant noise levels such as aircraft, armored vehicles, watercraft and machinery.

Aearo Technologies · 8001 Woodland Drive · Indianapolis, IN 46278 · Phone (800) 225-9038 · Fax (800) 488-8007
© 2006 Aearo Technologies. E-A-R®, Combat Arms™ and Hear-Through™ are trademarks licensed by Aearo Technologies.
Assembled in Mexico from foreign components. U.S. patents 4,807,143; 6,068,079; 6,070,693.

318-0021B  2/06
34-8705-7483-6

For Offical Use Only-Law Enforcement Sensitive

**Exhibit**  ___

CID File0030



Only-Law Enf...

0019-16-CID133-014635

## INSTRUCTIONS FOR USE:

Determine the proper end (green or yellow) for insertion depending upon your application needs. Grasp the earplug by the stem and insert into earcanal. Adjust plug for best sealing performance.

### ⚠ CAUTION:

Remove slowly with twisting motion to gradually break the seal. Rapid removal may damage eardrum.

### Fitting tips:

Fitting is easier if ear is pulled upward and outward during insertion and is also improved if the sealing rings of the outward directed plug are rolled back upon themselves. Some individuals with smaller earcanals may experience discomfort with the dual-ended Combat Arms Earplug due to their restricted canal opening. A single-sided version of the Combat Arms Earplug is also available and will often times provide greater comfort for smaller earcanals. Single-Sided Combat Arms Earplug - NSN # 6515-01-512-6072.

### Cleaning:

Plug tips may be cleaned with water and soap. Avoid any blockage of the channel through the yellow tip. This tip may be removed for cleaning by pulling it away from the remaining earplug assembly. Carefully replace after cleaning. Regularly examine the plugs for tears and cracks under any of the flanges. Replace as necessary.

### ⚠ CAUTION:

Inserting the yellow tip end under conditions of continuous hazardous noise can result in under protection and hearing loss. Improper fit of this device will reduce its effectiveness in attenuating noise. Follow Instructions For Use for proper fit.

The EPA has selected the NRR as the measure of a hearing protector's noise reducing capabilities. Aearo Technologies makes no warranties as to the suitability of the NRR as a measure of actual workplace protection since such protection is highly dependent on user training, motivation, and utilization. A better estimate of workplace protection can be obtained by derating the labeled NRR of this, or any other hearing protector, by 50%.

ATTENUATION DATA (ANSI S3.19-1974)

### Combat Arms - Yellow Level-Dependent End

| Frequency (Hz) | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 | NRR | CSA CLASS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mean (dB) | 4.7 | 4.2 | 6.0 | 9.5 | 16.7 | 18.6 | 18.3 | 16.7 | 17.2 | 0 | — |
| SD (dB) | 4.0 | 4.3 | 5.0 | 6.7 | 4.9 | 8.7 | 5.8 | 6.1 | 6.8 | | |

### Combat Arms - Green Steady State End

| Frequency (Hz) | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 | NRR | CSA CLASS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mean (dB) | 32.7 | 31.8 | 33.0 | 32.0 | 34.5 | 37.3 | 38.9 | 43.8 | 43.3 | 22 | AL |
| SD (dB) | 5.9 | 6.1 | 6.5 | 5.8 | 4.1 | 5.3 | 6.1 | 6.7 | 6.9 | | |

The level of noise entering a person's ear when a hearing protector is worn as directed is closely approximated by the difference between the A-weighted environmental noise level and the NRR.

Example:

1. The environment noise level as measured at the ear is 92 dBA.
2. The NRR is 22 decibels (dB).
3. The level of noise entering the ear is approximately equal to 70 dBA.

### ⚠ Caution:

For noise environments dominated by frequencies below 500 Hz, the C-weighted environmental noise level should be used. The NRR used in the above example was achieved under laboratory conditions.

Although hearing protectors can be recommended for protection against the harmful effects of impulse noise, the Noise Reduction Rating (NRR) is based on the attenuation of continuous noise and may not be an accurate indicator of the protection attainable against impulse noise such as gunfire. (Wording required by EPA.)

### ⚠ Caution:

Earplugs must be worn at all times in noisy surroundings for proper protection.

For Official Use Only-Law Enforcement Sensitive

Exhibit    CID File0031

FOR OFFICIAL USE ONLY- LAW ENFORCEMENT SENSITIVE        0019-16-CID133-014635

# Soldier who suffered hearing loss in war game has won compensation from Army

- 18:52, 10 JAN 2016
- BY MARTIN FRICKER , MIKE LOCKLEY

### Philip Goodman, 29, was firing live rounds at targets in 2011 ahead of deployment to Afghanistan

AFP



Compensation: Soldier Philip Goodman suffered hearing loss while training to be deployed to Afghanistan

A soldier whose hearing was damaged by gunfire noise in a war game has won a landmark compensation claim against the Army.

Philip Goodman, 29, was firing live rounds at targets in 2011 ahead of deployment to Afghanistan when his left earplug fell out.

FOR OFFICIAL USE ONLY- LAW ENFORCEMENT SENSITIVE    0019-16-CID133-014635

The damage caused by the din from other troops' shots before he got it back in means he has to wear a hearing aid and suffers tinnitus.

Philip, formerly of the Queen's Royal Hussars, is set for a big payout following the War and Armed Forces Tribunal hearing -- and dozens of other soldiers are now preparing similar claims.

He said: "I was with a medic for an hour or two but the ringing never stopped.

Reuters



Hearing problems: Philip Goodman has constant ringing in his ears

"I can't stay in a room that is totally silent as the ringing becomes deafening.

"The earplugs kept slipping out. I was wearing protection called The Christmas Tree.

"The yellow end looks like roots, the green end like a Christmas tree. As soon as you got hot, the yellow end fell out.

"Other soldiers complained about them and are making claims."

Philip, of Evesham, Worcs, had been in the Army five years when he was injured on the exercise in Wales.

FOR OFFICIAL USE ONLY- LAW ENFORCEMENT SENSITIVE     0019-16-CID133-014635

He went to Afghanistan but had to return after three weeks.



Dishcharged: Philip Goodman went to Afghanistan but had to return after three weeks

The father-of-two was discharged on medical grounds in 2013 and is now a telecoms engineer.

He said: "The bottom fell out of my world. I'd set myself up to be in the Army for life. I now wear a hearing aid in my left ear and suffer tinnitus."

The Army, which now uses new earplugs, confirmed other claims are in the pipeline.

A spokesman said: "It is vital that those who are injured receive the compensation and support they deserve."

Since 2005, £520million has been paid out through the Armed Forces Compensation Scheme.

| AGENT'S INVESTIGATION REPORT<br>*CID Regulation 195-1*<br>**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | ROI NUMBER<br>0019-16-CID133-014635 |
|---|---|
| | PAGE 1 OF 1 PAGES |

DETAILS

**David ZARENKIEWICZ; DOB:** ▉▉▉; **POB:** ▉▉▉ **Last 4:** ▉▉ **Address:** ▉▉▉ ▉▉▉; **Current Job: Contracting Officer (KO), Defense Logistics Agency (DLA) Troop Support**

On 13 September 2016, the reporting agent and SA Gil ROSEN, Defense Criminal Investigative Service (DCIS), Charleston Post of Duty, Charleston, SC interviewed Mr. ZARENKIEWICZ. Also present were Assistant United States Attorneys Fran TRAPP and Stan RAGSDALE, both Civil Division, District of South Carolina, Columbia, SC; Ms. Brandie WEDDLE, US Department of Justice, Civil Division, Washington, DC; Mr. Michael DELANEY and Ms. Lillian WEISS, both Procurement Fraud Attorney's for DLA Troop Support, Philadelphia, PA. Mr. ZARENKIEWICZ was interviewed about his knowledge of the Dual Ended Combat Arms Earplugs, National Stock Number 6515-01-466-2710 (CAE).

Mr. ZARENKIEWICZ began working at DLA Troop Support as a Contractor for Diverse Business Systems from 2006-2009. In 2009, he began an internship as a US Government employee. Mr. ZARENKIEWICZ was a KO for the CAE from 2013-2014 and awarded contracts to New Dynamics. Mr. ZARENKIEWICZ stated that by the time be began awarding contracts for the CAE it was already sourced and was considered commercially exclusive with part number 370-1000.

Mr. ZARENKIEWICZ stated the contracts for commerciality was under Federal Acquisition Regulation (FAR) 46.202, which relies on an email from the contractor saying the specification is up to date.

Mr. ZARENKIEWICZ did not know of any issues with the CAE and was not sure if the CAE's were part of the Prime Vendor program. Mr. ZARENKIEWICZ stated if the CAE's were part of the prime vendor program then there would be a Distribution and Pricing Agreement (DAPA) between the Distributor and the Original Equipment Manufacturer (OEM). The Distributor, OEM, and US Government would have a copy.

Mr. ZARENKIEWICZ was asked if he had known about any potential misrepresentations of the CAE testing if it would have been important in his eyes. Mr. ZARENKIEWICZ advised that it would be very important.

Mr. ZARENKIEWICZ did not have anything else to add.
///////////////////////////////////////////////////////////LAST ENTRY///////////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE<br>*Jennifer Coleman* | DATE<br>13 September 2016 | EXHIBIT<br>4 |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

CID File0035

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 1 OF 1 PAGES |

DETAILS

**James A. JOHANSON, Jr.; DOB:** ▮▮▮ **POB:** ▮▮▮ **Last 4:** ▮▮ **Address:** ▮▮
▮▮ **Current Job: Quality Assurance Engineer, Defense Logistics Agency (DLA) Troop Support**

On 13 September 2016, the reporting agent and SA Gil ROSEN, Defense Criminal Investigative Service (DCIS), Charleston Post of Duty, Charleston, SC interviewed Mr. JOHANSON. Also present were Assistant United States Attorneys Fran TRAPP and Stan RAGSDALE, both Civil Division, District of South Carolina, Columbia, SC; Ms. Brandie WEDDLE, US Department of Justice, Civil Division, Washington, DC; Mr. Michael DELANEY and Ms. Lillian WEISS, both Procurement Fraud Attorney's for DLA Troop Support, Philadelphia, PA. Mr. JOHANSON was interviewed about his knowledge of the Dual Ended Combat Arms Earplugs, National Stock Number 6515-01-466-2710 (CAE).

Mr. JOHANSON has worked for DLA Troop Support since 1985 as a Quality Assurance Engineer in the Medical field. His primary duties deal with recalls, Product Quality Deficiency Reports (PQDR), pre-award surveys, and anything medical. Mr. JOHANSON did not have much information regarding the CAE and when DLA began purchasing them. Mr. JOHANSON only recalled that Dr Douglas OHLIN, complained that New Dynamics did not make earplugs as well as Aearo. However, this was in reference to the foam earplugs and not the CAE.

Mr. JOHANSON stated he researched complaints and recalls in their systems but did not find anything as it related to the CAE.

Mr. JOHANSON also stated that DLA Troop Support stopped conducting laboratory testing back in 1997/1999.

Mr. JOHANSON was asked if he had known about any potential misrepresentations of the CAE testing if it would have been important in his eyes. Mr. JOHANSON advised that it would be very important.

Mr. JOHANSON did not have anything else on the subject.
///////////////////////////////////////////////////////LAST ENTRY///////////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE *Jennifer Coleman* | DATE | EXHIBIT |
| | 13 September 2016 | 5 |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE   CID File0036
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 1 OF 2 PAGES |

DETAILS

**Brian SCHOTT; DOB:** ▮▮▮▮▮ **; POB:** ▮▮▮▮▮ **; Last 4:** ▮▮ **; Address:** ▮▮▮▮▮▮▮▮▮▮▮▮ **Current Job: Chief for Medical Surgical Manufacturer/Distributor (FSF), Defense Logistics Agency (DLA) Troop Support**

On 14 September 2016, the reporting agent and SA Gil ROSEN, Defense Criminal Investigative Service (DCIS), Charleston Post of Duty, Charleston, SC interviewed Mr. SCHOTT. Also present were Assistant United States Attorneys Fran TRAPP and Stan RAGSDALE, both Civil Division, District of South Carolina, Columbia, SC; Ms. Brandie WEDDLE, US Department of Justice, Civil Division, Washington, DC; Mr. Michael DELANEY and Ms. Lillian WEISS, both Procurement Fraud Attorneys for DLA Troop Support, Philadelphia, PA. Mr. SCHOTT was interviewed about his knowledge of the Dual Ended Combat Arms Earplugs, National Stock Number 6515-01-466-2710 (CAE).

Mr. SCHOTT began working at DLA Troop Support on 25 July 2005. Mr. SCHOTT began dealing with the CAE in the spring of 2012. At that time the CAE were already coded as a commercial item, part number 377-1000.

Mr. SCHOTT stated that 3M developed a partnership with New Dynamics wherein 3M would manufacture the part and New Dynamics would be in charge of the assembly. Mr. SCHOTT signed the paperwork for the pricing on 21 March 2012 for a box of 10 and then again in May 2013 for a box of 50. Mr. SCHOTT also stated that he signed the paperwork to get the CAE on the AbilityOne Program, which is for disabled.

Mr. SCHOTT stated he had no knowledge of the history of the CAE.

Mr. SCHOTT stated that the CAE contract lapsed due to no sales. Mr. SCHOTT stated that he and Mr. David ZARENKIEWICZ had significant requirements and as such put together a long term contract. However, once it was put into a contract the amount of volume required had significantly stopped.

Mr. SCHOTT stated that they searched to see if any were in stock several weeks ago but did not find anything. Mr. SCHOTT advised that there were four depot locations where the CAE would have been stored under a long term contract.

Mr. SCHOTT stated that the CAE was not a full blown Commercial Item Description (CID) but it was a general item description plus a part number, cage code and Medical Procurement Item Description (MPID).

There are three other NSN that are alternatives to the CAE and each one goes to a different size (Small, Medium and Large) 6515-01-576-8837, 6515-01-576-8861, and 6515-01-576-8869.

Mr. SCHOTT did recall that a company, Moldex) had tried contacting him 3-4 different times and left messages for him. Mr. SCHOTT did not return their call until they contacted his supervisor and his supervisor called him. At that time he called them and advised that he was not the correct person to be contacting as he

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| *Jennifer Coleman* | 14 September 2016 | 6 |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE  CID File0037
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 2 OF 2 PAGES |

DETAILS

did not make the decisions on what brand to purchase, but instead Fort Detrick, MD would be the correct entity.

Mr. SCHOTT stated that he was uncertain if the CAE had Distribution and Pricing Agreements (DAPA).

Mr. SCHOTT was asked if he had known about any potential misrepresentations of the CAE testing if it would have been important in his eyes. Mr. SCHOTT advised that it would be very important.

Mr. SCHOTT did not have anything else to add.
//////////////////////////////////////////////LAST ENTRY//////////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| | 14 September 2016 | 6 |

CID FORM 94
(Automated)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 1 OF 2 PAGES |

DETAILS

**Thomas SIDOR; DOB:** ███████ **; POB:** ███████ **; Last 4:** ███ **; Address:**
███████ **; Current Job: Retired Contracting Officer (KO), Defense Logistics Agency (DLA) Troop Support**

On 14 September 2016, the reporting agent and SA Gil ROSEN, Defense Criminal Investigative Service (DCIS), Charleston Post of Duty, Charleston, SC interviewed Mr. SIDOR. Also present were Assistant United States Attorneys Fran TRAPP and Stan RAGSDALE, both Civil Division, District of South Carolina, Columbia, SC; Ms. Brandie WEDDLE, US Department of Justice, Civil Division, Washington, DC; Mr. Michael DELANEY and Ms. Lillian WEISS, both Procurement Fraud Attorney's for DLA Troop Support, Philadelphia, PA. Mr. SIDOR was interviewed about his knowledge of the Dual Ended Combat Arms Earplugs, National Stock Number 6515-01-466-2710 (CAE).

Mr. SIDOR began working with the DLA Troop Support in April 1981 as a procurement agent doing post awards and on the buying team for medical and retired in May 2013.

Mr. SIDOR recalled a long term contract that may have been done in the late 90s (1999/2000) with Aearo but as a Contracting Officer he did not have anything to do with testing. The CAE would have already been approved by Maryland. Mr. SIDOR stated that it was not his job as the KO to vet the CAE. He would assume that the Engineers would have looked into it, maybe Mr. John KOMADA, Quality Assurance Engineer, DLA Troop Support. If not Mr. KOMADA then the QA Engineer before Mr. KOMADA, who he doesn't know.

Mr. SIDOR stated that he did not recall even receiving any complaints or knowing of any problems with the CAE.

At this time, Mr. SIDOR was shown an email between him and Dr Douglas OHLIN in 2006. Mr. SIDOR stated it sounds like it was regarding market research but he doesn't remember the email (see email for details).

Mr. SIDOR stated that before he became the KO for the CAE, small buys were being done. When he became the KO he entered into the long term contract, maybe the 2007 contract. Once he left he thought that Mr. Mark ANTHONY took over as the KO for the CAE but it could have been someone else.

Mr. SIDOR stated that he only met Dr OHLIN one time regarding issues with the foam earplugs.

Mr. SIDOR stated that the CAE was important because it was the only one of its kind that allowed service members to be protected from loud noises, such as gun fire and impulse noise, while still allowing them to hear people speak. He learned this from reading about them.

Mr. SIDOR stated that any fitting instructions would have been with the product. Mr. SIDOR also stated that he had not heard anything about filters being too long. If there was a problem it would have been in the post award documentation.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE<br><br>*Jennifer Coleman* | DATE<br><br>14 September 2016 | EXHIBIT<br><br>7 |

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 2 OF 2 PAGES |

DETAILS

Mr. SIDOR was asked if he had known about any potential misrepresentations of the CAE testing if it would have been important in his eyes. Mr. SIDOR advised that it would be very important.

Mr. SIDOR did not have anything else to add.
/////////////////////////////////////////////////LAST ENTRY/////////////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| _je_ | 14 September 2016 | |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE  CID File0040
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 1 OF 3 PAGES |

DETAILS

On 9 Sep 2016, the reporting agent began reviewing the first production provided by 3M. The following information was noted:

3M00000001 – Fitting instruction on Dual Ended Combat Arms Earplugs (CAE)

3M00000424 – 2012 Report conducted by the US Marine Corps.

3M00001698 – Email regarding the CAE which was protesting the award to Moldex, dated 4 June 2012.

3M00001703 – USACHPPM Report regarding the Combat Arms Earplugs.

3M00001705 – Hearing Protection Evaluation for the Combat Arms Earplug at Idaho National Laboratory, dated March 2007.

Between 20-21 September 2016, the reporting agent completed the review of the production provided by 3M. The following information was noted:

3M00002006 – Email from Dr Doug OHLIN regarding his response to a congressional question about why the list of approved hearing protection devices was so short, dated 12 May 2012.

3M00002052-2055 – ANSI S12.6 used on hearing protection for E A Real Laboratory (Empirical Evaluation using Impulse Noise of the Level-Dependency of Various Passive Earplug Designs), dated 23 June 2008 and revised 4 January 2010.

3M00002113-2142 – Army Research Laboratory Report, dated September 2008, looking at utilizing artificial ears for hearing protection.

3M00002148 – Memorandum requesting National Stock Number (NSN) for AEARO Combat Arms Earplugs, dated 1997.

3M00002150 – Justification for non-linear earplugs. Specifically, page 2 documents that the dual ended earplugs would preclude the need for a second set of earplugs that would not fit into the standard carrying case.

3M00002153 – Typed indicating that the Impulse Noise cannot be accurately measured using the EPA's test method. As such an artificial ear was used.

3M00002568 – Blister card

3M00002990 – Letter from 3M to Moldex regarding the Noise Control Act.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| *Jennifer Coleman* | 21 September 2016 | 8 |

CID FORM 94　　FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE
(Automated)　　　　　　　　　Protective Marking is Excluded From　　　　　　　　CID File0041
　　　　　　　　　　　　　Automatic Termination (Para 13, AR 34-16)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| *CID Regulation 195-1* | 0019-16-CID133-014635 |
| **FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | PAGE 2 OF 3 PAGES |

DETAILS

3M00003002 – Certificate of Conformance, dated 2012.

3M00003006 – Improved Combat Earplugs ARI Status report, dated 26 June 2006.

3M00003388 – Document detailing the differences between ANSI S3.19 (1974) and ANSI S12.6 (1997).

3M00003995-4041 – Testing protocols for ANSI S3.19 and ANSI S12.6, dated 21 August 2003.

3M00004325-4340 – Contract SPE2Ds-15-D-N-0001.

3M00004342-4343 – Fitting instruction which document that personnel with very large ears should fold opposing plug back. However, not same NSN number.

3M00004465-4469 – Memorandum from Dr OHLIN requesting CAE memo be published, not dated.

3M00004468 – Caution sentenced appears as though it was added after the memorandum was written.

3M00004550-4551 – Indicates tests conducted in 2000, 2004, and 2006 on the CAE v 2
  - Version 3 was stopped due to fitting problems (see 4551).

3M00004558 – Email regarding differences in NRR ratings on tests conducted over time, dated 23 Jan 2009.

3M00004559 – Email in 2009 regarding customer out of Seattle who was informed that the CAE did not work as performed and requesting white papers to refute the information.

3M00004577 – Email explaining why impulse testing not necessary for hearing protection, email dated 2009.

3M00004880-4882 – AEARO test reports for 2000 (no back up data).

3M00004885 – Letter from Michael and Associates (Research Lab) – stated testing performed according to ANSI S3.19 and ANSI S12.6, dated 2001.

3M00005005 – Test report dated 2003.

3M00005285-5290 – E A RCAL Testing (folding back flanges affects REAT results)

3M00005361-5368 – E A RCAL Laboratory test report, dated 2000

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| | 21 September 2016 | 8 |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

CID File0042

| AGENT'S INVESTIGATION REPORT<br>CID Regulation 195-1<br>FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | ROI NUMBER<br>0019-16-CID133-014635 |
|---|---|
| | PAGE 3 OF 3 PAGES |

DETAILS

3M00005437-5439 – Email from Dr Ohlin (3M employee) to Benjamin Durig (Summer Research Assistant for VA Hospital in Oregon) advising that the testing for the speech should be conducted in relatively quiet surroundings as it was made to be able to hear in between shots fired not during shots fired (2009).

3M00005531 – Email about issues with using the CAE in the open position, dated 2014.

3M00006947-6960 – Test Reports for 2000.

3M00006960-6965 – Test Reports for 2006.

3M00006966-7281 Monthly Reports from 1990-2015 (not attached).
////////////////////////////////////////////////LAST ENTRY/////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE | DATE<br>21 September 2016 | EXHIBIT |

3M Confidential

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635





3M00000001



CID_File0044

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

## REPORT DOCUMENTATION PAGE

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports (0704-0188), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.
**PLEASE DO NOT RETURN YOUR FORM TO THE ABOVE ADDRESS.**

| 1. REPORT DATE (DD-MM-YYYY) | 2. REPORT TYPE | 3. DATES COVERED (From - To) |
|---|---|---|
| January 2013 | Final | 1–31 October 2012 |

| 4. TITLE AND SUBTITLE | 5a. CONTRACT NUMBER |
|---|---|
| U.S. Marine Corps Level-Dependent Hearing Protector Assessment: Objective Measures of Hearing Protection Devices | |
| | 5b. GRANT NUMBER |
| | 5c. PROGRAM ELEMENT NUMBER |

| 6. AUTHOR(S) | 5d. PROJECT NUMBER |
|---|---|
| Angelique A. Scharine and Rachel A. Weatherless | |
| | 5e. TASK NUMBER |
| | 5f. WORK UNIT NUMBER |

| 7. PERFORMING ORGANIZATION NAME(S) AND ADDRESS(ES) | 8. PERFORMING ORGANIZATION REPORT NUMBER |
|---|---|
| U.S. Army Research Laboratory<br>ATTN: RDRL-HRS-D<br>Aberdeen Proving Ground, MD 21005 | ARL-TR-6780 |

| 9. SPONSORING/MONITORING AGENCY NAME(S) AND ADDRESS(ES) | 10. SPONSOR/MONITOR'S ACRONYM(S) |
|---|---|
| John H. O'Donnell<br>2200 Lester St<br>BLG 2200 BC538<br>Quantico, VA 22134 | USMC |
| | 11. SPONSOR/MONITOR'S REPORT NUMBER(S) |

| 12. DISTRIBUTION/AVAILABILITY STATEMENT |
|---|
| Approved for public release; distribution unlimited. |

| 13. SUPPLEMENTARY NOTES |
|---|
| |

**14. ABSTRACT**

To characterize the effects of four level-dependent earplug-style hearing protection devices (HPDs), measurements were made of the passive attenuation of steady-state and impulsive noise, as well as the localization ability of listeners while they wore each HPD. Three HPDs were mechanical (Moldex BattlePlugs, 3M Combat Arms Earplugs, and the SureFire EP4 Sonic Defenders Plus). These triple-flange earplug-style HPDs provide level-dependent protection through the incorporation of a filter that allows the user to hear ambient sounds with minimal attenuation but protects against impulsive noises above 105-dB peak. We tested the fourth HPD (Etymōtic Electronic BlastPLG EB15) in the inactive condition only, but it can provide ambient environmental hearing via external microphones and uses electronic circuitry to limit or shut off the transmission of unsafe levels of noise. The three mechanical earplugs provided similar (8–14 dB) passive attenuation of steady-state pink noise presented at 105 dB A. One-third octave band analyses of this attenuation showed differences in the spectral profile at higher frequencies. The inactive EB15, tested with foam ACCU-Fit ER38-14F ear-tips, provided 28 dB of passive attenuation. The devices all provided in excess of 30-dB attenuation of an impulsive noise presented at approximately 157-dB peak; in particular, the inactive EB15 provided more than 34 dB of passive attenuation. All four devices caused an increase in average localization error—near 0° and 180°, most likely due to reversals. The average unsigned azimuth error did not differ significantly across the four earplugs, ranging from about 38 to 42. All four earplugs, as tested, provide sufficient protection against noise. The significance of the mechanical earplugs' differential effects on the spectral content of lower-level steady-state noise on spatial orientation and, ultimately, user acceptance are discussed. Similarly, we note the limitations of inferences made from tests of the EB15 in only a passive mode.

| 15. SUBJECT TERMS |
|---|
| hearing protection, level dependent, sound localization, attenuation, noise |

| 16. SECURITY CLASSIFICATION OF: | | | 17. LIMITATION OF ABSTRACT | 18. NUMBER OF PAGES | 19a. NAME OF RESPONSIBLE PERSON |
|---|---|---|---|---|---|
| a. REPORT | b. ABSTRACT | c. THIS PAGE | UU | 32 | Angelique A. Scharine |
| Unclassified | Unclassified | Unclassified | | | 19b. TELEPHONE NUMBER (include area code) |
| | | | | | 410-278-5957 |

Standard Form 298 (Rev. 8/98)
Prescribed by ANSI Std. Z39.18

ii

3M Confidential

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000424
CID File0045

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

---

# Contents

---

**List of Figures**                                                                        **v**

**List of Tables**                                                                         **vi**

**1. Objective**                                                                           **1**

**2. Steady-State Attenuation Testing**                                                     **2**

   2.1  Facilities and Instrumentation ..................................................................2

       2.1.1  Auditory Test Fixture (ATF), Reference Microphone, and Recording
       System ................................................................................................2

       2.1.2  Research Facilities, Loudspeaker, and Test Signal ........................3

   2.2  Variables....................................................................................................4

   2.3  Procedures .................................................................................................4

   2.4  Data Analysis ............................................................................................5

**3. Impulse Noise Attenuation Testing**                                                    **8**

   3.1  Facilities and Instrumentation ..................................................................9

       3.1.1  ATF, Reference Microphone, and Recording System ...................9

       3.1.2  Impulsive Noise Signal ...................................................................9

   3.2  Calibration ...............................................................................................10

   3.3  Testing Procedure....................................................................................10

   3.4  Data Analysis and Results .......................................................................10

**4. Localization Testing Methods**                                                         **12**

   4.1  Participants ..............................................................................................12

   4.2  Facilities and Instrumentation ................................................................12

       4.2.1  Loudspeaker Array .......................................................................12

       4.2.2  Rotating Chair ..............................................................................13

   4.3  Variables..................................................................................................14

   4.4  Procedures ...............................................................................................14

   4.5  Data Analysis, Results, and Discussion ..................................................14

**5. Summary and Conclusions**                                                              **20**

EXHIBIT 2

3M Confidential

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000425
CID File0046

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

6.   **References**                                                                22

**Distribution List**                                                        23

iv

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000426
CID File0047

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

## List of Figures

Figure 1. Hearing protectors tested: (a) Moldex BattlePlugs, (b) 3M Combat Arms Earplugs, (c) SureFire EP4 Sonic Defenders *Plus* (SF), and (d) Etymōtic Electronic BlastPLG EB15 earplug ..................................................................................................... 1

Figure 2. G.R.A.S. Hearing-Protector Test Fixture Type 45CA (shown with Mx inserted). (The Styrofoam headform was not on this ATF during testing.) ...................................... 3

Figure 3. Dome Room of the Environment for Auditory Research at the U.S. Army Research Laboratory. (Person and chair shown were not present during recordings and were replaced by the G.R.A.S. 45CA shown in figure 2.) ................................................ 4

Figure 4. Average overall steady-state attenuation values measured for each HPD under test. The error bars represent ±1 standard deviation ..................................................... 5

Figure 5. Average octave-band steady-state attenuation values measured for each HPD under test. The error bars represent ±1 standard deviation ...................................................... 6

Figure 6. Average one-third octave-band steady-state attenuation values measured for each HPD under test. (Error bars not shown for visual clarity.) ....................................... 7

Figure 7. Left to right, G.R.A.S 40BH reference microphone, Institute Saint Louis (ISL) auditory test fixture, and shock tube used for impulse testing ..................................... 9

Figure 8. Average impulse attenuation measured for each HPD under test. ........................... 11

Figure 9. Testing setup used for the localization test. (No helmet used in this experiment.) ....... 13

Figure 10. Signed and unsigned azimuth error as a function of head condition and azimuth. ....... 16

Figure 11. Average unsigned azimuth error as a function of head condition. The error bars represent ±1 standard deviation ......................................................................... 18

Figure 12. Percent of trials classified as reversals shown as a function of head condition. .......... 19

Figure 13. Percent of trials classified as reversals shown as a function of head condition and azimuth ...................................................................................................... 20

v

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE
3M00000427
CID File0048

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

## List of Tables

Table 1. Significant ANOVA results for attenuation ($\alpha < .05$)......................................................8

Table 2. Attenuation values (dB) obtained for the EB15 HPD.................................................11

Table 3. Signficant ANOVA results for signed azimuth error ($\alpha < .05$). ........................................15

Table 4. Signficant ANOVA results for unsigned azimuth error ($\alpha < .05$). ................................15

Table 5. Results of special contrasts comparing  the unsigned azimuth attenuation of the HPDs.  Values shown are $p$ values. Asterisks indicate  significant contrasts.........................18

3M Confidential

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000428
CID File0049

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE    *00019-2016-CID133-014635*

## 1. Objective

This effort was funded by the U.S. Marine Corps Program Manager Infantry Combat Equipment (PM ICE) as a part of its Marine Rifle Expeditionary Squad program. The objective was to determine the comparative attenuation performance characteristics of four level-dependent earplugs in impulsive and steady-state noise environments in order to assess how these differences might affect user acceptance (figure 1). As these attenuation characteristics can also affect a user's auditory spatial perception, auditory localization ability was also measured. Three of these were designed with a filter that prevents levels of noise exceeding approximately 105 dB from entering the ear. We tested the Moldex* BattlePlugs† (Mx), the 3M‡ Combat Arms§ Earplugs (CAE), and the SureFire** EP4 Sonic Defenders†† Plus (SF).



Figure 1. Hearing protectors tested: (a) Moldex BattlePlugs, (b) 3M Combat Arms Earplugs, (c) SureFire EP4 Sonic Defenders *Plus* (SF), and (d) Etymótic Electronic BlastPLG EB15 earplug.

---

*Moldex is a registered trademark of Moldex, Culver City, CA.
†BattlePlugs is a registered trademark of Moldex, Culver City, CA.
‡3M is a registered trademark of The 3M Company, St. Paul, MN.
§Combat Arms is a registered trademark of The 3M Company, St. Paul, MN.
**SureFire is a registered trademark of SureFire, LLC, Fountain Valley, CA.
††Sonic Defenders is a registered trademark of SureFire, LLC, Fountain Valley, CA.

1

    FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE    3M00000429
CID File0050

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

The fourth item, the Etymōtic* Electronic BlastPLG† EB15‡ earplug (EB15) is an "active" device designed to use electronic limiters and compression to provide hearing of low-level ambient sounds while protecting against high-level noise; it was tested with ACCU-Fit§ ER38-14F foam ear-tips and with the batteries removed. Testing the EB15 without batteries makes it a passive hearing protector without level-dependent features. This was done by request from the customer, as active testing of the same device was planned for future testing. Without the level-dependent features, it is expected that the device will have higher levels of attenuation, both of steady-state and impulsive noise. Effects on localization will depend on the degree to which localization cues are audible. It is acknowledged that (as-tested) comparisons of the EB15 to the other earplugs are not reasonable and were not the intent of the study. Rather we report the objective data as observed.

## 2. Steady-State Attenuation Testing

One common criticism of level-dependent hearing protectors is that even at safe levels (below 85 dB A), they cause some attenuation, which may reduce the detection of, and impair auditory sensitivity to, desirable auditory information. If a user feels that this attenuation is too great, it may affect acceptance of a hearing protector and compliance with mandated hearing protector use. Therefore, while the primary function of these hearing protectors is to attenuate high-level impulse noise, we wish to document the steady-state attenuation introduced by wearing the protectors. Ideally, a level-dependent HPD will provide little attenuation of safe levels (less than 85 dB A) of steady-state noise and at least 25-dB attenuation of very intense (greater than 140 dB peak) impulsive noise.

### 2.1 Facilities and Instrumentation

### 2.1.1 Auditory Test Fixture (ATF), Reference Microphone, and Recording System

A G.R.A.S. Hearing-Protector Auditory Test Fixture (ATF) Type 45CA (see figure 2), fitted with IEC 60711 ear simulators and molded pinnae, was positioned in the center of the room and used to record the test signal. A PreSonus Firestudio** recording interface set to a sampling rate of 44.1 kHz was used for analog to digital conversion and to transmit the signal to a laptop computer where it was recorded using Adobe Audition 3.0.

---

*Etymōtic is a registered trademark of Etymōtic Research, Inc., Elk Grove Village, IL.

†BlastPLG is a registered trademark of Etymōtic Research, Inc., Elk Grove Village, IL.

‡EB15 is a registered trademark of Etymōtic Research, Inc., Elk Grove Village, IL.

§ACCU-Fit is a registered trademark of Etymōtic Research, Inc., Elk Grove Village, IL

**Firestudio is a registered trademark of PreSonus Audio Electronics, Inc., Baton Rouge, LA.

2

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000430
CID File0051

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 2. G.R.A.S. Hearing-Protector Test Fixture Type 45CA (shown with Mx inserted). (The Styrofoam headform was not on this ATF during testing.)

### 2.1.2 Research Facilities, Loudspeaker, and Test Signal

A pink-noise test signal was presented from four background loudspeakers placed in the corners of the U.S. Army Research Laboratory's Environment for Auditory Research (EAR) Dome Room (Henry et al., 2009) about 4 m from the center of the room (see figure 3). The noise was presented at 100 dB A, as measured with a Brüel & Kjær Sound Level Meter Type 2226 held at the location of the ATF. This level was chosen because it is within the range for which the microphones (inside the ears) of the ATF are designed and high enough to remain in that range when a HPD is in place. It is not expected that this level would be high enough to involve any significant increase in attenuation over the HP's attenuation at low sound levels.

3

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000431
CID File0052

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 3. Dome Room of the Environment for Auditory Research at the U.S. Army Research Laboratory.
(Person and chair shown were not present during recordings and were replaced by the G.R.A.S.
45CA shown in figure 2.)

## 2.2   Variables

There were two independent variables investigated in the study: HPD condition and one-third octave frequency. The four HPD conditions were Mx, CAE, SF, and EB15. The dependent variable was attenuation, defined as the difference between the signal level, as measured by the ATF with and without the HPD.

## 2.3   Procedures

A G.R.A.S. 42AA sound calibrator with an adapter that allows it to be coupled to the ATF was used to generate a signal of 250 Hz at 114 dB. This signal was recorded through each channel (left and right ears) of the testing system and used as a calibrated reference for the other measurements.

The 100-dB pink-noise test signal was then played continuously from the loudspeakers. A reference measurement was made by recording the test signal with no hearing protection in place. Then the HPD under test was inserted into the ears of the ATF and a 5-s recording was made from both ATF ears (left-right channels) simultaneously. The HPD was then removed and reinserted and the recording process repeated. This procedure was repeated for each of the HPDs under test.

4

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

### 2.4 Data Analysis

Each set of recordings (2 × HPD) was processed using a custom MATLAB algorithm to compute the levels for each component octave and one-third octave band (ANSI/ASA S1.6-1984, 2011). This was also done for the reference set recorded with no HPD. A-weighting (ANSI/ASA S1.42-2001, 2011) was then applied and the A-weighted one-third octave, octave, and overall levels were obtained. A-weighted values were used for all analyses reported in this report. For each HPD, attenuation was calculated by computing the reduction in the overall A-weighted signal level when the device was in place compared to the level in the bare-head fixture. Attenuation, as a function of one-third octave and octave band frequency, was then calculated in the same manner. Figures 4–6 show overall attenuation and attenuation as a function of frequency for the HPDs under test. The error bars represent ±1 standard deviation.



Figure 4. Average overall steady-state attenuation values measured for each HPD under test. The error bars represent ±1 standard deviation.

5

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE
3M00000433
CID File0054

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 5. Average octave-band steady-state attenuation values measured for each HPD under test. The error bars represent ±1 standard deviation.

6

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000434
CID File0055

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 6. Average one-third octave-band steady-state attenuation values measured for each
HPD under test. (Error bars not shown for visual clarity.)

The 34 dB of attenuation shown for the EB15 hearing protectors was clearly higher than for the
other HPDs, but this earplug was the only HPD with electronic features, and it was tested in the
"off" position. Therefore, it did not have any of the level-dependent features provided by the
other earplugs. Of the three HPDs with mechanical filters, the most attenuation, approximately
25 dB, was observed for the Mx. The least attenuation overall was observed for the CAE,
approximately 20 dB.

The ear canal typically amplifies frequencies in the 1- to 4-kHz range (Moore, 2012). Therefore,
obstruction of the ear canal should result in not only passive attenuation of noise but also
eliminate the amplifying function of the ear canal at those frequencies. Consistent with this
prediction, all HPDs showed the most attenuation in this frequency range. The frequency
envelope of attenuation for the EB15 differs in that the average attenuation of frequencies below
500 Hz is 22 dB versus 6 dB (Mx), 3 dB (SF), and 1 dB (CAE) for the other HPDs. At high
frequencies there seemed to be some differences in the passive attenuation provided by the
earplugs, and this effect was quite apparent at the one-third octave band level of analysis. The
CAE consistently attenuated less across nearly all frequencies. At the octave band level, some of
these finer differences disappeared, but the general pattern remains that the CAE attenuated the
least, followed by the SF and the Mx HPDs; the EB15 attenuates the most.

7

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000435
CID File0056

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Each of the recording events resulted in two recordings (left and right ears) and a set of attenuation values for each octave and one-third octave band. A two-factor analysis of variance with recording event as a covariate (ANCOVA) was computed for attenuation as the dependent variable with the independent variables being HPD and one-third octave band frequency. Table 1 shows the statistics for the significant variables. The data indicate significant main effects of HPD and of one-third octave band frequency, $F(3, 359) = 790.4$, $p < .01$; and $F(29, 359) = 311.7$, $p < .01$. The data indicates a significant interaction between HPD and frequency, $F(87, 359) = 12.5$, $p < .01$. Note that because the attenuation observed for the EB15 was clearly different from the other HPDs, it could potentially account for all of the significant effects. However, planned contrasts confirm that the three mechanical earplugs are significantly different from each other and from the EB15 ($p < .01$).

Table 1. Significant ANOVA results for attenuation ($\alpha < .05$).

| Source of Variance | dF | F | p |
|---|---|---|---|
| HPD | 3 | 790.4 | 0.000 |
| Frequency | 29 | 311.7 | 0.000 |
| HPD*Frequency | 87 | 12.5 | 0.000 |
| Error | 359 | 7.28 | — |

If attenuation is driving user acceptance, the CAE is the winner for the mechanical earplugs. There is less attenuation overall, in the speech range (300–3000 Hz) and in the higher frequencies (greater than 4 kHz) where monaural localization cues are derived. However, if comfort is the driver, acceptance may be more idiosyncratic, depending on the users' perceptions of fit and preferences. Although no measures of comfort were used during testing, it was noted by the experimenters that the SF and EB15 earplugs are constructed with a softer, more pliable material and are available in multiple sizes. (Other versions of the CAE are manufactured in multiple sizes, but the version issued to the Marines and supplied for testing is available in only one size.) Since the EB15 was not tested with its talk-through microphones turned on, the frequency envelope of the pass-through levels is not known from this testing. Therefore, although the measured attenuation would seem undesirable for allowing the user to remain sensitive to the auditory environment, the conditions in which it was measured do not reflect normal intended usage. 

## 3.  Impulse Noise Attenuation Testing

We tested all four HPDs for their attenuation of impulse noise. For the three HPDs designed with mechanical filters, this was a test of whether the level-dependent filters function as intended to protect against impulse noise. The EB15 was tested in the passive "off" condition.

8

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

### 3.1    Facilities and Instrumentation

### 3.1.1 ATF, Reference Microphone, and Recording System

All impulse noise measurements were made in the EAR Distance Hall. Recordings were made using the French-German Research Institute of Saint-Louis (ISL) ATF designed to accommodate pressure levels of up to 190 dB peak (Buck and Parmentier, 1999). Recordings were made using the same reference microphone and PreSonus Firestudio system described in section 2.1.1. The reference microphone and ATF were 1 m apart at the same distance from the shock tube.

### 3.1.2 Impulsive Noise Signal

A pneumatic impulse noise source (PINS) was used to present impulsive noises for measurement. Figure 7 shows the reference microphone, ATF, and PINS used to present impulses for measurement. The average impulse level presented from the shock tube as measured with the reference microphone was 157 dB peak and the standard deviation of impulses was 1.9 dB.



Figure 7. Left to right, G.R.A.S 40BH reference microphone, Institute Saint Louis (ISL) auditory test fixture, and shock tube used for impulse testing.

9

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000437
CID File0058

*00019-2016-CID133-014635*

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

### 3.2    Calibration

A reference level was established for all of the measurements by recording a 114-dB, 250-Hz calibration signal with each ATF microphone and the reference microphone. Subsequently, recordings were made of two instances of impulsive noise with the microphones of the ATF (unoccluded ears) and the reference microphone. These recordings were used to estimate the transfer function of the ear canal. From these recordings, it was determined that the left and right ears of the ATF contribute amplifications of 4.87 and 4.68 dB, respectively, due to resonance in the ear canal (Shaw, 1974). To determine attenuation, we computed the difference between the peak level measured by the ATF (the left and right ear each contributed separate data points) and the peak level measured by the reference microphone, minus the transfer function for that ear.

### 3.3    Testing Procedure

We positioned the HPD on the ATF and obtained a recording of the shock-tube-generated impulsive noise from the microphones of the ATF and the reference microphone. This process was repeated three times for each HPD with refitting between each measurement. During testing it was noted that different levels of attenuation were being obtained with the EB15 HPDs, and that these differences depended on the person inserting the earplugs. Depending on the depth and manner of insertion, attenuation values varied from about 40–60 dB. Noting this, a fourth set of recordings was conducted for the EB15 HPDs (with the insertion performed by the experimenter getting the better results) and the specifics will be discussed in the results section of this report.

### 3.4    Data Analysis and Results

At least three impulses were presented for each HPD, resulting in six attenuation values for each HPD. The average impulse attenuation values are shown in figure 8. The error bars represent ±1 standard deviation.

3M Confidential

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE



3M00000438
CID File0059

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 8. Average impulse attenuation measured for each HPD under test.

We were obtaining variable results with the EB15 foam ear-tips. Figure 8 shows the average of all values obtained for the EB15. Table 2 shows all eight values obtained by experimenters A and B. When experimenter A inserted the ear-tips, we obtained attenuation values that were approximately 10–20 dB higher. This is consistent with other documented findings that link attenuation to skill when rolling and inserting the foam earplugs. However, these values are probably higher than what would be expected for a human listener due to attenuation limits caused by bone-conducted sound transmission. The ATF does not account for bone-conducted transmission of sound, and as such, inflates estimates of impulsive noise attenuation. The dotted line in figure 8 represents the expected cap on actual protection due to the attenuation limits on bone-conducted sound transmission.

Table 2. Attenuation values (dB) obtained for the EB15 HPD.

| Ear | EB15_1 | EB15_2 | EB15_3 | EB15_4 |
|-----|--------|--------|--------|--------|
| Left | 41 | 55 | 63 | 60 |
| Right | 41 | 43 | 64 | 62 |

Note: Lighter shading indicates insertions performed by experimenter B; darker shading indicates insertions performed by experimenter A.

11

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000439
CID File0060

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

All HPDs provided 30 dB of attenuation, showing that the filters functioned as intended to protect against impulsive noise. Of the HPDs with a level-dependent feature, the Mx provided the most attenuation (34 dB) and the SF provided the least (31 dB). A one-way analysis of variance (ANOVA) was computed for attenuation with HPD as the independent variable. The main effect of HPD condition was significant [$F(3, 22) = 24.0, p < .01$]. Simple contrasts confirmed that all of the HPDs were significantly different from each other ($p < .01$); however, it is unclear that there is practical significance in the differences in auditory sensitivity caused by the three different earplugs with mechanical filters.

## 4.  Localization Testing Methods

The differences in the effect of the HPDs on the spectral envelope of attenuation may affect a user's auditory spatial perception and consequently, his or her acceptance of the HPD. Therefore, the ability to localize sounds was evaluated for each of the HPDs as well as for the bare head.

### 4.1   Participants

Thirteen listeners, aged 18–40 years, participated in this study. Due to equipment issues, data were not recorded for the first two participants; therefore, we report the data for 11 participants (8 male, 3 female). One of the investigators inspected the listeners' ears with an otoscope prior to testing to ensure that their ear canals were unobstructed and that there would be no interference with the use of earplugs. We then screened their hearing by measuring their pure tone thresholds for octave frequencies 250–4000 Hz using calibrated audiometric equipment in a sound-treated room. All 13 participants met the U.S. Army's H1 hearing classification, defined in the Army Hearing Conservation Program (DA PAM 40-501, 1998) as an average threshold level at 500, 1000, and 2000 Hz that does not exceed 25-dB hearing level (HL) with no individual threshold greater than 30-dB HL, and the threshold at 4000 Hz with no individual threshold greater than 45-dB HL. The investigators adhered to the policies for protection of human participants as prescribed in AR 70-25 (1990).

### 4.2   Facilities and Instrumentation

#### 4.2.1 Loudspeaker Array

Target stimuli were presented from a spherical loudspeaker array consisting of 57 Meyer Sound MM-4XP miniature loudspeakers housed in the EAR Sphere Room (Henry et al., 2009). We used only the 16 loudspeakers on the horizontal ring (radius 2.5 m) at 0° elevation to present target sounds, with the loudspeakers located at equal intervals of 22.5° separation (figure 9).

12

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000440
CID File0061

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 9. Testing setup used for the localization test. (No helmet used in this experiment.)

### 4.2.2 Rotating Chair

Each participant sat in a rotating chair at the center of the loudspeaker array on a raised platform that placed their ears at the same elevation as the 0° loudspeaker ring. The chair was free to rotate 360° and was equipped with an optical shaft encoder and a laser tracker on the center of a horizontal bar attached to the chair in front of the participant. Although the bar is free to rotate plus or minus 90° in pitch, it was fixed in place to allow for responses only from the horizontal plane during this study. Participants began each trial facing 0° azimuth and then responded by rotating the chair to point the laser in the direction from which they believed a stimulus came, pushing a button to register their response. A computer recorded the direction of the response based on the outputs of the laser tracker and the optical shaft encoder, providing redundant positional information. During this study, the laser tracker data were used in the analyses.

13

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE
3M00000441
CID File0062

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

### 4.3   Variables

There were two independent variables investigated in the study: head condition, and sound source azimuth. Five head conditions were evaluated: bare head, Mx, CAE, SF, and EB15. The 16 azimuth locations were 0°, ±22.5°, ±45°, ±67.5°, ±90°, ±112.5°, ±135°, ±157.5°, and 180°. A 250-ms burst (with 5-ms ramps) of white noise at 70 dB was presented nine times from each of the loudspeakers for a total of 144 instances per block of trials. The order of presentation location was varied randomly within the block. A single block of trials was presented for each of the head conditions.

The dependent variable of interest was azimuth error, defined, as the difference in degrees between the perceived stimulus source location azimuth (as identified by the listener) and that of the actual stimulus source azimuth.

### 4.4   Procedures

After the initial audiometric screening, all participants were familiarized with the listening task prior to initiation of their first block. Each participant was then fitted properly with the appropriate HPD. Participants listened to blocks of stimuli that consisted of all trials for a particular head configuration condition (bare, Mx, CAE, SF, and EB15). Presentation of each block lasted approximately 25 min. Participants were given breaks between blocks to reduce the effects of fatigue. Additionally, each trial was initiated by the participant, so additional breaks could be taken if needed.

### 4.5   Data Analysis, Results, and Discussion

Our objective was to measure the effects of HPDs on auditory localization ability relative to that with the bare head as a measure of spatial auditory perception. Localization errors made in this study were calculated as both signed (constant) and unsigned azimuth errors. Signed error contains information about both the magnitude and direction of an error. Average signed error can reveal underlying distortions of the auditory space stemming from the acoustics of the equipment or the test space itself. However, when averaged, signed data underestimates overall error magnitude because errors in opposite directions cancel each other out. The precision of judgments must be obtained from the average unsigned error of localization responses and is a measure of random error (Hartmann, 1983). Therefore, both types of errors will be discussed.

Two-factor ANOVAs were conducted for the signed (table 3) and unsigned (table 4) azimuth error with the independent variables being HPD condition and sound source azimuth. Subject ID was included as a covariate in order to account for individual differences. Polar plots show the signed errors as a function of HPD and sound source azimuth (figure 10).

14

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Table 3. Signficant ANOVA results for signed azimuth error ($\alpha < .05$).

| Source of Variance | dF | F | p |
|---|---|---|---|
| Azimuth | 15 | 300.9 | 0.000 |
| Head condition × azimuth | 60 | 12515.2 | 0.000 |
| *Error* | *7580* | *2004.22* | — |

Table 4. Signficant ANOVA results for unsigned azimuth error ($\alpha < .05$).

| Source of Variance | dF | F | p |
|---|---|---|---|
| Head condition | 4 | 60.0 | 0.000 |
| Azimuth | 15 | 61.1 | 0.000 |
| Head condition × azimuth | 60 | 3.7 | 0.000 |
| *Error* | *7580* | *1710.25* | — |

15

3M Confidential

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000443
CID File0064

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 10. Signed and unsigned azimuth error as a function of head condition and azimuth.

In the signed error data, negative errors indicate the participant estimated the sound source to be closer to the front (0°) than the actual target location. Positive errors mean that the estimate was farther to the rear than the actual target location. If localization errors are driven by lack of precision, estimates will fall on either side of the target location and on average cancel out. Using average signed data will obscure any real differences in the magnitude of errors occurring for the

16

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

various HPDs. This is not to suggest that all errors are likely to be cancelled out. Differences due to an increase in front-back confusions will result in an increase in positive errors near 0° and an increase in negative errors near 180°. Even without HPDs, it is normal to observe some differences in error as a function of azimuth, due to front-back confusions.

The data did not indicate a significant difference in signed azimuth error as a function of hearing protection use. There was a main effect for azimuth—$F(15, 7580) = 300.9$, $p < .01$—consistent with the expected changes in error size due to front-back confusions. The different effects of the HPDs are revealed in the interaction between head condition and azimuth—$F(60,7580) = 12,515.2$, $p < .01$—and are observed in the polar plot shown in the upper half of figure 10. Wearing hearing protection increased positive errors in the front near 0°, and increased negative errors in the rear near 180°, consistent with what would occur as a function of increased front-back confusions.

The signed error data allow us to detect any biases that signal problems with the measurement method or acoustics of the facility. The data shown here are symmetric relative to the midline. Although the data indicated a small difference between the left and right hemispheres, the differences are idiosyncratic and not of practical importance.

The bottom half of figure 10 gives the unsigned error data as a function of head condition and azimuth. There were significant main effects of head condition and azimuth [$F(4, 7580) = 60$, $p < .01$; $F(15, 7580) = 61.1$, $p < .01$]. Figure 11 shows the average unsigned error and standard deviation for each of the head conditions. A planned comparison of the average unsigned azimuth error observed for the HPDs and the bare head indicated that the difference (averaging 17°) is significant ($p < .01$). Table 5 lists the $p$ values for all pair-wise comparisons; when significant, this is indicated with an asterisk. Of the HPDs, the unsigned azimuth error was least for the CAE (37°) and greatest for the EB15 (43°). Although there were some statistically significant comparisons, given that the overall range is 6°, it is not clear that they would be of practical significance to a user.

17

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 11. Average unsigned azimuth error as a function of head condition. The error bars represent ±1 standard deviation.

Table 5. Results of special contrasts comparing the unsigned azimuth attenuation of the HPDs. Values shown are *p* values. Asterisks indicate significant contrasts.



| | Mx | CAE | SF |
|---|---|---|---|
| **CAE** | 0.086 | | |
| **SF** | 0.509 | 0.018* | |
| **EB15** | 0.013* | 0.000* | 0.064 |

The interaction between head condition and azimuth was significant [$F(60, 7580) = 3.7, p < .01$]. The plot on the bottom half of figure 10 suggests that this difference is due to an increase in the magnitude of errors near 0° and 180° when wearing hearing protection. This azimuth-dependent pattern of error magnitude is associated with errors that are the result of front-back confusions, otherwise known as reversals.

An analysis to determine whether the results can be explained by errors due to reversals was done by computing whether the reverse of an estimate was closer to the sound source location

18

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

than the estimate. If it was, the trial was coded as a reversal. Figures 12 and 13 show the percentages of trials coded as a reversal for each head condition and as a function of azimuth. The similarity of these graphs to figures 10 and 11 suggest that errors due to reversals drive most of the differences in localization performance. Performance was best for the bare head. Among the earplugs, performance was best with the CAEs and worst with the EB15. There was a significant increase in the tendency to make front-back reversal errors at 180° ($p < .05$) with the SF. However, for the most part, the differences between the earplugs were of no practical significance, suggesting that one might do best to choose based on an individual's preferred fit.



Figure 12. Percent of trials classified as reversals shown as a function of head condition.

19

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000447
CID File0068

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*



Figure 13. Percent of trials classified as reversals shown as a function of head condition and azimuth.

## 5. Summary and Conclusions

Four HPDs (Mx, CAE, SF, and EB15) were evaluated objectively for their attenuation of steady-state and impulsive noise. Their effects on auditory spatial perception were also assessed by measuring listener's ability to localize sounds while wearing the HPDs and comparing it to their performance without a HPD.

Measures of attenuation showed significant differences in the amount of attenuation provided by each of the HPDs. Three of the HPDs, the Mx, CAE, and SF, had a level-dependent filter designed to engage and protect against impulsive noise, but provide minimal attenuation of lower level steady-state noise. The CAE caused the least attenuation (greater than 20 dB) and the Mx had the most (25 dB). The fourth HPD, the EB15, was tested without the level-dependent electronics engaged and had 34 dB of attenuation. Analysis of the spectral envelope of this attenuation at one octave and one-third octave band resolutions suggests that the primary difference between the attenuation of the EB15 and that of the level-dependent HPDs is found in

20

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

the lower frequencies (less than 500 Hz). Among the level-dependent HPDs, the differences are in the higher frequencies, where the effects are most likely to be changes in spatial perception and mild effects on speech perception.

All HPDs provided at least 30 dB of attenuation of impulsive noise. There were significant differences between all of the HPDs; the EB15 had the most attenuation at 53 dB. However, it is unlikely that there is practical significance in the differences of the three level-dependent HPDs, as the range was 30 dB (SF) to 34 dB (Mx).

Measures of auditory localization with the HPDs revealed minor differences between them as compared with the bare head, consistent with their measured effects on attenuation. Specifically, of the HPDs localization was best with the CAE and worst for the EB15. Both the Mx and the SF had more attenuation of frequencies in the range above about 2 kHz than did the CAE and on average unsigned azimuth error was 2°–3° greater than that observed for the CAE. Since the EB15 was tested without its level-dependent features active, it is not surprising that its performance was the poorest. It is more surprising that this difference was quite minimal. Since the target signal was presented at 70 dB, it is likely that it was sufficiently audible to gain localization information. Because the spectral transfer function of the active device is not known, it is not possible to predict the device's active performance.

By coding localization errors to determine which can be explained by front-back reversals, it is possible to argue that reversals were the primary cause of the degradation of localization performance observed for the HPDs as compared with the bare head. It does seem that localization performance decreases as a function of increased attenuation; however, the differences in localization performance among the HPDs were small compared to that with the bare head. It is suggested that users may wish to choose hearing protection based on personal preference and comfort, with the understanding that there may be some tradeoffs in that they may have slightly higher auditory detection thresholds and may find it more difficult to localize sounds.

3M Confidential

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000449
CID File0070

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

## 6. References

ANSI/ASA S1.42-2001. *Design Response of Weighting Networks for Acoutical Measurement*;
American National Standards Institute, 2011.

ANSI/ASA S1.6-1984. *Preferred Frequencies, Frequency Levels, and Band Numbers for
Acoutical Measurements*; American National Standards Institute, 2011.

AR 70-25. *Use of Volunteers as Subjects of Research*; Department of the Army, Washington,
DC, 1990.

Buck, K.; Parmentier, G. *Artificial Heads for High-Level Impulse Sound Measurement;* Report
No. 341/99; French-German Institute of Saint-Louis: St. Louis, France, 1999.

DA PAM 40-501. *Hearing Conservation Program*; Department of the Army, Washington, DC,
1998.

Hartmann, W. M. Localization of Sound in Rooms. *Journal of the Acoustical Society of America*
**1983**, *74*, 1380–1391.

Henry, P. P.; Amrein, B. E.; Ericson, M. A. The Environment for Auditory Research. *Acoustics
Today* **2009**, *5*, 9–16.

Moore, B. C. Absolute Thresholds. In *An Introduction to the Psychology of Hearing*, 6th ed.;
Emerald: Bingley, UK, 2012; pp 57–66.

Shaw, E. A. Transformation of Sound Pressure Level From the Free Field to the Eardrum in the
Horizontal Plane. *Journal of the Acoustical Society of America* **1974**, *56*, 1848–1861.

3M Confidential

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

3M00000450
CID File0071

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

| NO. OF COPIES | ORGANIZATION |
|---|---|
| 1 (PDF) | DEFENSE TECHNICAL INFORMATION CTR DTIC OCA |
| 1 (PDF) | DIRECTOR US ARMY RESEARCH LAB IMAL HRA |
| 1 (PDF) | DIRECTOR US ARMY RESEARCH LAB RDRL CIO LL |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM C   A DAVISON 320 MANSCEN LOOP  STE 115 FORT LEONARD WOOD MO 65473 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM D T DAVIS BLDG 5400  RM C242 REDSTONE ARSENAL AL 35898-7290 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRS EA   DR V J RICE BLDG 4011  RM 217 1750 GREELEY RD FORT SAM HOUSTON TX 78234-5002 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM DG   J RUBINSTEIN BLDG 333 PICATINNY ARSENAL NJ 07806-5000 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED ARMC FIELD ELEMENT RDRL HRM CH   C BURNS THIRD AVE  BLDG 1467B  RM 336 FORT KNOX KY 40121 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED AWC FIELD ELEMENT RDRL HRM DJ   D DURBIN BLDG 4506 (DCD)  RM 107 FORT RUCKER AL 36362-5000 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM CK   J REINHART 10125 KINGMAN RD  BLDG 317 FORT BELVOIR VA 22060-5828 |

| NO. OF COPIES | ORGANIZATION |
|---|---|
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM AY   M BARNES 2520 HEALY AVE STE 1172  BLDG 51005 FORT HUACHUCA AZ 85613-7069 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM AP   D UNGVARSKY POPE HALL  BLDG 470 BCBL 806 HARRISON DR FORT LEAVENWORTH KS 66027-2302 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM AT   J CHEN 12423 RESEARCH PKWY ORLANDO FL 32826-3276 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM AT   C KORTENHAUS 12350 RESEARCH PKWY ORLANDO FL 32826-3276 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM CU B LUTAS-SPENCER 6501 E 11 MILE RD  MS 284 BLDG 200A  2ND FL  RM 2104 WARREN MI 48397-5000 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED FIRES CTR OF EXCELLENCE FIELD ELEMENT RDRL HRM AF   C HERNANDEZ 3040 NW AUSTIN RD RM 221 FORT SILL OK 73503-9043 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM AV   W CULBERTSON 91012 STATION AVE FORT HOOD TX 76544-5073 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED HUMAN RSRCH AND ENGRNG DIRCTRT MCOE FIELD ELEMENT RDRL HRM DW   C CARSTENS 6450 WAY ST BLDG 2839 RM 310 FORT BENNING GA 31905-5400 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED RDRL HRM DE   A MARES 1733 PLEASONTON RD  BOX 3 FORT BLISS TX 79916-6816 |

23

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

| NO. OF COPIES | ORGANIZATION |
|---|---|
| 8 (PDF) | ARMY RSCH LABORATORY – HRED SIMULATION & TRAINING TECHNOLOGY CENTER RDRL HRT   COL M CLARKE RDRL HRT    I MARTINEZ RDRL HRT T   R SOTTILARE RDRL HRT B   N FINKELSTEIN RDRL HRT G   A RODRIGUEZ RDRL HRT I   J HART RDRL HRT M   C METEVIER RDRL HRT S   B PETTIT 12423 RESEARCH PARKWAY ORLANDO FL 32826 |
| 1 (PDF) | ARMY RSCH LABORATORY – HRED (PDF) HQ USASOC RDRL HRM CN  R SPENCER |
| 1 (PDF) | ARMY G1 DAPE MR B KNAPP |
| 4 (PDF) | US ARMY NATICK SOLDIER RSRCH & DEV CTR A CHISHOLM S GERMAIN D LEE  TSPID J P KRUSZEWSKI  TSPID |
| 1 (PDF) | DIRECTOR US ARMY AEROMEDICAL RSRCH LAB RSRCH PSYCHOLOGIST AIRCREW PROTECTION DIV W A AHROON  PH D |
| 1 (PDF) | AIR FORCE RSRCH LAB LEAD  SF VIBROACOUSTICS WPAFB  US R MCKINLEY |
| 1 (PDF) | AIR FORCE RSRCH LAB S AND T INTEGRATOR ATI COMBAT EQUIPMENT AND SUPPORT SYSTEMS PG-16 MARINE CORPS SYS CMND J O DONNELL |

ABERDEEN PROVING GROUND

| NO. OF COPIES | ORGANIZATION |
|---|---|
| 34 (14 PDF 20 HC) | DIR USARL RDRL HR L ALLENDER P FRANASZCZUK C COSENZO |

| NO. OF COPIES | ORGANIZATION |
|---|---|
| | RDRL HRM  P SAVAGE-KNEPSHIELD RDRL HRM AL  C PAULILLO RDRL HRM B  J GRYNOVICKI RDRL HRM C  L GARRETT RDRL HRS  J LOCKETT RDRL HRS B  M LAFIANDRA RDRL HRS C  K MCDOWELL RDRL HRS D  B AMREIN  A SCHARINE (20 HC)  R WEATHERLESS RDRL HRS E  D HEADLEY |

24

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

(EXHIBIT  )

3M00000452
CID File0073

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



"Walter Pawlowski"
<WPawlowski@occupations.org>

06/04/2012 02:55 AM

To "doug_moses@mmm.com" <doug_moses@mmm.com>

cc

bcc

Subject FW: Protest of award to Moldex-Metric for product specified in Solicitation Numbers W91YTV1R0001 (UNCLASSIFIED)

History: This message has been replied to.

Doug,

My bcc to you bounced back.

Walter C. Pawlowski
Walter C. Pawlowski
Vice President Business Development

Occupations, Inc./New Dynamics Corp.
15 Fortune Rd. West
Middletown, NY 10941
Fax: 845-692-2004
Wpawlowski@occupations.org
sth

-----Original Message-----
From: Walter Pawlowski
Sent: Sunday, June 03, 2012 9:15 PM
To: 'Washington, Kiah W MS CIV USA MEDCOM BAMC'; Ron Feravidino
cc: Brazdzicki, Chris P MS CIV USA MEDCOM BAMC'; Ron Feravidino
Wpawlowski@occupations.org; Jdavidson@occupations.org;
likely@mish.org
Subject: Protest of award to Moldex-Metric for product specified in Solicitation Numbers W91YTV1R0001 (UNCLASSIFIED)
Importance: High

Ms. Washington,

We protest the award to Moldex-Metric for the above referenced solicitation (our copy attached) for the following reasons:

1. The substitute product supplied by Moldex-Metric does not meet the item measure called out in the solicitation section under Item No. 0001 as shown: Item No. 0001: 59,150 Sets of Size: Medium 3M Enfore Combat Arms Earplugs-Corded Single-End Version. Part No: 370-1031 4th Generation.

2. To our knowledge, the 3M/New Dynamics Combat Arms Earplug (CAE) is the only non-linear (level dependent) earplug that has been tested with human subjects for its impulse noise protection and sound localization capabilities. The CAE technology was found

to be protective up to 190 dBP in a walk-up study conducted under the direction and funding of the US Army Medical Research and Development Command with the US Air Force tested its tactical hearing protectors including the CAE for human factor performance.

The CAE was the only protector without sound amplification and still scored the highest on sound localization.

1a. Johnston, D., "Nonlinear Earplug Study," Research Project conducted by EG&G Management Systems Inc, under Contract DAMD17-93-C-3101, to the US Army Medical Research and Material Command, June 1995. 2. Brungart, D., Kalb, J., Huang, C., Hudson, T., McKinley R., Brungart, D., Parlai, J., and Hamil, "Widefield Hearing Intelligibility, and Sound Protection (WHISPr): Tactical Headset Evaluation, Jan 2009, Air Force Research Laboratory Wright-Patterson Air Force Base, Dayton, Ohio.

3. The solicitation specifies the 3M CAE Plug P/N 370-1031, and the open position of the CAE P/N 370-1031 NRR is 7 dB for the specifications of this product. The Moldex-Metric plug has an open position NRR of 9 dB. Thus it does not meet the specification.

4. The Army audiology department has supported the purchase of the 3M Enfore CAE since its earliest generation during back in 1999 with the military purchasing over 7,000,000 pair of these ear plugs since 1999. We believe that the Moldex-Metric earplug has not been field proven.

We request that the USA MEDCOM BAMC cancel the award to Moldex-Metric and award the contract to New Dynamics Corp. as the sole supplier of the CAE P/N 370-1031 earplugs which meet the needs of our warfighters.

Please advise at your earliest.

Walter
Walter C. Pawlowski, Vice President
Business Development

Occupations, Inc./New Dynamics Corp.
15 Fortune Rd. West
Middletown, NY 10941
Office 845-692-4454 x108
www.newdynamics@occupations.org

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

EXHIBIT 7
CID_File0074

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3M00001698

3M00001699

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

Confidentiality Note: This message is intended only for the named recipient, and may contain confidential, proprietary or legally privileged information. Unauthorized individuals or entities are not permitted access to this information. Any dissemination, distribution, or copying of this information is strictly prohibited. If you have received this message in error, please advise the sender by reply e-mail, and delete this message and any attachments.

-----Original Message-----
From: Washington, Kiah M Ms CIV USA MEDCOM EAMC [mailto:Kiah.Washington@us.army.mil]
Sent: Thursday, May 31, 2012 7:51 AM
To: Ron Berardino
Cc: Walter Pawlowski
Subject: RE: Inquiring on Solicitation Number W91YTV12R0011 [UNCLASSIFIED]

Classification: UNCLASSIFIED
Caveats: NONE

Hi Mr. Berardino,

The award went to Moldex-Metric, 10111 Jefferson Blvd, Culver City CA 94231 in the amount of $14,751.43.

-----Original Message-----
From: Ron Berardino [mailto:RBerardino@occupations.org]
Sent: Wednesday, May 30, 2012 9:05 AM
To: Washington, Kiah M Ms CIV USA MEDCOM EAMC
Cc: Walter Pawlowski
Subject: RE: Inquiring on Solicitation Number W91YTV12R0011 [UNCLASSIFIED]

Good morning Ms. Washington,

I've been watching Fed Biz Ops for the award of Solicitation W91YTV12R0011. Could you confirm that this is where I would see the results of this award? If not, where else would I find the results of this Solicitation being awarded?

Best Regards, Ron

Ron Berardino
Sales & Business Development
Occupations / New Dynamics Corp.
845-692-4454 x 147 Office
845-679-1063 Cell

Thank You.

Ron Berardino

-----Original Message-----
From: Ron Berardino
Sent: Wednesday, May 09, 2012 1:26 PM
To: Washington, Kiah M Ms CIV USA MEDCOM EAMC
Subject: RE: Inquiring on Solicitation Number W91YTV12R0011 [UNCLASSIFIED]

Classification: UNCLASSIFIED
Caveats: NONE

It's in the award process.

-----Original Message-----
From: Ron Berardino [mailto:RBerardino@occupations.org]
Sent: Wednesday, May 09, 2012 9:22 AM
To: Washington, Kiah M Ms CIV USA MEDCOM EAMC
Cc: Walter Pawlowski
Subject: Inquiring on Solicitation Number W91YTV12R0011

Good morning Ms. Washington,

I assist Mr. Walter Pawlowski, our VP Business Development, who is out of the office for a few days.

I'm inquiring the status of the solicitation for Moncrief Army Community Hospital, Fort Jackson, SC.

We have been supplying Sgt. Harris with 4th generation CAE earplugs through our distributors. We would like sell direct at our lower price to the Military.

We do have price concurrence with DLA Troop Support Philadelphia Medical.

3M Confidential - Attorneys Eyes Only

3M00001700

3M Confidential - Attorneys Eyes Only

3M00001701

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0075

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

I hope you can let me know of the status of this solicitation.

Best regards, Ron

Ron Berardino
Sales & Business Development
Occupations: New Dynamics Corp.
845-692-0414 x 167 Office
845-679-1063        Cell

Description: Occupations Loop 13)  Description: new dynamics
Description: AbilityOne (*)

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

Classification: UNCLASSIFIED
Caveats: NONE

- Aberdeen comments re CAE.pdf    - Combat Arms Earplug testing.pdf

3M Confidential - Attorneys' Eyes Only

3MO0001702

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE


CID File0076




00019-2016-CID133-014635

3-404-0204

# USACHPPM
### Readiness Thru Health

## The Combat Arms Earplug

### Just the Facts...

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

**The Problem.** For the dismounted soldier or marine, conventional hearing protection can interfere with communication requirements when hearing protection is needed the most, i.e., when firing weapons away from fixed firing points with rapid changes in the steady-state noise (over 85 dBA (e.g., in armored vehicles, aircraft or watercraft)), conventional hearing protectors can impede communication ability. They function to reduce noise and auditory cueing to a level where the ear is not "overloaded." In certain situations, however, conventional (linear) hearing protectors interfere with speech communication and the detection steps in feature operation of a rifle bolt, etc.

**The Solution.** The dismounted soldier or marine requires a non-linear hearing protector that mitigates the impulse noise from weapons firing/impulse noise to keep the muzzle, range, but marginally interferes with required verbal communications and detection of combat sounds. One solution has been developed that adapted the acoustic impedance of impulse noise through a small orifice in the insert. German Institute in Saint Louis have dramatically improved this low cost and inexpensive solution to the center (stem) of a one-eared, preformed earplug. This filter is a cylindrical device of a specified length (7.5 mm) with holes on 50 sites in each end." French cryonomic designers proposed a non-linear configuration which adapted the earplug for steady-state noise use while eliminating wind noise over the plug opening.

**Communication and Detection Capabilities.** With high-frequency/impulse noise is significant, reduced, most speech energy is passed. In addition, a detection model developed at the Army Research Lab predicts a normal-hearing soldier (H-1 profile) can detect a truck with a low-frequency noise signature at the same distance (1600 meters) with or without the non-linear plug. That detection capability is comparable to conventional foam plugs. Note that the detection and localization of sounds with a high-frequency emphasis are only slightly better than with conventional hearing protectors.

**Color Coding.** The yellow color of the non-linear earplug points in the requirement to keep the hole clear and free of ear wax, sand etc. The solid (linear) yellow end of the plug is inserted, which allows when the linear olive drab plug is inserted with the non-linear mode engaged. The yellow non-linear end of the plug is inserted, which shows when the linear olive drab plug is inserted, this should assist in the enforcement and monitoring of the correct device to use for steady-state noise.

**Protection Available.** The cushioned holes in the non-linear earplug significantly dampen the more hazardous high-pressure components of the impulse noise signature. Noise reduction at the term, non-linear noise level of weapons fire, hence the term, non-linear i.e., level dependent. The non-linearity begins at about 110 dBP and increases with increasing peak pressure, level. At 190 dBP there is an attenuation of about 25 dB." See attached graph. Testing at a U.S. military facility found that non-linear earplug protective up to 190 dBP."

### Ordering.
A National Stock Number (NSN) 6515-01-466-2710 has been issued for the double-ended earplug. The one size that is available will fit most of the adult population. A single-sided non-linear version will soon be available (NSN 6515-01-512-6072). Absolute smaller ear canals (NSN 6515-01-512-6071). Absolute smaller ear canals (NSN 6515-01-512-6071). Note: the Defense Logistics Agency has added such a substantial handling fee, the most cost effective source currently available is a private distributor, Brock Sales Co., 1155 Providence Rd., Suite C, Brandon, FL 33511, (813) 662-5800. The double-ended plug is available in lots of 50 pairs at approximately: $3.75 a pair from this distributor and the single-sided version is available in lots of 100 pairs at approximately: $2.25 a pair.

### User Tips.
• Consumers should know that the non-linear earplug is not protective in relation to hearing Earplug be properly inserted. This is more difficult with the plug because there aren't readily available landmarks of the plug to the ear to verify proper insertion of the plug during firing. If flexion of proper insertion, that is a good indication of proper insertion. Also, the non-linear plug tends to extend out of the individual wearing the plug will sound more low-toned and slightly muffled to that wearer.

• For exceptionally large ear canals, fold the opening plug back to reinforce proper insertion.

• The carrying device for the triple-flange earplug on the lid of the standard carrying case will accommodate the single-sided plug and assist in proper insertion.

• Keep these earplugs clean with soap and water. Immersion in water will not block the filter holes. Return them dry to the carrying case.

• Restrict the non-linear earplug to impulse noise exposures (weapons fire).

• Weird noise may be an issue with the single-sided version.

### References

"Swan, L. J., "Acoustic Impedance of Small Orifices," Journal of the Acoustical Society of America, 7 (2), 94-101, 1935.

"Dancer, A. and Hamery, P. "Nonlinear Hearing Protection Devices," Proceedings of the 23rd Annual Conference of the National Hearing Conservation Association, Albuquerque, New Mexico, 19-21 Feb 1998.

"Ibid

"Johnson, D. L. "Nonlinear Earplug Study," Research Project Conducted, by EG&G Management Systems, Inc., under Contract DAMD 17-93-C-3161 to the U.S. Army, Medical Research and Material Command, June 1995.

"Testing standards for Noise Reduction Ratings (NRR's) were not designed to evaluate non-linear devices or impulse noise reduction and do not apply.

## DETECTION OF SOUND BY

Open Ear Canal    Combat Arms Earplug    Foam Earplug

insert YELLOW plugs for weapons fire.

insert CARM DRAB plugs for steady state noise.

**COMBAT ARMS EARPLUG**

Hearing Conservation
U.S. Army Center for Health Promotion and Preventive Medicine
5158 Blackhawk Road, Aberdeen Proving Ground, MD 21010-5403
410-436-3797 or DSN 584-3797

**Insertion Loss (dB)** vs **Frequency (Hz)**

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3MX0001703

3MX0001704

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0077

3M Confidential - Attorneys' Eyes Only

3M00001705

3M Confidential - Attorneys' Eyes Only

3M00001706



FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

INL/EXT-07-12320

# Hearing Protection Evaluation for the Combat Arms Earplug at Idaho National Laboratory

James Lovejoy

March 2007

The INL is a U.S. Department of Energy National Laboratory operated by Battelle Energy Alliance

---

INL/EXT-07-12320

## Hearing Protection Evaluation for the Combat Arms Earplug at Idaho National Laboratory

James Lovejoy

March 2007

Idaho National Laboratory
Idaho Falls, Idaho 83415

Prepared for the
U.S. Department of Energy
Office of Nuclear Energy
Under DOE Idaho Operations Office
Contract DE-AC07-05ID14517

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

(EXHIBIT
CID-File0078 )

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

# EXECUTIVE SUMMARY

The Idaho National Laboratory (INL) is managed by Battelle Energy Alliance, LLC (BEA) for the Department of Energy. The INL Protective Security Forces (Pro Force) are involved in training exercises that generate impulse noise by small arms fire. Face-on-force (FOF) training exercises that simulate real-world scenarios require the Pro Force to engage the opposition force (OPFOR) while maintaining situational awareness through verbal communications.

The Combat Arms™ earplug was studied to determine if it provides adequate hearing protection in accordance with the requirements of MIL-STD-1474D. The Combat Arms earplug uses a design that allows continuous noise through a critical orifice while effectively attenuating high-energy impulse noise. The earplug attenuates noise on a non-linear scale, as the sound increases the attenuation increases. The INL studied the effectiveness of the Combat Arms earplug with a Brüel & Kjær (B&K) head and torso simulator used with a selection of small arms to create impulse sound pressures. The Combat Arms earplugs were inserted into the B&K head and torso simulator ears, and small arms were then discharged to generate the impulse noise.

The INL analysis of the data indicates that the Combat Arms earplug does provide adequate protection, in accordance with MIL-STD-1474D, when used to protect against impulse noise generated by small arms fire using blank ammunition. Impulse noise generated by small arms fire ranged from 135-160 dB range unfiltered un-weighted. The Combat Arms earplug attenuated the sound pressure 10-25 dB depending on the impulse noise pressure. This assessment is consistent with the results of previously published studies on the INL intends to use the Combat Arms earplug for FOF training exercises.

---

a. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the U.S. Government, any agency thereof, or any company affiliated with the Idaho National Laboratory.

iii

# CONTENTS

EXECUTIVE SUMMARY .................................................................................... iii

ACRONYMS ..................................................................................................... vii

1. INTRODUCTION ........................................................................................... 1

2. METHODOLOGY ........................................................................................... 1

3. RESULTS ...................................................................................................... 2

4. CONCLUSION .............................................................................................. 11

5. REFERENCES .............................................................................................. 13

## FIGURES

1. An illustration of how the unprotected ear, the Combat Arms earplug, and the foam earplug affect ability to hear ........................................................................ 2

2. The Combat Arms earplug ............................................................................. 3

3. Combat Arms earplug in ear canal ................................................................. 3

4. Performance of hearing protectors in impulse noise, French-German Research Institute study ............................................................................................... 11

5. Non-linear attenuation curve measuring insertion loss versus frequency (U.S. Center for Health Promotion and Preventive Medicine) ............................................. 11

## TABLES

1. Assumed print of an impulse noise generated by a firearm: a very sharp rise followed by a slower drop off .................................................................................... 3

2. MIL-STD-1474D impulse noise exposure daily limits ........................................ 3

3. MIL-STD-1474D impulse noise exposure daily limits ........................................ 4

4. M-16/M-4 outdoor impulse noise print ........................................................... 5

5. M-16/M-4 indoor impulse noise print ............................................................. 6

6. M-16/M-4 peak indoor impulse print (isolated section) ..................................... 7

7. M-2/M-4 outdoor impulse noise print ............................................................. 8

8. M-249 machine gun impulse indoor impulse noise print .................................... 9

9. LAW impulse noise graph plot (isolated section) .............................................. 10

v

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID_File0079

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## ACRONYMS

| | |
|---|---|
| ACGIH | American Conference of Governmental Industrial Hygienists |
| ANSI | American National Standards Institute |
| DOD | Department of Defense |
| FOF | force-on-force |
| INL | Idaho National Laboratory |
| ISO | International Standards Organization |
| LAW | Light Anti Tank Weapon |
| OPFOR | Opposition Forces |
| Pro Force | Protective Security Forces |
| SPO | Pro Force officers |
| TLV | Threshold Limit Values |

3M Confidential - Attorneys' Eyes Only

vii

3MO0001709

3M Confidential - Attorneys' Eyes Only

viii

3MO0001710

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

# Hearing Protection Evaluation for the Combat Arms Earplug at Idaho National Laboratory

## 1.  INTRODUCTION

The INL Protective Security Forces (Pro Force) are involved in training exercises that generate impulse noise (blast overpressure) by small arms fire. Force-on-force (FOF) training exercises that simulate real world scenarios require the Pro Force to engage the opposition force (OPFOR) while maintaining situational awareness (communication). FOF exercises expose Pro Force personnel to impulse noise (levels exceeding MIL-STD-1474D limits). Figure 1) is currently used by the U.S. military to protect soldiers from excessive noise exposure while allowing for adequate verbal communication between first line leaders and soldiers in a combat environment. The INL Safeguards and Security organizations needed the Combat Arms earplug to determine if attenuation levels of the earplug provide necessary protection and yet still allow the wearer to maintain situational awareness. The INL protective security forces activities for INL protective security forces activities.

Previous studies have been conducted on the Combat Arms earplug. These studies were sponsored by the Department of Defense (DOD) (see Section 5 "References") and the French German Research Institute. The INL evaluation of the Combat Arms earplug used similar methodologies for the basis of this study. The INL study was performed in order to provide further evidence of the adequacy of the Combat Arms earplug and its effectiveness relative to conditions at the INL.

Figure 1, referenced in the DOD study, illustrates the benefit of using the Combat Arms earplug during FOF exercises and distinct sounds identified at listed distances. The detection model developed at the DOD Army Research Laboratory predicts a normal-hearing soldier can detect a truck at the same distance (1800 meters) with or without the non-linear earplug. The detection capability is cut in half (490 meters) with conventional foam ear plugs.



DETECTION OF SOUND BY

Figure 1. An illustration of how the unprotected ear, the Combat Arms earplug, and the foam earplug affect its ability to 'hear'.

The data for this study was collected using B&K Pulse Version 11 software with the B&K Pulse sound and vibration hardware and B&K artificial head and torso simulator based on the ability to determine effective impulse noise attenuation of the Combat Arms earplug based on the ability to determine effective impulse noise attenuation of the Combat Arms earplug using objective data by capturing insertion loss of the earplug.

It is recognized that the B&K head and torso simulator, off the shelf, does not meet the criteria for the International Standard Organization (ISO) or the American National Standards Institute (ANSI) standards on low frequency noise measurements. In addition, sound pressure is transferred through bones and flesh in the audio receptors in the ear. The B&K head and torso simulator does not transfer noise the same way the human head transfers noise. ANSI/ISO methods require additional soundproofing and isolating in the B&K head to meet the standards. Because of these differences, the actual transmission of impulse noise can be presumed to be slightly higher than actual impulse noise levels because the B&K head and torso used in this study was not modified to meet the ANSI/ISO standard. This results in a conservative estimate of overall exposure measurement.

The design of the Combat Arms earplug, shown in Figure 2, is described as a non-linear earplug that has a precise orifice in the earplug that allows continuous noise to enter and internal flow the ear canal. Impulse noise is attenuated by the precise dimensions of the orifice in the earplug. Figure 2 demonstrates placement of the yellow insertion end of the earplug into the ear canal. The yellow end contains the orifice providing "deep-through" protection while the green end provides a conventional closed earplug with a constant NRR of 22dB.

## 2.  METHODOLOGY



Figure 2. The Combat Arms earplug.



FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0081

3M Confidential - Attorneys' Eyes Only

3M00001711

3M Confidential - Attorneys' Eyes Only

3M00001712

3M Confidential - Attorneys Eyes Only

*00019-2016-CID133-014635*

The number of allowable unprotected sound pressure impulses is based on MIL-STD-1474D based on sound pressure and impulse duration, as shown in Table 2. Table 2 illustrates the maximum allowable exposures as the impulse noise increases in duration, pressure, or both. MIL-STD-1474D states, "The initial requirement is that impulse noise shall not exceed the limits specified for limit W in order to meet the hearing conservation criterion for unprotected ears. Limits X, Y, or Z for which hearing protection is mandatory, shall be selected only if it can be clearly demonstrated that meeting limit W is beyond the state-of-the-art, the cost of noise abatement or reducing the noise level is so prohibitive, or that system effectiveness will be seriously degraded by reducing the noise level as that specified for limit W. Limits X, Y, or Z shall be selected only with the approval of the procuring activity subject to reduction of the level by the impulse noise levels above limit W (i.e., anything greater than 140 dB) require the use of hearing protectors for any number of exposures per day."





Figure 3. Combat Arms earplug in ear canal.

Impulse noise, generated from small arms fire at the PML, is a short burst of an acoustic energy consisting of either a single impulse or a series of impulses, as shown in Table 1. The pressure time history of a single impulse includes a rapid rise to a peak pressure, followed by a slower decay of the pressure to ambient pressure, occurring in less than 1 second.

Table 1. Acoustical plot of an impulse noise generated by a firearm's very sharp rise followed by a slower drop off.

Impulse noise passes through the orifice of the Combat Arms earplug and creates acoustic friction, which attenuates the loud pressure. This non-protective capability increases with the noise level. The non-linearity attenuation begins at 110 dB and increases to 190 dB with an overall peak reduction of 25 dB. Department of Defense noise limits established in MIL-STD-1474D regulate C-weighted impulse sound pressure above 140 dB, as referenced in the ACGIH TLV booklet. Exposures over 140 dB require the use of hearing protection providing adequate impulse noise attenuation.

Table 2. MIL-STD-1474D impulse noise exposure daily limits.

| Impulse Noise Limit | No. Protection | Either Plug or Muffs | Peak Plug and Muffs |
|---|---|---|---|
| W | 0 | Unlimited Exposure | |
| X | 0 | 2000 | |
| X | 0 | 166 | 40000 |
| Y | 0 | | 2000 |
| Z | 0 | A | 100 |

A viable exposure consists of either (a) a viable number (or one-impulse) systems providing not more than one impulse per second, or (b) a rocket launcher fired from the shoulder; or (c) a similar weapon/repetitive systems remotely producing more than one impulse per second.

$$N_t = 10^x, \text{ where } X = \frac{1}{5}[175 - J + 6.61 \log_{10} \frac{20000}{N_g}]$$

$N_t$ = allowable number of impulses/day (single protection)
$N_g$ = allowable number of attenuated peak level, in dB
$J$ = intensity of peak sound pressure level, in dB
$T$ = increased fluctuation, in milliseconds

3MX0001713

3M Confidential - Attorneys Eyes Only

3MX0001714

CID File0082

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

Table 3. MIL-STD-1474D impulse noise exposure daily limits



Data was collected both outdoors and indoors using an M16 A2, M-4 Carbine, M-240B MG, and a Light Anti Tank Weapon (LAW) simulator. Each weapons system was discharged with the B&K recording the impulse noise. The head and torso were isolated on a tabletop for the weapon and recording measurements. The head and torso were placed in proximity to the right ear. It is important to note that the head would be held at the shoulder of the torso in a check-to-stock weld (cheek position), or a tabletop so the head would be held in proximity to the weapon during discharge. In human subjects, the ear that is held closest to the stock of the weapon during discharge is protected more than the other ear. The B&K head and torso ears were exposed equally to the firearm discharge. The B&K recorded peak impulses unfiltered and un-weighted.

The M-16A2 and M-4 Carbine were discharged in increments of five rounds each, repeated three times for a total of 15 rounds. Two unprotected microphones were used. Two protected microphones were foreted in the mocked ears. The Combat Arms earplug was inserted in each ear. The M-240B was discharged in increments of three, five round bursts, repeated 12 times for a total round count of approximately 40-50 rounds both indoors and outdoors. The LAW simulator was discharged only outdoors and using a total of four rounds. Outdoor tests were performed away from buildings with the B&K head and torso on a standard tabletop. Therefore, reflected from any objects that the ground would have on the impulse noise data. The M-240B was discharged in bursts of five expending a total of 45-50 rounds.

## 3. RESULTS

The impulse noise prints compare the sound pressure versus the duration in milliseconds for each of the microphones. Table 4 is the impulse noise print of the M-16/M-4 rifle. The first five peaks in the graph are single discharges from a weapon discharged for firing blanks only. By porting and plugging the barrel, it eliminated the need for a military blank adapter. Table 5 is the same weapon discharged indoors to allow for the influence of acoustically reflective surfaces in the analysis. Table 6 is a single impulse print of the indoor test. The reflective properties of the building account for the increased sound pressure levels between Table 4 and 5.

Tables 5, and 6 shows four distinct data plots: right and left ears without the Combat Arms earplug and right and left ears with the Combat Arms earplug. The impulses impact prior, on Table 5 represents the unprotected exposure on the M-16/M-4, between 143–146 dB. The Combat Arms earplug attenuated the impulse noise 7-10 dB, resulting in protected exposures between the 140 dB limit. The allowable exposure for single hearing protections at levels above 140 dB is 2000 impulses per day (see Table 2). Table 4 shows the peak impulse noise for the M-16/M-4 discharged outdoors is below the 140 dB limit requiring hearing protection.

The difference between the impulse noise levels versus the Combat Arms earplug is approximately 14 dB or no sound absorbing material. The roll up on door to the bay was closed with no vehicle bay with little highest level in the bay that the weapon is discharged indoors.



Table 4. M-16/M-4 outdoor impulse noise print.

3M Confidential - Attorneys Eyes Only

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0083

3M Confidential - Attorneys' Eyes Only

3M00001717

3M Confidential - Attorneys' Eyes Only

3M00001718

Table 5: M-16/M-4 indoor impulse noise print.



Table 6 is a single M-16/M-4 peak indoor impulse noise print. The impulse noise print shows the attenuation of the Combat Arms earplug. The data demonstrates that the non-linear coupling provides attenuation of impulse noise.

Table 6: M-16/M-4 peak indoor impulse noise print (isolated section).

Table 7 is the impulse noise print recorded outdoors with the B&K head and torso on a tabletop. The impulse noise print recorded indoors. The impulse noise indoors is almost 160 dB. The Combat Arms earplug attenuated the sound pressure to approximately 142 dB in the right protected ear and 132 dB in the left protected left ear. The delta between the two ears represents the distance the sound travels and the curvature of the head. The non-linearity of the earplug attenuation increases as the sound pressure increases.



The M-240B weapon was dropped with the bipod and it bolt-fed. The weapon can be fired from a standing position, however the bipod scenario is that it will be used in a prone position closer to the ground or a barrier which will influence the impulse noise print of the weapon. The M-240B is a loud weapon system with a distinct sound. The weapon sound pressure delta between indoors and outdoors ranges between 10 and 15 dB. This weapon has a high cyclic rate of fire and high sound pressure. The attenuation of the Combat Arms earplug reduces the impulse noise on the protected non-linear scale.

7

8

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

3M00001719

3M Confidential - Attorneys' Eyes Only

3M00001720

Table 7. M-240B outdoor impulse noise print.



Table 8. M-240B machine gun impulse indoor impulse noise print.



Table 9. LAW outdoor impulse noise graph plot (isolated sections).

Table 9 is the impulse noise print for the LAW rocket simulator. The print is very sharp with a quick drop off. The LAW rocket simulator is not a weapon system that is fired indoors during EOF exercises. The impulse noise is attenuated from an unprotected 157.69 to approximately 141 dB protected. The graph represents outdoor measurements for a single ear in order to show the detail of the impulse print.



FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0085



FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

The objective data measured in this study using the B&K head and torso simulator correlates directly with previous studies performed by the French-German Research Institute and U.S. Army Center for Health Promotion and Preventive Medicine using the Combat Arms earplug. Figures 4 and 5 from these studies also illustrate that at respective frequencies and sound pressures, non-linear attenuation is achieved.

Figure 4: Performance of hearing protectors in impulse noise. French-German Research Institute study.



Figure 5: Non-linear attenuation curve measuring insertion loss versus frequency. (U.S. Center for Health Promotion and Preventive Medicine)

## 4. CONCLUSION

The INL study of the Combat Arms earplug concluded that non-linear attenuation of impulse noise levels, using the Combat Arms earplug, provides adequate protection for INL Pro Force officers (SPOs) while allowing necessary verbal communications during POF exercises. Impulse noise is significantly reduced and most speech energy passes through its central orifice to be audible to the eardrum. Results of the INL study were also consistent with previous studies performed by the French-German Research Institute and U.S. Army Center for Health Promotion and Preventive Medicine.

The Combat Arms earplug provides conservative ear protection, from impulse noise generated by small arms fired in training scenarios. The indoor impulse noise generated by firearms using blanks is above 140 dB and requires hearing protection in accordance with MIL-STD-1474D. Foam earplugs or standard earmuffs do not allow the SPO to hear effectively, not only enemy activity, but also the coordinating commands or signals from leadership or fellow SPOs during the POF exercises. Using the Combat Arms earplug on POF exercises provides a balance between realistic training and compliancy protection. The results of this study support multi-purpose and use of Combat Arms earplug during POF exercises performed at the INL.

11

12

3M Confidential - Attorneys' Eyes Only

3M000001721

3M Confidential - Attorneys' Eyes Only

3M000001722

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0086

3M Confidential - Attorneys' Eyes Only

13

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## 5. REFERENCES

1. MIL-STD-1474D, "Department of Defense Design Criteria Standard Noise Limits," U.S. DOD, Washington, DC, February 12, 1997.

2. Buck, K., "Performance of Hearing Protectors in Impulse Noise," French-German Research Institute, June 2000.

3. USACHPPM 51-004-0204, "The Combat Arms Earplug," U.S. Army Center for Health Promotion and Preventive Medicine.

4. American Conference of Governmental Industrial Hygienists, "2004 Threshold Limit Values for Chemical Substances and Physical Agents".

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

From: Doug H. Moses<AV~Avenco/3M/US>
05/12/2010 02:59 PM

To: <doug.ohlin@comcast.net>
cc: Mike Crimson/CA-Canada/3M/US@3M-Corporate, Thomas Garcia/US-Corporate/3M/US@3M Corporate
bcc: Marc A. Santoro/AH-Aearo/3M/US@3M Corporate
Subject: 3M Confidential - Re: Fwd: RE: What Preceded Radar?...Early Hearing Aids !!!! (UNCLASSIFIED)

Doug O
Thanks for the heads up. Please keep as posted.

Mike,
FYI...

Tom,
Just as the Military Audiology community does, 3M has a strong interest in keeping the list of approved military hearing protection devices as short as possible. The 3M Combat Arms Earplug plays a pivotal role in combat and training hearing protection. Any thoughts? See attached PDF for product info.

Doug

Douglas Moses, Marketing Manager
3M Military Markets Center - OH&ES
5457 W. 79th Street
Indianapolis, IN 46268
(317)692-6865 - phone
(317)869-8227 - cell
(866)377-0918 - fax
doug.moses@mmm.com
www.peltormilitary.com

Doug H. Moses - Received

From: <doug.ohlin@comcast.net>
To: Doug
Date: 05/12/2010 09:49 AM
Subject: Fwd: RE: What Preceded Radar?...Early Hearing Aids !!!! (UNCLASSIFIED)

Doug     LTC Grantham called me yesterday...     05/12/2010 09:49:16 AM

LTC Grantham called me yesterday afternoon in a panic. Someone had been sitting on a congressional inquiry for a week and I got dumped on her at the last minute. She had to get an answer in this morning on a question as to why an Army website, Hoogh For Health, advertised the Combat Arms Earplug and how could other manufacturers get their products on this website. It's pretty obvious where this came from - probably Howard Leight or one other of our competitors.

I gave her some history of how we got the plug into the system, why it was so

unique, why the Army limits the list of approved hearing protectors and some key references to justify its use including the Dan Johnson overpressure study and Elliott's study on the nonlinear devices he evaluated.

The Army's problem is that there is no formal system for evaluating new hearing protectors. For years, I functioned as the gatekeeper to keep the list manageable. If a device offered something unique I would run it passed the DOD working group for their recommendation. Otherwise, I did feel any obligation to recommend approval. My rationale for limiting the list of approved protectors was to be able to keep a handle on the training aids needed and to be able to record this type of hearing protectors used for program monitoring purposes.

Hopefully, Marjorie's answer to the congressional will answer the mail, but this is the kind of nonsense I had to constantly deal with in that job. These congressmen are ready to sacrifice a Soldier's hearing to curry favor with a constituent. Note what happened with the Classic foam earplug.

Doug

----- Forwarded message -----
From: Marjorie A LTC MIL USA MEDCOM PHC Grantham
To: doug.ohlin@comcast.net
Sent: Tue, 11 May 2010 21:09:56 +0000 (UTC)
Subject: RE: What Preceded Radar?...Early Hearing Aids !!!! (UNCLASSIFIED)

Classification: UNCLASSIFIED
Caveats: NONE

Doug,

I am answering a congressional inquiry regarding CAEs. Can I call you?

Marjorie

-----Original Message-----
From: doug.ohlin@comcast.net [mailto:doug.ohlin@comcast.net]
Sent: Tuesday, May 11, 2010 5:02 PM
To: Abrams, Harvey, Ateck, Rodney, Bill, Bill P, Blungart, Douglas S CIV USA
Cameron, Cherry, Chuck N. Cleveland, Leanne M CPT MIL USA MEDCOM EACH, Craig D'Agosino, Art, Davis, James E MAJ MIL USA MEDCOM BRACH, Elliot, Fallon, Eric M LTC MIL USA MEDCOM PHC, Gates, Kathy E COL MIL USA MEDCOM WRAMC, Glen, Grantham, Marjorie A LTC MIL USA MEDCOM PHC, Hager, Lee, Hall, John A CIV USAF AFRL/RHCB, Hutchison, Tom I, Ken and Darlene, Marc, Mike P., Paul, CDR, Richard D., Robinette, Martin B MAJ MIL USA MEDCOM ORDANC, Seibert, Stan, TSrGC, Bjorn Valerie S CIV 716, Tuten, Vickie I, COL MIL USA MEDCOM

3M Confidential - Attorneys' Eyes Only          3MO0002006          3M Confidential - Attorneys' Eyes Only          3MO0002007

P1079.89

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

OTSG, Valerie Bjorn
Subject: What Preceded Radar?...Early Hearing Aids !!!!

Some great potential slides

Doug

Interesting history.

Due to the secrecy restrictions on radar, most photos of early WWII British early warning radars show the acoustical devices, usually manned by old men whose hearing is suspect. Just on the basis of age. Except for those with amplifiers, they worked just like the "ear trumpets" carried for comic effect by little old ladies in early black and white movies. And, oddly enough, they work fairly well. Much better than merely cupping a hand around your ear.

What Preceded Radar?

3M Confidential - Attorneys' Eyes
Only

3M00002008

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0089

EXHIBIT

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

# 3 Procedures

## 3.1 Real-ear attenuation at threshold (REAT)

## 3.2 Acoustical test fixture measurements

## 3.3 Product test samples

# 4 Results







Table 1 – Earplugs tested in this study

| Sample | Description of level-dependent element |
|---|---|

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

CID File0090

3M00020052

3M00020053

FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*









## 5  Conclusion

## References

3M00002054

3M00002055

CID File0091

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

# Army Research Laboratory
Aberdeen Proving Ground, MD 21005-5066

ARL-TR-4607                                                    September 2008

# Modeling of Acoustic Pressure Waves in Level-Dependent Earplugs

James DeSpirito
Weapons and Materials Research Directorate, ARL

Mary S. Binseel
Human Research and Engineering Directorate, ARL

Approved for public release; distribution is unlimited.

3M00002113

---

## REPORT DOCUMENTATION PAGE

Form Approved
OMB No. 0704-0188

| | | | | | |
|---|---|---|---|---|---|
| **1. REPORT DATE (DD-MM-YYYY)** September 2008 | **2. REPORT TYPE** Final | | | **3. DATES COVERED (From - To)** October 2006 – December 2007 | |
| **4. TITLE AND SUBTITLE** Modeling of Acoustic Pressure Waves in Level-Dependent Earplugs | | | | **5a. CONTRACT NUMBER** | |
| | | | | **5b. GRANT NUMBER** | |
| | | | | **5c. PROGRAM ELEMENT NUMBER** | |
| **6. AUTHOR(S)** James DeSpirito and Mary Binseel | | | | **5d. PROJECT NUMBER** 62218AH80 | |
| | | | | **5e. TASK NUMBER** | |
| | | | | **5f. WORK UNIT NUMBER** | |
| **7. PERFORMING ORGANIZATION NAME(S) AND ADDRESS(ES)** U.S. Army Research Laboratory ATTN: AMSRD-ARL-WM-BC Aberdeen Proving Ground, MD 21005-5066 | | | | **8. PERFORMING ORGANIZATION REPORT NUMBER** ARL-TR-4607 | |
| **9. SPONSORING/MONITORING AGENCY NAME(S) AND ADDRESS(ES)** | | | | **10. SPONSOR/MONITOR'S ACRONYM(S)** | |
| | | | | **11. SPONSOR/MONITOR'S REPORT NUMBER(S)** | |

**12. DISTRIBUTION/AVAILABILITY STATEMENT**
Approved for public release; distribution unlimited.

**13. SUPPLEMENTARY NOTES**

**14. ABSTRACT**
The report describes both experimental and computational fluid dynamics, real-ear attenuation at threshold U.S. Army Research Laboratory (level-dependent hearing protection device, or earplug). The Army's Combat Arms Earplug (CAE) was the device evaluated. Experimental real-ear attenuation at threshold measurements compared very well with design specifications for the CAE. Experimental continuous wave measurements showed higher than desired attenuation in the 1- to 4-kHz range. Experimental impulse tests provided dynamic response data under field-type conditions and were used to validate the CFD predictions. CFD predictions of the continuous wave input underpredicted the attenuation at higher frequencies. Predicted values of impulse noise attenuation were good, to within 15% of the experimental values.

**15. SUBJECT TERMS**
acoustics, level-dependent earplugs, muffler, computational fluid dynamics, real-ear attenuation at threshold

| 16. SECURITY CLASSIFICATION OF: | | | 17. LIMITATION OF ABSTRACT | 18. NUMBER OF PAGES | 19a. NAME OF RESPONSIBLE PERSON James DeSpirito |
|---|---|---|---|---|---|
| a. REPORT UNCLASSIFIED | b. ABSTRACT UNCLASSIFIED | c. THIS PAGE UNCLASSIFIED | UL | 32 | **19b. TELEPHONE NUMBER (Include area code)** (410) 306-0778 |

Standard Form 298 (Rev. 8/98)
Prescribed by ANSI Std. Z39.18

ii

3M00002114

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0092

FOR O... IAL USE ONLY – LAW ENFORCEMENT SENSIT...

00019-2016-CID133-014635

## Contents

List of Figures .......................................................................................................... iv

List of Tables ........................................................................................................... iv

Acknowledgments ...................................................................................................... v

1.  Introduction ......................................................................................................... 1

2.  Approach ............................................................................................................. 2

   2.1  Experimental .................................................................................................. 2

      2.1.1  Impulse Measurements ............................................................................ 3

      2.1.2  Continuous Noise Attenuation .................................................................. 3

      2.1.3  Real-Ear Attenuation Measurements ......................................................... 4

   2.2  CFD Modeling ............................................................................................... 6

3.  Results ................................................................................................................. 9

   3.1  Preliminary Studies ......................................................................................... 9

      3.1.1  Open Duct ............................................................................................. 9

      3.1.2  Expansion Chamber (Low-Pass Filter) ..................................................... 11

      3.1.3  Duct With Side Branch (High-Pass Filter) ................................................ 13

      3.1.4  Helmholtz Resonator (Band-Pass Filter) .................................................. 13

      3.1.5  Expansion Chamber Muffler .................................................................. 16

   3.2  CAE Investigation .......................................................................................... 17

4.  Conclusions ........................................................................................................ 19

5.  References ........................................................................................................... 21

Distribution List ........................................................................................................ 22

iii

3M00202115

## List of Figures

Figure 1   Combat Arms Earplug ............................................................................... 1

Figure 2   Typical impulse measurement setup (a) and ISL impulse markin (b) .................. 3

Figure 3   Knowles Electronics Manikin for Acoustic Research (KEMAR) ........................ 5

Figure 4   Full and cutaway solid model views of CAE acoustic element .......................... 5

Figure 5   Computational mesh of CAE acoustic element and extension chamber ................ 7

Figure 6   Locations of pressure history probes ............................................................ 8

Figure 7   Acoustic elements: (a) straight duct (b) expansion chamber (low-pass filter),
      (c) duct with side branch (high-pass filter) and Helmholtz resonator (band-pass filter)
      designed for (d) 166 Hz and (e) 333 Hz ......................................................... 10

Figure 8   Input and output signals in straight duct simulation: (a) input SPL, (b) output SPL,
      (c) transmission coefficient, and (d) transmission loss .......................................... 11

Figure 9   Transmission loss calculated in expansion chamber (low-pass filter) simulation ... 13

Figure 10  Transmission loss calculated in duct with side branch (high-pass filter)
      simulation ................................................................................................. 14

Figure 11  Transmission loss calculated in duct with Helmholtz resonator (band-pass filter)
      simulation: (a) design frequency $f_d$ and (b) design frequency $f_a$ ........................ 15

Figure 12  Comparison of predicted transmission loss with 1-D theory .............................. 16

Figure 13  Sound pressure level, 65-dB continuous noise input .......................................... 17

Figure 14  Transmission loss (continuous noise case) and insertion loss (REAT) values .......... 18

Figure 15  Impulse input peak pressure reduction ......................................................... 18

Figure 16  Comparison of experimental and predicted pressure response, M4 rifle at 1 m ....... 19

## List of Tables

Table 1   Impulse noise measurement results (in peak decibel, dB P, $p_{ref} = 20 \mu Pa$) .......... 4

Table 2   Continuous noise measurement results .......................................................... 4

Table 3   Real-ear attenuation at threshold values for the CAE nonlinear side ...................... 6

iv

3M00202116

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID_File0093

FOR O     IAL USE ONLY – LAW ENFORCEMENT SENSIT

00019-2016-CID133-014635

## Acknowledgments

The authors thank Dr. Joel Kalb for his assistance in obtaining impulse noise measurements for the Combat Arms Earplug. This work was supported in part by a grant of high-performance computing time from the U.S. Department of Defense High Performance Computing Modernization program at the U.S. Army Research Laboratory Major Shared Resource Center, Aberdeen Proving Ground, MD.

v

vi

3M00002117

INTENTIONALLY LEFT BLANK.

3M00002118

CID File0094

P1079.95

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

# 1. Introduction

Soldiers rely heavily on their hearing in combat environments to maintain their situational awareness. In many situations, hearing a sound is their first cue to events of importance to their survival and mission accomplishment. They also must communicate, both over radios and face-to-face. Finally, their hearing must be protected so that they may continue these tasks and not become a combat casualty. A single impulsive sound (such as a weapon firing) may be sufficient to cause temporary or permanent hearing loss. Listening, communicating, and protecting hearing are often conflicting requirements, as many hearing protection devices (HPDs) do a good job preserving hearing but at the cost of blocking sounds the Soldier needs to hear. A potential solution for protecting hearing in military environments is the use of level-dependent (also called nonlinear) HPDs. These HPDs allow low, nondamaging level sounds to pass through relatively unimpeded (allowing environmental monitoring and communication), yet at high, impulsive noise levels additional attenuation is activated due to the design of various elements in the earplug, thus protecting hearing. The Army's Combat Arms Earplug (CAE) (figure 1) is one example of such a device.



Figure 1. Combat Arms Earplug.

The CAE is a double-sided earplug. The dark green side is a standard triple-flange earplug with a solid stem. This side would be inserted in high continuous noise environments, such as when riding in an armored vehicle. The yellow side is nonlinear and is used where the continuous noise levels are not damaging, but impulse sounds may occur, such as in dismounted operations (infantry) that attenuate impulsive sounds. The entrance to the pathway is shown circled in figure 1.

The CAE functions well, however, feedback from Operation Iraqi Freedom indicates that Soldiers and Marines would like less attenuation of lower-amplitude sounds. Their perception is that too much attenuation occurs at these low levels, interfering with their ability to hear. Hence,

there is a need for an earplug that has very low passive attenuation in the auditory pass band yet provides protection from sudden high-amplitude acoustic waves.

Modifying the CAE's or similar earplug's parameters (orifice size and number, for example) could yield an earplug with the desired frequency and amplitude response characteristics. In order to search efficiently for an optimal solution and have a good theoretical basis for manipulating the parameters, the passage of acoustic waves should be modeled through elements similar to those found in these devices. By this modeling, understanding may be gained about how various elements (chambers, orifices, filters, baffles, and diaphragms, for example) modulate the energy that is passed through to the wearer and explore earplugs that would address Soldiers' concerns without degrading the hearing protection provided by the earplugs.

The objective of this effort was to develop a validated computational fluid dynamic (CFD) model of acoustic pressure wave travel through level-dependent hearing protectors. Such a model could eventually be used to assess current level-dependent earplug elements and to predict the sound attenuation characteristics of conceptual elements. Although there is some work in the literature on using CFD to model larger acoustic elements, such as mufflers, modeling of such small acoustic elements is a unique effort.

# 2. Approach

The implementation goal of this research is to develop level-dependent hearing protection with properties customized for particular applications. By developing a robust CFD model of earplug elements, changes can be virtually evaluated for their earplug performance impacts. This will enable research to modifier elements by eliminating the need for physical prototypes of promising configurations. The approach included developing the CFD model and validating it initially for the CAE by comparing predictions from the model to measured earplug characteristics. This work was a joint effort between the U.S. Army Research Laboratory (ARL) Weapons and Materials Research Directorate (WMRD) and Human Research and Engineering Directorate (HRED). HRED was responsible for providing experimental characterization of the attenuation of the CAE under both continuous and impulse noise conditions. WMRD was responsible for numerically modeling the CAE internal geometry using their CFD capabilities and resources, including the ARL Major Shared Resource Center's (MSRC's) high-performance computing facilities. The following approach description is divided into experimental and computational sections.

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0095

3M000002119

3M000002120

FOR O    IAL USE ONLY – LAW ENFORCEMENT SENSIT

00019-2016-CID133-014635

## 2.1 Experimental

The following experimental measurements were made to provide physical data for validation of CAE CFD modeling. These measurements included attenuation of impulse noise, attenuation of continuous noise, and real-ear attenuation at threshold (REAT).

### 2.1.1 Impulse Measurements

The attenuation of the pressure wave that travels though the CAE (nonlinear side) during exposure to an impulse noise was measured at HRED's M Range (an instrumented small-arms range). The impulse events were created using an M4 rifle, a shortened variant of the M16 A2. Figure 2 shows a typical test setup.



Figure 2. Typical impulse measurement setup (a) and ISL impulse manikin (b).

The earplugs were inserted into a special impulse manikin built by the French-German Research Institute of Saint-Louis (ISL). The ISL manikin (or "head") is specifically built to withstand high-impulse sound environments without excitation of the microphones from pathways other than that of the ear and ear canal. The ISL head consists of a headform with artificial ears and is instrumented with two Bruel & Kjaer (B&K) model 4136 microphones placed at the site where the tympanic membranes (eardrums) would be located in a human. The microphones were polarized with 28 V.

A third B&K 4136 microphone with a polarization of 28 V was used to measure the free-field sound. This microphone was placed close to and in the plane of the manikin head at a grazing angle to the sound source used.

Various peak pressure levels at the head were created by firing the M4 rifle at varying distances from the manikin. Distances of 0.25, 0.5, 1, 2, 4, 8, 16, 32, and 64 m were used, resulting in free-field peak pressure levels at the manikin location that varied from a low of 125-dB (20-μPa reference pressure) peak at 64 m to a high of about 187-dB peak at 0.25 m. The output of the

microphones was processed through a Tucker-Davis Technologies TDT2 A/2 array processor and stored on a portable computer. At the two farthest distances (32 and 64 m), the shorter stood on a stepladder in order to prevent multipath pressure waves from overlapping the primary impulse signal. Results of the impulse noise measurements are listed in table 1. The difference between the ISL ear peak pressure with the CAE inserted and the corresponding free-field peak pressure is the peak pressure reduction. Free-field measurements of the peak pressure and the measurements at the manikin microphone are shown.

Table 1. Impulse noise measurement results (in peak decibel, dB P, $P_{ref} = 20 \mu Pa$).

| Distance (m) | Free Field (dB P) | CAE (dB P) | Peak Pressure Reduction (dB) |
|---|---|---|---|
| 0.25 | 186.91 | 154.48 | 32.43 |
| 0.5 | 180.61 | 153.13 | 27.48 |
| 1 | 172.06 | 145.29 | 26.76 |
| 2 | 164.05 | 141.30 | 22.75 |
| 4 | 155.66 | 136.69 | 18.97 |
| 8 | 148.45 | 133.51 | 14.94 |
| 16 | 139.76 | 125.52 | 14.24 |
| 32 | 134.84 | 123.76 | 11.08 |
| 64 | 125.48 | 113.54 | 11.94 |

### 2.1.2 Continuous Noise Attenuation

CAE attenuation measurements were taken in the REAT chamber in the HRED Environmental Laboratory (Room 21, Bldg. 520, Aberdeen Proving Ground). The earplugs were inserted in a Knowles Electronics Manikin for Acoustic Research (KEMAR), shown in figure 3.[1] KEMAR, like the ISL head, is instrumented with microphones placed at the location of a person's eardrums. Berger (1) includes a discussion of three types of test fixtures and the various methods for measuring hearing protector attenuation. Although KEMAR can be too acoustically leaky for these types of measurements, for earplugs with an intentional acoustic pathway, such as the CAE, KEMAR is an acceptable test fixture (2).

Pink noise (noise with equal energy in all octave bands) was used as an input signal for the continuous attenuation measurements. The pink noise was presented in a reverberant room through a trio of Electro-Voice S/500+ loudspeakers amplified by two Crown Macro-Tech 602 amplifiers. The loudspeakers were positioned such that a diffuse sound field was generated within a sphere of ~1 m at the center of the room, where the KEMAR was positioned. The sound level was measured in A-weighted decibels (dB A) using a CEL. Instruments model

[1] The ISL head was not appropriate for continuous noise measurements because its microphones are designed for high-level sounds and do not function at the lower levels used. So, the continuous noise measurements. Conversely, KEMAR cannot be used for impulse measurements because its microphones are unusable for the very high-impulse sound levels.

3

4

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0096

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635




Figure 3. Knowles Electronics Manikin for Acoustic Research (KEMAR).

573. C1 sound level meter. Sound pressure levels (SPLs) of 45, 65, 85, and 100 dB A ($P_{ref}$ = 20 μPa) were used. Recordings were then made through the KEMAR with and without the CAE inserted. Unoccluded (no earplug) measurements were taken once. Three measurements were taken with CAE inserted into the KEMAR ear canals with removal and reinsertion of the earplugs between measurements. Measurements were made with linear weighting. Results of the continuous noise measurements for the three highest SPLs are listed in table 2.

## 2.1.3 Real-Ear Attenuation Measurements

REAT is a method for obtaining attenuation measurements of HPDs using human participants.

The methodology is described in an American National Standards Institute (ANSI) standard (3).

The measurements were performed under protocol ARL 20094-07026, and the investigators have adhered to the policies for protection of human subjects as prescribed in AR 70-25. The REAT methodology is to obtain two sets of auditory threshold measurements using one-third octave narrow band noise at seven center frequencies (125, 250, 500, 1000, 2000, 4000, and 8000 Hz). One set of thresholds is obtained with the hearing protector in place, and the other is obtained with it removed. The difference in the two sets of thresholds is the attenuation of the hearing protector. Each paired set of measurements (one without and one with the earplug in place) constitutes one trial. Each of the 10 participants performed two trials. The results of the trials are used as described in ANSI S12.6-1997 (3) to calculate the attenuation of the earplugs at the seven center frequencies.

The REAT measurements were performed in the same reverberant room and used the same amplifiers and loudspeakers to deliver the stimuli as in the continuous noise measurements. The REAT signals were generated by an Interacoustics AC40 clinical audiometer. Results of the REAT measurements are listed in table 3.

## 2.2 CFD Modeling

As stated previously, the CAE (figure 1) is a dual-purpose device. When the green side is in the ear, the CAE operates like a standard HPD to be used for exposure to steady, high-level noise (aircraft, armored vehicles, etc.). When the yellow side is in the ear, the CAE operates as a level-dependent device, which allows "hear-through" protection at ambient noise levels while attenuating impulse noise (e.g., gunshots). The active feature of the CAE is the acoustic element (the white plastic part in figure 1, which is shown as a solid model in figure 4).

Table 2. Continuous noise measurement results.

| Hz | 100 dB CAE | 100 dB Unocc | 100 dB Atten. | 85 dB CAE | 85 dB Unocc | 85 dB Atten. | 65 dB CAE | 65 dB Unocc | 65 dB Atten. |
|---|---|---|---|---|---|---|---|---|---|
| 63 | 69.7 | 70.2 | 0.5 | 55.1 | 56.6 | 1.5 | 32.9 | 34.6 | 1.7 |
| 80 | 65.6 | 66.8 | 1.2 | 48.7 | 51.8 | 3.1 | 20.4 | 29.7 | 9.3 |
| 100 | 70.8 | 70.8 | 0.0 | 61.7 | 63.7 | 2.0 | 21.9 | 24.4 | 2.5 |
| 125 | 79.9 | 80.8 | 0.9 | 64.6 | 67.1 | 2.4 | 33.9 | 34.6 | 0.7 |
| 160 | 85.6 | 86.5 | 0.9 | 71.8 | 73.4 | 1.6 | 41.0 | 44.0 | 3.0 |
| 200 | 84.3 | 84.9 | 0.6 | 70.8 | 70.9 | 0.1 | 45.2 | 45.3 | 0.1 |
| 250 | 87.0 | 89.5 | 2.5 | 75.7 | 77.0 | 1.3 | 49.6 | 53.1 | 3.5 |
| 315 | 84.4 | 88.1 | 4.5 | 70.9 | 76.6 | 5.7 | 45.7 | 53.9 | 8.2 |
| 400 | 84.6 | 91.8 | 7.2 | 71.6 | 79.6 | 6.2 | 54.9 | 60.7 | 8.0 |
| 500 | 81.7 | 91.7 | 10.0 | 70.6 | 80.2 | 9.6 | 53.5 | 62.0 | 8.5 |
| 630 | 78.5 | 92.9 | 14.4 | 66.9 | 81.1 | 14.2 | 48.8 | 62.0 | 13.2 |
| 800 | 72.6 | 90.0 | 17.4 | 61.3 | 78.2 | 16.9 | 42.7 | 58.9 | 16.2 |
| 1000 | 65.2 | 85.8 | 20.6 | 54.9 | 74.6 | 19.9 | 34.5 | 54.5 | 19.7 |
| 1250 | 63.1 | 86.4 | 23.3 | 51.2 | 74.6 | 23.4 | 33.1 | 58.1 | 19.2 |
| 1600 | 63.2 | 90.8 | 27.6 | 54.4 | 79.1 | 24.7 | 35.4 | 59.7 | 24.3 |
| 3150 | 63.9 | 96.5 | 32.6 | 52.8 | 84.5 | 31.7 | 32.5 | 44.8 | 12.1 |
| 2500 | 62.6 | 94.3 | 31.7 | 51.2 | 84.2 | 33.0 | 45.9 | 60.0 | 14.1 |
| 3150 | 62.9 | 92.1 | 29.2 | 53.5 | 80.2 | 28.7 | 51.9 | 66.0 | 22.6 |
| 4000 | 64.8 | 87.7 | 22.9 | 52.8 | 79.8 | 25.0 | 43.7 | 56.1 | 27.0 |
| 5000 | 71.3 | 89.6 | 18.3 | 66.6 | 77.1 | 16.8 | 38.0 | 57.8 | 19.8 |
| 6300 | 79.7 | 94.5 | 14.8 | 67.7 | 82.2 | 14.5 | 44.7 | 62.2 | 15.5 |
| 8000 | 78.3 | 94.5 | 16.1 | 66.1 | 82.2 | 16.1 | 50.0 | 62.4 | 12.4 |

Table 3. Real-ear attenuation (threshold values for the CAE earplug side).

| Attenuation (dB) $P_{ref}$ = 20 μPa | Frequency (Hz) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 125 | 250 | 500 | 1000 | 2000 | 4000 | 8000 |
| Mean | | | | | | | |
| Std. dev. | 3.07 | 3.54 | 3.55 | 2.40 | 7.34 | 5.36 | 4.69 | 3.76 |

3M00002123

3M00002124

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0097

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

The green side contains the solid section of the acoustic element, so it acts as a standard HPD when inserted. The yellow flanged component contains a passage that extends from the acoustic element so that sound is transmitted from outside the CAE. However, an acoustic filter (the blue and pink parts in figure 4) attenuates the impulse noise signals.

The internal passageway, including the acoustic filter, was modeled using a three-dimensional, unstructured mesh of both hexahedral and tetrahedral cells. It was found that an "extension" chamber past the exit of the filter was needed to obtain downstream pressure levels. The extension chamber was 8 mm long, about one-half the length of the passage in the yellow flange. The size of the computational mesh (figure 5) was about 2.5 million cells and took advantage of half-plane symmetry. The mesh size was driven by the need for near-uniform cell sizes and to resolve the very small orifices of the acoustic filter (about 0.13 mm). A mesh independence investigation using both coarser and finer meshes confirmed that this mesh was appropriate.




Figure 4. Full and cutaway solid model views of CAE acoustic element.



Figure 5. Computational mesh of CAE acoustic element and extension chamber.

7

Similarly, the size of computational time step was driven by the need to resolve travel through the small cavities of the CAE. A time step of $5.0 \times 10^{-8}$ s was used in all calculations except the two shortest distance impulse simulations, which required a time step of $2.5 \times 10^{-8}$ s to resolve the sharp rise to the high-peak input impulse pressure at those distances. The former time step corresponds to a Nyquist frequency of 1 MHz, which is much higher than is required to resolve the 20-kHz maximum frequency of interest in auditory acoustics.(4)

The commercial CFD code FLUENT (5) was used in this study. FLUENT is a general-purpose CFD package that supports flows that range from incompressible through hypersonic, single- and multiphase flows, and most state-of-the-art turbulence modeling capabilities for both Reynolds-averaged Navier-Stokes (RANS) and hybrid RANS and Large-Eddy Simulation methodologies. In these simulations, the pressure-based solver was used with its noniterative transient analysis (NITA), a second-order, implicit approach that eliminates the need for subiterations at each time step. The PISO (pressure-implicit splitting of operators) scheme was used for the pressure-velocity coupling and spatial discretization was second order for the pressure equation and third-order MUSCL (monotone upstream-centered schemes for conservation laws) for the density, momentum, and energy equations. All simulations were run with the laminar flow option.

Some computations were performed on local Dell Linux workstations, each with two dual-core 2.66-GHz Intel Xeon processors. The larger-scale simulations were run on the ARL MSRC Linux Network machine that has 2048, 3.6-GHz Intel Xeon EM64T processors. The largest simulations used 32 machine processors.

The pressure history was recorded at the 10 locations shown in figure 6. The pressure input was recorded at P1. The exit of the CAE acoustic filter is at P4. Locations P5–P9 are on the chamber wall at 1, 2, 4, 6, and 8 mm from the filter exit. The outlet of the computational domain was at P10. Data from locations P5–P9 were used for the impulse simulations while data from location P6 were used for the continuous noise simulations.

Figure 6. Locations of pressure history points.

8

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0098

P1079.99

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSIT

00019-2016-CID133-014635

The input signal was applied uniformly across the inlet boundary. The continuous noise input was simulated using numerically generated white noise at nominal SPLs of 45, 65, 85, and 100 dB. For the impulse simulations, the actual free-field pressure from the experiment was input at the inlet boundary. Both of these boundary conditions were applied using user-defined functions (UDFs), which are user-written C-code that allows direct access to the FLUENT solver.

## 3. Results

### 3.1 Preliminary Studies

Several basic validation cases were first performed to demonstrate that RANS simulations are adequate to predict the response of basic acoustic elements. Acoustic simulations were performed in a straight duct, an expansion chamber (low-pass filter), a vented duct (high-pass filter), and a duct with a Helmholtz cavity (band-pass filter). The geometry and setup of these simulations were based on an acoustic filter description by Professor D. A. Russell from Kettering University (6). Figure 7 shows the cases investigated in this preliminary study. The straight duct and expansion chamber were modeled using axisymmetry. Three-dimensional meshes were required for the side branch and Helmholtz resonator cases, but center-plane symmetry was used to reduce the mesh size by one-half.

The procedure for the simulation of each duct case was the same. The pressure-based NITA solver was used to perform a transient computation (2.5 × 10⁻⁴ time step) to calculate the pressure response at the output of the duct due to a given input pressure. The input pressure consisted of a white Gaussian noise signal, generated using the following equation (4):

$$P = (-2 \ln R_1)^{1/2} \cos(2\pi R_2),$$   (1)

where $P$ is the pressure and $R_1$ and $R_2$ are random numbers. $P$ will be normally distributed with a mean of zero and a standard deviation of one. $P$ can be given an arbitrary mean and standard deviation by taking the number generated by equation 1, multiplying it by the desired standard deviation, and adding the desired mean. Equation 1 was implemented in a UDF in FLUENT that applied the correct pressure at the input boundary at each time step. The outflow boundary was modeled with a pressure output boundary condition with a static pressure and temperature of 101 kPa and 300° K, respectively. The wall boundary was modeled via a no-slip condition and laminar flow was assumed. The axial and radial mesh spacing was 0.25 and 0.2 cm, respectively.

9

10



Figure 7. Acoustic elements: (a) straight duct, (b) expansion Chamber (low-pass filter), (c) duct with side branch (high-pass filter) and (d) Helmholtz resonator (band-pass filter) for (d) 444 Hz and (e) 353 Hz.

3M000021127

3M000021128

P1079.100

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

### 3.1.1 Open Ducts

Each duct in these preliminary studies has a length, $L$, of 101 cm and a diameter of 3.9 cm. The resonant frequencies for an unflanged, open duct can be approximated by [6]

$$f_n = \frac{nc}{2(L + 0.61a)} \quad (2)$$

where $n = 1, 2, 3, \ldots$, $a$ is the duct radius, $c$ is speed of sound, and the length of the duct includes an "end correction," $L_{eff} = (L + 0.61a)$. The fundamental and first harmonic frequencies for this duct are $f_1 = 170$ and $f_2 = 340$ Hz.

The input signal at the left end was generated by equation 1 using a standard deviation of 20, resulting in an SPL of about 90 dB (figure 8a). The output signal is shown in figure 8b: $c$ in the form of SPL, the transmission coefficient (TC), and the transmission loss (TL), where

$$TC = 20 \log_{10} \left( \frac{p_{out}}{p_{in}} \right) \quad (3)$$

and

$$TL = 20 \log_{10} \left( \frac{p_{in}}{p_{out}} \right) \quad (4)$$

Figure 8 shows that the first two frequencies were captured in the simulation, with the third nearly visible. The calculated fundamental frequency was 168 Hz, very close to that from equation 2. The second frequency was 316 Hz, 3x 340 Hz from equation 2. The CFD predicts the resonant frequencies of the open duct reasonably well, to within 1% and 7% for the first and second modes, respectively.

### 3.1.2 Expansion Chamber (Low-Pass Filter)

The diameter of the expansion chamber, figure 7b, is twice that of the duct, and the length is 15 cm. Figure 9 shows the calculated transmission loss (equation 4) for the expansion chamber compared to the unfiltered duct response. The calculated fundamental frequency for the expansion chamber is 131 Hz, and the second frequency is calculated as 344 Hz. Since it acts as a low-pass filter, the response of the expansion chamber is observed to be attenuated (higher transmission loss) at frequencies above the fundamental.

11

12



Figure 8. Input and output signals in straight duct simulation. (a) input SPL, (b) output SPL, (c) transmission coefficient, and (d) transmission loss.

(a)

(b)

(c)

(d)

3M000021129

3M000021130

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0100

FOR O     IAL USE ONLY – LAW ENFORCEMENT SENSI

### 3.1.3 Duct With Side Branch (High-Pass Filter)

The diameter and length of the side branch are each 3.9 cm. Figure 10 shows the calculated transmission loss for the duct with a side branch compared to the unfiltered duct response. Since the side branch acts as a high-pass filter, the calculated fundamental frequency is now 283 Hz, with the fundamental frequency of the unfiltered duct completely attenuated. The response at the higher frequencies (>500 Hz) is the same as the unfiltered duct.

### 3.1.4 Helmholtz Resonator (Band-Pass Filter)

A Helmholtz resonator acts much like a simple mass-spring system, having both inertia and compliance. The cavity resonates at a frequency

$$\omega_n = \sqrt{\frac{S_n}{l_{en} \cdot V}}$$ (5)

where $S_n$ is the neck area, $l_{en} = l + 1.7r$ is an effective neck length, and $V$ is the cavity volume. In the process of resonating, the cavity will absorb energy at the design frequency. All the absorbed energy is returned to the pipe later in the cycle, but due to phase relationships, it is returned toward the source, not toward the outlet. The resonator acts as a filter that will "pass" all the frequencies outside the design bandwidth. It is also (perhaps more aptly) called a "band-stop" filter because it will stop all the frequencies inside the design bandwidth.



Figure 9: Transmission loss calculated in expansion chamber (low-pass filter) simulation.

Two design frequencies were chosen for this preliminary study, 166 and 333 Hz. For each case the length of the neck, $l$, was 3.9 cm and the diameter of the cavity was 5.08 cm. The length of the cavity was 2.1 cm for the lower-frequency case and 5.4 cm for the higher-frequency case. Figure 11 shows the calculated transmission loss for the two Helmholtz resonators, compared to the unfiltered duct response and the theoretical transmission loss $(\theta)$.

When $\omega = \omega_n$, the resonance frequency of the resonator, the transmitted power is zero and the transmission loss is a maximum.

For the 166-Hz resonator (Figure 11a), the calculated transmission loss shows that the frequencies are attenuated near the design frequency. The fundamental response frequency has moved down to 116 Hz. The second response frequency is 317 Hz, very close to that of the unfiltered duct (316 Hz). Compared to the unfiltered duct, there is some additional attenuation of the response in the frequency range 200-500 Hz.

$$TL = 10 \log_{10} \left[ 1 + \left\{ \frac{c^2}{4 \times \left( \frac{\omega l_{en}}{S_n} - \frac{c^2}{\omega V} \right)^2} \right\} \right]$$ (6)



Figure 10: Transmission loss calculated in duct with side branch (high-pass filter) simulation.

13

14

3M00002131

3M00002132

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0101

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



Figure 11. Transmission loss calculated in duct with Helmholtz resonator/band-pass filter simulation: (a) design frequency $f_1$ and (b) design frequency $f_2$.

The result for the 333-Hz resonator (figure 11b) is not as good, with no attenuation observed near the design frequency. The frequency and transmission loss of the second resonance is not the same as the unfiltered duct, 316 Hz. It is likely that the second cavity is not sized properly to act as a Helmholtz resonator. The ratio of the cavity volume to neck volume was only 1.4 for the

15

smaller cavity, as opposed to 5.6 for the larger cavity. Additionally, the neck diameter is similar to the characteristic dimensions of the cavity. The higher-frequency cavity should have been designed with a smaller neck area.

### 3.1.5 Expansion Chamber Muffler

Another validation simulation modeled the acoustic performance of a simple expansion chamber muffler (7, 8). Figure 12 compares the predicted transmission loss (equation 4) to experimental data (7, 8) and to one-dimensional (1-D) theory, which is computed from equation 7 (6, 9).

$$ TL = 10 \log_{10} \left\{ \cos^2(kl_c) + 0.25 \left( \frac{S_2}{S_1} + \frac{S_1}{S_2} \right)^2 \sin^2(kl_c) \right\} \qquad (7) $$

Here, $S_1$ and $S_2$ are the areas of the duct and expansion chamber, respectively; $k$ is the wave number; and $l_c$ is the length of the expansion chamber. The predicted values compare very well to the experimental data across the given frequency range. Both the CFD predictions and the experimental data diverge from the 1-D theory at about 1500 Hz, indicating the breakdown of the simplified theory above this frequency.



Figure 12. Comparison of predicted transmission loss with 1-D theory.

As a result of these preliminary studies, a level of confidence was achieved that the response of the CAE could be predicted using this CFD methodology.

16

3M000021 33

3M000021 34

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0102

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## 3.2 CAE Investigation

Comparisons of the continuous noise cases showed that the attenuation at all four SPL levels investigated was similar. Therefore, the results for only one case are shown in figure 13, which compares the CFD-predicted SPL to the HRED experimental data at an input SPL of 65 dB. The CFD computations overpredict the attenuation at lower frequency and underpredict attenuation at higher frequency. Part of this may be due to the different input noise used in the CFD vs. the experiment, which used pink noise for the input. Pink noise should have also been used in the CFD, however, white noise was used. White noise contains equal energy at all frequencies, therefore more noise energy was contained in the higher frequency bands for the input to the CFD simulations. The shapes of the curves compare very well at frequencies above 1500 Hz.



Figure 13. Sound pressure level (65-dB continuous noise input.

These same data are plotted in figure 14 in the form of TL. Also plotted is the HRED experimental REAT data and the data (assumed REAT) from the CAE E-A-R design specifications sheet (1/1). The REAT values are actually insertion loss (IL, the difference between SPL at the same reference point without and with IBPD in place) rather than transmission loss (equation 1), so direct comparison to the CFD and continuous noise experiment values may be dubious. However, it does show that the HRED REAT data compared very well to the CAE specifications (the blue and brown curves, respectively, in figure 14). Interestingly, the experimental continuous noise attenuation level in the frequency range of 1 to 4 kHz is very close to the attenuation level provided by the green (standard IBPD) side of the CAE (file red and green curves, respectively). This may indicate the frequency range where there is an opportunity to improve the current earplug's level-dependent acoustic element.



Figure 14. Transmission loss (continuous noise case) and insertion loss (REAT) values

The CFD predictions for the nonlinear impulse response were better than the continuous noise results. Figure 15 shows the impulse input results plotted as the reduction in peak pressure between the impulse pressure and the response pressure measured in the ear canal. The CFD result was somewhat dependent on the location used for the receiving probe location. The values from probe locations P5–P8 were averaged, and the minimum and maximum values at those four locations were used to generate the error bars. Over most of the distance range, the maximum difference between the CFD and experimental values is about 15%.



Figure 15. Impulse input peak pressure reduction.

17

18

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0103

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

It is likely necessary to model the ear canal in order to improve the results. One may not need the actual shape of the ear canal, but the diameter and length might be adequate to ensure the recording location in the CFD is the same distance from the CAE acoustic element as the tympanic membrane is in the human ear. Figure 16 shows the input impulse pressure (left scale) and the comparison of the response pressure for the experiment and CFD (right scale) for the 1-m case. Data for the other impulse source distances were similar. The CFD values show a quicker rise and a "ringing" effect. The faster rise time is due to the recording probe location being closer to the CAE element. The ringing effect is due to the reflection of the pressure wave from the outlet of the extended chamber region. This outlet is not present in the experimental case and is an artifact of the simulation setup. Modeling the proper length and volume of the ear canal should improve these results. Wave reflection is also present in the experimental response pressure but is damped more than in the simulation.



Figure 16. Comparison of experimental and predicted pressure response; M4 rifle at 1 m

## 4. Conclusions

The experimental REAT measurements compared very well with the design specifications for the CAE. The experimental continuous noise measurements showed higher than desired attenuation in the 1- to 4-kHz range. The experimental impulse tests provided a good set of data to validate the CFD predictions. CFD predictions of the continuous noise impulse cases underpredicted the attenuation at the higher frequencies, but the general shape of the response curve was predicted well above 1000 Hz. Using a pink noise input to model the experimental data should improve these results.

Predicted values for impulse noise attenuation were good, to within 15% of the experimental values. These results should improve by adjusting the modeling of the downstream passageway to the impulse receiving element. Modeling the actual ear canal is not trivial, however, it can be implemented with a small increase in computational resources. It is believed that, with further refinement, the CFD modeling may be used to evaluate the effectiveness of level-dependent HPDs and provide direction for improvements to the design of these devices.

19

20

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE



FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## 5. References

1. Berger, E. H. Using KEMAR to Measure Hearing Protector Attenuation: When it Works, and When it Doesn't. In: *Proceedings of Inter-Noise 92;* Dajade, G. A.; Stinson, M. R., Eds. Noise Control Foundation: Poughkeepsie, NY, 1992; pp 273–278.

2. Berger, E. H. Preferred Methods for Measuring Hearing Protector Attenuation. *Proceedings of the 2005 Congress and Exposition on Noise Control Engineering,* Rio De Janeiro, Brazil, 7–10 August 2005. http://www.e-a-r.com/pdf/hearingcons/T05-01_I-NONEMeth.pdf (downloaded 16 March 2007)

3. ANSI S12.6-1997 [R2002]. *Methods for Measuring the Real-Ear Attenuation of Hearing Protectors* 1997.

4. Smith, S. W. *The Scientist and Engineer's Guide to Digital Signal Processing,* 2nd ed., California Technical Publishing: San Diego, CA, 1999.

5. *FLUENT v6.3 User's Guide,* Fluent, Inc.: Lebanon, NH, 2006.

6. Russel, D. A. Acoustic High-Pass, Low-Pass, and Band-Stop Filters http://www.kettering.edu/~drussel/GMI-Acoustics/Filters.html (accessed 21 June 2005)

7. Middelberg, J. M.; Barber, T. J.; Leong, S. S.; Byrne, K. P.; Leonardi, E. Computational Fluid Dynamics Analysis of the Acoustic Performance of Various Simple Expansion Chamber Mufflers. *Proceedings of Acoustics 2007,* Gold Coast, Australia, 3-5 November 2004.

8. Selamet, A.; Z. L. Acoustic Attenuation Performance of Circular Expansion Chambers With Extended Inlet/Outlet. *Journal of Sound and Vibration* 1999, 223 (2), 197–212.

9. Kinsler, L. E.; Frey, A. R.; Coppens, A. B.; Sanders, J. V. *Fundamentals of Acoustics,* 4th ed., John Wiley & Sons: New York, 2000.

10. E-A-R; Aearo Company. http://www.aearo.com/pdf/CombatArms_SS_Final.pdf (accessed 19 October 2007)

21

22

NO. OF
COPIES ORGANIZATION

1
(PDF
only)
DEFENSE TECHNICAL
INFORMATION CTR
DTIC OCA
8725 JOHN J KINGMAN RD
STE 0944
FORT BELVOIR VA 22060-6218

1 US ARMY RSRCH DEV &
ENGRG CMD
SYSTEMS OF SYSTEMS
INTEGRATION
AMSRD SST
6000 6TH ST STE 100
FORT BELVOIR VA 22060-5608

1 DIRECTOR
US ARMY RESEARCH LAB
IMNE ALC IMS
2800 POWDER MILL RD
ADELPHI MD 20783-1197

1 DIRECTOR
US ARMY RESEARCH LAB
AMSRD ARL CI OK TL
2800 POWDER MILL RD
ADELPHI MD 20783-1197

1 DIRECTOR
US ARMY RESEARCH LAB
AMSRD ARL CI OK T
2800 POWDER MILL RD
ADELPHI MD 20783-1145

ABERDEEN PROVING GROUND

1 DIR USARL
AMSRD ARL CI OK TP (BLDG 4600)

3M00002139

3M00002140

CID File0105

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

| NO. OF COPIES | ORGANIZATION |
|---|---|
| 2 | ANSYS INC<br>CENTERRA RESOURSE PARK<br>R HARWOOD<br>5 WHEGOO<br>10 CAVENDISH CT<br>LEBANON NH 03766-1442 |
| 20 | ABERDEEN PROVING GROUND<br>DIR USARL<br>AMSRD ARL HR<br>P MIITZ<br>T LETOWSKI<br>AMSRD ARL HR SD<br>B AMREIN<br>M BINDER<br>J KALB<br>AMSRD ARL HR M<br>F PARAGALLO<br>AMSRD ARL WM<br>S KARNA<br>J MCCAULEY<br>J SMITH<br>T WRIGHT<br>AMSRD ARL WM B<br>J NEWILL<br>AMSRD ARL WM BA<br>M ZOLTOSKI<br>D LYON<br>AMSRD ARL WM BC<br>P WEINACHT<br>J PRESPRITO<br>K HEAVEY<br>AMSRD ARL WM BD<br>S SILTON<br>AMSRD ARL WV BD<br>R FORCH<br>AMSRD ARL WM BF<br>V GORDLE<br>AMSRD ARL VT UV<br>M BUNDY |

23

INTENTIONALLY LEFT BLANK

24

3M00002141

3M00002142

EXHIBIT

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

MCHB-TS-CHC    (40)

MEMORANDUM FOR Staff Director, Joint Readiness Clinical Advisory
                Board, 1423 Sultan Drive, Fort Detrick, MD
                21702-5013

SUBJECT:  Request for National Stock Number (NSN) and Bulk
Purchase of Combat Arms Earplug


1.  Reference.  Memorandum, this Center, 27 April 1997, After
Action Report of the 14th Meeting of Department of Defense (DoD)
Hearing Conservation Working Group.

2.  The Department of Defense (DoD) Hearing Conservation Working
Group (HCWG) has recommended that a non-linear earplug
configured to the specifications of the enclosed production
samples be adopted for military use.  Request that an NSN be
assigned to facilitate ordering procedures.  If feasible, a bulk
purchase through the Defense Logistics Agency (DLA) could
minimize costs.  Initial demand is estimated between 200,000 to
250,000 pairs with an annual demand thereafter of approximately
75,000 to 100,000 pairs.  The final negotiated price per pair is
obviously going to affect demand.

3.  See enclosed justification for those details.

4.  Aero corporation of Indianapolis, IN has secured the leasing
agreements for production from the French-German Research
Institute of Saint Louis.  Their POC is Mr. Brian Meyers, (312)
692-6593.

3M Confidential

3M00002148
CID File0107

EXHIBIT 8

P1079.108

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## Justification for a Non-linear Earplug
### (Combat Arms Earplug)

For the dismounted soldier or marine, conventional hearing protection can interfere with the communication requirements of a mission when hearing protection is needed the most, i.e. firing weapons away from fixed firing points with loudspeaker systems that can overcome the attenuation of the hearing protectors.

In steady-state noise over 85 dBA in armored vehicles, aircraft or watercraft, conventional hearing protectors can actually improve communication ability. In steady-state noise, they function like sunglasses that cut down glare reducing the noise to a level where the ear is not "overloaded." In relative quiet, however, conventional "linear" hearing protectors interfere with both speech communication and the detection of environmental (combat) sounds.

The solution for the dismounted soldier or marine would be a non-linear hearing protector that would allow low hazard noise like weapons fire over a desired range, but marginally interfere with required communication and detection of combat sounds such as vehicle noise, steps in leaves, closing of a rifle bolt, etc.

The concept of non-linear earplugs is not new, however, Dr. Armand Dancer and his colleagues at the French-German Institute in Saint Louis have dramatically improved this low tech and inexpensive solution to a long standing problem. A small "weight" is inserted into the center lumen of an earplug. This filter is a cylindrical device with a specified length with holes in each end of a very precise diameter.

The American military's contribution in this development effort has been to recommend an American-made earplug that affords to house the French filter, the quiet-mode earmuff and blast overpressure testing. The single-sized filter scheme should accommodate most of our combat arms users. Moreover, thanks to French ergonomic designers, a solution has been provided on how to eliminate wind noise while adapting the earplug for steady-state noise use.

One end of the double-use design includes a solid (linear) earplug that can be used for steady-state noise environments. This precludes a requirement to carry a second set of conventional earplugs which won't fit into the standard earplug carrying case. The light color of the non-linear earplug assists in the requirement to keep the ears clean and free of colored olive mud. The light color of the earplug is associated with dismounted operations. The visibility of the light-colored, non-linear earplug is not an issue in steady-state environments. Moreover, the light color should assist in the enforcement and monitoring of the correct device to be used for that noise environment.

The calibrated holes in the non-linear earplug significantly dampen the more hazardous high frequency component of the impulse noise signature. The reader's understanding of the concept could be assisted by the analogy of an acoustic friction being created as the impulse noise passes through a narrow orifice. This noise reduction capability actually increases with the noise level of weapons fire, hence the term, non-linear. The non-linearity begins at about 110 dBP and increases by 17 dB to 190 dBP. Testing at a U.S. facility found this non-linear earplug protective up to 190 dBP.

While high frequency impulse noise is significantly reduced, most speech energy is passed. In addition, a detection model developed at the Army Research lab predicts a normal-hearing soldier in profile can detect a tank at the same distance (900 meters) with or without the non-linear plug. Their auditory localization capability is cut in half (400 meters) with conventional foam plugs.

In summary, the Combat Arms Earplug affords a cheap, low tech solution for protecting the hearing of soldiers and marines in dismounted operations from impulse noise weapons fire. These passive, non-linear devices work without batteries, are easy to maintain and are compatible with most head gear. They present minimal interference with sound levels which allows for speech communication, without affecting the detection and localization of acoustic sources at almost the same conditions as without hearing protectors. In the Combat Arms Earplug, we finally have a hearing protector that protects without impairing military effectiveness.

3M Confidential

3M00002150   3M Confidential   3M00002151

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0108

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential

References

Dancer, A. and Mamey P., "Nonlinear Hearing Protection Devices," Proceedings of 23rd Annual Conference of the National Hearing Conservation Association, Albuquerque, New Mexico, 19-21 Feb 1998.

Johnson, D., Nonlinear Earplug Study, Research Project conducted by EARG Management Systems, Inc., under Contract DAMD-17-93-C-3101 to the U.S. Army Medical Research and Material Command, June 1995.

3M00002152

CID_File0109    7
(EXHIBIT _____)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

E-A-R™ ARC Plugs have been evaluated to determine the Noise Reduction Rating (NRR) for both wearing positions:  Continuous protection mode and impulse protection mode.  Since the current EPA test method for determining the NRR does not  accurately measure the effectiveness of hearing protectors against very-short duration blasts or impulses such as gunfire or arc flash, you will note that the NRR for this device in the impulse protection mode is zero.  A new NRR test method for measuring protection against impulse noise has been proposed by the EPA but has not yet been finalized.

3M has collaborated with the Institute of Saint-Louis (ISL) in France to evaluate the effectiveness of the non-electronic acoustic filter as deployed in E-A-R™ ARC Plugs and E-A-R™ Combat Arms Earplugs.  An article describing our findings, including measurements made on similar devices, is attached.  A summary table from that article appears below.

The noise reduction provided by the E-A-R™ ARC Plug in this test is shown as the Insertion Loss (IL) in decibels (dB) over a range of sound frequencies as measure on an Acoustical Test Fixture or ATF; essentially an artificial ear used for testing.  There are 5 curves on the graph representing the IL provided by theses earplugs as the Sound Pressure Level (SPL) of the blast is increased from 110 dB to 190 dB.  You will notice that the noise reduction (the IL) increases as the dB level of the blast increases.  Essentially, the noise reduction provided by such devices is "level-dependent".

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3M00002153
CID File0110



P1079.111

FOR ⌐ .CIAL USE ONLY – LAW ENFORCEMENT SENS ⋮

00019-2016-CID133-014635

3M Confidential



BL-29877-000

3M00002568

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0111

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

Eric D. Levinson
Assistant Chief Intellectual Property
Counsel

3M Innovative Properties Company
Office of Intellectual Property Counsel

P.O. Box 33427
St. Paul, MN 55133-3427 USA

Phone:   651-733-1512
Fax:     651-736-7586
Email:   edlevinson@mmm.com



June 26, 2012

Harold Barza
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017

Dear Hal:

Your letter dated June 13, 2012 was forwarded to me from Felicia Boyd. As you know, the purpose of the Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.*, is to protect individuals from exposure to excessive noise. The regulations published by the Environmental Protection Agency at 40 C.F.R. § 211 *et seq.* provide that the "value stated on [a hearing protective device] label must be no greater than" the Noise Reduction Rating (NRR) determined using the appropriate computation method. A label that reports an NRR that is lower than the tested value does not violate regulations prohibiting a label that reports an NRR that is higher than a tested value. Therefore, your letter does not properly allege a violation of the Noise Control Act, and you have not provided any indication of the "specific standard or regulation alleged to have been violated." 40 C.F.R. § 210.3(a).

Nevertheless, even though there has been no violation of the Noise Control Act, I did want to respond to your allegation that the NRR on our packaging is incorrect. Accordingly, please find the enclosed report supporting the labeled values of our Dual-Ended Combat Arms™ earplug - Weapons Fire mode. Although the test results you have provided differ from the enclosed report, the regulations you have cited require that the test results having the lowest measured NRR provide the basis for any labeled values.

Therefore, not only is the NRR provided on our packaging not a violation of the Noise Control Act, the NRR provided on the packaging is the value that is required to be reported under the Noise Control Act.

Sincerely,


Eric D. Levinson

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3M00002990
CID-File 0112

(EXHIBIT X)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



# INSPEC

CE

## EC TYPE-EXAMINATION CERTIFICATE 2308

**Product description:-** Hearing Protector - Ear Plugs

**Product identification:-** 3M 370-1014 Double End Combat Arm Ear Plugs

**Manufacturer:-**
3M United Kingdom PLC
3M Centre
Bracknell
Berkshire
RG12 8HT
United Kingdom

When assessed and examined against harmonised standard EN352-2:2002 and additional high level impulse noise testing, as referenced on page 4, are found to be in conformity with Council Directive 89/686/EEC and associated amendments, relating to personal protective equipment.

Signed

Date: 16th January 2012

K J Warren, Manager Certification Services

For and on behalf of INSPEC International Ltd.
56 Leslie Hough Way, Salford, Gt Manchester M6 6AJ
England (Notified Body No 0194)

For terms and conditions of issue, see page 2

---

## Terms and Conditions

**Reference Document:**

i)    Test Reports:    INSPEC Test Report-
                       1:11.69.63
                       P.O. Wiester, 22nd September 2011

ii)   Test and Inspection Plan    Ref 3M Tech File - TF0307
                                  SOP238

iii)  Technical File    TF2308

Conditions attached to the issue of this certificate:

i)    Marking and instructions have been assessed in the English language only. It is the Manufacturers/Authorised Representatives responsibility to obtain and supply language versions acceptable to the country where the product is to be sold.

ii)   Any changes to the product, technical file or quality manual/quality plan shall be immediately notified to INSPEC.

iii)  The Manufacturer/Authorised Representative shall comply at all times with INSPEC's Regulations governing CE Product Certification.

iv)   This Certificate remains the property of INSPEC and may be withdrawn if any of the conditions attached to its issue are not complied with.

v)    This certificate may be copied or reproduced by the certificate holder, complete and without omissions or additions, and in accordance with INSPEC's terms of business.

vi)   This certificate has been provided in accordance with our standard Terms of Business, which can be viewed at, and printed from:
      http://inspec-international.com/Tcf.pdf

      If you have difficulty accessing the Terms of Business, you may contact us for a copy.

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0113

(EXHIBIT 2)



FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## CERTIFICATION INDEX

| Item | Status | Issued | Amendment |
|---|---|---|---|
| Certificate, Pages 1 – 4 | Valid | 120126 | Initial Issue |

3M Confidential

EC Certificate: 2306

Page 3 of 4

Revision: 120126

3M0000300304

## CERTIFICATION SCHEDULE

Description: Flanged, double erq, uncorded ear plug

Nominal size designation - 7mm to 12mm

Minimum Attenuation data - EN352-2:2002 – using olive green end of ear plug

| Frequency Hz | 63 | 125 | 250 | 500 | 1000 | 2000 | 4000 | 8000 |
|---|---|---|---|---|---|---|---|---|
| Mean Attenuation (dB) | 25.8 | 26.4 | 22.3 | 24.4 | 26.4 | 35.4 | 36.8 | 41.4 |
| Standard Deviation (dB) | 5.5 | 5.4 | 5.4 | 7.2 | 5.7 | 5.4 | 6.3 | 6.7 |
| Assumed Protection (dB) | 20.3 | 21.0 | 17.5 | 17.2 | 20.7 | 25.0 | 30.5 | 34.7 |

H = 26; M = 21; L = 19

SNR = 24dB

High Impulse noise environments only – using yellow end of ear plug

Peak noise reduction values as determined by the
Institute of Saint-Louis (ISL) laboratory, France.

| | 110 | 130 | 150 | 170 | 190 |
|---|---|---|---|---|---|
| External Peak Sound Level (dB) | | | | | |
| Peak noise reduction (dB) | 25.4 | 22.3 | 22.0 | 24.7 | 23.1 |
| Standard Deviation (dB) | 3.4 | 12.3 | 17.0 | 24.7 | 1.6 |

In addition to the products referenced on this certificate, the standard product may also be sold as market specific packaged variants. Such variants will be differentiated and the Technical File will be updated with the appropriate information.

3M Confidential

EC Certificate: 2306

Page 4 of 4

Revision: 120126

3M0000300305

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

---

## Improved Combat Arms Earplug
## QRI Status

Prepared for
Elliott Berger, Aearo Inc.

Mary S. Binseel
Dr. Joel Kalb
Dr. Tomasz Letowski
Visual and Auditory Processes Branch
Soldier Performance Division
Human Research and Engineering Directorate
U.S. Army Research Laboratory

26 June 2006

6/30/2006 8:09:21 PM

3M Confidential                                    3M00003006

---



### Problem Statement

Human Research and Engineering Directorate

Military environments are not loud and are not quiet. They are both. Sound is frequently the earliest source of information about the enemy and loud sound can destroy the needed sensor – the ear. Therefore, both hearing protection and auditory awareness of environments are important to the Soldier.

6/30/2006 8:09:21 PM

3M Confidential                                    3M00003007

---

### Solution: Combat Arms Earplug

Human Research and Engineering Directorate

#### General Information

Developer: French-German Institute in Saint Louis
Proponent: CHPPM
Manufacturer: Aearo Inc.
NSN: 6165-01-512-6072 (single ended)
NSN: 6515-01-466-2710 (double ended)



The non-linearity begins at about 110 dBp and increases by 17 dB to 190 dBp with an overall peak reduction of 25 dB.

http://chppm-www.apgea.army.mil/hcp/CABhpinfo.htm

6/30/2006 8:09:21 PM

3M Confidential                                    3M00003008

---

### Solution: Combat Arms Earplug

Human Research and Engineering Directorate

#### User Feedback

Results of a survey of 950 redeploying Soldier from Louisiana National Guard (256th Infantry Brigade)

* 95% of Soldiers reported using the Combat Arms Earplugs
* 86% of Soldiers reported they found the Combat Arms Earplug beneficial in combat operations
* 70% of Soldiers reported they feel that the Combat Arms Earplugs protect their ears as well as improve communication ability in noise



LTC Kathy E. Gates AuD
Consultant to the Army Surgeon General for Hearing Conservation and Audiology

June 12, 2006

6/30/2006 8:09:21 PM

3M Confidential                                    3M00003009

---

*FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSI*

*00019-2016-CID133-014635*



Solution: Combat Arms Earplug

**User Feedback**

1. Perception of too much attenuation with yellow side
2. Uncomfortable – due to noise, fit, and design/materials
3. Must remove and replace to change mode
4. Extends far from ear – incompatible with some systems
5. One size doesn't fit all

6/30/2006 8:09:21 PM

3M Confidential                                3M00003010

Quick Research Initiative

**Response to Concerns: Improved CAE QRI**

Program: Internal Army Research Laboratory program
Goal: Replace current CAE with an improved version
Requirement: Provide materiel solutions in 6-9 month time frame
ARL POC for CAE QRI: Mary S. Binseel
Aearo POC for CE QRI: Elliott Berger

**Improved CAE QRI Timeline**

Proposed by ARL-HRED in FY05
Contract with Aero signed end of December 2005
Prototypes (12 pairs) delivered late February 2006
Limited-scope testing conducted in May 2005
Production-quality 100 pairs due for testing early July 2006

3M Confidential                                3M00003011



Quick Research Initiative

**Prototype Configuration**

Corded

"Open" – impulse protection

"Closed" – continuous noise protection

3M Confidential                                3M00003012



Quick Research Initiative

**Completed and Planned Studies**

|  | Prototype | Production |
|---|---|---|
| Impulse noise attenuation – live fire | ☑ | ☐ |
| Impulse noise attenuation – shock tube |  | ☐ |
| Continuous noise attenuation |  | ☐ |
| Sound detection |  | ☐ |
| Sound localization | ☑ | ☐ |
| User acceptance (comfort, ease of use, perceived protection) |  | ☐ |

6/30/2006 8:09:21 PM

3M Confidential                                3M00003013

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635









FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSI

*00019-2016-CID133-014635*









FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSI

*00019-2016-CID133-014635*



Sound Localization Study

Human Research and Engineering Directorate

Location: Hostile environment Simulator, Aberdeen Proving Ground

One elevation – ear level

Azimuths (12): 0°, ±30° ±60° ±90° ±120° ±150°, 180°

Backgrounds (2): quiet (30 dB A), Baghdad street noise (70 dB A)

Sound stimuli per background (2):

quiet: "medic" and rifle bolt click

noise: "medic" and rifle shot

Ear conditions (3): no earplugs, CAE, QRI

6/30/2006 6:09:21 PM



Sound Localization Study

Error by earplug and source azimuth; weighted means

6/30/2006 6:09:21 PM



QRI CAE Prototype Testing

Human Research and Engineering Directorate

### Conclusions

The QRI earplug attenuates impulse noise as well as or better than the current CAE while operating in the nonlinear mode and both earplugs appear to perform equally well in the linear mode (very few data points for linear mode).

There is no practically important difference in the performance of the two earplugs in the sound localization task investigated.

Experimenter observation and participant comments confirm the needs for additional sizes and a stronger detent for the nonlinear mode

6/30/2006 6:09:21 PM



QRI CAE Prototype Testing

Human Research and Engineering Directorate

### Comments and Recommendations

Users typically attempt to rotate cord retainer rather than inner cylinder – the mode change mechanics are not intuitive

It is difficult to change protection modes while earplugs are inserted in the ear due to difficulty in rotating cylinder

The detent is virtually impossible to feel – it is very difficult to ensure nonlinear mode if the mode is changes when the earplug is inserted

Recommendation: Reconfigure rotating parts such that cord retainer can be used to rotate the cylinder; or add "wings" or other easy-to-grasp way of rotating cylinder.

6/30/2006 6:09:21 PM

*FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSI*

*00019-2016-CID133-014635*



QRI CAE Prototype Testing

Human Research and Engineering Directorate

## Comments and Recommendations

Having replaceable tips is a benefit (tips are clearly different elements than nonlinear filters, unlike current CAE).

The cord connecting the earplugs needs to break easily if needed for injury avoidance.

5/30/2006 6 09 21 PM

3M Confidential                                    3M90003926

*FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE*

CID File0120

FOR O. .JIAL USE ONLY – LAW ENFORCEMENT SENSI.

00019-2016-CID133-014635

E•A•R 91-41/HP                                              Page - 23

| ANSI S3.19 | ANSI S12.6 |
|---|---|
| Cover Sheet | Cover Sheet |
| Page 1 - Summary data | Page 1 - Summary data |
| Page 2 - Individual subject data | Page 2 - Individual subject data |
| Page 3 - Outlier test for extreme ranges | Page 3 - NRS and NRG values spreadsheet |
| Page 4 - Outlier test for extreme means | Page 4 - Outlier Test for extreme ranges |
| Page 5 - Computation of the NRR | Page 5 - Outlier Test for extreme means |
| Page 6 - Age, gender, and anatomical data | Page 6 - Age, gender, and anatomical data |
| Page 7 - Graph of the individual-subject and mean data, and photo of test device | Page 7 - Graph of the individual-subject and mean data, and photo of test device |
| | Page 8 - Exact copy of the HPD usage instructions provided to the test subjects |

The NRR is computed per the requirements of EPA (1979), and reported to a precision of 0.1 dB. As noted on page 5 of the Test Report, labeled NRRs are to be rounded to whole numbers with values ending in 0.5 rounded down to the next lower integer. The $NRS_A$ and $NRS_G$ values are reported for S12.6-2008 tests per the requirements of that standard and of ANSI S12.68-2007. These values are also reported to a precision of 0.1 dB. Additionally, the Canadian Class is reported for S3.19 and S12.6 Method-A testing, and the Canadian Grade is reported for S12.6 Method-B testing (CSA, 2002)

### GENERAL UNCERTAINTY OF MEASUREMENT

The measurement of real-ear attenuation at threshold (REAT) is an insertion-loss (IL) type of procedure, i.e. the quantity that is observed is the difference between two measurements taken at the same point, with and without the noise control element in place; in this case measured at the listener's eardrum with and without the hearing protector in place. Instead of a microphone being used as the transducer, the sensing elements are the hair cells in the cochlea. As such the general uncertainty of measurement (GUM) is primarily based upon issues pertaining to subjective responses.

The calibration procedures involved in REAT measurements are intended to assure that an appropriate signal is being presented to the listener, but the calibration itself has no effect on measurement uncertainty. If the signal presented for the threshold measurements is distorted, or too directional, or masked by room noise, this will cause an inaccurate estimate of the measurand. However, since REAT is a difference measurement, errors of this type will be present in both the occluded and unoccluded thresholds and therefore will not influence within-laboratory uncertainty, i.e. will have no effect on precision. As such, the only variable germane to an estimation of within-laboratory GUM is the variance observed in the computed standard deviations (SDs) over the 10- or 20-subject test panels used for the REAT measurements.

Within the E•A•RCAL Laboratory experience suggests that reproducibility (95%) in terms of the NRR is approximately ± 2.6 to 4.6 dB, based on our 30 years of testing (E•A•R 91-44/HP).

ANSI S3.19 provides no indications of GUM, but the current standard, S12.6-2008 includes an Annex A that speaks to precision. In that Annex variability both within and between laboratories, is identified as arising from:

    1.   uncertainty in the measurement of the subject's unoccluded and occluded thresholds,

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3M00003388
CID File0121

(EXHIBIT )

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSI

00019-2016-CID133-014635

Policies and Procedures Manual
for the E•A•R / Aearo Company
E•A•RCAL™ Acoustical Laboratory
to ANSI S3.19-1974 and ANSI S12.6-1997

E•A•R 91-41/HP

Elliott H. Berger, M.S.
Ronald W. Kieper, B.S.

E•A•R / Aearo Company
E•A•RCAL™ Acoustical Laboratory
7911 Zionsville Road
Indianapolis, IN 46268-1657
phone: 317-692-1111
fax:    317-692-3116

August 21, 2003

Version 7.1



E•A•RCAL™ Laboratory is accredited by the National Institute of Standards and

Technology, National Voluntary Laboratory Accreditation Program, for the measurement of attenuation of hearing protection devices in ANSI S3.19-1974 and ANSI S12.6-1997. Laboratory Code 100374.0

3M Confidential - Attorneys' Eyes Only

3M00003995

3M Confidential - Attorneys' Eyes Only

3M00003996

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

3M00003997

3M Confidential - Attorneys' Eyes Only

3M00003998

## ABSTRACT

Policies and procedures by which E-A-R CAL™ Laboratory, Aearo Company's acoustical laboratory, conducts real-ear attenuation at threshold (REAT) testing re ANSI S3.19-1974 and ANSI S12.6-1997 are defined and described. The report enumerates the quality policy statement that governs the overall operations of the facility, states the project acceptance policies and fees, specifies the instrumentation and calibration schedule, and describes the staff qualification and training requirements. It then goes on to detail the procedures involving experimental test subjects, the processing of test samples, attenuation testing, and the handling of data and statistical procedures. Sample hearing protection device test reports are included. E-A-R CAL policies for complaint resolution and corrective actions, and use of the NVLAP logo on laboratory reports are also presented.

## TABLE OF CONTENTS

INTRODUCTION ... 1
QUALITY POLICY STATEMENT ... 1
LABORATORY MANAGEMENT ... 2
   Project Acceptance Policies, Confidentiality, and Fees ... 2
   Laboratory Access ... 3
   Use of Subcontractors ... 3
INSTRUMENTATION, CALIBRATION, AND TRACEABILITY ... 3
   Procurement of Sound-Field Audiometric Test Cards ... 3
STAFF QUALIFICATION AND TRAINING POLICIES ... 4
   Laboratory Director ... 4
   Acoustical Technician(s) ... 5
EXPERIMENTAL TEST SUBJECTS ... 5
   Subject Recruitment ... 5
   Initial Screening ... 6
   Training ... 6
   Requalification ... 7
   Removal from Panel ... 8
HANDLING TEST SAMPLES ... 8
TESTING PROCEDURES ... 8
   Daily Calibration ... 9
   Subject Selection, and for S12.6 Method B Requirements for Requalification
      and Reuse ... 9
   Head Colds ... 9
   Test Protocol ... 10
   Fitting the HPD ... 10
   Waiting Period(s) ... 12
   Administering the Audiogram ... 12
   Comfort Ratings ... 13
   Equipment Operation / Scoring the Audiogram ... 13
   Measuring Band Force ... 13
HANDLING THE DATA ... 13
STATISTICAL PROCEDURES ... 14
DESCRIPTION OF THE HPD TEST REPORT ... 14
GENERAL UNCERTAINTY OF MEASUREMENT ... 16
COMPLAINT RESOLUTION PROCEDURES ... 16
REQUIREMENTS FOR REVIEWS, AUDITS, AND CORRECTIVE ACTION ... 17
   Project Acceptance ... 17
   Audit Requirements ... 17
   Corrective Action Procedures ... 18
USE OF THE NVLAP LOGO ... 18

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

RECORD RETENTION .............................................................. 9
REVISIONS TO THIS MANUAL AND RETIREMENT OF OBSOLETE
DOCUMENTS ..................................................................... 9
Document History .............................................................. 9
Revisions and Retirement of Obsolete Documents ..................... 21

REFERENCES ...................................................................... 22

Tables I - III

Figures 1 - 5

(TOTAL PAGES excluding appendix cover page)

APPENDICES
I    - Sample ANSI S3.19 Test Report for an earmuff .................... (8)
II   - Sample ANSI S12.6 Test Report for an earplug .................... (9)
III  - Complete Equipment List for ANSI S3.19/S12.6 Test Procedures ... (2)
IV   - Procedures for Recording Anatomical Measurements and Related Data (3)
V    - Statistical Procedures for Reducing Outlier Data ................ (3)
VI   - Excerpts from Naretta (1988), Chapter 17 ......................... (4)
VII  - Detailed Description of ANSI S3.19 and S12.6 HPD Test Reports ... (2)

## INTRODUCTION

This report defines the operating policies and procedures by which E·A·RCAL™ Laboratory, E·A·R/Aearo Company's acoustical laboratory, conducts real-ear attenuation at threshold (REAT) testing re ANSI S3.19-1974 and ANSI S12.6-1997. The E·A·RCAL Laboratory was designed and constructed in 1972 and has been utilized for hearing protector testing since 1979. It was first accredited under the NVLAP program in January, 1992.

E·A·RCAL Laboratory is principally involved in the testing, development, and quality assessment of new and existing hearing protection devices (HPDs) for E·A·R/Aearo Company, and research in support of standards development and peer-reviewed journal articles. Additionally E·A·RCAL Laboratory provides contract test services to industry, the government, and universities.

This report is the parent document of a series of five reports that describe E·A·RCAL Laboratory's S3.19/S12.6 testing and calibration. The reports, which are included in the References, are also listed below. This laboratory and associated instrumentation are described in the general calibration document, E·A·R 90.32HP.

- E·A·R 90.32HP          General calibration.                          [1/27/81, Version 4.1]
- E·A·R 91.44HP          Audiometer calibration                       [MicroSINE Version 3.11]
- E·A·R 91.51HP          Microphone and calibrator calibration        [07/27/99, Version 2.11]
- E·A·R 91.46HP          Reliability of REAT measurements.            [04/05/02, Version 6.1]

The rationale behind the series of reports is that procedures involving calibration, especially those which are conducted only occasionally (for example, annually), are described in separate reports which will be able to meet the appropriate sections of the reports and follow them step by step. On the other hand, procedures that are conducted on a weekly or daily basis are not presented in a step-by-step manner, but rather are summarized so that the key components are described for reference purposes.

## QUALITY POLICY STATEMENT

E·A·RCAL Laboratory is committed to providing acoustical testing services within the limits of its operational capabilities, in conformance with the relevant ANSI standards, dictates of Policy Manual E·A·R 91.41HP, and the requirements of NIST Handbook 150. This includes adherence to the interpretation of the subjective aspects of the ANSI standards such as the subject selection, fitting, and management specifications, and meticulous attention to the details of calibration, documentation, equipment maintenance, and preventive action procedures found in the Policy Manual. Every member of the laboratory staff has read and affirms this quality policy, including the Laboratory Director, whose responsibility it is to implement and oversee the quality system. This quality policy is also promoted and supported by all the levels of management to which the Laboratory Director reports, as evidenced by this signed certificate, stored in the E·A·RCAL files along with the Policy Manual.

[Footnote] Review of this Policy and Procedures Manual is documented by a signature on the Policy Manual Review Form, located in the Training Records Binder in the Acoustical Laboratory files.

The ANSI standards, S3.19 and S12.6, for which E·A·RCAL Laboratory maintains NVLAP conformance, are retained in the Acoustical Laboratory file drawers.

3M Confidential - Attorneys' Eyes Only

3M00003999

3M Confidential - Attorneys' Eyes Only

3M00004000

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

3M00004001

3M Confidential - Attorneys' Eyes Only

3M00004002

E-A-RCAL 91-41HP

The quality system necessary to implement the above stated policy is embedded in this policy and procedures manual and the accompanying documentation and practices defined therein.

## LABORATORY MANAGEMENT

E-A-RCAL Laboratory is a reporting unit within the Manufacturing and R&D Group of Aearo Company, one of the world's largest manufacturers of safety products. The organizational structure of which E-A-RCAL Laboratory is a part is shown in Figure 1. The operations and functions are supervised by the Manager of Acoustical Engineering, who also serves as the E-A-RCAL Hearing Protection Director. He reports to the Technical Director, E-A-RCAL Hearing Products, but should the need arise can also communicate directly with the Senior Vice President, Manufacturing and R&D. The Laboratory Director maintains the quality manual and monitors document control (see Revisions and retirement of obsolete documents), and is the only approved signatory for all contract testing and for all correspondence with NVLAP.

The office of the Laboratory Director is in close proximity to the laboratory, and as such he works closely, on a daily basis, with the acoustical technician(s).

Project Acceptance Policies, Confidentiality, and Fees
The Laboratory's primary activities revolve around internally generated research. However, an additional mandate for E-A-RCAL Laboratory is to conduct solicited, contract testing. The contact person for those tests is the Laboratory Director. Final decisions upon project acceptance are made by the E-A-RCAL Director, in conjunction with the Technical Director, E-A-RCAL Hearing Products. The evaluation includes a determination of the suitability of the facility, and the resources for the testing being requested.

E-A-RCAL Laboratory conducts research projects for industry, government, and universities, but must be cautious when accepting work from competitors. Confidentiality of test results is maintained, and must be so at the contractor's request, but no information can be disclosed to a product being finalized, patented (if appropriate), and introduced to the market, unless a written agreement is entered into between the contractor and Aearo Company. Customers are welcome to witness testing upon arrangement with the Laboratory Director.

Hearing protector attenuation tests can be conducted in conformance with either ANSI S3.19 or S12.6. E-A-RCAL Laboratory also provides tests in nominal compliance with the aforementioned standards, but with variances as to the exact subject fitting protocol (see Testing Procedures, Fitting the HPD), or the number of subjects and repetitions (i.e., the client may request the S3.19 required 10 x 2 or S12.6 required 20 x 2 protocols, or optionally a 15 x 2 or 20 x 1 protocol). Deviations from S3.19/S12.6 will be noted in the final report. Reports may be faxed to customers, at their request, but under such conditions the customers will be reminded that confidentiality can not be ensured.

¹ A fixed fee¹ has been established for S3.19/S12.6 testing which includes a multi-page report detailing the test results and the Noise Reduction Rating (NRR as per EPA, 1979), and/or NRR[Subject Fit] computed therefrom (see Description of the HPD Test Report, and Appendices I and II). For an additional fee, to be individually negotiated, a more comprehensive report with extensive analyses and complete descriptions of all test procedures can be provided.

¹ A 50% deposit is required to initiate testing.

E-A-RCAL 91-41HP

Laboratory Access
Use of the E-A-RCAL equipment and accompanying test chamber is limited to the staff of the E-A-RCAL Laboratory. Any calibrated equipment that is loaned for other purposes shall be fully tested and verified for performance upon its return. Access to the Technical Department in which E-A-RCAL Laboratory is located is controlled after hours by key card locks and deadbolts at the various entrances.

Use of Subcontractors
E-A-RCAL Laboratory only accepts contracts that can be accommodated in the laboratory's normal test schedule. E-A-RCAL Laboratory has not in the past, and does not intend to in the future, use subcontractors to complete scheduled work. Should the unexpected need to use a subcontractor arise, or should the client request such additional involvement in the project, E-A-RCAL Laboratory will develop a policy consistent with NIST Handbook 150 (Ogler and White, 2001, Sec. 4.5)

## INSTRUMENTATION, CALIBRATION, AND TRACEABILITY

All of the equipment utilized for signal generation and measurement value/sen for the S3.19/S12.6 test procedures is specified in a computer data base that is regularly updated (Attachment A7, file name = EarsabP.mdb). A sample of the output of information retained in EarsabP.mdb is shown in Figure 2 for four pieces of test equipment, and a complete listing of all of the E-A-RCAL instrumentation involved in the S3.19/S12.6 procedures, along with the calibration intervals and party responsible for the calibration, is provided in Appendix III. The interconnection of the equipment is specified in E-A-R 90-32/HP. Instruction manuals for all of the E-A-RCAL instrumentation are retained in the drawers in the Acoustical Laboratory.

The EarsabP.mdb file is accessed at least monthly. A list of equipment requiring calibration within the next 30 days, along with a list of all pending calibrations, is printed and included with the technician's monthly report. The actual records of externally-conducted calibrations are also retained in the file cabinets in the Acoustical Laboratory; internally-conducted calibrations are recorded in the lab cabinets, in 3-ring binders in the technician's laboratory notebooks.

The E-A-RCAL facility is expressly calibrated in its entirety every 24 months using the complete set of procedures outlined in Appendix I of document E-A-R 90-32/HP. In the alternate years, a biological validation is conducted by measuring the attenuation of a reference hearing protectors as described in E-A-R 91-44-HP. The frequency of general calibration of the ensemble of equipment and other regular calibration intervals are also specified in the section on Routine Calibration Requirements in E-A-R 90-32/HP, and the details of the calibration procedures themselves are found in Appendix I of that same report.

The reference standard equipment utilized by E-A-RCAL Laboratory, which is part of our traceability protocol, shall not be used for routine measurements. It is intended only for calibration measurements. The reference standard equipment includes the:
• B&K 4230 Calibrator   S/N 1595221
• B&K 4144 Microphone   S/N 1596050
• B&K 2619 Preamplifier   S/N 847065

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0125

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

---

E-A-R/Cal 91-4-1-HP

Page - 4

The regular calibration interval for the electronic equipment that is sent out of house for calibration, including the B&K 4230 acoustical calibrator, B&K 4144 1" microphone, and B&K 2619 preamp, is once every two years. The stability of the equipment over this period of time, as well as costs of calibration, argue for the merits of biennial calibration. Furthermore, the suggestion of extended calibration intervals was recommended by Richard Peppin during his 1998, 1999, and 2003 on-site NVLAP assessments of our facility.

Traceability of all calibrations to NIST is insured by requiring that all external calibration of E-A-R/Cal equipment be conducted in facilities that have been audited by E-A-R/Cal by Design Printing, Inc. under the direction of a NVLAP Policy Guide PD-1:1996. Copies of the policy manuals of the external facilities are kept on file in the E-A-R/Cal Acoustical Laboratory.

**Procurement of Sound Field Audiometric Test Cards**

Sound-field audiometric test cards are the one supply utilized by the laboratory that requires accordance testing. They are printed for the E-A-R/Cal Laboratory by Design Printing, Inc. of Indianapolis and are ordered in batches of 1500 to 2000 cards every two to three years. The current card are of several styles 84-1, 84-2, and 84-3. An example of 84-1 is illustrated in Figure 3. Upon delivery, approximately 1% of the cards is sampled by placing them one at a time on the TD 25 audiometer. The audiometer gain is initially set at 20 dB with ... horizontally across the entire range of test frequencies for each sample card to assure that all grid lines up with the reference card, within the width of the pen tracing. A check is also run at 40 dB. If problems are detected, Design Printing is contacted and requested to reprint the cards.

**STAFF QUALIFICATION AND TRAINING POLICIES**

**Laboratory Director**

The Director of E-A-R/Cal Laboratory is Mr. Elliott H. Berger, Manager, Acoustical Engineering, Aearo Company, M.S., INCE Board Certified, Fellow of the Acoustical Society of America, past President of the National Hearing Conservation Association, past chair of the American Industrial Hygiene Association Committee on Noise, and current Board Member of the Council for Accreditation in Occupational Hearing Conservation. Mr. Berger designed and supervised the construction of the E-A-R/Cal facility in 1977 and has been involved in hearing protector research and development since 1976. He is directly involved with another who supervises all E-A-R/Cal research and testing projects and is also responsible for training of the laboratory technician(s).

Mr. Berger has written over 60 articles on hearing protection/conservation, and was the principle editor for the 4th and 5th editions of the American Industrial Hygiene Association (AIHA) Noise Manual. He chairs the Acoustical Standards Working Group S12/WG11 Hearing Protector Attenuation and Performance, and is also involved with numerous other hearing-protection related standards committees.

General minimum qualifications for the Laboratory Director include:

1) Graduate degree in acoustics or related professional area
2) Minimum of 4 years post-graduate or professional experience in laboratory experimentation in a hearing conservation-related area

---

E-A-R/Cal 91-4-1-HP

Page - 5

3) Course work and/or professional experience in statistics and in psychophysical experimentation

The Laboratory Director must be competent in his or her field and must retain awareness of state-of-the-art developments in hearing protection measurement methodology and standardization. S/he should participate in national standards or working groups on hearing protection and in professional organizations such as the Acoustical Society of America, the National Hearing Conservation Association, and the American Industrial Hygiene Association

**Acoustical Technician(s)**

E-A-R/Cal's current Senior Acoustical Technician, Mr. Ronald W. Kieper, B.S., C.O.H.C., is the person who conducts all accredited tests. Mr. Kieper has been administering hearing protector tests for E-A-R/Cal for over 14 years and thus has experience with a wide variety of practices and procedures.

The Senior Acoustical technician who conducts REAT testing must meet the following requirements:

1) Possess an Associates degree in electronics or related technical area
2) Complete a 20-Hr. CAOHC audiometric technician course, and every five years, an 8-hr. refresher course
3) Complete an annual hearing-protection related workshop or conference, such as the NHCA Conference
4) Practice testing self-recording audiometric topos using a reference set of nine audiograms
5) Participate as subject in a Series 1 test conducted by an E-A-R/Cal Laboratory Director or experienced technician
6) Conduct two complete 10-subject REAT evaluations per §3.1.9&§12.6 under direct supervision, and personally participate in both tests as an eleventh subject
7) Independently conduct 10-subject REAT evaluations of E-A-R® Plug and V-51R, and compare results to those in E-A-R® 91-4HP
8) Hearing threshold levels not to exceed 25 dB from 500 Hz to 4000 Hz, and 40 dB at 6000 and 8000 Hz, at the time of initial hire

Technician competence is maintained on an ongoing basis through supervision by the Laboratory Director of all REAT tests. This is possible due to the small size of the laboratory and staff. On a biennial basis, the technician competency will be assessed per the section on Audit Requirements.

Records of all technician training activities are maintained in the NVLAP file drawer.

**EXPERIMENTAL TEST SUBJECTS**

**Subject Recruitment**

E-A-R/Cal Laboratory maintains a panel of "experienced" test subjects. As of June 2003, their average age was 36 years, with an average time of service on the panel of approximately 5 years (maximum of 19 years). The subjects are drawn from Aearo Company's work force, as well as members of the local community. Subjects who are not already experienced are formally hired through a part-time employment agency before beginning their training sessions.

For §12.6 Method-B testing, or if requested by a client, subjects who are audiometrically experienced but naive with respect to use of hearing protection can be utilized. They are recruited from the Aearo

---

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3MO0004003

3MO0004004

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorney's Eyes Only    3M00004005
3M Confidential - Attorney's Eyes Only    3M00004006

E-A-R 91-4/HP    Page - 8

Company work force or local community, according to the requirements of the test. Also, if requested by the client, a group of non-Aearo employees can be utilized.

All subjects participate on a voluntary basis, and except for initial screening tests for non-Method-B subjects, are compensated for their participation. For Method-B subjects the initial screening is part of their first session for which they are paid.

Initial Screening

The initial screening of a subject who will become part of the standard subject panel for ANSI S3.19 and for S12.6-Method-A testing takes place on his/her first visit to the laboratory. For those subjects being considered for Method-B testing the initial screening takes place over the phone; they must answer questions all through (1) in Clause 9.11 of S12.6 and be found acceptable according to that standard. Refer to Training Procedures, Administering the Method-B subjects, for details on administering the sound-field tests and for specific directions for instructing the subject how to take a self-responding audiogram. The initial screening consists of the following steps:

1) Otoscopic examination are given to check for infection, malformation, excessive cerumen, and integrity of the tympanic membrane.

2) Subject asked if he suffers from tinnitus, cold or allergy symptoms, a feeling of ear blockage, recent high-level noise exposures, or other problems that might interfere with hearing. In doubtful cases, a tympanogram should be administered to assure that eardrum and pressure falls within the range of ± 0.25 Pa.

3) Technician obtains answers to questions and takes anatomical measurements as described in Appendix IV, and records data on back of audiogram card as shown in Figure 4 (Chart No. 1703-0105).

4) Subject is given conventional pure-tone audiogram with GSI 1703B from 500 Hz to 8 kHz; and MA 39 at 125 Hz and 250 Hz; or alternatively at all frequencies with audiometer and technician in test chamber with subject. MA 39 audio is given with audiometer and technician in test chamber with subject. MA39 must warm up in test chamber for 10 min. prior to testing. All data are recorded on front of audiogram card as shown in Figure 4. The subject is identified using full last name, and initials.

5) Non-Method-B Subjects participation as a Series test subject if pure-tone HTLs are ≤25 dB at all frequencies. A Series test consists of a single open-ear sound-field audiogram, (followed by a subject-fit¹ occluded sound-field audiogram, and an experimenter-fit (taking comfort into account) occluded sound-field audiogram, with whatever HPD is currently under test.

6) To be an S3.19 participant, HTL's must be ≤10 dB at 250, 500 and 1000 Hz, and ≤20 dB at all other test frequencies from 125 Hz to 8000 Hz. For S12.6 the requirements are more lenient, allowing thresholds ≤25 dB from 125 Hz to 8000 Hz. Additionally, for S12.6 thresholds can be no more than 5 dB below those listed in Line 8 of Table II of E-A-R 90-32/HP.

7) If results of steps 1) and 2) are acceptable, and hearing thresholds meet the requirements of 6), and the subject is interested in becoming a trained subject, then s/he proceeds to the training phase.

¹ This is the same as procedure d) in Testing Procedures, Fitting the HPD, except that the subject may request the use of fitting noise.

E-A-R 91-4/HP    Page - 7

Training

Subjects for S3.19 and for S12.6 Method-A are trained per the items listed below. For Method-B subjects the training simply consists of 5 open-ear sound-field audiograms, the last three of which must meet the 6-dB variability requirement. The anatomical data are entered in the appropriate Excel file (lastname.xls).

1) Subject visits E-A-R·CAL lab 5 or 6 acoustic occasions.
   a) 7 visits of 3 open-ear sound-field audiograms/visit
   b) 2 visits of 3 REAT measurements/visit for E-A-R Model 1000 earmuff
   c) 2 visits of 3 REAT measurements/visit for E-A-R foam earplug
   Each REAT measurement consists of a paired open and occluded threshold. For each of the visits the subject make sure consistent results can be obtained without undue discomfort.

2) During the fitting of the HPD should be experimenter supervised, with assistance as needed to make sure consistent results can be obtained. The range of the last three audiograms at visit 2 of 1)a) must be ≤8 dB at any test frequency from 125 Hz to 8 kHz. If the range is exceeded, additional audiograms are administered until the subject can meet the requirement of ≤8 dB.

3) If subject completes all 6 visits and still wishes to be an E-A-R·CAL listener, and has acceptable test-taking skills with low threshold, then subject will be transitioned to specific products. The training will produce adequate practice in fitting by the experimenter; and determination of how to obtain optimal earplug or earmuff fittings. In the case of large enough attention will be expended to treatments if the problem was deemed related to hearing protector testing.

4) Subjects whose attenuation values fall outside of the acceptable range may possibly be utilized for labeled testing on those particular products.

5) Upon successful completion, the subject is added to the E-A-R·CAL panel of listeners.

6) If at any time a subject, on the interest products will be sent to the consulting otolaryngologist for a complete audiological workup to assess the situation and recommend treatment if warranted. Aearo will cover the cost of the visit and treatments if the problem was deemed related to hearing protector testing.

Once the subject is added to the E-A-R·CAL panel, his/her anatomical data and the results of the most recent pure-tone audiogram (including the date of the test), are added to the Test Subject File (Excel file Test-subj.xls) and a new copy is printed and posted in the laboratory (see Table.)

Requalification

Once subjects are added to the panel, they are considered "experienced listeners" and are utilized as needed. At least annually, beginning the first day of each calendar year and concluding by February 15, panel members must be re-administered a requalification pure-tone audiogram to assure that their hearing thresholds are still within the acceptable range. In conjunction with the retest, their earcanals shall also be re-sized. Infrequently utilized subjects, such as college students, will be requalified prior to their next participation as a test subject.

CID File0127

3M Confidential - Attorney's Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

E-A-A-R 91-4 HP

Page - 8

If subjects are not utilized for periods of time exceeding one year, they must be additionally retrained/requalified (including rearranging sizing) by taking a minimum of four sequential open-ear sound-field audiograms during a single visit, the last three of which must meet the 6-dB variability requirement.

**Removal from Panel**

Subjects normally stay on the test panel until, for their own personal reasons, they choose to rotate. Potential reasons for the dismissal from the panel include inability to meet the variability or absolute sensitivity requirements of ANSI S3.19/S12.6, a deterioration in test-taking skills such that subjects have excessive retests or no longer obtain the values of attenuation they observed upon initial qualification, frequent tardiness or missed appointments, or lack of reply availability.

**HANDLING TEST SAMPLES**

At the option of those requesting the tests, products to be evaluated are purchased by E-A-R/CAL Laboratory from manufacturers or distributors, or provided by the clients. When samples are received, they are inspected for damage, and their packages are marked with the date received, from whom they were received, and their projected lot number (if available). This information is also recorded on the E-A-R/CAL HPD Test Administration Form (Table I).

Before beginning any REAT testing, the technician, in conjunction with the Laboratory Director, will assign a 4-digit (HPDA) test identification number and mark this on the package in which the samples will be tested. For custom-molded earplugs, an individual subject-number will be written directly on each sample or on a tag affixed directly to the samples to be tested. Beginning on 01/01/93, the letter "C" was used as the initial character in the Test ID# for all externally funded contract testing. Starting 01/01/05, the letter "C" was used as the second character for internal communication devices.

Samples are retained in the Acoustical Laboratory until testing is completed. No sooner than 30 days subsequent to completion of the tests, the samples will either be returned to the client or relocated to the Technical Department mezzanine area for storage of at least one year. Longer storage of samples will be required if space permits. In the case of premolded and formable earplugs, samples will be selected randomly from those provided with each subject getting his/her own pairs. For semi-insert devices and S3.19-testing, depending on the clearance of the tip, a separate pair may be required for each subject, or alternatively with the replaceable tips, two tips can be used for each subject. For earmuffs, at least two samples for S3.19 (a band + tips), or S12.6 (a band + tips) is used for each subject. For S12.6 a separate pair of devices or two entire samples with earmuffs, those samples will be distributed among the subjects so that each sample is tested on an equal number of subjects as called for in the standard.

Prior to the commencement of REAT evaluations, the band force of semi-insert and earmuff devices shall be measured on the INSPEC Rig Model 5.02.B (see Testing Procedures, Measuring Band Force). Samples will be examined visually by the technician before use. Obvious defects will be called to the attention of the Laboratory Director and at his discretion the client may be notified for his or her recommendations.

3M00004007

3M Confidential - Attorney's Eyes Only

---

E-A-A-R 91-4 HP

Page - 9

**TESTING PROCEDURES**

**Daily Calibration**

All noise generation and measurement equipment are left on at all times for maximum stability. The temperature and humidity in the chamber should be checked, and brought into the specified range of 68 - 72°F, and 35 - 64% RH, as needed.

Sound level calibration is verified using Procedure #14B of E-A-R 90-32HP. On the first testing day of each week the calibration is verified at all test frequencies listed in Table h2 of E-A-R 90-32HP. For the remainder of the week only the frequency of 1 kHz is tested. Values are recorded each day on a clean copy of Table h2, which is kept on file in the calibration binder in the Acoustical Laboratory. Periodically, these old records will be archived to the Technical Department mezzanine where they will be retained for a period of at least seven years. Also see Record Retention.

**Subject Selection, and for S12.6 Method B, Requirements for Requalification and Reuse**

When testing under S3.19 or S12.6 Method A, the panel of subjects will be selected from the current "standard" panel. An examinee listing of which subjects have been found to meet all test criteria, obtain consistently good and uniform attenuation values with the products to be tested, and are related to schedule and work with. Additional criteria are as follows:

1) For S3.19 tests, unless otherwise specified, the goal is to achieve a greater balance of 50/20 ± 20%.

2) For retesting tests under S3.19 or S12.6 Method A, a desirable but not necessary distribution of external earcanal sizes is shown in Table III. This distribution is based upon E-A-R/CAL Laboratory's internal characterization in Novecook 2452-12.

3) Also in S12.6 Clause 6.1.3.6, the requirement is to ask Method B subjects to reaffirm the questions that requiring on a daily basis yields perfunctory responses.

4) Method B places limits on subject retention and reuse, specified in Clause 9.1.3. Records are maintained to assure that a subject is used for a maximum of 30 separate subject-fit tests. Of those 30 tests, the total number of open-ears and semi-inserts for both, shall not exceed 12, and they shall not be more than 8 tests on any one product.

At this time there are no requirements for distribution of head sizes for the measurement of banded type (earmuff and semi-insert) hearing protectors.

**Heat Colds**

Subjects are to be reminded on a regular basis that if they perceive a change in their hearing sensitivity, whatever the reason, the appointment should be rescheduled. Subjects who have allergies and are taking medication for colds, will have their thresholds mentioned particularly (toxin).

A subject who suspects he/his is affected and corrects the hearing levels may be affected and compared to typical values for testing, will begin testing with an open threshold so that hearing levels can be compared to typical values for that subject. If a subject reports to the laboratory for a test unaware of any problems and the technician notes differences of 5 dB or more, at 3 or more frequencies, compared to typical values, the subject is questioned about the condition of her/his ears. In either of these cases, testing of the subject will continue, however the auditor may recognize the condition of herm/his ears, leaving of the subject 5 dB of herm/is typical values on subsequent audiograms in the session.

3M00004008

3M Confidential - Attorney's Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID-File0128

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSI

3M Confidential - Attorneys' Eyes Only

00019-2016-CID133-014635

ExAmR 91-4-1/HP

Page - 10

**Test Protocol**

ANSI S3.19 requires that each device model be measured with three separate fittings on each subject (i.e. three occluded, also called protected (also called open) thresholds with which they are paired, for S12.6 only two occluded and two open thresholds are required. In only one HPD is being tested the test sequence will be P-O, P-O, P-O for one-half of the subjects and O-P, O-P, O-P for the other one-half of the subjects (with only two pairings used if S12.6 is specified). Alternatively, to save time, two HPDs, P and P2, can be tested simultaneously when implementing S3.19, or Method A) at S12.6., in that case the sequence is P1-O-P2, P1-O-P2, for one-half of the subjects and three sets of P2-O-P1 for the other one-half of the subjects (again, with only two pairings of S12.6 is specified). When implementing Method B only P-O type series the permissible since only one HPD can be fitted at a time.

Once the testing has begun, if is preferable that the subject remain in the chamber for the entire P-O, or P-O-P series. However, if the subject becomes tired, s/he may exit the chamber for a short 5- to 10-min. break between P-O's or between P-O-P's, but not within a grouping of protected and open thresholds.

**Fitting the HPD**

How the HPD is fitted works with the subjects, and how the experimenter and subjects fit the HPDs are the most critical parts of the experimental protocol. These are areas where training, experience, and judgment are of utmost importance.

E-A-R/CAL Laboratory provides five different options with respect to fitting HPDs. The report that is issued will be explicitly labeled to indicate which fitting option has been selected. The options are:

1) S3.19 (EPA/Experimenter Fit) this procedure is in accordance with the EPA's regulations contained in 40 CFR Pt. 211 et seq. and the interpretation of its administration, Ken Feith (see introduction of Franks et al., 2001, in submission)

2) E-A-R/CAL Experimenter-Supervised Fit This was primarily how E-A-R/CAL Laboratory tested HPDs for laboratory performance from its inception in 1979 through the late 1980s.

3) S12.6-1997, Method A (Experimenter-Supervised Fit), a modification of 2) above to conform to S12.6, clause 8 or the standard.

4) S12.6-1997, Method B (Subject Fit). Per clause 9 of the standard.

5) Customized fit for specific specifications of the client.

Further description of fitting options 1 - 5 is found below. Option 4 is unique with respect to subject selection and experimental involvement, and is fully described in the S12.6 standard, and of course option 5 is at the customer's choosing.

**1) S3.19 (EPA/Experimenter Fit)**

The technician gives the subject precise directions on fitting the HPD in conformance with the instructions provided by the manufacturer. If the HPD is provided in more than one size the technician working in concert with the subject outside the test chamber, and select the best size. The technician then enters the chamber with the subject, and using the manufacturer's instructions as a guide, fits the protector to the subject to obtain a visual and tactile inspection. The assessment should also include subjective feedback from the subject based upon his/her listening to the

ExAmR 91-4-1/HP

Page - 11

technician's voice and/or perception of the magnitude and balance/balanced of the occlusion effect. If necessary, the size selection may be altered at this time.

Once the technician is satisfied with the fit, the fitting noise is turned on from inside the chamber, and the subject is asked if the noise appears equally attenuated in both ears. If not, s/he is requested to change the protector for a better fit. In the case of earplugs, if the fitting test indicates a poor fit, the device must be removed and refitted by the technician. The technician then makes another assessment to confirm the final fit. If at this time the technician determines that a good fit cannot be obtained, the subject is excused from the test.

Once the technician and subject have confirmed that a best fit has been obtained, neither the technician nor the subject is allowed to touch the protector. It is important to note that during actual testing (as opposed to preliminary precious sessions) the measurement of occluded sound field thresholds is not a option that can be used to assist in the determination of acceptable fit. The technician now exits the room, and after a 5-min. waiting period, the audiometric test is begun.

**2) E-A-R/CAL Experimenter-Supervised Fit**

The technician asks the subject to read the manufacturer's instructions or other instructions provided by the experimenter. The subject fits the plug before entering the test chamber in conjunction with, and if needed, with the direct physical assistance of the experimenter. If the HPD is provided in more than one size the technician, working in concert with the subject outside the test chamber, shall select the best size. Subjects are given

"A fine hearing protector for best noise reduction consistent with a reasonable degree of comfort. Fit the hearing protector for the most noise reduction that is, in a way in which you could normally wear this device for protection from noise for extended periods of time."

Once the subject has satisfactorily demonstrated that s/he can reasonably use the product, the subject enters the test chamber and then fits the HPD, without experimenter assistance, for the occluded thresholds. The subject is instructed how to put the fitting noise to adjust the HPD for the most noise reduction in both ears, and/or how to use the magnitude and balanced balance of the occlusion effect to assist in the fitting/adjustment process. If comfort becomes an issue during the in-chamber fitting process, the subject is reminded of the instruction regarding "a reasonable degree of comfort."

The technician will observe the initial test fitting in the room to assure that no obvious problems have occurred. Unless the subject appears to be having substantial trouble fitting the device, the experimenter will not usually personally touch the HPD during the actual test. Normally the technician will not be present in the room for subsequent 2nd and 3rd occluded) fittings of the device.

**3) S12.6-1997, Method A**

This procedure is similar to E-A-R/CAL Experimenter-Supervised Fit, except that no mention is made of fitting for reasonable comfort. Subject installation of the HPD and assistance to the experimenter, if any, will be observed and assessed by the experimenter. Under no conditions is the experimenter allowed to touch or fit the HPD (or the conditions of the actual test). However, when the experimenter deems it necessary, the subject shall be required to reinsert or readjust the protector as many times as necessary to obtain a "best" fit prior to testing, but not after the test has begun.

3M Confidential - Attorneys' Eyes Only   3M00004009

3M Confidential - Attorneys' Eyes Only   3M00004010

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID-File0429

(EXHIBIT ___)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

E-A-A-R 91-4/HP

## Waiting Periods

Both ANSI standards require a waiting period with no test signals present, and no sleeves, i.e., sitting quietly in the chamber, before beginning threshold tracking (5 min.* for S3.19, and 2 min.* for S12.6). The waiting period is only provided prior to the first audiogram after the subject reenters the chamber when a break has been taken between sets of PPQs, or E-C-Qs, etc. For all tests, except those for which conformance with S3.19 is required, E-A-R-CAL utilizes a 2 min. waiting period.

An additional waiting period of a minimum of two minutes (unless otherwise specified by the manufacturers) is required by S12.6 whenever hearing protectors, such as foam earplugs, are inserted that require time in position to conform to the residual or decrease... in this case, for each and every fitting of the HPD, a waiting period is provided to allow for full conformance of the device to the ear prior to commencing threshold tracking. E-A-R-CAL implements this waiting period as S3.19 testing as well.

## Administering the Audiogram

Subjects must be carefully and consistently instructed in how to take a self-recording audiogram, whether that be a pure-tone test under earphones or a sound-field test. The exact instructions, which are to be read to the subject for the pure-tone audiogram, are as follows:

"I am going to check your hearing by presenting a series of pulsing, whistle-like tones. They will begin in your left ear and then go to your right ear, and will be in each ear with lower-pitched sounds and proceed to higher-pitched sounds.

You control the loudness of the tones with the hand switch. Put your finger on the light beam as soon as you hear the tone (or think you hear it), and remove your finger from the light beam as soon as the tone is no longer audible. Don't let the tone grow too loud. Press as soon as you hear it and don't let it remain inaudible for long."

Subjects will always have taken at least one pure-tone audiogram administered by the staff of E-A-R-CAL Laboratory, prior to any sound-field testing. Before beginning the sound-field test, the subject must be properly located in the chamber and the head-positioning device (a small suspended metal ball) moved into place within 2 cm of his/her nose. The importance of maintaining this head position throughout each set of open/occluded audiograms must be stressed to the subject.

The following additional instructions regarding the sound-field audiometric procedure are also given to the subject:

"Your listening task will be very similar to the audiogram you just took with the earphones, except the sounds will come from the two loudspeaker systems in the room and you will hear them with both ears simultaneously. These test sounds are more masklike than the ones you just listened to. Also, they start at a lower pitch, as low in fact that they may sound like gruff noises or heart beat, and the somewhat difficult to distinguish from those sounds. The higher-pitched test signals are similar to the noise of a cricket chirping.

Your task is the same as with the earphone audiogram you just took - put your finger in the light beam as soon as you hear the sounds and withdraw it as soon as they fade away."

Page - 12

---

E-A-A-R 91-4/HP

## Equipment Operation / Scoring the Audiogram

New technicians are trained by the Laboratory Director or an experienced technician (see Staff Qualification and Training (Raters)) and therefore receive extensive practice in the daily equipment operational procedures. The following points are listed for purposes of documentation and as a reminder of key items. Sound-level audiograms are administered as follows:

1) The GSI 17008 is set in the Attenuator Mode, with a 5-dB HL rate (slew step), and the Pulsed presentation mode. A green plen is used for open thresholds and a red one for occluded thresholds.

2) The 20-dB that will always be on for the open trace. It may be IN or OUT on the occluded trace depending upon the degree of attenuation provided by the HPD, but whatever its mode, it must be indicated on the audiogram card (Figure 3) by masking the Red Trace Axis box, and by indicating whether the mode was changed during the test.

3) The CGS Microprocessor is set in the Nua Mode and Run. Instructions on its use are in the Instruction Manual Tree and information on the specific programs used for testing are in Notebook S783-23.

4) The sequence of test frequencies always begins at the lowest frequency to be tested, usually 125 Hz, and proceeds upward to the highest frequency tested, usually 8 kHz. It normally concludes with a retest of the initial test frequency.

5) Individual traces are scored re S12.6 Clause 7.5. Unacceptable traces are entered immediately after the completion of the entire audiogram by selecting a blue pen, repositioning the audiometer to the desired frequency location, and relaying the test frequency into the CGS unit.

6) An additional retest requirement on an audiogram trace is that if the initial and retest trace for the lowest test frequency differ by more than 5 dB, that frequency is retested and the threshold is taken to be the average of the three traces.

7) The subject is identified on the first audiogram card in the test series using his last name, and model, intake only, are used to subsequent cards.

## Measuring Band Force

The band force of all bandpod devices (semi-insert HPDs and earmuffs) must be measured prior to commencement of the REAT testing. Temperature and relative humidity are to be recorded prior to...

Force is measured using the INSPEC Headband Force Rig Model 3.00.B (see E-A-A-R 80-32HP) per ANSI S12.6-1997, clause "0." For earmuffs, the headband width is adjusted to 145 mm and the height to 130 mm; for semi-inserts the dimensions are 145 mm to the bregus breadth and for head height; 130 mm, to the band's minimum setting, whichever is greater. Force readings are taken 2 min at 5 after

Page - 13

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3M Confidential - Attorneys Eyes Only

3M00004011

3M00004012

EXHIBIT 2

CID-File0130

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

E-AAR 91-41HP                                                                 Page - 14

the device is positioned on the fixture. Even when earmuffs are tested to S3.19 which calls for a width of 142.5 mm and a height of 130.6 mm, the S12.6-1997 dimensions are used since the differences in measured force have been shown to be trivial (Royster and Berger, 1990).

## HANDLING THE DATA

The HPD Test Administration Form (Table II) is used to track the progress of the test, to record all necessary information about each test and sample, and to record spectral comments or observations particular to each subject. The six-digit Test ID#, Device, Start Date, Source of Samples, Date Received, Test Type, and Band Force on the slide of banded devices, must be recorded prior to commencing REAT testing.

The audiometric traces and spectral raw data is recorded on the blue source-sheet audiogram cards (Figure 3) and the attenuation values manually computed during the completion of the noth and protected audiograms. Once the subject has completed testing the device, his/her ancillary data are also entered on the HPD Test Administration Form.

The audiogram cards are stored, grouped by test I.D. in order files on the Acoustical Laboratory. Tests greater than one year old are transferred, as space required, to long-term storage files on the Technical Department Mezzanine, where they are retained for a minimum of seven years (see Record Retention).

When a test is completed, the data from the HPD Test Administration Form and the audiogram cards are input to an Excel computer spreadsheet template (REAT_DEFAULT.xls) for analysis, and for preparation of pages 2, 3, and 4 of the HPD Test Report (see Appendices I and II). For internal reports, pages 5 and 6 of the HPD Test Report are not normally generated. Once the data are entered, the file is stored with a new name (XXXXXX.xls) corresponding to the test ID#. The spreadsheet is printed out, and the individual attenuation values for each subject, at each frequency, for each fitting, are checked against the audiogram cards by having one person read the data to the technician who created the file.

The means and standard deviations are then entered into a Word file (XXXXXX.doc) to create page 1 of the HPD Test Report (see Description of the HPD Test Report), and also the Hearing Protection Data Analysis (HPDA) data base (also found on a local area network, see below) for comparative analysis to other E-AARICAL, as well as nut-of-house data.

The HPDA files are backed up on formpgs.ZIP PC760 Disks semi-monthly, and backed up off site every two months. Hard copies of pages 1 – 4, and 7 of the HPD Test Reports, along with the HPD Test Administration Form, are filed by Test ID# in the Acoustical Laboratory file cabinet.

## STATISTICAL PROCEDURES

The following sections of S3.19 and S12.6 affect the experimenter to discard certain outlier data.

S3.19, 3.2.3 – ... In reporting the results, listeners for whom an adequate fit cannot be obtained should be noted, but should not be included in the evaluation.

S12.6 (Method A), 8.1. ... A subject shall be dismissed if she/he cannot obtain a good fit with the test product. Subjects not excluded by this criterion, who satisfy the other requirements of this

E-AAR 91-41HP                                                                 Page - 15

standard shall not be dismissed for attaining small amounts of attenuation, nor for being unable to obtain a subjectively assessed noise-blocking seal in the presence of the fitting noise as described in clause 6.2.

S12.6 (Method B), 8.1. ... There shall be no subject selection criteria besides those specified in 8.2 of 8.4, and 8.1 of 8.5 and 8.1 of S12.6. With the exception of illness or physical inability to participate on the day of the test, no subjects shall be rejected for any reasons other than failure to meet the specified requirement.

Unfortunately, neither S3.19 nor Method B provides specific guidance on how rejection is to be accomplished. Method B, however is more plain about that requirement is currently under review with the S12/WG11 committee.

Experience at E-AARICAL Laboratory has indicated that an objective method of removing outliers from REAT data is necessary in order to provide internal consistency and comparability between test results. Beginning in 1990, we chose to utilize objective statistical tests instead of relying solely on the judgment of the Laboratory Director (E-AAR 85-17HP). The current practice, somewhat modified since that time, reflect the same general practices that we have found useful during the intervening years.

The most recent revisions to the statistical rejection procedures (subsequent to version 2.0 of this report) occurred in the summer of 1992 as a result of experience gained testing a poorly-designed competitor's foam earplug. The data and associated statistical analyses were included in an E-AAR Technical Report 93-26HP.

For S3.19 or Method A testing, statistical tests and determination of the need for retest or implementation of subjects occur at the conclusion of all attenuation tests on all subjects. The complete set of data (normally 10 subjects x 3 evaluations, or 15 or 20 subjects x 2 evaluations) per subject is then analyzed for outliers using the Dixon Criterion (Natrella, 1966, Chapter 17). The statistical tests operate at comparing both the range of each subject's attenuation values, as well as his/her mean attenuation values across reproductions, to the values of the other subjects in the test. The exact procedures and formulae for conducting the statistical tests are presented in Appendix V. Selected portions of Natrella's Chapter 17 are reproduced in Appendix VI.

The final test report (see Appendices I and II) will note any rejections, the reasons for them, and their effects on the computation of the NRR. The audiogram cards which contain the actual rejected data are retained in the card files together with the accepted data.

## DESCRIPTION OF THE HPD TEST REPORT

The HPD Test Report that describes the results of an S3.19 or S12.6 attenuation test consists of a cover sheet and additional pages.

• Cover Sheet
• Page 1: Summary Data
• Page 2: Individual Subject Data
• Page 3: Outlier Test for Extreme Ranges
• Page 4: Outlier Test for Extreme Means

3M Confidential - Attorneys' Eyes Only          3M00004013          3M00004014

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE          CID.File0131

FOR    CIAL USE ONLY – LAW ENFORCEMENT SENS

00019-2016-CID133-014635

## Page – 16

Example Test Reports appear in Appendices I and II. A detailed description of the Test Report is provided in Appendix VII.

- Page 5, Computation of the NRR
- Page 6, Age, Gender, and Anatomical Data
- Page 7, Summary of individual subject and test device
- Page 8 (Method B style), dust cover photo of the subjects

The NRR is computed per the requirements of EPA (1979) and reported to a precision of 0.1 dB. The Compensation Association (NHCA) Task Force on Hearing Protector Effectiveness (Berger and Royster 1996), and is also reported to a precision of 0.1 dB. As noted on page 5 of the Test Report, labeled NRRs are to be rounded to whole numbers. As shown down in the next lower integer. Additionally, the Canadian Class is reported for S3.19 testing and the Canadian Grade is reported for S12.6 Method-B testing (CSA, 2002).

### GENERAL UNCERTAINTY OF MEASUREMENT

The measurement of real-ear attenuation at threshold (REAT) is an important loss (IL) type of procedure i.e., the quantity that is observed is the difference between two measurements taken at the same point with and without the noise control element in place. In this case measured at the listener's eardrum with and without the hearing protector in place. Instead of a microphone being used as the transducer, the sensing elements are the hair cells in the cochlea. As such the general uncertainty of measurement (GUM) is primarily based upon issues pertaining to subjective responses.

The calibration procedures involved in REAT measurements are intended to assure that an appropriate signal is being presented to the listener, but the calibration itself has no effect on the measurement uncertainty. If the signal presented for the threshold measurements is distorted, or the directionality masked by room noise, this will cause an inaccurate estimate of the measured. However, since REAT is a difference measurement, errors of this type will be present in both the occluded and unoccluded measurements and tend to cancel out, improving the variance. As such, the only variable germane to an estimation of within-laboratory GUM is the variance observed in the computed standard deviations (SDs) over the 10- or 20-subject test panels used for the REAT measurements.

Within the EⱯ•RCAL Laboratory experience suggests that reproducibility in terms of the NRR is approximately ± 2.5 to 3 dB, based on our 22 years of testing (EⱯ•R 91-44HP).

AND S3.19 provides no indications of GUM, but the newer standard S12.6-1997 includes an Annex C that speaks to precision. In that Annex variability both within and between laboratories, is identified as arising from:

1. uncertainty in the measurement of the subjects unoccluded and occluded thresholds.
2. variations in fitting the hearing protectors from time to time and subject to subject.
3. differences in the anatomy of the ears and heads of the subjects.
4. differences in the acoustic test environments and test equipment from facility to facility.

## Page – 17

The standard does not permit but the various uncertainties, but does go on to provide an estimate of the overall GUM of about ± 3 dB for each octave-band frequency at an α of 0.05.

The related ISO standard (4869-1:1990) does provide some indication of the contributors of uncertainty for a similar though not identical procedure to S3.19 or S12.6-1997 Methods A and B. Values of reproducibility (for measurements under identical test conditions), repeatability (for test group variations but otherwise identical test conditions), and for reproducibility (for measurements in different laboratories), vary by hearing protection type, being larger for earmuffs and by frequency. The reproducibility values across laboratories are reported as ± 2 to ± 5.25 dB for earmuffs and ± 3.25 to ± 4 dB for earplugs, depending upon test frequency.

### COMPLAINT RESOLUTION PROCEDURES

If a client questions the data in a test report, the original audiogram cards will be rechecked against the data on page 2 of the HPD Test Report, the computations in the report will be re-verified, the Laboratory Director will interview the technician responsible to determine any special problems or events which may have transpired during testing. If a test is found to be in error, then the earplugs or earmuffs will be re-examined to see if the results appear in error.

If the foregoing procedures indicate that the data are, or may be in error, the device will be retested at no expense to the client using the same subjects (if available) that participated in the initial test. A second audiogram for the client including the revised data, as well as mention of the initial results and why they were suspect. A record will be retained with the revised report of the initial errors, their causes, and corrective actions. Additionally, a record will be retained in a separately marked folder labeled Corrective Actions, located in the Laboratory Director's office. As of the preparation of this version of this manual, no such errors have been reported or detected.

If the procedures in paragraph one of this section do not reveal any reason to discount the data, the client will be notified. If the client can raise any objective evidence or factors for retest, the matter will be discussed by the Laboratory Director in conjunction with the Technical Director of EⱯ•R Hearing Products. Their decision will be final.

### REQUIREMENTS FOR REVIEWS, AUDITS, AND CORRECTIVE ACTION

If the client is still displeased with the results, s/he may at his or her own cost, contract for additional testing. The client may not specify the exclusion of particular subjects who were utilized in the prior allegedly questionable test, but may stipulate the use of an entirely different panel of listeners.

Any complaints regarding administrative issues, such as delivery times, return of samples, labeling of reports, etc., will be reviewed and evaluated, and if appropriate, the applicable sections of this manual will be modified to help assure the complaint does not recou.

This manual shall be reviewed in its entirety by the Laboratory Director and his staff each September in order to instruct new personnel on all operating policies, to check the document for required changes and updates, and to assure the ongoing suitability and effectiveness of the quality system. Each year, the date of actual review shall be recorded with signatures, on a form kept with the quality system, training records

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0132

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

E-A+RCAL 9.1.4.1HP                                                                 Page - 18

(bovoof.doo). Whenever this document (E-A+R 9/141) is revised, all E-A+RCAL staff shall review the relevant sections and so indicate by signature in the training records.

During the annual reviews attention shall be directed towards the results of recent internal audits, corrective and preventive actions, NVLAP assessments, and any complaints that have been received. Besides the annual reviews, management reviews shall be conducted if significant customer complaints are received, when audits detect problems, if significant customer complaints are reported, or following staff or substantial instrumentation changes. All findings shall be documented in the Acoustical Laboratory files.

**Audit Requirements**

The functions of the E-A+RCAL laboratory shall be independently audited by an Asset Company Quality Specialist on a biennial basis, in the alternate years from those selected by NVLAP for their on-site assessments. The internal audits, initiated at the request of the Laboratory Director, shall assure compliance with the policies of this manual as well as the General Operations Checklist in Appendix B of NIST Handbook 150-6. Test methods, practices, and calibration procedures shall also be reviewed in conjunction with the Laboratory Directory who will take corrective action, if necessary, in regard to any findings in a report to the Laboratory Director. The Quality Specialist shall document his or her findings in a report to the Laboratory Directory who will take corrective actions, including written confirmation, within 45 days. Records of audits and any associated corrective actions are retained in the Acoustical Laboratory file drawers.

Internal audits may also be triggered if substantial issues of nonconformance with this Policy Manual arise, in order to examine the overall integrity of the quality policy system.

An additional aspect of the biennial audit will be the conduct in the fall of the year of four complete REAT tests using reference sample HPDs. The results are compared to prior data and evaluated by the criteria described in report E-A+R 91-44HP.

In addition to the biennial audit function, the Laboratory Director shall check on an ongoing basis the results of all tests conducted by the acoustic technicians(s), as well as periodically reviewing the techniques, test practices and calibration procedures. Such reviews will be documented in the training records. For those activities conducted by a junior technician or apprentice the reviewing staff Technician shall review all materials prior to submitting them to the Laboratory Director.

**Corrective Action Procedures**

Whenever discrepancies are noted between actions and specified procedures, or errors are detected in computations or calibrations, this shall be called to the immediate attention of the Laboratory Director for an analysis of the root causes so that corrective action can be initiated. This shall include reworking as needed, and correction of all existing inaccurate documentation. In the case of error on previously issued test reports, the device with a corrected test report will be re-issued, which will include the revised data, as well as mention of the initial results and why they were changed. Additionally, a record will be retained in a separately marked folder labeled Corrective Actions, located in the Acoustical Laboratory file drawers.

---

E-A+RCAL 9.1.4.1HP                                                                 Page - 19

**USE OF THE NVLAP LOGO**

The NVLAP logo and E-A+RCAL laboratory code (100324-0) will appear on the cover page and page 1 of all HPD Test Reports, and on all E-A+RCAL technical reports pertaining to the measurement of HPD attenuation via REAT or other acoustical procedures. However, when the procedures utilized to generate those data are not an acoustical conformance with both the provisions of this manual, and with either 53.19 or S12.6, the following statement will be included at the beginning of the report: "This report contains data from tests which are not covered by the NVLAP accreditation."

When HPD reports are based upon E-A+RCAL Experimenter-Supervised Fit or client-customized fitting procedures, the NVLAP logo will not be used, but the above disclaimer must also appear, since of the five fitting procedures described in this report (Testing Procedures, Fitting the HPD), only ANSI/Experimenter Fit, and Methods A and B of S12.6 comply fully with standardized procedures covered by the accreditation.

If all test practices are in strict conformance with the accreditation with the exception of the number of subjects and replications (for example, 15 X 2 or 20 x 1 instead of 10 x 2 or 20 x 2), the following statement will be included: "The NVLAP accreditation re ANSI S3.19 (or S12.6-2) encompasses tests for at least XX subjects tested X times each. The data in this report are based upon XX subjects tested only X times each."

When testing is contracted by outside clients, and the procedures required to complete those tests do not strictly conform with the accreditation as stated in the first paragraph of this section, the client will be notified in advance.

Internal E-A+RCAL reports will generally only consist of five (for S3.19) or six pages (Method B) i.e. will be prepared without a cover page and pages 5 - 8. However, when appropriate the NVLAP logo will still appear on page 1 of those reports along with the report number pertains only to the sample and subjects tested, and that the report may not be used to claim product endorsement by NVLAP, or any other agency of the U.S. Government. If the reports are later sent out of house, the missing pages will be added, if requested, before distribution.

**RECORD RETENTION**

All records of calibration, testing, and training, including completed test reports, shall be retained a minimum of seven years from the date they are entered into the files. Also see sections on Daily Calibration, and Handling the Data.

**REVISIONS TO THIS MANUAL AND RETIREMENT OF OBSOLETE DOCUMENTS**

**Document History**

The original version of this manual which was reviewed by the NVLAP assessor, Mr. Rich Peppin, during his initial on-site visit of 11/20/91, was Version 1.1. A modified version (2.0), incorporating his suggestions, was finalized subsequent to his inspection and became E-A+RCAL policy as of December 1, 1991. The initial accreditation of E-A+RCAL Laboratory was granted in a letter dated December 9, 1991.

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3M Confidential - Attorneys' Eyes Only

3M00004017

3M Confidential - Attorneys' Eyes Only

3M00004018

3M Confidential - Attorneys Eyes Only

FOR [OFFI]CIAL USE ONLY – LAW ENFORCEMENT SENS[ITIVE]

00019-2016-CID133-014635

## E-A-R 91-41/HP

Page - 20

Version 3.0 was prepared in January, 1994. It was reviewed and finalized as version 3.1 subsequent to E-A-R-CAL Laboratory's second on-site assessment, conducted by Dr. Howard Pergibuny on the same day over recorded in acclamation history (1/19/94 - 33 HP).

Version 4.0 was prepared subsequent to the issue of revised NVLAP requirements that replaced numerous ISO 9000-like procedures. That version was reviewed by an internal auditor (Steve Tudor) who was not a member of the E-A-R-CAL Laboratory and the finalized document was completed as version 4.1, dated February, 1996. Principal changes in Version 4.1 consisted of:

- inclusion of a Quality Policy Statement
- inclusion of audit procedures
- inclusion of statement regarding review of new work to see if appropriate facilities are available for the project
- statement regarding restriction on use of reference standard equipment
- reference to ANSI draft document S12.6-199X in the section Fitting the HPD
- specification of record retention requirements

Version 4.2 was prepared subsequent to E-A-R-CAL Laboratory's third on-site assessment, conducted by Mr. Rich Pappin. Changes were incorporated as a result of suggestions by Mr. Pepple; principally covering clarification of issues of confidentiality, procedures for auditing requirements and corrective actions, and extending regular calibration intervals for certain equipment to two years instead of annually. Additionally, indication of the change of name from Cabot Safety Corporation to Aearo Company was included, as well as reference to the new data basis program used for tracking equipment calibration: Microsoft Access.

Version 5.0 was prepared in January 1999 prior to set on-site assessment scheduled for early February of that year. This version was reviewed by an internal auditor (Steve Tudor) who was not a member of the E-A-R-CAL Laboratory and the finalized document was completed as version 5.2 in February, 1999. Principal changes consisted of:

- Modification to reflect compliance with ANSI S12.6-1997 which superseded S12.6-1984
- Change of frequency of MIRE microphone calibration on the reference B&K 4144/29 microphone system from annual to every 18 months
- Reference to the use of Excel instead of Quattro Pro as the spreadsheet of choice
- Addition of a new Appendix B so that examples of both S3.19 and S12.6 reports could be illustrated

Version 6.0 was prepared in June 2001, subsequent to E-A-R-CAL Laboratory's fifth on-site assessment, which was conducted by Mr. Jeff Schmitt and supervised by the NVLAP Accredits Program Manager, Carroll Brakenridge. E-A-R-CAL was one of the first laboratories assessed to the 200? edition of NIST Handbook 150 (modified to conform to the new ISO/IEC 17025-1999), which was finalized May 30, just two weeks prior to the assessment. Changes in Version 6.0 were primarily made to conform to the new 17025-type requirements, and to reflect internal reporting requirements for tracking revisions, and modifications in E-A-R-CAL's subject selection and training policies. This version underwent various drafts summarily as it is version 6.3. Principal changes consisted of:

- Additional page numbering added in the table of contents as ?? that the completeness of the document could be confirmed.

## E-A-R 91-41/HP

Page - 21

- Complaint procedures further specified to indicate that any complaints are kept on file and a record of cause analysis will be implemented to solve any problems
- A section was added on the general uncertainty of the measurements
- The statement about non-endorsement by NVLAP of product testing, was moved from the report cover page (which is not always distributed) to the first page of the actual report
- The management team is now updated to indicate the new line of report which extends up through product development and manufacturing instead of through marketing
- A procedure for monitoring of test costs and allegais was added
- The requirements for a particular distribution of seminal sizes was made optional instead of mandatory
- New more stringent procedures were specified for subject selection and training, for the standard listener panel
- The requirement for an ENT examination of subjects, once admitted to the panel, was deleted since in our 25 years of testing experience no problems that would have benefited from such a procedure have occurred.

Version 7.0 was prepared in July 2003, prior to E-A-R-CAL Laboratory's sixth on-site assessment, which was conducted by Mr. Rich Pappin, subsequent to this audit. The principal changes consisted of:

- External calibration intervals on the reference B&K calibrator, microphone, and preamplifier) were extended to two years, at the suggestion of Mr. Pappin, in recognition of the regular external checks that are conducted and the documented long-term stability of the devices in question.
- Provision of an expanded corrective action chart to more clearly indicate the relationship of the E-A-R-CAL facility to the other parts of Aearo Company.
- Elimination of the requirement for remeasure the band force of semi-insert HPDs and earmuffs to check subsequent to testing.
- Expanded descriptions of conditions under which management reviews and internal audits are conducted.
- Addition of the computed CSA Grade or Class, as appropriate, to the test report
- Addition of an extra page to test reports consisting of a graphical presentation of the individual subject and mean data, and a digital photograph of the test device.

### Revisions and Retirement of Obsolete Documents

Revisions to this manual and the current NVLAP-related documents are the responsibility of the Laboratory Director. The practices and policies will be reviewed on an ongoing basis, and will involve special attention at the time of biennial reaudit/assessment, when equipment is replaced or upgraded, and in conjunction with the potential internal and NVLAP audits. Collection of obsolete documents will be supervised by the Laboratory Director. The documents will be 'disposed of', except in the case of this manual (see next paragraph).

Subsequent versions of this report will be indexed by a change of version number and date of issue. A single copy of prior versions will be retained in the Technical Department Technical Reports file.

3M Confidential - Attorneys Eyes Only

CID File0134

3M0004019

3M0004020

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

E-A-R 91-41/HP

Page - 22

## REFERENCES

1. ASA (1975). "Method for the measurement of real-ear protection of hearing protectors and physical attenuation of earmuffs." Acoustical Society of America. Standard ASA STD 1-1975 (ANSI S3.19-1974), New York, NY.

2. ANSI (1957). "Methods for measuring the real-ear attenuation of hearing protectors, Am. Natl. Stds. Inst. S3.26-1997, New York, NY.

3. Berger, E. H. (1986). "Quieter rejection criteria for REAT testing," E-A-R Tech. Rept. 80-17/HP, Indpls., IN

4. Berger, E. H. and Kerper, R. W. (1996). "Manual for calibration of the Aearo Company E-A-R/CAL (tm) Acoustical Laboratory at ANSI S3.19-1974 and ANSI S3.12-1957, E-A-R Tech. Rept. 96-33/HP, Indpls., IN

5. Berger, E. H. and Kerper, R. W. (1999a). "Procedures for calibration of Grason-Stadler 1703B and Meico 39 audiometers," E-A-R Tech. Rept. 91-14/HP, Indpls, IN

6. Berger, E. H. and Kerper, R. W. (1999b). "Usability of REAT measurements conducted in the E-A-R/CAL Laboratory," E-A-R Tech. Rept. 91-41/HP, Indpls., IN

7. Berger, E. H. and Kerper, R. W. (1998c). "Procedures for calibration of Bruel & Kjaer 4144/4134 microphones and 4230/4231 calibrators," E-A-R Tech. Rept. 91-15/HP Indpls., IN

8. Berger, E. H. and Royster, L. H. (1996). "In search of meaningful measures of hearing protector effectiveness," Spectrum Suppl. 1 13, p 29

9. Berger, E. H. Lindgren, F. and Kerper, R. W. (1993). Establishing the "true" laboratory NRR - An experimenter's dilemma," E-A-R Tech. Rept. SX-63/HP, Indpls., IN

10. CSA (2002). "Hearing protection devices – performance selection, care and use." Canadian Standards Assoc., Z94.2-02, Rexdale, Ontario.

11. Franks, J. R. Murphy, W J. Harris D. A. Johnson J. L. Shaw, P. B. (2001; in submission). "Alternative field methods for measuring hearing protector performance." Am, Ind. Hyg J

12. Natrella, M. C. (1990). "Experimental Statistics." National Bureau of Stds. Handbook 91, Washington, DC

13. EPA (1979). "Noise labeling requirements for hearing protectors," Environmental Protection Agency, Fed. Regist. 44(190), 40CFR Part 211, 59100-59147

14. ISO (1990). "Acoustics – hearing protectors – Part 1: Subjective method for the measurement of sound attenuation, International Organization for Standardization, ISO 4869-1:1990, Switzerland

15. Kerper, R. W. and Berger, E. H. (1999). "Comparison of earmuff-band force measured using the head within specified in ANSI S3.19-1974 and S3.6-1957," E-A-R Tech. Rept. 96-01/HP, Indpls., IN

16. White V. R. Alderman, D. F. and Faison, C. D. (2001). "NVLAP Procedures and General Requirements." U.S. Dept of Commerce, Natl. Inst. of Stds. and Technology, NIST Handbook 150 Washington, DC

Table II - HPD Test Administration Form [E-A-R 91-41/HP, G1101]

Test ID#: _____   Device (Mfg., Model, Type): _____

Start date: _____   Source of samples: _____   Date received: _____

End date: _____   Test type: _____   Lot or HB#: _____

Comments: _____   Temp: _____   RH: _____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |

3M Confidential - Attorneys' Eyes Only

3M00004021
3M00004022

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

**Table III - Preferred distribution of earcanal sizes for panels of hearing protector test subjects when testing to ANSI S3.19-1974 or to ANSI S12.6-1997 Method A.**

| No. of Subjects | Canal Sizes XS and S | Canal Size M | Canal Sizes L and XL |
|---|---|---|---|
| 10 | 2 | 3 | 2 |
| 15 or 16 | 4 | 5 | 4 |
| 20 | 5 | 6 | 5 |
| 24 | 6 | 7 | 6 |

NOTES

1. Values shown in table are minimum number of subjects for each category. Abbreviations are XS (extra small), S (small), M (medium), L (large), and XL (extra large)

2. Both of the following requirements also apply:

   $M \geq XS + S$

   $M \geq XL + L$

3. To apply the above table, subjects must be characterized as having a single earcanal size. When earcanal sizes are bilaterally different it has no effect unless the divergence crosses the boundaries between the three columns. For those cases the following guidelines apply.

   S and M = S     M and L = L
   S+ and M = M    M and L = L
   S+ and M+ = M   M+ and L+ = L

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



Figure 1 - Organization chart demonstrating relationship of EᴀᴀRCAL Acoustical Laboratory to Aearo Company

Figure 5 - EᴀᴀRCAL Laboratory comfort scale.

HEARING PROTECTION DEVICE COMFORT RATING SCALE

3M Confidential - Attorney's Eyes Only

3M Confidential - Attorneys' Eyes Only

3MX0004025

3MX0004026

(EXHIBIT 7)

CID-FR-00137

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

APPENDIX I

Sample ANSI S3.19 Test Report for an earmuff

3M00004027

3M Confidential - Attorneys' Eyes Only

APPENDIX II

Sample ANSI S12.6 Test Report for an earplug

3M00004028

EXHIBIT
CID File 0138

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



APPENDIX III

Complete Equipment List for ANSI S3.19/S12.6 Test Procedures

APPENDIX IV

Procedures for Recording Anatomical Measurements and Related Data

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3M00004029

3M00004030

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

## Earcanal Sizing

The Aearo Company EARGAGE™ Ear Insert Fitting Device which consists of 5 plastic screwless densities as extra small (XS), small (S), medium (M), large (L), and extra large (XL), is used for sizing earcanals. The diameters of the spheres are 7.7, 8.4, 9.1, 10.4, and 11.4 mm, respectively.

Although the gauge has only 5 regular sizes, there are 11 earcanal sizes that may be assigned with the following procedure. They are the five sphere sizes (XS, S, M, L, and XL), the five in-between larger sizes (XS+, S+, M+, L+, and XL+), and one negative size (XS-).

Choose a sphere which appears to be a little small for the earcanal being measured. Put the pinna outward and upward to assist in placing the gauge in the earcanal opening until the tab of the gauge touches the floor of the concha. Release the pinna and observe if all of the earcanal opening conforms to the sphere. Then using the gauge in the earcanal with a slight, gentle movement of about 1-2 mm, move up in gauge size until the subject feels suction. Ask the subject if s/he feels a suction or pressure. Move up if gauge size until the subject feels suction, this earcanal opening appears to conform to the sphere, and the gauge has still lies on the concha floor, indicating a fully inserted sphere. The sphere accommodating these requirements represents the size of the earcanal.

If suction can be achieved with a partial insertion, recheck the next smaller size to confirm. The assigned size will then either be the smaller size (if suction is achieved) or the between (+) size if suction can still only be achieved with a partial insertion of the next size which is too large for a full insertion. For example, if the gauge sphere is required for suction, but only the Medium sphere can be fully inserted, the assigned size is M+.

## Measuring Head and Pinna Dimensions

All dimensions illustrated in Figure IV.1 are to be measured in millimeters. Calliper points should just barely indent the flesh.

- Bizygion breadth is measured with a calliper as illustrated in Figure IV.2.
- Head height is measured with right angle and straight edge.
- Ear protrusion is measured with straight edge.
- Ear breadth and length are measured with calliper as illustrated in Figure IV.3.

## Additional Questions on the Audiogram Card

Other information, including the subject's date of birth, age at time of test, gender, and race are also recorded. Additionally, the technician asks the subject to characterize his/her previous experience in using hearing protectors as:

- NONE;
- OCCASIONAL: HPDs worn ≤ two-months or 5 times/yr;
- REGULAR: HPDs worn more than occasionally;
- EXPERIENCED: Knowledge of HPDs exceeding that gained by simple utilization within a HCP, such as a researcher, technician, or experimenter.

After inspecting the subject's earcanals using an otoscope, the technician estimates to the nearest 25% increment (0%, 25%, 50%, 75%, 100%) the percentage by which the wax occludes the lumen of the earcanal and records that number for the respective ear.

**Figure IV.1 – Illustration of the anatomical measurements of the head and pinna that are recorded by EARCAL Laboratory.**



Bizygion breadth: The breadth of the head as measured from the superior base of the right tragus to the superior base of the left head.



Head height: The vertical distance from the superior base of the tragus to the level of the top of the head.



Ear protrusion: The horizontal distance from the bony eminence directly behind the ear to the most lateral protrusion of the ear.





Ear breadth: The breadth of the ear measured perpendicular to its long axis.

Ear length: The maximum length of the ear as measured along the long axis.

3M00004031

3M Confidential - Attorneys' Eyes Only

3M00004032

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSI

00019-2016-CID133-014635







Figure IV-3 – Caliper used for measuring ear breadth and length



Figure IV-2 – Caliper used for measuring bitragus breadth

3M0000004033

3M Confidential - Attorneys' Eyes Only

APPENDIX V

Statistical Procedures for Rejecting Outlier Data

3M0000004034

FOR ~~CIAL~~ USE ONLY – LAW ENFORCEMENT SENS ~~:~~

00019-2016-CID133-014635

## PURPOSE AND OVERVIEW

The purpose of the following tests is to exclude aberrant results due to either an unusual inability of a subject to consistently fit an HPD (as measured by their range of attenuation values across the multiple, usually three, fittings of the device), or to the dissimilarity of his or her range of attenuation values with respect to the other subjects tested. The procedures are applied after all subjects (not less than 10) have been tested.

The following description assumes 10 subjects x 3 measurements per subject. To apply the statistics to other sample sizes, see Appendix VI.

All probability tests are conducted at the p<0.05 level using the Dixon Criterion (Natrella, 1966). First the data are tested for repeatability of data within subjects using a one-sided test ($r_{11}$ is looked up in Table A-14 [see Appendix VI of this report]), and then tested for similarity of mean attenuation values across subjects using a two-sided test ($r_{11}$ is looked up in Table A-14).

## Statistical Test Procedures (June, 1992)

A1. **RANGE TEST** : Compute the individual range in attenuation values across the three measurements for each subject at each frequency.

A2. A one-sided Dixon test is used to determine if any subject's value is aberrantly large.

A3. At each frequency, arrange the individual range values in ascending order.

$X_1, X_2, ... X_9, X_{10}$

Calculate $r_{11} = (X_{10} - X_9)/(X_{10} - X_1)$

The value is considered an outlier if $r_{11} > 0.477.^*$

A4. A subject who fails this test if he/she data are found to be outliers at two or more frequencies. For earplug testing, the replacement subject's ear/ear sizes must be the same, or which one ear size of those of the rejected subject.

A5. Whether or not the replacement data fail a subsequent Range test, or cause the ranges of any of the other subjects to become outliers, no further rejections for aberrant ranges are permitted. If the original, retest, and replacement runs all fail the Range test, the data yielding the highest NRR shall be utilized for the final report.

A6. At this point, the experiment proceeds to phase two of the outlier testing (Step B1).

B1. **MEAN VALUE TEST** : Compute the average attenuation values across the three measurements for each subject at each frequency.

B2. A two-sided Dixon test is used to determine if any subject's value is aberrantly small or large.

B3. At each frequency, arrange the mean attenuation values in ascending order:

$X_1, X_2, ... X_9, X_{10}$

To test for a value that is too small, calculate $r_{11} = (X_2 - X_1)/(X_9 - X_1)$

To test for a value that is too large, calculate $r_{11} = (X_{10} - X_9)/(X_{10} - X_2)$

The values are considered outliers if $r_{11} > 0.555.^{**}$

B4. A subject who fails this test is rejected . If the same subject fails a second time, s/he is replaced with another subject per the corollare criteria of A4. In that case, no further testing is conducted by application of A4. In that case, no further testing is conducted.

B5. Whether or not the replacement subject fails a subsequent Mean Value test, or causes the mean values or ranges of any of the other subjects to become outliers, no further rejections are permitted. If the original and replacement data both fail the Mean Value test, the data yielding the highest NRR shall be utilized for the final report.

B6. The results of all Range and Mean Value statistical test failures, and their effects on the NRR, are to be stated in the final report.

_____
$^*$ One-sided test of significance at p<0.05
$^{**}$ Two-sided test of significance at p<0.05

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3MX00004035

3MX00004036

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

**APPENDIX VI**

Excerpts from Natrella (1966), Chapter 17

3M00004037

3M Confidential - Attorneys' Eyes Only

**APPENDIX VII**

Detailed Description of ANSI S3.19 and S12.6 HPD Test Reports

3M00004038

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0143

FOR CIAL USE ONLY – LAW ENFORCEMENT SENS

00019-2016-CID133-014635

## Detailed Description of ANSI S3.19-1974 HPD Test Report

- **Cover Sheet**
  Customer; products tested; reference information, and note about the acceptable use of data that are contained in a NVLAP report.

- **Page 1, Summary Data**
  Product brand name, device type, and manufacturer; Relevant test parameters including test date, the [DA number of subjects and test samples, the computed NRR and CSA Grade], band force for the test samples, band position, and the specific fitting procedure selected for the test; Mean attenuation and standard deviation values at the frequencies which were tested; Notes regarding statistical failures, including the results of statistical tests and an indication of any subjects who were rejected or retested and the effect this had on the NRR; Notes indicating whether certain data in the report are not covered by the NVLAP accreditation; Note about non-endorsement of the product by NVLAP or any government agency.

- **Page 2, Individual Subject Data**
  Specific sample in Appendix I illustrates an exemplar report. For earplug reports, earplug sizes (for sized earplugs) replace head dimensions. Above table - Mean comfort rating and comments specific to key features of the particular test; Within table - Attenuation results for each trial on each subject, including each subject's comfort rating, head dimensions, and individually-computed NRRs (right column) using group standard deviations computed across subjects with each subject's multi-trial average as one value; Last four rows of table - Mean values and associated standard deviations across all subjects and trials [sd(t)], and across the average of each subject's multi-trial average [sd(10)], for attenuation, comfort ratings, anatomical data, and individually-computed NRRs. Q-values are an intermediate step for computing NRR with the lowest Q-value being the frequency most affecting the resultant value. Below table - NRRs computed from means and sd(24) values, with 2-standard deviation (2sd), -1 standard deviation (1sd), and 0-standard deviation (0sd) corrections; Bottom of page - Band force for each sample for all devices possessing a headband.

- **Page 3, Outlier Test for Extreme Means**
  E=A=RCAL Laboratory statistical tests as described in Appendices V and VI of E=A=R 81-4-1HP. Values in table are mean attenuation for each subject at each frequency across the repeated trials.

- **Page 4, Outlier Test for Extreme Ranges**
  E=A=RCAL Laboratory statistical tests as described in Appendices V and VI of E=A=R 81-4-1HP. Values in table are range in attenuation for each subject at each frequency across the repeated trials.

- **Page 5, Comparison of the NRR**
  E=A=RCAL Laboratory statistical tests are described in Appendices V and VI of the E=A=R 81-4-1HP. Illustration of computation of the NRR for data in the Test Report. See notes at bottom of table regarding computational accuracy and rounding errors between the various tables of a Test Report.

- **Page 6, Age, Gender, and Anatomical Data**
  Age, gender, and anatomical data for the subjects utilized in the particular test, as well as information on how those subjects were selected for participation.

- **Page 7, Graph of Individual and Mean Attenuation and Digital Photo of the Test Device**

## Detailed Description of ANSI S12.6-1997 HPD Test Report

- **Cover Sheet**
  Customer; products tested; reference information, and notes about the acceptable use of data that are contained in a NVLAP report.

- **Page 1, Summary Data**
  Product brand name, device type, and manufacturer; Relevant test parameters including test date, the [DA number of subjects and test samples, the computed NRR, NRR(SF), and CSA Grade], band force for the test samples, band position, and the specific fitting procedure selected for the test; Mean attenuation and standard deviation values at the frequencies which were tested; Notes regarding statistical failures, including the results of statistical tests and an indication of any subjects who were rejected or retested and the effect this had on the NRR; Notes indicating whether certain data in the report are not covered by the NVLAP accreditation; Note about non-endorsement of the product by NVLAP or any government agency.

- **Page 2, Individual Subject Data**
  Specific sample in Appendix I illustrates an exemplar report. For earplug reports, earplug sizes (for sized earplugs) replace head dimensions. Above table - Mean comfort rating and comments specific to key features of the particular test; Within table - Attenuation results for each trial on each subject, including each subject's comfort rating, head dimensions, and individually-computed NRRs (right column) using group standard deviations computed across subjects with each subject's multi-trial average as one value; Last four rows of table - Mean values and associated standard deviations across all subjects and trials [sd(t)], and across the average of each subject's multi-trial average [sd(10)], for attenuation, comfort ratings, anatomical data, and individually-computed NRRs. Q-values are an intermediate step for computing NRR with the lowest Q-value being the frequency most affecting the resultant value. Below table - NRRs computed from means and sd(10) values, with 2-standard deviation (2sd), -1 standard deviation (1sd), and 0-standard deviation (0sd) corrections; Bottom of page - For semi-inserts and earmuffs, mean band force and standard deviation for the samples tested, along with temperature and relative humidity at which such tests were conducted.

- **Page 3, Outlier Test for Extreme Ranges**
  E=A=RCAL Laboratory statistical tests as described in Appendices V and VI of E=A=R 81-4-1HP. Values in table are range in attenuation for each subject at each frequency across the repeated trials.

- **Page 4, Outlier Test for Extreme Means**
  E=A=RCAL Laboratory statistical tests as described in Appendices V and VI of E=A=R 81-4-1HP. Values in table are mean attenuation for each subject at each frequency across the repeated trials.

- **Page 5, Comparison of the NRR**
  E=A=RCAL Laboratory statistical tests are described in Appendices V and VI of the E=A=R 81-4-1HP. Illustration of computation of the NRR(SF) for data in the Test Report, along with discussion of computation of the NRR(SF). See notes at bottom of table regarding computational accuracy and rounding errors between the various tables of a Test Report.

- **Page 6, Age, Gender, and Anatomical Data**
  Age, gender, and anatomical data for the subjects utilized in the particular test, as well as information on how those subjects were selected for participation.

- **Page 7, Graph of Individual and Mean Attenuation and Digital Photo of the Test Device**

- **Page 8, Specific Manufacturer-Provided Fitting Instructions Utilized for the Test**

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3M0000404039

3M0000404040

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENS       :

00019-2016-CID133-014635



Figure 2 - Sample printouts of entries in Access data base file on laboratory equipment (Earcal&r.mdb)

Figure 3 - Example sound-field audiogram card (Form 84-1.0P6-82)

Figure 4 - Example audiogram card for pure-tone audiometry (Chart No. 1703-9105), including area on back of card (shown below card in this figure) for ancillary subject data.

Figure III-1 - Representative portion of the listing in the HPDA database.

Figure III-2 - Sample record from the HPDA database.

3M00004041

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0145

*FOR 'CIAL USE ONLY – LAW ENFORCEMENT SENS   E*

3M Confidential

3M0004342

3M Confidential

3M0004343

-014635



FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS
OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30

STANDARD FORM 1449 (REV. 2/2012)

Award sent EDI. Do not duplicate shipment.

3M Confidential - Attorneys' Eyes Only

3M00004325

3M Confidential - Attorneys' Eyes Only

3M00004326

STANDARD FORM 1449 (REV. 2/2012) BACK

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File 0147



3M Confidential - Attorneys Eyes Only

3M Confidential - Attorneys Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

CONTINUATION SHEET

REFERENCE NO. OF DOCUMENT BEING CONTINUED
SPE7S-15-D-A001

PAGE 3 OF 18 PAGES

CONTINUED ON NEXT PAGE

**SECTION B - SUPPLIES/SERVICES**

PAGE 4 OF 18 PAGES

Form

52.216-01  TYPE OF CONTRACT  (APR 1984)  FAR

The Government contemplates award of a Firm Fixed Price contract resulting from this solicitation.

(End of provision)

PID Data - Custom Clause

Insert (copy and paste) text for -- PID information here

Part II Clauses

2710 XML

CONTRACT NO. SPE1D15D5001

Page  2

Continuation of Blocks from SF 1442

**This is an Indefinite Delivery/Indefinite Quantity Contract** Options may be issued on this contract for **a period of 5 years (60** months), broken down into a 24 month option period 1, and a 12 month option period 2.

Note:  Actual unit prices will be specified on individual delivery orders issued under this contract.  The estimated amount in Block 26 is for administrative purposes only

NSN AND CONTRACT LINE/SUBLINE NO:
SEE REMARKS SECTION OF RFQ/ALLOCATION, DELIVERY SCHEDULE
ITEM: PLUG, EAR, COMBAT ARMS, DOUBLE-ENDED; 50/PR
NSN: 6515-01-466-2710
CLINS 0001, 0002, AND 0003 (Routine Peacetime Requirements):

3M00004327

3M00004328

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0148

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## Page 5 of 18

CONTINUATION SHEET

SECTION B - SUPPLIES/SERVICES

PAGE 5 OF 18 PAGES

| LINE ITEM | TIME PERIOD | GUARANTEED MINIMUM QUANTITY | ANNUAL ESTIMATED QUANTITY | MAXIMUM QUANTITY |
|---|---|---|---|---|
| 0001 | Base Period - 24 mos. | 5000 | 4500 | 7000 |
| 0002 | Option Period 1 - 24 mos. | 2000 | 4500 | 7000 |
| 0003 | Option Period 2 - 12 mos. | 1000 | 2250 | 3500 |

Note: Clin 0001 and 0002's quantities are estimates computed and apply on a 24 month basis. Clin 0003 quantities are estimates computed and apply on a 12 month basis.

There is no surge and sustainment requirements on subject material.

The Annual Estimated Quantity (AEQ) is the government estimate of what is anticipated to be ordered under the resultant contract. However, the Government reserves the right to order up to the maximum quantity. The government also reserves the right to order within the overall minimum and maximum quantities.

All prices are to be based on FOB Destination only with inspection and acceptance at destination only.

The Minimum, AEQ and Maximum quantities apply to only a base term of 24 months in length, an option period of 24 months in length, and a second option period of 12 months in length.

## Page 6 of 18

CONTINUATION SHEET

SECTION B - SUPPLIES/SERVICES

PAGE 6 OF 18 PAGES

New Dynamics, the Ability One workshop, will be able to produce and deliver up to 50,000 units per month. The stated production capabilities will allow Troop Support to be in compliance with the monthly demand needed by the Navy, the 50% program and DLA to the previously stated locations for peacetime requirement. New Dynamics will be able to ship and deliver routine peacetime material within a 30 day period from the date of the actual order as addressed in CLINs 0001, 0002, 0003

SHIPPING ADDRESSES FOR **SUBJECT NSN**

DELIVERY SPECIFICATIONS: DLA Depot Stock - DESTINATION locations are identified as follows: DDSP, DDC, DDWG, and DDJO

W35G11<br>
TRANSPORTATION OFFICER<br>
NEW CUMBERLAND FACILITY<br>
2001 NORMANDY DRIVE DOOR 113 T13 T14<br>
NEW CUMBERLAND PA 17070-5002<br>
US PHONE: 480-307-8496

SW31H<br>
DLA DISTRIBUTION WARNER ROBINS<br>
455 BYRON STREET BLDG 176<br>
ROBINS AFB GA 31098-1867<br>
USA

W62G2T<br>
DEF DIST DEPOT SAN JOAQUIN DDSP<br>
25484 S CHRISMAN ROAD<br>
RTE 99/DR 168<br>
TRACY CA 95304-5000<br>
TRACY, CA 95376-9307<br>
US PHONE 209-839-4307

SW31J1<br>
DLA DISTRIBUTION DEPOT OKLAHOMA<br>
3301 F AVE CEN REC BLDG 906 DR 22<br>
TINKER AFB OK 73145-3000<br>
USA

**NOTES:**

1. This will be an indefinite quantity, firm-fixed price contract. Please see FAR clauses 52.216-18, 52.216-22, 16-501.2, 16.503, 16.504

2. Subject requirement(s) to be administered by:

DLA Troop Support<br>
Medical Supply Chain FSR, SPEDS<br>
700 Robbins Avenue<br>
PHILADELPHIA, PA 19111-5092

3. Nothing is specified by this award document. All orders will be made via subsequent and separate delivery orders. All delivery orders shall reference the specification information as stated in the contract. Delivery orders may be issued with one or more locations per order

4. All prices shown are FOB Destination.

5. Special Delivery Notes: Before any deliveries to DDSP New Cumberland, please contact the facility 24 to 48 hours before delivery to set up and appointment to enter the base - phone number is 1-800-307-8496. No special appointments apply to delivery at DDC, Tracy, CA, Warner Robins, GA, and Tinker, Ok.

6. Variation in quantity. Plus or minus 2% per each contract CLIN number.

3M Confidential - Attorneys' Eyes Only

3M000004329

3M Confidential - Attorneys' Eyes Only

3M000004330



FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENS...

00019-2016-CID133-014635

CONTINUATION SHEET
SECTION B - SUPPLIES/SERVICES
PAGE 8 OF 18 PAGES

7. Contract effective period. Orders may be issued under this contract (base period) from the effective date of award through 24 months thereafter. The government may extend this contract via option clause 52.217-9 for a period not to exceed 24 additional months. In the event the government elects to exercise the option, on period or period basis, written notice of intent to extend the term of the contract will be given to New Dynamics within 60 days of the expiration of the specified ordering period

8. PLACE OF PERFORMANCE IS INTENDED TO BE USED for contract performance IAW FAR 52.215-6, since one or more plants are located at different addresses from the address of the offeror.

**PLACE OF PERFORMANCE:**

New Dynamics Corp (14GRP)
15 Fortune Road
Middletown, NY 10941

**OPERATIONS:**

New Dynamics Corp (14GRP)
15 Finn Drive
Middletown, NY 10941

9. INVOICES WITH RECEIVING REPORTS (46-250's) FOR EACH DELIVERY ORDER PROCESSED SHALL BE SUBMITTED THROUGH WAWF (WIDE AREA WORKFLOW) AS A "COMBO" INVOICE IAW DFARS CLAUSE 252.232-7003

10. Please reference clauses referenced in solicitation SPE2DS14R0001 for applicability to subject award document.

Previous Supplier: New Dynamics Corporation - Cage 14GR9

3M Confidential - Attorneys Eyes Only

3M00004331

CONTINUATION SHEET
SECTION B - SUPPLIES/SERVICES
PAGE 9 OF 18 PAGES

**PURCHASE ORDER TEXT—NSN 6515-01-495-2710**

PLUG, EAR, COMBAT ARMS, DOUBLE-ENDED, 50 PAIR SWEPT-BACK TRIPLE-FLANGE STYLE, OLIVE DRAB END PROTECTS USER FROM CONTINUOUS NOISE, YELLOW END PROTECTS USER FROM MILITARY WEAPONS NOISE.

UNIT OF ISSUE IS A PACKAGE(PG) OF 50 PAIR

MERCURY OR MERCURY CONTAINING COMPOUNDS SHALL NOT BE INTENTIONALLY ADDED TO OR COME IN DIRECT CONTACT WITH ANY HARDWARE OR SUPPLIES FURNISHED UNDER THIS CONTRACT. EXCEPTION: FUNCTIONAL MERCURY USED IN BATTERIES, FLUORESCENT LIGHTS, REQUIRED INSTRUMENTS, SENSORS OR CONTROLS, WEAPON SYSTEMS, AND CHEMICAL ANALYSIS REAGENTS SPECIFIED BY NAVSEA. PORTABLE FLUORESCENT LAMPS AND PORTABLE INSTRUMENTS CONTAINING MERCURY SHALL BE SHOCK PROOF AND CONTAIN A SECOND BOUNDARY OF CONTAINMENT OF THE MERCURY OR MERCURY COMPOUND. (IAW NAVSEA S100-6021D)

**MILITARY/UNIQUE ITEM: DO NOT SUBSTITUTE!**

**This device or drug is regulated by the FDA.**
Note to Buyer: The Government contracting official shall submit a pre-award survey request, through email, to product specialist

**SHALL BE IN ACCORDANCE WITH MEDICAL PROCUREMENT ITEM DESCRIPTION NO. 2 DATED 14 JULY 2006.**

EXCEPT AS FOLLOWS:

IN PARA. 1.2, DELETE "AERO CORPORATION" ENTIRELY AND SUBSTITUTE "NEW DYNAMICS CORPORATION".

IN PARA. 6.1, DELETE "DEFENSE... (PACKAGING)" ENTIRELY AND SUBSTITUTE "DLA TROOP SUPPORT, ATTN: FSFB (PACKAGING)".

DELETE PARA. 6.2.1 ENTIRELY AND SUBSTITUTE "6.2.1 MEDICAL MARKING STANDARD NO. 1 IS AVAILABLE FROM DLA TROOP SUPPORT, ATTN: FSFB (PACKAGING), VIA EMAIL DSCP-PACKAGING@DLA.MIL OR ELECTRONICALLY AT HTTP://WWW.LANDANDMARITIME.DLA.MIL/DOWNLOADS/PACKAGING/MMS1.PDF"

PRESERVATION, PACKAGING, PACKING, LABELING AND MARKING FOR 6515-01-495-2710 SHALL BE AS SPECIFIED IN MEDICAL PROCUREMENT ITEM DESCRIPTION NO. 2.

3M Confidential - Attorneys Eyes Only

3M00004332

CID File0150

EXHIBIT

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

---

CONTINUATION SHEET

**SECTION B – SUPPLIES/SERVICES**

6515-01-466-2210 20 FEBRUARY 2013

PAGE 10 OF 18 PAGES

SOURCE: NEW DYNAMICS CORPORATION PART NO: 3704000

BIDDER SHALL SPECIFY SOURCE AND P/N BEING SUPPLIED

CLAUSE 52.247-9012 (REQUIREMENTS FOR TREATMENT OF WOOD PACKAGING MATERIAL (WPM)) SHALL BE MANDATORY FOR ALL SHIPMENTS PACKED IN WOODEN BOXES, CRATES, WIRE-BOUND BOXES, PALLETS, SKIDS. HEAT TREATMENT (OR KILN DRIED) HEAT TREATMENT OF WPM SHALL BE THE ONLY METHOD AUTHORIZED FOR SHIPMENT TO DOD LOCATIONS. ADDITIONAL INFORMATION REGARDING DOD'S WPM REQUIREMENT IS AVAILABLE ON THE DLA PACKAGING WEBSITE: HTTP://WWW.LANDANDMARITIME.DLA.MIL/OFFICES/PACKAGING/PALLETIZATION_WPM/NOTICE.ASP

PACKAGING AND PACKING SHALL BE
PACKAGING - MILITARY
PACKING - LEVEL B
IN ACCORDANCE WITH APPLICABLE SPECIFICATION CITED HEREIN.

PALLETIZATION SHALL BE IN ACCORDANCE WITH THE LATEST EDITION OF MIL-STD-147. UNITIZED LOADS COMMENSURATE WITH THE LEVEL OF PACKING SPECIFIED IN THE CONTRACT OR ORDER SHALL BE USED WHENEVER TOTAL QUANTITY FOR SHIPMENT TO ONE DESTINATION EXCEEDS 250 LBS (EXCLUDING THE PALLET) OR 20 CU FT. LOADS SHALL BE UNITIZED ON TYPE IV OR TYPE V 4-WAY ENTRY PALLETS. A PALLET SHALL HAVE A LENGTH OF 40 INCHES AND A WIDTH OF 48 INCHES. PALLET LOAD, INCLUDING THE PALLET, SHALL NOT EXCEED 54 INCHES IN HEIGHT, 43 INCHES IN LENGTH AND 52 INCHES IN WIDTH

QUANTITY FOR SHIPMENT TO ONE DESTINATION OF LESS THAN 250 LBS OR 20 CUBIC FEET NEED NOT BE PALLETIZED

APPLICABLE TO EQUIPMENT ITEMS HAVING A HEIGHT OF 48 INCHES OR GREATER. IF A PROPERLY PALLETIZED LOAD (EQUIPMENT ITEM AND PALLET) EXCEEDS 54 INCHES IN HEIGHT, HEIGHT LIMITATION NEED NOT BE ADHERED TO

APPLICABLE TO A SINGLE ITEM HAVING DIMENSIONS EXCEEDING THE MAXIMUM PALLET LOAD LENGTH AND/OR WIDTH DIMENSIONS. IF A SINGLE ITEM EXCEEDS THE MAXIMUM PALLET

3M Confidential - Attorneys Eyes Only

3MC00004333

---

CONTINUATION SHEET

**SECTION B – SUPPLIES/SERVICES**

PAGE 11 OF 18 PAGES

LOAD DIMENSIONS, LENGTH AND WIDTH NEED NOT BE ADHERED TO. CONTACT THE CONTRACTING OFFICER FOR ADDITIONAL GUIDANCE

COPIES OF THE LATEST EDITION OF MIL-STD-147 ARE AVAILABLE FROM DLA DOCUMENT SERVICES, BLDG 4/D, 700 ROBBINS AVENUE, PHILADELPHIA, PA 19111-5094 COPIES ARE ALSO AVAILABLE ONLINE AT HTTP://QUICKSEARCH.DLA.MIL

IN ADDITION TO ALL MARKING REQUIREMENTS SPECIFIED HEREIN AND IN THE APPLICABLE SPECIFICATION DOCUMENT, ALL ORDERS FOR DEPOT STOCK SHALL ALSO REQUIRE PASSIVE RFID TAGS IN ACCORDANCE WITH DFARS CLAUSE 252.211-7006. HOWEVER, EXCEPTIONS TO THIS REQUIREMENT ARE CURRENTLY APPLICABLE TO NSNS IN FSCS 6505/6506/6508/6550

MARKING SHALL BE AS SPECIFIED IN MEDICAL MARKING STANDARD NO. 1A DATED 4 FEBRUARY 2013

MARKINGS SHALL INCLUDE BAR CODES, AS FOLLOWS: UNIT, BAR CODES ARE NOT REQUIRED UNLESS THE UNIT IS ALSO THE EXTERIOR (SHIPPING) CONTAINER

INTERMEDIATE PACKAGE - BAR CODES ARE NOT REQUIRED

EXTERIOR (SHIPPING) CONTAINER - BAR CODES (NSN, PIN AND CAGE) SHALL BE SUPPLIED ON THE IDENTIFICATION-MARKED SIDE OF THE CONTAINER

UNITIZED LOAD - BAR CODES (NSN, PIN AND CAGE) SHALL BE SUPPLIED ON THE IDENTIFICATION MARKED SIDES OF THE LOAD

NOTES: SEE MEDICAL MARKING STANDARD NO. 1A FOR PLACEMENT OF ALL REQUIRED MARKINGS

BAR CODES SHALL INCLUDE THE HUMAN READABLE INTERPRETATION (HRI)

PIN REFERS TO THE CONTRACT OR ORDER NUMBER, TOGETHER WITH DELIVERY ORDER NUMBER, WHEN APPLICABLE.

MIL-STD-11898 - STANDARD DEPARTMENT OF DEFENSE BAR CODE SYMBOLOGY - HAS BEEN CANCELLED AND REPLACED BY COMMERCIAL BAR CODE STANDARD

3M Confidential - Attorneys Eyes Only

3MC00004334

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENS...

00019-2016-CID133-014635

## SECTION "D" OF SUPPLIES/SERVICES

CONTINUATION SHEET                                PAGE 12 OF 18 PAGES

ISO/IEC 16388 (INFORMATION TECHNOLOGY - AUTOMATIC IDENTIFICATION AND DATA CAPTURE TECHNIQUES - CODE SYMBOLOGY SPECIFICATION - CODE 39). COPIES OF ISO/IEC 16388 ARE AVAILABLE FOR PURCHASE FROM ANSI, 25 WEST 43RD STREET, NEW YORK, NY 10036. WWW.ANSI.ORG

COPIES OF MEDICAL MARKING STANDARD NO. 1A (MMS NO. 1A) MAY BE OBTAINED BY CONTACTING DLA TROOP SUPPORT VIA EMAIL TO DSCP PACKAGING@DLA.MIL. MMS NO. 1A IS ALSO AVAILABLE ONLINE AT HTTP://WWW.LANDANDMARITIME.DLA.MIL/DOWNLOADS/PACKAGING/MMS1.PDF

THE FOLLOWING CHANGES/DELETIONS ARE APPLICABLE TO THE SECTION HEADED "PACKAGING DATA":

APPLICABLE TO ALL MEDICAL ACQUISITIONS:

PRESERVATION, PACKAGING, PACKING, UNITIZATION LABELING, AND MARKING SHALL BE AS SPECIFIED IN THE APPLICABLE PROCUREMENT DOCUMENT REFERENCED IN THE ITEM DESCRIPTION SECTION, AND/OR AS SPECIFIED IN THE "CLEAR IN THE ITEM DESCRIPTION AND PACKAGING DATA" SECTIONS OF THE ACQUISITION.

DISREGARD ALL REFERENCE TO MIL-STD-2073 UNDER THE HEADING PREPARATION FOR DELIVERY". DELETE THE SECTION BEGINNING WITH "PKGING DATA -" AND ENDING WITH "DATED 980507 IN ITS ENTIRETY.

DISREGARD ALL REFERENCES TO SPECIAL PACKAGING INSTRUCTIONS (SPI). SPIS ARE NOT PREPARED FOR MEDICAL ITEMS. ALL APPLICABLE PACKAGING REQUIREMENTS ARE SPECIFIED IN THE ACQUISITION

DELETE "MIL-STD-129" WHEREVER IT APPEARS AND SUBSTITUTE "MEDICAL MARKING STANDARD NO. 1A".

DELETE THE PARAGRAPH BEGINNING WITH "FOR ALL SHIPMENTS OF PACKAGED MATERIEL TO THE GOVERNMENT" AND ENDING WITH "THE SCHEDULE TAKES PRECEDENCE" IN ITS ENTIRETY.

IAW BASIC DRAWING NR 1JGR9 014692710
REVISION NR 1 DTD 07/15/2005
PART PIECE NUMBER

SHALL BE PACKAGED STANDARD COMMERCIAL IN ACCORDANCE WITH ASTM D 3951.

Markings Paragraph
When ASTM D3951, Commercial Packaging is specified, the following apply:

## SECTION "D" OF SUPPLIES/SERVICES

CONTINUATION SHEET                                PAGE 13 OF 18 PAGES

- All Section "D" Packaging and Marking Clauses take precedence over ASTM D3951.
- In addition to requirements in MIL-STD-129, when Commercial Packaging is used, the Method of Preservation for all MIL-STD-129 marking and labeling shall be "CP"
- The Unit of Issue (U/I) and Quantity per Unit Pack (QUP) as specified in the contract take precedence over QUP in ASTM D3951.

PSC:

| NATIONAL STOCK NO. | ITEM DESCRIPTION | NUMBER | DATE |
|---|---|---|---|
| 6515-01-466-2710 | PSC: 6515 DESC: Plugs, Ear, Double-Ended, 50/pair | 2 | 26 July 2006 |

1. SCOPE:

This Medical Procurement Item Description covers military-unique, double-ended ear plugs suitable for use as a hearing protection for military personnel in dismounted noisy environments.

Shall be [MIL-P-] (or equal) "Equal" items shall possess the salient characteristics specified below.

2. SALIENT CHARACTERISTICS:

Commercial: Shall be double-ended, never-neck triple-flange style ear plugs.

Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.

The ear plugs designed for protection from steady-state noise shall be camouflage green or another visible dark color. The ear plugs designed for protection from impulse noises shall be yellow or another suitable bright color. The ear plugs shall meet all requirements as set forth.

Sound Attenuation: At each frequency listed below, each end of the earplugs shall provide the level of sound attenuation as specified. Sound attenuation shall be measured in dB.

| SOUND ATTENUATION OF THE CAMOUFLAGE GREEN END OF THE EAR PLUG | | | | SOUND ATTENUATION OF THE YELLOW END | |
|---|---|---|---|---|---|
| Frequency, Hz | Sound Attenuation, dB | Minimum Mean Attenuation, dB | | Sound Frequency, Hz | Sound Attenuation, Hz | Minimum Mean Attenuation, dB |

3M Confidential - Attorneys' Eyes Only

3M00004335

3M Confidential - Attorneys' Eyes Only

3M00004336

00019-2016-CID133-014635

# SECTION E - INSPECTION/ACCEPTANCE

CONTINUATION SHEET

MFG# (6515-01-466-2719)

PAGE 14 OF 18 PAGES

| | | | | |
|---|---|---|---|---|
| 125 | | | | |
| 250 | 20 dB | 25 dB | 250 | |
| 500 | 25 dB | 25 dB | 500 | |
| 1000 | 25 dB | 20 dB | 1000 | |
| 2000 | 30 dB | 35 dB | 2000 | |
| 4000 | 35 dB | 45 dB | 4000 | |
| 4000 | 45 dB | 40 dB | 8000 | |

and services continue to preestablished requirements.

**Inspection.** Inspection, as used herein, shall be an examination and testing of items. Examination shall be defined as an auditory, visual, or olfactory investigation. Testing shall be the use of laboratory equipment and procedures to determine various properties of an item. Inspection shall be conducted to determine compliance with specification requirements, to determine the determination of two or more inspection characteristics, shall be used for the determination characterization. For inspection purposes, see part of product shall be one pair of ear plugs.

**Sampling information.** Sampling for inspection of each attenuation of the level dependent yellow end shall be 100 percent, and shall be verified using an acceptable for inspection of the sound attenuation of the camouflage green end shall be in accordance with AQL 2.5. Inspection level S-2 shall be used for the 1.0 percent.

1. **Responsibility for inspection.** Unless otherwise specified in the contract or purchase order, the contractor is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified in the contract or purchase order, the contractor may use his own or any other facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies

**Records.** Records of inspections performed by or for the contractor shall be maintained by the contractor and made available to the Government upon request, at any time, or from time-to-time, during the performance of the contract and for a period of three years after delivery of the supplies to which such records pertain.

1. **Reception.**

**Material.** The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.

---

CONTINUATION SHEET

MFG# (6515-01-466-2719)

PAGE 15 OF 18 PAGES

**Classification of inspections.** The examination of this product, and conformance to the specifications, standards, and quality assurance provisions contained herein. The examination shall certify that the product offered meets the specification of the product as specified.

1. **Preservation.** Preservation shall be military.

5.1 **Unit.** Package (PKG). One package containing 10 pairs of ear plugs, as specified, shall be war unit. Unit package shall be any suitable sealed commercial container capable of protecting contents. Illustrated instructions for use, as specified in para. 2.15 shall be supplied with each unit.

5.11 **Intermediate package.** Intermediate package may be supplied at the option of the contractor.

---

3M Confidential – Attorneys' Eyes Only

3M00004337

3M Confidential – Attorneys' Eyes Only

3M00004338

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only
3MO0004339
3MO0004340

---

**CONTINUATION SHEET** — REFERENCE NO. OF DOCUMENT BEING CONTINUED — SPE2D5-15-D-0001 — PAGE 16 OF 18 PAGES

5.2  Packing: Material shall be level B.

SPE2D #1 (4315-01-456-2315)

5.3  Marking:

5.3.1  Unit: Each unit shall be marked as specified in Medical Marking Standards No. 1 for military materiel. In addition, buildings shall conform for item identification, and the manufacturer's 2-part address and telephone number.

Source of documents:

Medical Marking Standards No. 1 is available from Defense Supply Center, Philadelphia, ATTN: DSCP-MSB, (Packaging), Military Marking Standard No. 4

ASTM standards are available from ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA 19428-2959.

The Federal Food, Drug and Cosmetic Act is available from the Food and Drug Administration, Washington, DC 20204.

**SECTION C - CLAUSES**

| H4DG14 | 52-246-9007 | SEPARATION OF RECALL WARRANTY PROVISIONS (MAY 2013) |
| | | WHEN USED Use in solicitations and contracts that contain clauses DLAC 52.211-9046, 52.246-9345, and FAR 52.246-17 |

CONTINUED ON NEXT PAGE

---

**CONTINUATION SHEET** — REFERENCE NO. OF DOCUMENT BEING CONTINUED — SPE2D5-15-D-0001 — PAGE 17 OF 18 PAGES

(Cont. on next page)

52.202-01  DEFINITIONS (NOV 2013) FAR
52.203-05  COVENANT AGAINST CONTINGENT FEES (MAY 2014) FAR
52.203-06  RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (SEP 2006) FAR
52.203-07  ANTI-KICKBACK PROCEDURES (MAY 2014) FAR
52.203-08  CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (MAY 2014) FAR
52.203-10  PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (MAY 2014) FAR
52.203-12  LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (OCT 2010) FAR
52.203-17  CONTRACTOR EMPLOYEE WHISTLEBLOWER RIGHTS AND REQUIREMENT TO INFORM EMPLOYEES OF WHISTLEBLOWER RIGHTS (DEC 2008) DFARS
52.203-990  PROHIBITION ON PERSONS CONVICTED OF FRAUD OR OTHER DEFENSE-CONTRACT-RELATED FELONIES (DEC 2008) DFARS
52.204-02  PRINTED OR COPIED DOUBLE-SIDED ON POSTCONSUMER FIBER CONTENT PAPER (MAY 2011) FAR
52.204-7012  SAFEGUARDING OF UNCLASSIFIED CONTROLLED TECHNICAL INFORMATION (NOV 2013) DFARS
52.209-7000  PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS (DEC 1991) DFARS
52.209-06  PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (AUG 2013) FAR
52.209-7004  SUBCONTRACTING WITH FIRMS THAT ARE OWNED OR CONTROLLED BY THE GOVERNMENT OF A TERRORIST COUNTRY (MAR 2014) DFARS
52.222-26  EQUAL OPPORTUNITY (MAR 2007) FAR
52.222-21  PROHIBITION OF SEGREGATED FACILITIES (FEB 1999) FAR
52.222-26  EQUAL OPPORTUNITY (MAR 2007) FAR
52.222-40  NOTIFICATION OF EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT (DEC 2010) FAR
52.226-7001  UTILIZATION OF INDIAN ORGANIZATIONS, INDIAN-OWNED ECONOMIC ENTERPRISES, AND NATIVE HAWAIIAN SMALL BUSINESS CONCERNS (SEP 2004) DFARS
52.232-17  INTEREST (MAY 2014) FAR
52.232-7010  LEVIES ON CONTRACT PAYMENTS (DEC 2006) DFARS
52.242-13  BANKRUPTCY (JUL 1995) FAR
52.243-7002  REQUESTS FOR EQUITABLE ADJUSTMENTS (DEC 2012) DFARS

CONTINUED ON NEXT PAGE

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

CONTINUATION SHEET

REFERENCE NO. OF DOCUMENT BEING CONTINUED
SPE2D8-15-D-M601

PAGE 16 OF 18 PAGES

(b) (ii) In accordance with 10 U.S.C. 2410(a), any request for equitable adjustment to contract terms that exceeds the simplified acquisition threshold shall bear, at the time of submission, the following certificate executed by an individual authorized to certify the request on behalf of the Contractor:

I certify that the request is made in good faith, and that the supporting data are accurate and complete to the best of my knowledge and belief.

_____
(Official's Name)

_____
(Title)

**52.247-34  F.O.B. DESTINATION (NOV 1991)  FAR**

**52.247-0034  POINT OF CONTACT FOR TRANSPORTATION INSTRUCTIONS (JUN 2013)  DLAD**

**52.216-18  ORDERING (OCT 1995)  FAR**

(a) Minimum order. When the Government requires supplies or services covered by this contract in an amount of less than 25 units or less the Government is not obligated to purchase, nor is the Contractor obligated to furnish, those supplies or services under the contract.

(b) Maximum order. The Contractor is not obligated to honor—

(1) Any order for a single item in excess of 7000;

(2) Any order for a combination of items in excess of 7000; or

(3) A series of orders from the same ordering office within 10 days that together call for quantities exceeding the limitation in paragraph (b)(1) or (2) of this section.

(c) If this is a requirements contract (i.e., includes the Requirements clause at subsection 52.216-21 of the Federal Acquisition Regulation (FAR)), the Government is not required to order a part of any one requirement from the Contractor if that requirement exceeds the maximum-order limitations in paragraph (b) of this section.

(d) Notwithstanding paragraphs (b) and (c) of this section, the Contractor shall honor any order exceeding the maximum order limitations in paragraph (b), unless that order (or orders) is returned to the ordering office within 3 days after issuance, with written notice stating the Contractor's intent not to ship the item (or items) called for and the reasons. Upon receiving this notice, the Government may acquire the supplies or services from another source.

(End of Clause)

**52.216-22  INDEFINITE QUANTITY (OCT 1995)  FAR**

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum". The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum".

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided, that the Contractor shall not be required to make any deliveries under this contract after 120 days.

(End of Clause)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential

3M00004465    3M Confidential

3M00004466

MCHB-TS-CHC (40)

MEMORANDUM FOR CHIEF OF STAFF, ARMY, ATTN: DACS-DMS

SUBJECT: Proposed Weekly Summary Item – Combat Arms Earplug

1. Request the enclosed item be published in the Chief of Staff's Weekly Summary for dissemination to Army general officers worldwide.

a. Title: Combat Arms Earplug

b. Author/Action Officer: Dr. Doug Ohlin

c. Telephone No./FAX No.: (410) 436-3797/1125

d. Building/Room No.: E1570/Rm152

e. Email Address: douglas.ohlin@amedd.army.mil

f. Staff Agency: U.S. Army Center for Health Promotion and Preventive Medicine

2. All abbreviations have been spelled out followed by acronyms in parentheses. The proposed item has been approved at general officer level as indicated by the signature below.

Encl

//Original Signed//
BRYCE H. SIMMONS
Brigadier General, USA
Commanding

The Combat Arms Earplug
Dr. Doug Ohlin
U.S. Army Center for Health Promotion and Preventive Medicine (USACHPPM)

In partnership with the French-German Institute in Saint Louis, France and the Army Research Laboratory (ARL), USACHPPM has coordinated the introduction of a new earplug specifically designed for the dismounted Soldier or Marine. The Combat Arms Earplug affords protection from weapons fire over a wide range (up to 190 decibels peak level) while marginally interfering with voice communications and the detection and localization of environmental (combat) sounds.

While protective, the Combat Arms Earplug also promotes realism in training since weapons fire sounds louder than with conventional hearing protection. The filter inserted in the stem of the earplug is "nonlinear." Noise reduction capability increases with the noise level of the weapons fire. At low sound levels, however, there is little or no sound reduction and speech communication occurs without shouting. A detection model, developed at ARL, predicts that a normal hearing soldier can detect a truck at the same distance (800 meters) with or without the Combat Arms Earplug. That detection capability is cut in half with conventional foam plugs.

The double plug design includes a solid linear earplug that can be used for steady-state noise such as in helicopters or armored personnel carriers. The solid earplug also prevents wind noise at the filter opening. In addition, the earplug color scheme (yellow and olive drab) promotes stealth in the dismounted mode and monitoring of proper use in steady-state noise.

These passive devices work without batteries, are easy to maintain and compatible with military headgear. In the Combat Arms Earplug, we finally have a hearing protector that protects without impairing military effectiveness. Use National Stock Number 6515-01-466-2710 to order.

The Combat Arms Earplug point of contact is Dr. Doug Ohlin, USN 584-3797, Commercial (410) 436-3797, email douglas.ohlin@amedd.army.mil.

CID_File0156

(EXHIBIT 2)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## The Combat Arms (Non-Linear) Earplug

For the dismounted soldier or marine, conventional hearing protection can interfere with the communication requirements of a mission. When hearing protection is needed the most, i.e., firing weapons away from fixed firing points with a loudspeaker systems that can overcome the attenuation of the hearing protectors.

In steady-state noise over 85 dBA (e.g., in armored vehicles, aircraft or watercraft), conventional hearing protectors can actually improve communication ability. In steady-state noise, they function like sunglasses that cut down ambient noise to a level where the ear is not "overloaded". In relative quiet, however, conventional (linear) hearing protectors interfere with both speech communication and the detection of environmental (combat) sounds.

The solution for the dismounted soldier or marine would be a non-linear hearing protector that would mitigate the hazard from weapons fire over a desired range, but marginally interfere with communications and detection of combat sounds such as vehicle noise, enemy in leaves, closing of a flakbolt, etc.

The concept of non-linear earplugs is not new; however, Dr. Armand Dancer and his colleagues at the French-German Institute de Saint Louis have dramatically improved this low tech and inexpensive solution to a long-standing problem. A shell "filter" is inserted into the center (stem) of an earplug. This filter is a cylindrical device of a specified length with holes in each end of a very precise diameter.

The American military's contribution in this development effort has been to recommend an American-made earplug to the French filter, the color scheme and accommodate testing. The singles-sized Ultrafit should be the French ergonomic designers, a solution has been provided on how to stabilize and wind noise while sampling the earplug for steady-state noise use.

One end of the double-wave design includes a solid (linear) earplug that can be used for steady-state noise environments. This precludes a requirement to carry a second set of conventional earplugs that won't fit into the standard carrying case. The light color of the non-linear earplug assists in keeping the requirement to keep the non-linear earplug clean and in good working order. The solid (linear) end of the earplug is colored olive drab for compatibility with the stealth mode associated with the operation. Moreover, the visibility of the light-colored, non-linear end of the earplug is not as important in law enforcement and monitoring of the correct device to be used for that noise environment.

The calibrated holes in the non-linear earplug significantly dampen the more hazardous high frequency component of the noise signature. The reader's understanding of the concept could be assisted by the analogy of an acoustic friction being created as the impulse noise (that overpressure) passes through a narrow orifice. This noise reduction capability actually increases with the noise level of weapons fire. Here the term, non-linear. The non-linearity begins at about 110 dBP and increases by 17 dB to 190 dBP with an overall peak reduction of 25 dB. Testing at an overall earplug provides protection up to 190 dBP.

While high frequency impulse noise is significantly reduced, speech energy is passed. In addition, a detection model developed at the Army Research Lab predicts a normal-hearing soldier (H-1 profile) can detect a truck at the same distance (800 meters) with or without the non-linear plug. That detection capability is cut in half (400 meters) with conventional foam plugs.

A National Stock Number (NSN) 6515-01-466-2710 has been issued. The one size that is available will fit most of the adult male population. A smaller size may be required in the near future. The following information is included in the Defense Logistics Agency catalog file: Prior, EarUnit package quantity 2." Catalog #30-1000 Price 95.00. For now the price is a guideline only. #370-1000 Price 95.00. For now the price is a bag that could bring down the unit price.

In summary, the Combat Arms Earplug affords a cheap, low tech solution for protecting the hearing of soldiers and marines in dismounted operations from impulse noise weapons fire. These

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File 0157

3M Confidential

3M000004467

3M000004468

3M Confidential

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential

3M00004469

passive, non-linear devices work without batteries, are easy to maintain and are compatible with most headgear. They present little insertion loss at low sound levels, which allows for speech communication (without shouting) and the detection and localization of acoustic sources at almost the same conditions as without hearing protectors. In the Combat Arms Earplug, we finally have a hearing protector that protects without impairing military effectiveness.

References

[1]Dancer, A. and Hamery P., "Nonlinear Hearing Protection Devices," Proceedings of 22nd Annual Conference of the National Hearing Conservation Association, Albuquerque, New Mexico, 19-21 Feb 1998.

[2]Johnson, D., "Nonlinear Earplug Study," Research Project Conducted by EG&G Management Systems, Inc., under Contract DAMD-17-93-C-3101 to the U.S. Army Medical Research and Materiel Command, June 1995.

CID_File0158

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

| Device | Date of Label Test | Laboratory | Test ID | Notes |
|---|---|---|---|---|
| 3M '1100' | 4/1999 | Michael & Assoc. | OO15A | |
| 3ME-A-R Taperfit 2 | 7/1992 | E-A-RCAL | 124002 | |
| 3M/EAR EARsoft Yellow Neon | 4/1999 | E-A-RCAL | 22401'0 | |
| 3M/EAR EARsoft Y N. Blass² | 2/2000 | Michael & Assoc. | OO76A | |
| 3M/EAR EARsoft FX | 2/2000 | E-A-RCAL | 294026 | |
| 3M Tattoo | 2/2000 | | OO76A | |
| 3M/EAR Express Pod | 5/1994 | E-A-RCAL | 114002 | |
| 3M/EAR Push-ins | 6/2002 | E-A-RCAL | 214026 | |
| 3M/EAR Skull Screws | 1/2006 | E-A-RCAL | 214038 | |
| 3M/EAR Skull Screws | 8/2011 | E-A-RCAL | 214059 | Original test |
| 3M/EAR UltraFit 27 | 1/2006 | Michael & Assoc. | C867A | Formula change |

**Notes:**

¹ Tested for 3M prior to 3M purchasing E-A-R/Aearo Technologies ('06)

² The EARsoft Yellow Neon Plug (2-sizes) label test [224010] was completed in Apr. 1999. The label test of the Yellow Neon Blass (1 size) was completed in Feb., 2000 at Michael & Assoc. test, OO76A, is used for the Tattoo Plug also.

**Label tests of Versions 1, 2, 3, and 4 of the Combat Arms Earplug (CAE):**

| | | | |
|---|---|---|---|
| Version 1, Single end (Open) | 5/2003 | E-A-RCAL | 215006 |
| Version 2, Yellow (Open) end | 1/2000 | E-A-RCAL | 213016 |
| Version 2, Green (solid) end | 5/2000 | E-A-RCAL | 213017 |
| Version 3. Open | 8/2008 | E-A-RCAL | 215018 |
| Version 3. Closed | 5/2007 | E-A-RCAL | 215015 |
| Version 4. Open | 9/2009 | E-A-RCAL | 215023 |
| Version 4. Closed | 6/2009 | E-A-RCAL | 215024 |

**Other 16-subject tests of the CAE, Version 2:**

| | | | |
|---|---|---|---|
| Version 3, Open | 9/2004 | E-A-RCAL | 215009 |
| Version 4, Closed | 4/2008 | E-A-RCAL | 21501'2 |

Table 1 – Listing of REAT Tests of 4 versions of the Combat Arms Earplugs

| Test ID and N | Date | Ver. | Position | NRR Closed/Open | Notes |
|---|---|---|---|---|---|
| 213527 (5) | Sept., 2002 | 1 | Open | 8 | |
| 215006 (10) | May, 2002 | 1 | Open | 8 | |
| 213015 (8) | Jan., 2000 | 2 | Closed | 11 | Tested stopped, fitting problems |
| 21301'8 (10) | Jan., 2000 | 2 | Open | 0 (-2)?? | |
| 21301'7 (10) | May, 2000 | 2 | Closed | 22 | Flanges of yellow end folded back |
| 215009 (10) | June, 2004 | 2 | Open | 0 (-1)?? | |
| 215007 (5) | June, 2005 | 2 | Open | 4 | |
| 215008 (5) | June, 2005 | 2 | Closed | 15 | |
| 215511 (5) | June, 2005 | 2 | Open | 6 | |
| 215512 (5) | Sept., 2005 | 2 | Closed | 21 | |
| 215515 (5) | Sept., 2005 | 2 | Closed | 21 | |
| 21501'2 (10) | April, 2008 | 2 | Open | 6 | |
| 215516 (5) | April, 2007 | 2 | Closed | 14 | |
| 215503 (3) | April, 2005 | 3 | Closed | 14 | |
| 215504 (3) | April, 2005 | 3 | Open | 5 | |
| 215505 (5) | June, 2005 | 3 | Closed | 0 (-8)?? | |
| 215506 (5) | June, 2005 | 3 | Open | 17 | Chooses largest tip |
| 215609 (5) | June, 2005 | 3 | Open | 6 | |
| 215612 (10) | June, 2005 | 3 | Closed | 21 | |
| 215513 (5) | Sept., 2005 | 3 | Open | 6 | |
| 215514 (5) | Sept., 2005 | 3 | Closed | 23 | |
| 21501'8 (10) | Aug., 2008 | 3 | Open | | Chooses smallest tip |
| 215012 (10) | Aug., 2008 | 4 | Open | 7 | |
| 215013 (10) | Feb., 2009 | 4 | Closed | 17 | Medium tip is beige |
| 215020 (10) | May, 2009 | 4 | Open | 5 | Medium tip is beige |
| 215021 (10) | May, 2009 | 4 | Closed | 7 | Medium tip is blue |
| 215016'(10) | May, 2007 | 3 | Closed | 20 | |
| 215617 (3) | May, 2007 | 3 | Closed | 21 | Medium tip is blue |
| 215622 (10) | June, 2009 | 4 | Open | | Medium tip is blue |
| 215623 (10) | June, 2009 | 4 | Open | 7 | Modified rocker panel |
| 215624'(10) | June, 2009 | 4 | Open | | Chooses smaller tip |

3M Confidential - Attorneys' Eyes Only

3MO0004550

3M Confidential - Attorneys' Eyes Only

3MO0004551

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

Elliott H.
Berger/AH-Aearo/3M/US

10/10/2009 07:42 PM

To   <richard.mckinley@wpafb.af.mil>, <Rich3audio@aol.com>

cc

bcc

Subject   arguments why impulse testing is not necessary for
conventional HPDs up to 165 dB (copy was sent to your
home and others)

Rich,

As promised, my thoughts on the above issue. The two attached papers demonstrate that conventional HPDs offer constant or mildly increasing attenuation up to about 165 dB. It is only in the extreme levels above about 170, that impulse testing may be needed and unusual effects occur. It would greatly simplify guidance for most users and for EPA labeling and still give you what you need for your extreme exposures if we could just say that for conventional products, for continuous or impulsive noise up to 165 dB, you can just run the REAT and use the results.

One of your concerns is that you want to require impulse testing for all devices for "consistent" comparisons for performance in impulse noise. However, that will still not be accomplished even if you require the an ATF-Impulse test be run for all products. That is because the errors in the ATF, and there are indeed errors (see next paragraph) are different for different devices. For conventional passive HPDs for which the principal sound path is mechanical, i.e. motion of the HPD against the head or in the canal, the ATF error is because of lack or precise mechanical modeling and of course BC paths that must be estimated. However, for intentionally level-dependent HPDs the principal sound path over most of their performance range is an acoustical path, either through an orifice or electronically. That path is more accurately captured by the ATF and prone to different types of errors, but there is still the BC error if the devices give particularly high levels of attenuation. Thus the head fails to provide a consistent means to compare the various devices. I was with Karl Buck the last couple of days in Canada and we discussed this issue and indeed I believe he agrees with my point of view.

As for the "errors" in the ATF, those are clear when one considers that REAT is the gold standard (except for known minor errors at and below 250 Hz) and the fact that no ATFs have provided data over the entire range of products (especially inserts, and particularly foam inserts) that properly corresponds with REAT data.

16,094.pdf   T07-38 ASA Level Dep Plug Eval.pdf

Thus, the use of impulses is desirable and does test the HPD with the signal to which it will be exposed, but tests it on a fixture that has its own inaccuracies. On the other hand, REAT provides the best estimate of the true IL, albeit tested with a different signal than the one you desire. However, up to 165 dB this is not a problem. Furthermore, even though you are testing with an impulse, performance will clearly differ for various impulse shapes, and we are only using one specific impulse in our test protocol.

I support keeping the impulse testing an offering it, even requiring it for impulses above 165 dB, but also feel that we should make it clear that such tests below 165 dB are applicable, but not more any more definitive than the straightforward REAT evaluation. Thus I feel that our Table 1 in S12.42 should be changed so that instead of saying "preferable" in the cells under impulse testing for passive muffs and passive plugs, we state instead that it is "applicable."

Thank you for considering these suggestions.

Also, please at your earliest convenience provide the materials we discussed to complete the comments response to ARL's vote on our standard.

Regards,

Elliott

Elliott H. Berger
Product Development Specialist
3M Occupational Health & Environmental Safety Division
7911 Zionsville Rd.
Indianapolis IN, 46268-1657
317-692-3031 (desk)
317-752-0614 (cell)
Elliott.Berger@mmm.com

(EXHIBIT 1)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENS

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

| | | |
|---|---|---|
| **Elliott H.** | **To** | John P. Doyle/SS-SalesSupport/3M/US@3M-Corporate |
| **Berger/AH-Aearo/3M/US** | **cc** | Deborah L. Frisco/US-Corporate/3M/US@3M-Corporate |
| 02/27/2009 05:32 PM | **bcc** | |
| | **Subject** | Re: Combat Arms support |

John,
We do not have any white papers on this product at this time. You of course have the sell sheets.

I have attached ppt slides that demonstrate performance. The second slide is data from the ISL Franco-German laboratory and the 1st and 3rd slides are from the Army. They do not deal specifically with speech. The Arc will not be transparent in that it does block some sound in the speech frequency range, but it blocks much less than conventional HPDs.

I have also attached a paper I presented last year at an international conference that, albeit in a rather technical format, demonstrates the performance of the product. This is the background for the simple slide 2 in the ppt file.

Hope this helps.



Combat Arms Plug.ppt

PS - the Combat Arms and Arc are the same except for color. T07-38 ASA Level Dep Plug Eval.pdf

Elliott H. Berger
Senior Scientist, Auditory Research
E-A-R / Aearo Technologies
317-692-3031

John P. Doyle/SS-SalesSupport/3M/US

| | | |
|---|---|---|
| **John P.** | | |
| **Doyle/SS-SalesSupport/3M/** | **To** | Elliott H. Berger/AH-Aearo/3M/US@3M-Corporate |
| **US** | **cc** | Deborah L. Frisco/US-Corporate/3M/US@3M-Corporate |
| 02/15/2009 10:18 AM | **Subject** | Combat Arms support |

Elliot,

We have an challenge to support our claim of how well Combat Arms / Arc plug works. One of our Government Reps, Deb Frisco in Seattle, has a customer that does not believe the technology works as we say it does. Basically our position is 1) the ability to hear clear communications, such as voice, in low to no noise areas, and 2) the protection of extreme amounts of noise in the event of a blast / bang / shot.

Do you have any literature on hand that may clarify what this product does and how we might substantiate it?

(EXHIBIT 5)

Confidential Subject to Protective Order – Attorneys' Eyes
Only

3M00004559
CID File0161

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

Elliott H.
Berger/AH-Aearo/3M/US

01/23/2009 04:44 PM

To   Ron W. Kieper/AH-Aearo/3M/US@3M-Corporate

cc

bcc

Subject   info for combat arms report - please include in the report at some point

On 1/13/09 a conversation between Jeff Hamer, Brian Myers, Doug Moses, and Elliott Berger transpired over the issue of additional testing on the Version 2 CAE earplug. The issue under review was the NRR of 0, 0, and 5 on three different valid tests and whether 0 was a suitable NRR to retain for that version of the product. The decision was made to abide by the first test of 0 (as confirmed by the second test 4 years later).

In the same way we would maintain an initial NRR on any conventional HPD, unless we had suspicion that the original test was flawed or the product had changed, the thinking was that the same rules should apply to the CAE. This is the case even though for the CAE in the open mode, lower attenuation is more desirable rather than higher in terms of NRR. However, on might argue that for audibility, the rating should be a ARR (audibility reduction rating) and that 2 standard deviations should be added to the mean instead of being subtracted from it. So the NRR as computed is not well adapted to the audibility issue. It is better that we continue to report the value of 0, but make sure that we point out that this does not imply "no effect on audibility."

Of further concern was the question of what to do with a new, fourth test. Would it supplant the prior data or be averaged together with it? And what if it were outside the range of prior values? In the absence of compelling data to suggest a flaw in the initial protocol or samples that were tested, we decided to maintain the number at 0.

Elliott H. Berger
Senior Scientist, Auditory Research
E-A-R / Aearo Technologies
317-692-3031

(EXHIBIT 1)

Attorneys' Eyes
Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENS...

3M00004558
CID File0162

FOR ... CIAL USE ONLY – LAW ENFORCEMENT SENS ...

00019-2016-CID133-014635

## E-A-Rcal ATTENUATION TEST REPORT
### PER ANSI S3.19-1974

Page 1 of 4

DEVICE: Combat Arms Plug
DEVICE TYPE: Premolded, level-dependent earplug
MANUFACTURER: E-A-R/Aearo Company
TEST DATE: January 25, 2000    TEST ID#: 213016
SUBJECTS/SAMPLES: 10/10    NRR (per EPA-1979): -2.0
BAND FORCE (N): NA    POSITION: NA
FITTING PROCEDURE: EPA/Experimenter Fit

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 4.7 | 4.0 |
| 250 | 4.2 | 4.3 |
| 500 | 6.0 | 5.0 |
| 1000 | 9.5 | 6.7 |
| 2000 | 16.7 | 4.9 |
| 3150 | 18.6 | 5.7 |
| 4000 | 16.3 | 5.8 |
| 6300 | 16.7 | 6.1 |
| 8000 | 17.2 | 6.8 |

Performed by: Ronald W. Klepe
Ronald W. Klepel
Sr. Acoustic Technician

Reviewed by: Elliott H. Berger
Manager, Acoustical Engineering

3M Confidential

3M00004880

---

## E-A-Rcal ATTENUATION TEST REPORT
### PER ANSI S3.19-1974

Page 1 of 4

DEVICE: UltraFit Earplug end of the Combat Arms Plug
DEVICE TYPE: Premolded earplug
MANUFACTURER: E-A-R/Aearo Company
TEST DATE: May 9, 2000    TEST ID#: 213017
SUBJECTS/SAMPLES: 10/10    NRR (per EPA-1979): 21.7
BAND FORCE (N): NA    POSITION: NA
FITTING PROCEDURE: EPA/Experimenter Fit

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 32.7 | 5.9 |
| 250 | 31.8 | 6.1 |
| 500 | 33.0 | 6.6 |
| 1000 | 32.0 | 5.6 |
| 2000 | 34.5 | 4.1 |
| 3150 | 37.3 | 5.3 |
| 4000 | 38.9 | 6.1 |
| 6300 | 43.8 | 6.7 |
| 8000 | 43.3 | 6.9 |

Performed by: Ronald W. Klepe
Ronald W. Klepel
Sr. Acoustic Technician

Reviewed by: Elliott H. Berger
Manager, Acoustical Engineering

Comments: GWG failed the Extreme Range test at 125 (27) and 500 Hz (21); he was retested. The original NRR was 20.7 dB.

3M Confidential

3M00004881

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0163

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

**E-A-RCAL ATTENUATION TEST REPORT**
**PER ANSI S3.19-1974**

Page 1 of 4

NVLAP

DEVICE: Tactical 6-S
DEVICE TYPE: Electronic Earmuff
MANUFACTURER: Peltor/Aearo Company
TEST DATE: May 18, 2000
SUBJECTS/SAMPLES: 10/2
BAND FORCE (N): 12.0
FITTING PROCEDURE: EPA/Experimenter Fit

TEST ID#: 268121
NRR (per EPA-1979): 19.4
POSITION: Behind the head

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 11.0 | 3.5 |
| 250 | 17.1 | 3.3 |
| 500 | 27.2 | 4.3 |
| 1000 | 35.0 | 4.3 |
| 2000 | 31.1 | 2.5 |
| 3150 | 39.4 | 3.8 |
| 4000 | 40.7 | 3.8 |
| 6300 | 38.0 | 4.2 |
| 8000 | 36.5 | 4.7 |

Performed by: _Ronald W. Kieper_
Ronald W. Kieper
Sr. Acoustical Technician

Reviewed by: _Elliott H. Berger_
Elliott H. Berger
Manager, Acoustical Engineering

Comments: Two batteries were installed into cup and the electronics were turned off during all testing.

3M Confidential

3M0004882

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

(EXHIBIT 2)

CID-File0164

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

# Michael & Associates, Inc.

Penn State Research Park
200 Innovation Blvd, Suite 223-014635
State College, PA 16801
814-234-7042 phone
814-235-1381 fax
Email: michaelassoc@home.com
URL: www.michaelassociates.com

March 2, 2001

Hearing Protective Device Test Report Number Q184A Revision 1

AEARO Corp.
Attn: Dick Knauer
7911 Zionsville Road
Indianapolis, IN 46268-1657

Date of Sample Receipt: 2/7/01
Date of Sample Test: 2/9/01-2/28/01

Attenuation measurements have been performed according to the American National Standards Institute (ANSI) Specifications, ANSI S3.19-1974, using the experimenter-fit protocol, on the Aearo 2014-I insert-type hearing protector worn (test ID Q184A). The specified threshold measurement data were obtained using ten normal-hearing listeners, five male and five female, with ages ranging from 19 to 45 years. These listeners were selected from a standby group of about 35 volunteers, mostly graduate students, who regularly serve as listeners for measurements of this kind.

The measurements were made in a room designed for this purpose. All acoustic characteristics of the room meet the requirements outlined in ANSI S3.19-1974. The ambient noise levels in this room are below the limits specified in ANSI S3.19-1974, and open ear thresholds are used on a continuing basis to monitor the background noise levels. An automatic recording attenuator was used to record both open and occluded ear thresholds.

Each of ten subjects was tested three times at each of nine test frequencies. The attached Tables show grand mean attenuation values in decibels (dB) for each test signal along with group attenuation values. Standard deviations (S.D.) for the 30 different attenuation determinations for each test signal are also given. The results presented in this report pertain to the samples tested only.

Michael & Associates is accredited by the National Institute of Standards and Technology (NIST) National Laboratory Accreditation Program (NVLAP) for tests performed according to ANSI S3.19-1974 and ANSI S12.6-1984. These accreditation criteria encompass the requirements of international standards ISO 9002:1994 (ANSI / ASQC Q92-1987), ISO / IEC Guide 25:1990, and ISO / IEC Guide 58:1993 as suppliers of test results. This report may only be reproduced or transmitted electronically in it's entirety. This report shall not be used to claim product endorsement by NVLAP or by any agency of the U.S. Government. All measurement equipment are calibrated with instrumentation traceable to the NIST.

*Use these laboratory-derived attenuation data for comparison purposes only. The amount of protection afforded in field use is often significantly lower depending on how the protectors are fitted and worn.*

Kevin Michael, Ph.D.
President

3/2/01
Date

Page 1 of 3

3M Confidential

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3M00004885
EXHIBIT 4

FOR ... CIAL USE ONLY – LAW ENFORCEMENT SENS. ...

00019-2016-CID133-014635

Policies and Procedures Manual
for the E-A-R / Aearo Company
E-A-RCAL™ Acoustical Laboratory
re ANSI S3.19-1974 and ANSI S12.6-1997

E-A-R 91-41/HP

Elliott H. Berger, M.S.
Ronald W. Kieper, B.S.

E-A-R / Aearo Company
E-A-RCAL™ Acoustical Laboratory
7911 Zionsville Road
Indianapolis, IN 46268-1657
phone: 317-692-1111
fax:    317-692-3116

8/20/2003

Version 7.1

E-A-RCAL™ Laboratory is accredited by the National Institute of Standards and Technology, National Voluntary Laboratory Accreditation Program, for the measurement of attenuation of hearing protection devices re ANSI S3.19-1974 and ANSI S12.6-1997. Laboratory Code 103744.

3M Confidential - Attorneys' Eyes Only

3M00005005

3M00005006

3M Confidential - Attorneys' Eyes Only

EXHIBIT

CID File0166

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## ABSTRACT

Policies and procedures by which E·A·RCAL™ Laboratory, Aearo Company's acoustical laboratory, conducts real-ear attenuation at threshold (REAT) testing re ANSI S3.19-1974 and ANSI S12.6-1997 are defined and described. The report annotates the quality policy statement that governs the overall operations of the facility, states the project acceptance policies and fees, specifies the instrumentation and calibration schedule, and describes the staff qualification and training requirements. It then goes on to detail the procedures involving experimental test subjects, the processing of test variables, attenuation testing, and the handling of data and statistical procedures. Sample hearing protection device test reports are included. E·A·RCAL policies for complaint resolution and corrective actions, and use of the NVLAP logo on laboratory reports are also presented.

## TABLE OF CONTENTS

INTRODUCTION ... 1
QUALITY POLICY STATEMENT ... 1
LABORATORY MANAGEMENT ... 2
    Project Acceptance Policies, Confidentiality, and Fees ... 2
    Laboratory Access ... 3
    Use of Subcontractors ... 3
INSTRUMENTATION, CALIBRATION, AND TRACEABILITY ... 3
    Procurement of Sound-Field Audiometric Test Cards ... 3
STAFF QUALIFICATION AND TRAINING POLICIES ... 4
    Laboratory Director ... 4
    Acoustical Technician(s) ... 5
EXPERIMENTAL TEST SUBJECTS ... 5
    Subject Recruitment ... 5
    Initial Screening ... 6
    Training ... 7
    Requalification ... 7
    Removal from Panel ... 8
HANDLING TEST SAMPLES ... 8
TESTING PROCEDURES ... 9
    Daily Calibration ... 9
    Subject Selection, and for S12.6 Method B, Requirements for Requalification and Reuse ... 9
    Head Colds ... 9
    Test Protocol ... 10
    Fitting the HPD ... 10
    Waiting Period(s) ... 11
    Administering the Audiogram ... 12
    Comfort Ratings ... 12
    Equipment Operator / Scoring the Audiogram ... 13
    Measuring Band Force ... 13
HANDLING THE DATA ... 13
STATISTICAL PROCEDURES ... 14
DESCRIPTION OF THE HPD TEST REPORT ... 15
GENERAL UNCERTAINTY OF MEASUREMENT ... 16
COMPLAINT RESOLUTION PROCEDURES ... 16
REQUIREMENTS FOR REVIEWS, AUDITS, AND CORRECTIVE ACTION ... 17
    Audit Requirements ... 17
    Corrective Action Procedures ... 18
USE OF THE NVLAP LOGO ... 19

3M Confidential - Attorneys' Eyes Only

3M00005007

3M00005008

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

RECORD RETENTION ................................................................. 19

REVISIONS TO THIS MANUAL AND RETIREMENT OF OBSOLETE DOCUMENTS
Document History ................................................................. 19
Revisions and Retirement of Obsolete Documents ................... 21

REFERENCES ......................................................................... 22

APPENDICES                                                      (TOTAL PAGES excluding appendix cover page)
I   - Sample ANSI S3.19 Test Report for an earmuff                    (8)
II  - Sample ANSI S12.6 Test Report for an earplug                    (9)
III - Complete Equipment List for ANSI S3.19/S12.6 Test Procedures    (2)
IV  - Procedures for Recording Anatomical Measurements and Related Data (2)
V   - Statistical Procedures for Rejecting Outlier Data               (3)
VI  - Excerpts from Marsala (1988), Chapter 17                        (4)
VII - Detailed Description of ANSI S3.19 and S12.6 HPD Test Reports   (2)

Tables I - III
Figures 1 - 5

## INTRODUCTION

This report defines the operating policies and procedures by which E•A•R/Aearo™ Laboratory, E•A•R/Aearo Company's accredited laboratory, conducts realear attenuation at threshold (REAT) testing re ANSI S3.19-1974 and ANSI S12.6-1997. The E•A•R/CAL Laboratory was designed and constructed in 1977, and has been utilized for hearing protector testing since 1979. It was first accredited under the NVLAP program in January, 1992.

E•A•R/CAL Laboratory is principally involved in the testing, development, and quality assessment of new and existing hearing protection devices (HPDs) for E•A•R/Aearo Company, and research in support of standards development and peer-reviewed journal articles. Additionally E•A•R/CAL Laboratory provides contract test services to industry, the government, and universities.

This report is the parent document of a series of five reports that describe E•A•R/CAL Laboratory's S3.19/S12.6 testing and calibration. The reports, which are included in the References, are also listed below. The laboratory and associated instrumentation are described in the general calibration document, E•A•R 90-32/HP.

- E•A•R 90-32/HP    General calibration    [11/27/91, Version 4.1]
- E•A•R 91-14/HP    Audiometer calibration    [05/03/99, Version 3.1]
- E•A•R 91-15/HP    Microphone and calibrator calibration    [07/12/89, Version 2.1]
- E•A•R 91-44/HP    Reliability of REAT measurements    [04/09/02, Version 6.1]

The rationale behind this series of reports is that procedures involving calibration, especially those which are conducted only occasionally (for example, annually), are described in exacting detail. The technician will be able to read the appropriate series of the reports and follow them step by step. On the other hand, procedures that are conducted on a weekly or daily basis are not presented in a step-by-step manner, but rather are summarized so that the key components are described for reference purposes.

The ANSI standards, S3.19 and S12.6, for which E•A•R/CAL Laboratory maintains NVLAP conformance, are reserved in the Acoustical Laboratory file drawers.

## QUALITY POLICY STATEMENT

E•A•R/CAL Laboratory is committed to providing acoustical testing services within the limits of its operational capabilities, in conformance with the relevant ANSI standards, dictates of Policy Manual, E•A•R 9-1/HP, and the requirements of NIST Handbook 150. This includes adherence to interpretation of the subjective aspects of the ANSI standards such as the subject selection, fitting, and management specifications, and meticulous attention to the details of calibration, documentation, equipment maintenance, and preventative action procedures found in the Policy Manual. Every member of the laboratory staff has read and affirms the Laboratory Director's quality policy, including the responsibility it is to implement and oversee the quality system. The quality policy is also promoted and supported by all the levels of management to which the Laboratory Director reports, as evidenced by this signed certificates, stored in the E•A•R/CAL files along with this Policy Manual.

† Review of this Policy and Procedures Manual is documented by signature on the Policy Manual Review Form, located in the Training Records binder in the Acoustical Laboratory files.

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File 0168

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

E-A-R 91-41HP    Page - 2

The quality system necessary to implement the above stated policy is embodied in this policy and procedures manual and the accompanying documentation and prescribed defined herein.

## LABORATORY MANAGEMENT

E-A-RCAL Laboratory is a reporting unit within the Manufacturing and R&D Group of Aearo Company, one of the world's largest manufacturers of safety products. The organizational structure of which E-A-RCAL Laboratory is a part is shown in Figure 1. The operations of the laboratory are supervised by the Manager of Acoustical Engineering, also for purposes of this report referred to as the Laboratory Director. He reports to the Technical Director, but should the need arise can also communicate directly with the Senior Vice President, Manufacturing and R&D. The Laboratory Director maintains the quality manual and monitors document control (see Revisions and maintenance of obsolete documents), and is the only approved signatory for all contract testing and for all correspondence with NVLAP.

The office of the Laboratory Director is in close proximity to the laboratory, and as such he works closely, on a daily basis, with the acoustical technician(s).

### Project Acceptance Policies, and Fees

The Laboratory's primary activities revolve around internally generated research. However, an additional mandate for E-A-RCAL Laboratory is to conduct outside, contract testing. The costliest portion for those tests is the Laboratory Director. Final decisions upon project acceptance are made by the Laboratory Director in conjunction with the Technical Director, E-A-R Hearing Products. The evaluation includes a determination of the suitability of the facility, and the resources for the testing being requested.

E-A-RCAL Laboratory conducts research projects for industry, government, and universities, but must be judicious when accepting work from competitors. Confidentiality of test results is maintained, at the contractor's request, but no information related to product testing finalized, patented (if appropriate), and introduced to the market, unless a written Agreement is entered into between the contractor and Aearo Company. Customers are welcome to witness testing upon arrangement with the Laboratory Director.

Hearing protector attenuation tests can be conducted in conformance with either ANSI S3.19 or S12.6. E-A-RCAL Laboratory also provides tests in normal compliance with the aforementioned standards, but with variances set to the exact subject fitting protocol (see Testing Procedures, Fitting the HPD), or the number of subjects and replications (i.e. they may request the S3.19-required 10 x 3 or S12.6-required 20 x 2 protocol, or optionally a 15 x 2, 20 x 1 protocol). Deviations from S3.19/S12.6 will be noted in the final report. Reports may be faxed to customers, at their request, but under such conditions the customers will be reminded that confidentiality can not be ensured.

A fixed fee[2] has been established for S3.19/S12.6 testing which includes a multi-page report detailing the test results and the Noise Reduction Rating (NRR as per EPA, 1979), and/or NRR(subject Fit) computed therefrom (see Description of the HPD Test Report, and Appendices I and II). For an additional fee, id customers a more comprehensive report with extensive analyses and complete descriptions of all test procedures can be provided.

[2] A 50% deposit is required to initiate testing.

E-A-R 91-41HP    Page - 3

### Laboratory Access

Use of the E-A-RCAL equipment and accompanying test chamber is limited to the staff of the laboratory. Any calibrated equipment that is loaned for other purposes shall be fully tested and verified for performance upon its return. Access to the Technical Department in which E-A-RCAL Laboratory is located is controlled after hours by key card locks and deadbolts at the various entrances.

### Use of subcontractors

E-A-RCAL Laboratory only accepts contracts that can be accommodated in the laboratory's normal test schedule. E-A-RCAL Laboratory has not in the past, and does not intend to in the future, use subcontractors to complete scheduled work. Should the unexpected need to use a subcontractor arise, or should the client request such additional involvement in the project, E-A-RCAL Laboratory will develop a policy consistent with NIST Handbook 150 (Gigac and White, 2001, Sec. 4.5).

### INSTRUMENTATION, CALIBRATION, AND TRACEABILITY

As of the equipment utilized for signal generation and measurement validation for the S3.19/S12.6 test procedures is specified in a computer data base that is regularly updated (Microsoft Access 97, file name = Earcal97.mdb). A sample of (the type of information contained in Earcal97.mdb is shown in Figure 2 for four pieces of test equipment, and a complete listing of all of the E-A-RCAL instrumentation involved in the S3.19/S12.6 procedures, along with the calibration intervals and party responsible for my calibration, is provided in Appendix III. The interconnection of the equipment is specified in E-A-R 90-32HP Instruction manuals for all of the E-A-RCAL instrumentation are retained in file drawers in the Acoustical Laboratory.

The Earcal97.mdb file is accessed at least monthly. A list of equipment requiring calibration within the next 30 days, along with a list of all pending calibrations, is printed and included with the technician's monthly report. The actual records of externally-conducted calibrations are retained in the cabinets in the Acoustical Laboratory; internally-conducted calibrations are also obtained in the file cabinets, in 3-ring binders in the laboratory, or in the technician's laboratory notebooks.

The E-A-RCAL facility is objectively calibrated in its entirety every 24 months using the complete set of procedures outlined in Appendix III of document E-A-R 90-32HP. In the alternate years, a biological validation is completed by measuring the attenuation of reference hearing protectors and other regular E-A-R 91-44HP. The traceability of external calibration of the ensemble of equipment and other regular calibration intervals are also specified in the section on Routine Calibration Requirements in E-A-R 90-32HP and the details of the calibration procedures themselves are found in Appendix III of that same report.

The reference standard equipment utilized by E-A-RCAL Laboratory, which is part of our traceability protocol, shall not be used for routine measurements. It is intended only for calibration measurements. The reference standard equipment includes the:

- B&K 4220 Calibrator                SN# 1595221
- B&K 4144 Microphone            SN# 1596056
- B&K 2619 Preamplifier            SN# 847855
- B&K 2619 Preamplifier            SN# 847856

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3M Confidential - Attorneys' Eyes Only

3MO0005011

3M Confidential - Attorneys' Eyes Only

3MO0005012

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

E·A·R·CAL 91-41/HP

Page 4

The regular calibration interval for the electronic equipment that is sent out of house for calibration, including the laboratory standard microphone and the acoustic calibrator, B&K 4144.1.1 microphone, and B&K 2619 preamp), is once every two years. The stability of the equipment, the labor and costs of calibration, and the transport of damages from shipping and handling, or storage in a controlled laboratory environment, argue for the merits of biennial calibration. Furthermore, the suggestion of extended calibration intervals was recommended by Richard Peppin during his 1996, 1999, and 2003 on-site NVLAP assessments of our facility.

Traceability of all calibrations to NIST is insured by requiring that all external calibration of E·A·R·CAL equipment be conducted in facilities that have been audited by E·A·R·CAL staff according to NVLAP Policy Guide PG-1/1998. Copies of the most recent documentation of the external facilities are kept on file in the Acoustical Laboratory.

### Procurement of Sound Field Audiometric Test Cards

Sound field test cards are the core supply utilized by the laboratory that requires acceptance testing. They are printed for the E·A·R·CAL Laboratory by Design Printing, Inc. of Indianapolis and are ordered in batches of 1000 to 2000 cards every two to three years. The current cards are of styles 84-1, 84-2, and 84-3. An example of 84-1 is illustrated in Figure 3. Upon delivery, approximately 1% of the cards is selected by placing them one at a time on the 1703B audiometer. The audiometer gain is initially set at 20 dB (left axis) using a reference card from ref. [3P5-8]. The pen is then slid horizontally across the entire range of test frequencies. A check is also run at 40 dB. If problems are detected, Design Printing is contacted and requested to reprint the cards.

## STAFF QUALIFICATION AND TRAINING POLICIES

### Laboratory Director

The Director of E·A·R·CAL Laboratory is Mr. Elliott H. Berger, Manager, Acoustical Engineering, Aearo Company, M.S., INCE Board Certified, Fellow of the Acoustical Society of America, past chair of the American Industrial Hygiene Association Committee on Noise, past President of the National Hearing Conservation Association, and current Board Member of the Council for Accreditation in Occupational Hearing Conservation. Mr. Berger designed and supervised the construction of E·A·R·CAL facility in 1977 and has been involved in continued hearing protector research and development since 1979. He is directly involved with and/or supervises all research and testing projects and is also responsible for staffing of the laboratory technician(s).

Mr. Berger has written over 60 articles on hearing protection/conservation, and was the principle editor for the 4th and 5th editions of the American Industrial Hygiene Association (AIHA) Noise Manual. He chairs the Acoustical Society of America's Accredited Standards Working Group S12/WG11 Hearing Protector Attenuation and Performance, and is also involved with numerous other hearing protection related standards committees.

General minimum qualifications for the Laboratory Director include:
1) Graduate degree in physics, engineering, audiology, or related professional area
2) Minimum of 3 years post-graduate or professional experience in a laboratory experimentation in a hearing conservation-related area

E·A·R·CAL 91-41/HP

Page 5

3) Course work and/or professional experience in statistics as well as psychoacoustical experimentation.

The Laboratory Director must be competent in his or her field and must retain awareness of state-of-the-art developments in hearing protector measurement methodology and standardization. She should participate in national standards working groups on hearing protection and in professional organizations such as the Acoustical Society of America, the National Hearing Conservation Association, and the American Industrial Hygiene Association.

### Acoustical Technician(s)

E·A·R·CAL Laboratory's Senior Acoustical Technician, Mr. Ronald W. Kieper, B.S., C.O.H.C., is the person who conducts all accredited tests. Mr. Kieper has been administering hearing protector tests for E·A·R·CAL Laboratory for over 14 years and thus has experience with a wide variety of products and procedures.

The Senior Acoustical technician who conducts REAT testing must meet the following requirements:
1) Possess an an Associates degree or electronics or electronics
2) Complete a 20-hr CAOHC audiometric technician course, and every five years, an 8-hr refresher course
3) Bi-annually, attend hearing-conservation-related workshop or conference, such as the NHCA Conference.
4) Practice meeting self-recording audiometric traces using a reference set of nine audiograms.
5) Participate as subject in a Series Test conducted by the Laboratory Director or experienced technician.
6) Conduct two complete 10-subject REAT evaluations per S3.19/S12.6 under direct supervision.
7) Independently conduct 10-subject REAT evaluations of E·A·R plug and V-51R, and personally participate in both tests as an eleventh subject.
8) Have thresholds not to exceed 25 dB from 500 Hz to 6000 Hz, and 40 dB at 6000 and 8000 Hz, at the time of initial test.

Technician competence is maintained on an ongoing basis through supervision by the Laboratory Director of all REAT tests. This is possible due to the small size of the laboratory and staff. On a biennial basis, the technicians' competency will be assessed per the position on Audit Requirements.

Records of all technician training activities are maintained in the NVLAP file drawer.

## EXPERIMENTAL TEST SUBJECTS

### Subject Recruitment

E·A·R·CAL Laboratory maintains a panel of "experienced" test subjects. As of June 2003, their average age was 38 years, with an average time of service on the panel of approximately 5 years (maximum of 19 years). The subjects are drawn from Aearo Company's work force, as well as members of the local community. Subjects who are not already employees of Aearo Company are formally hired through a part-time employment agency before beginning their training sessions.

For S12.6 Method-B testing, or if requested by a client, subjects who are audiometrically experienced, but naive with respect to use of hearing protection can be utilized. They are recruited from the Aearo

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File 0170

3M00005013

3M00005014

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

Ex-A-FF 9-1-1 HP

Page - 6

Company work force or local community, according to the requirements of the test. Also, if requested by the client, a group of non-Aearo employees can be utilized.

All subjects participate on a voluntary basis and, except for initial screening tests for non-Method-B subjects, are compensated for their participation. For Method-B subjects the initial screening is part of their first session for which they are paid.

**Initial Screening**

The initial screening of a subject who will become part of the attendant subject panel for ANSI S3.19 and/or for S12.6-Method-A testing takes place on his/her first visit to the laboratory. For those subjects being considered for Method-B testing the initial screening takes place over the phone; they must answer questions 1) through (4) of Clause 8 in S12.6 and be found acceptable according to that standard. Method-B subjects being administered the audiogram for later use for Ex-A-FF measurement/or void S12.6 testing the sound-field tests are administered during the sound-field visits and for specific directions for instructing the subject how to take a self-recording audiogram. The initial screening consists of the following steps:

1) Otoscopic examination to check for infection, malformation, extensive cerumen, and integrity of the tympanic membrane.

2) Subject is asked if she suffers from tinnitus, cold or allergy symptoms, a feeling of ear blockage, recent high-level noise exposures, or other problems that might interfere with testing. In doubtful cases, a tympanogram should be administered to assure that middle ear pressure falls within the range of ±0.25 dPa.

3) Technician obtains answers to questions and takes anatomical measurements as described in Appendix IV, and records data on back of audiogram card as shown in Figure 4 (Chart No. 1703-9105).

4) Subject is given conventional pure-tone audiogram with GSI 1723B from 500 Hz to 8 kHz; and with MA 39 at 125 Hz and 250 Hz; or alternatively at all frequencies with a clinical audiometer. MA 39 audio is given with audiometer and technician in test chamber with subject. MA39 must warm up in test chamber for 10 min. prior to testing. All data are recorded on front of audiogram card as shown in Figure 4. The subject is identified using full last name, and initials. Non-Method-B subjects participate on a Series test booked if hunt-tone HTLs are ≤50 dB at all frequencies. A Series test consists of a single open-text audiogram, followed by a subject "if" occluded sound-field audiogram, and an experimenter-fit (taking occluded sound-field audiogram), with whatever HPD is currently under test.

5) To be an S3.19 participant, HTLs must be ≤10 dB at 250, 500, and 1000 Hz; and ≤20 dB at all other test frequencies from 125 Hz to 8000 Hz. For S12.6 the requirements are more lenient, allowing thresholds ≤25 dB from 125 Hz to 8000 Hz. Additionally, for S12.6, thresholds can be no more than 3 dB below those listed in Line 8 of Table III of Ex-A-FF 9E-32HP.

6) If results of steps 1) and 2) are acceptable, and hearing thresholds meet the requirements of 6), and the subject is interested in becoming a trained subject, then s/he proceeds to the training phase.

---

Ex-A-FF 9-1-1 HP

Page - 7

The audiogram cards (Chart No. 1703-9105) for pure-tone audiograms and Form 8A-3-OPX-GX for sound-field audiograms are stored together in the audiogram card files under the appropriate Series test heading. The anatomical data are entered in the appropriate Excel file (Anthro .xls).

**Training**

Subjects for S3.19 and for S12.6 Method-A are trained per the items listed below. For Method-B subjects the training simply consists of 5 open-ear sound-field audiograms, the last three of which must meet the 6-dB variability requirement. The training for standard panel audiograms proceeds as follows:

1) Subject completes Ex-A-FF-CAL lab on 5 separate occasions
   a) 2 visits of 6 open-ear sound-field audiograms/set
   b) 3 visits of 6 REAT measurements/void for Ex-A-FF. Most 1000 earmuff
   c) 2 visits of 3 REAT measurements/void for Ex-A-FF. 1000 earmuff.
   Each REAT measurement consists of a paired open and occluded threshold. For each of the visits the fitting of the HPD should be experimenter supervised, with assistance as needed.

2) The range of hearing thresholds at all three audiograms of visit 2 of 1 lab must be -30 dB or less, and the range of hearing thresholds at any two audiograms from 125 Hz to 8 kHz. If this range is exceeded, additional audiograms are administered until the subject can meet the requirement or until the technician decides to reject the subject.

3) If subject completes all 6 visits and still wishes to be an Ex-A-FF-CAL listener, and has acceptable inter-subject results with less variation, then subject will be transferred/used for specific products. The training will include practice in fitting by the experimenter and attention to obtaining an optimal earplug or earmuff fittings. In the case of plugs special attention will be exercised to make sure consistent results can be obtained without undue discomfort.

4) Subjects whose attenuation values for particular products appear to be outside of the acceptable range may be retrained on the panel, but will not be utilized for later testing on those particular products.

5) Upon successful completion, the subject is added to the Ex-A-FF-CAL panel of listeners.
   6) If at any time a subject on the listener panel experiences an earcanal or hearing-related problem, s/he will be sent to the consulting otolaryngologist for a complete audiological workup to assess the situation and recommend treatment. If warranted, Aearo will cover the cost of the visit and treatments if the problem was deemed related to hearing protector testing.

**Requalification**

Once subjects are added to the panel, they are considered "experienced listeners" and are utilized as needed. At least annually, beginning in the day of each calendar year and according to the most recent pure-tone audiogram (including the date of the test), are added to the Test Subject File (Excel file Testbuky.xls) and a new copy is printed and posted in the laboratory (see Table).

When subjects are added to the Ex-A-FF-CAL panel, their anatomical data and the results of the most recent pure-tone audiogram (including the date of the test) are added to the Test Subject File (Excel file Testbuky.xls) and a new copy is printed and posted in the laboratory (see Table).

Each member must be administered a requalification to assure that they have not lost experience. Subjects who are still within the acceptable range. In conjunction with the retest, their earcanals shall also be measured. Infrequently utilized subjects, such as college students, will be requalified prior to their next participation as a test subject.

---

¹ This is the same as procedure 4) in Testing Procedures, Fitting the HPD, except that the subject may request the use of fitting noise.

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3MO0005015

3MO0005016

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0171

(EXHIBIT 7)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential – Attorneys' Eyes Only

---

E-A·R 91-41·P

Page - 8

If subjects are not utilized for periods of time exceeding one year, they must be additionally remanded/disqualified (including subjective sizing) by taking a minimum of four sequential open-ear sound-field audiograms during a single visit; the last three of which must meet the 6-dB variability requirement.

**Removal from Panel**

Subjects normally stay on the test panel until, for their own personal reasons, they choose to retire. Potential reasons for dismissal from the E-A·R·CAL panel include inability to meet the variability or absolute sensitivity requirements of ANSI S3.19/S12.6, a demonstration in test-taking skills such that subjects have excessive retests or no longer obtain the variability that was observed upon initial qualification, frequent tardiness or missed appointments, or lack of body availability.

**HANDLING TEST SAMPLES**

At the option of those requesting the tests, products to be evaluated are purchased by E-A·R/CAL Laboratory from manufacturers or distributors, or provided by the clients. When samples are received they are inspected for damage, and their packages are marked with the date received, from whom they were received, and their production lot number (if available). This information is also recorded on the Test Administration Form (Table II).

Before beginning any E-A·R testing, the technician, in conjunction with the Laboratory Director, will assign a 6-digit (HPDA) test identification number and mask this on the package in which the samples were received and on the Test Administration Form. In the case of banded devices (semi-insert HPDs and earmuffs) the 6-digit ID will be written directly on each band. For custom-molded earplugs, an individual impression will be taken for each earcanal of each subject. For semi-insert devices and the Test ID# for all externally-funded contract testing. Starting 01/01/01, the letter "C" was used as the second character in the test ID# for externally-funded contract testing.

Samples are retained in the Acoustical Laboratory until testing is completed. No sooner than 30 days subsequent to completion of the tests, products to be re-evaluated are returned to the client or relocated in the Technical Department mezzanine area for storage of at least one year, longer if space permits. In the case of premolded and formable earplugs, samples will be selected directly from those provided, with each subject getting his/her own pair. For custom-molded earplugs an individual impression will be taken for each earcanal of each subject. For semi-insert devices and earmuffs, at least two samples are used for each subject: for S3.19, or alternatively with S12.6 (i.e., one pair subject), and two samples used with semi-insert devices. For earmuffs, those samples will be distributed among the subjects so that each sample is tested on an equal number of subjects as called for in this standard.

Prior to the commencement of REAT evaluations, the band force of semi-insert and earmuff devices shall be measured on the MSPEC Rig Model 3.02 B (see Testing Procedures, Measuring Band Force).

Samples will be examined visually by the technician before use. Obvious defects will be called to the attention of the Laboratory Director and at his discretion the client may be notified for his or her recommendations.

---

E-A·R 91-41·P

Page - 9

**TESTING PROCEDURES**

**Daily Calibration**

All room, personal and measurement equipment are left on at all times for maximum stability. The temperature and humidity in the chamber should be checked, and brought into the specified range of 68 - 72°F, and 56 - 84% RH, as needed.

Sound level calibration is verified using Procedure #148 of E-A·R 90-32H-P. On the first day of each week the calibration is verified at all test frequencies listed in Table II-2 of E-A·R 90-32H-P. For the remainder of the week only the frequency of 1 kHz is tested. Values are recorded each day on a data copy of Table II-2 which is then filed in the calibration binder in the Acoustical Laboratory. Periodically old records will be archived to the Technical Department mezzanine where they will be retained for a period of at least seven years. Also see Record Retention.

**Subject Selection, and for S12.6 Method B, Requirements for Requalification and Reuse**

When testing under S3.19 or S12.6 Method A, the panel of listeners will be selected from the current "defended" panel, an example listing of which appears in Table I. Standard subjects are those whom have been found to meet all test criteria, obtain consistently good threshold values and work with the products to be tested, and are resistant to schedule and work with. Additional criteria are involved with the selection of test subjects upon E-A·R/CAL Laboratory's:

1) For all tests, unless otherwise specified, the goal is to achieve a gender balance of 50%, ± 25%.

2) For testing under S3.19 or S12.6 Method A, a desirable but not necessary distribution of earcanal sizes is shown in Table III. This distribution is based upon E-A·R/CAL Laboratory's internal anatomical studies as summarized in Notebook 2452-72.

3) Also in S12.6 Clause 6.1.3 is the requirement to ask Method-B subjects to reaffirm the questions in 9.1.1 (a), (b), and (d). These questions shall be asked every two weeks since our experience is that inquiring on a daily basis seems to annoy the subjects. Measuring Band Force).

4) Method B places limits on subject retention and reuse, specified in Clauses 9.1.3. Reports are maintained to assure that a subject is used for a maximum of 30 separate subject-fit tests. Of those 30 tests, the total number permissible for earplugs and semi-inserts or 50%, shall not exceed 10, and if there shall not be more than 6 tests on any one product.

At this time there are no requirements for distribution of head sizes for the measurement of banded type (earmuff and semi-inset) hearing protection.

**Head Colds**

Subjects are to be reminded on a regular basis that if they perceive a change in their hearing sensitivity, whatever the reason, their appointment should be rescheduled. Subjects who have allergies and take medication for them, will have their thresholds monitored particularly closely.

A subject who suspects he/her hearing levels may be affected and comes to the laboratory for testing, will begin testing with an open threshold so that hearing levels can be compared to typical open values for that subject. If a subject reports in the laboratory for a test unaware of any problems and the technician notes differences of 5 dB or more, at 3 or more frequencies, compared to the subject's typical open values, the subject is questioned about the condition of her/his ears. If the subject is not feeling at the subject will be rescheduled for another day if the subject open sound-field threshold values shall be 5 dB of her/his typical values on subsequent audiograms in the session.

---

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3MD0005017

3MD0005018

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

E-A-AR 91-41/HP

## Test Protocol

ANSI S3.19 requires that each device tested be measured with three separate fittings on each subject (i.e., three occluded thresholds), and three uncoccluded (also called open) thresholds with each device. If any one HPD is being tested the test sequence will be P-O, P-O, P-O for one-half of the subjects and O-P, O-P, O-P, for the other one-half of the subjects (with only two pairings used if S12.6 is specified). Alternatively, to save time, two different HPDs, P₁ and P₂, can be tested simultaneously when implementing S3.19, or Method A of S12.6. In this case the sequence is P₁-O-P₂, P₁-O-P₂, P₁-O-P₂ for one-half of the subjects and three sets of P₂-O-P₁ for the other one-half of the subjects (again, with only two pairings of S12.6 is specified). When implementing Method B only P-O-P series are permissible since only one HPD can be tested at a time.

Once the testing has begun, it is preferable that the subject remain in the chamber for the entire P-O, or P-O-P series. However, if the subject becomes tired, s/he may exit the chamber for a short 5- to 10-min. break between P-O-P or between P-O-P, but not within a grouping of protected and open thresholds.

## Fitting the HPD

How the experimenter works with the subjects, and how the experimenter and subjects fit the HPDs are the most critical parts of the experimental protocol. These are areas where training, experience, and judgment are of utmost importance.

E-A-R/ARCAL Laboratory provides five different options with respect to fitting HPDs. The report that is issued will be explicitly labeled to indicate which fitting option has been selected. The options are:

1) S3.19 (EPA/Experimenter Fit): this procedure is in accordance with the EPA's regulations contained in 40 CFR Pt. 211 et seq. and the interpretation of its administrator, Ken Feith (see introduction of Franks et al., 2001)

2) E-A-R/ARCAL (Experimenter-Supervised Fit): this was formerly how E-A-R/ARCAL Laboratory tested HPDs for laboratory performance from its inception in 1979 through the mid-1980s.

3) S12.6-1997, Method A (Experimenter-Supervised Fit): a modification of 2) above to conform to S12.6, clause B of the standard.

4) S12.6-1997, Method B (Subject-Fit): Per clause B of the standard.

5) Customized per the specification provided in the client.

Further description of fitting options 1 - 3 is found below. Option 4 is unique with respect to the subject selection and experimenter involvement, and is fully described in the S12.6 standard, and of course option 5 is at the customer's choosing.

1) S3.19 (EPA/Experimenter Fit)
The experimenter gives the attentive directions on fitting the HPD in conformance with the instructions provided by the manufacturer. If the HPD is provided in more than one size, the technician then selects the subject with the subject outside the test chamber, shall select the best size. The technician then waters the chamber with the subject, and using the manufacturer's instructions as a guide, fits the protector to the subject in a "best" fit as assessed via visual and tactile inspection. The assessment should also include subjective feedback from the subject based upon his/her listening to the

3M Confidential - Attorneys Eyes Only

3MO0005019

E-A-AR 91-41/HP

technician's voice and/or perception of the magnitude and bilateral balance of the occlusion effect. If necessary, the size selection may be altered at this time

Once the technician is satisfied with the fit, the fitting noise is turned on from inside the chamber, and the subject is asked if the noise appears equally attenuated in both ears. If not, s/he is requested to manipulate the protector for a better fit. In the case of foam plugs, if the listening test indicates a poor fit, the device must be removed and re-inserted. The technician then makes another assessment to confirm the final fit. If at this time the technician determines that a good fit cannot be obtained, the subject is excused from the test.

Once the technician and subject have confirmed that a best fit has been obtained, neither the technician nor the subject is allowed to touch the protector. It is important to note that during actual testing (as opposed to preliminary practice sessions) the measurement of occluded sound field thresholds is not a criterion that can be used to assist in the determination of acceptable fit. The technician now exits the room, and after a 5-min. waiting period, the audiometric test is begun.

2) E-A-R/ARCAL Experimenter-Supervised Fit
The technician asks the subject to read the manufacturer's instructions or other instructions provided by the experimenter. The subject fits the plug before entering the test chamber in conjunction with, and if needed, with the direct physical assistance of the technician. If the HPD is provided in more than one size, the technician, working in concert with the subject outside the test chamber, shall select the best size. Subjects are told:

*"Fit the hearing protector for best noise reduction consistent with a reasonable degree of comfort, that is, in a way in which you could normally wear this device for protection from noise for extended periods of time."*

Once the subject has satisfactorily demonstrated that s/he can reasonably use the product, the subject enters the test chamber and then fits the HPD, without experimenter assistance, for the occluded fittings called for by the test procedure. The subject is instructed how to use the manipulate the HPD for the most noise reduction, and for equal noise reduction in both ears, and/or how to use the magnitude and bilateral balance of the occlusion effect to assist in the fitting/adjustment process. If comfort becomes an issue during the in-chamber fitting process, the subject is reminded of the admonition regarding "a reasonable degree of comfort".

The technician will observe the procedure but in no case will assist or touch the subject. The subject must fit the HPD by his/herself. The technician will observe that each least fitting in the room to assure that no obvious problems have occurred. Unless the subject appears to be having substantial trouble fitting the device, the experimenter will not usually personally touch or fit the HPD during the actual test. Normally the technician will not be present in the room for subsequent (2nd and 3rd occluded) fittings of the device.

3) S12.6-1997, Method A
This procedure is similar to E-A-R/ARCAL Experimenter-Supervised Fit except that no mention is made of fitting for reasonable comfort, each insulation of the HPD are made of the experimenter, and no conditions as to the experimenter deems it necessary, the subject shall be required to reinsert or reinstall the protector as many times as necessary to obtain a "best" fit prior to testing, but not after the test had begun.

3M Confidential - Attorneys Eyes Only

3MO0005020

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

EXHIBIT
CID File0173

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENS

00019-2016-CID133-014635

E•A•R 9/-4/-HP

Page - 12

**Waiting Period(s)**

Both ANSI standards require a waiting period with no lead signals present, and no noise or sitting quietly in the chamber, before beginning threshold tracking (5 min. for S3.19 and 2 min. for S12.6). The waiting period is only provided prior to the first audiogram when the subject initially enters the chamber, and prior to the first audiogram after the subject reenters the chamber when a break has been taken between sets of P+Qs or P+Qs+Rs. For all tests, except those for which conformance with S3.19 is required, E•A•R/CAL utilizes a 2-min. waiting period.

An additional waiting period of a minimum of two minutes (otherwise specified by the manufacturer) is required by S12.6 whenever hearing protectors, such as foam earplugs, are worn that require time to expand or conform to the external ear canal or circumaural regions. In this case, for each and every fitting of the HPD, a waiting period is provided prior to the first audiogram, to allow for full conformance of the device so the ear prior to commencing threshold tracking. E•A•R/CAL implements this waiting period for S3.19 testing as well.

**Administering the Audiogram**

Subjects must be carefully and consistently instructed in how to take a self-reporting audiogram, whether that be a pure-tone test under earphones or a sound-field test. The exact instructions, which are to allow for the pure-tone audiogram, are as follows.

"You are going to check your hearing by presenting a series of pulsing, whistle-like tones. They will begin in your left ear and then go to your right ear, and in each ear start with lower-pitched sounds and proceed to higher-pitched sounds.

You control the loudness of the tones with the hand switch. Put your finger in the light beam as soon as you hear the tone (or) think as you hear it), and remove your finger from the light beam as soon as the tone is no longer audible. Don't let the tone grow loud and don't let it remain inaudible for long. Press as soon as you hear it and release as soon as you don't."

Subjects will always have taken at least one pure-tone audiogram administered by the staff of E•A•R/CAL laboratory, prior to any sound-field testing. In sound-field testing, the subject must be properly located in the chamber and the head-positioning device (a small suspended metal ball) moved into place within 2 cm of his/her nose. The importance of maintaining the head position throughout sets of open-occluded audiograms must be stressed to the subject.

The following additional instructions regarding the sound-field audiometric procedure are also given to the subject.

"Your following task will be very similar to the audiogram you just took with the earphones, except the sounds will come from the room and you will hear them with both ears simultaneously. These test sounds are more noise-like than the tones you just listened to.

Also, they start at a lower pitch, so low in fact that they may sound like your body noises or heart beat, and be somewhat difficult to distinguish from these sounds. The higher-pitched test signals are similar to the sounds of water dripping.

Your task is the same as with the earphone audiogram you just took - put your finger in the light beam as soon as you hear the sounds and withdraw it as soon as they fade away."

E•A•R 9/-4/-HP

Page - 13

Subjects are to be instructed, and regularly reminded that if they hear any extraneous sounds while in the chamber, especially while taking an audiogram, they are to immediately speak up and/or flick the hand switch to get the technician's attention to stop the test.

**Comfort Ratings**

Comfort ratings are elicited from subjects on their final occluded evaluation in each test session. The Comfort Scale utilized for this purpose is represented in Figure 5. This scale is shown to the subjects while the HPDs are still being worn and they are asked to assign a number from 0 -10. This value is recorded on the audiogram card (Figure 3).

**Equipment Operation/ Scoring the Audiogram**

New technicians are fully trained by the Laboratory Director or an experienced technician (see Staff Qualification and Training Policies) and therefore receive extensive practice in the daily equipment operational procedures. The following points are listed for purposes of documentation and as a reminder of key items. Sound-field audiograms are administered as follows:

1) The GSI 1703B is set in the Attenuator Mode, with a 5-dB HL rate (slew rate), and the Pulsed presentation mode. A green pen is used for open thresholds and a red one for occluded thresholds.

2) The 20-dB Pad will always be in for the open trace. It may or be IN or OUT for the occluded trace depending upon the degree of attenuation provided by the HPD, but whatever its mode, it must be indicated on the audiogram card (Figure 3) by marking the Red Trace Atts box, and by indicating whether this mode was changed during the test.

3) The CC3 Microprocessor is set in the Aux Mode and Run. Instructions on its use are in the Instruction Manual File and information on the specific programs used for testing are in Notebook 57B3-23.

4) The sequence of test frequencies always begins at the lowest frequency to be tested, usually concludes with a repeat of the initial test frequency. The HPD, but whatever its mode, the audiometer after the completion of the entire audiogram by selecting a blue pen, repositioning the audiometer to the desired frequency location, and marking the first frequency onto the CC3 unit.

5) Individual traces are scored in S12.6 clause 7.5. Unacceptable traces are retested immediately.

6) An additional requirement on audiogram traces is that if this initial and retest trace for the lowest test frequency differ by more than 5 dB, that frequency is retested and the threshold is taken to be the average of the three sizes.

7) The subject is identified on the first series using full last name, and initials, initials only, are used on subsequent cards.

**Measuring Band Force**

The band force of all banded devices (semi-insert HPDs and earmuffs) must be measured prior to commencement of the REAT testing. Temperature and relative humidity are to be recorded.

Force is measured using the INSPEC Headband Force Rig Model 1.02.B (see E•A•R BC-32sHP) per ANSI S12.6-1997 clause 10. For earmuffs, the head width is adjusted to 145 mm and each of the two cups are abducted to 145 mm for the banded device test. For semi-inserts the dimensions are 145 mm for the head band and 130 mm or the band's minimum setting, whichever is greater. Force readings are taken 2 min 15 s after

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID_File0174

3M Confidential - Attorneys' Eyes Only    3M0005021

3M Confidential - Attorneys' Eyes Only    3M0005022

3M Confidential - Attorneys Eyes Only

00019-2016-CID133-014635

E+AAR 91-41-HP                                                           Page - 14

(the device is positioned on the fixture. Even when earmuffs are tested to S3.19 which calls for as widths of 14.5 mm and a length of 130.8 cm, the S12.6-1997 dimensions are used since the differences in measured force have been shown to be trivial (Kroyer and Berger, 1999).

### HANDLING THE DATA

The HPD Test Administration Form (Table II) is used to track the progress of this test, to record all necessary information about a test and test samples, and to record special comments or observations. Received, Test Type, Start Date, Source of Samples, Date in particular to each subject. The HPD Test Device, and Band Force in the it case of banded devices, must be recorded prior to commuting REAT testing.

The audiometric tracks and actual raw data (i.e. sound traces) are recorded on the blue sound-field audiogram cards (Figure 3) and the attenuation values manually computed during an individual to the completion of the open and protected audiograms. Once the subject has completed testing the device, his/her ancillary data are also stored on the HPD Test Administration Form.

The audiogram cards are stored, grouped by test ID, in card files on the main bench in the Acoustical Laboratory. Tests greater than one year old are transferred, as space requires, to long-term storage has on the Technical Department Mezzanine, where they are retained for a minimum of seven years (see Record Retention).

When a test is completed, the data from the HPD Test Administration Form and the audiogram cards are input to an Excel computer spreadsheet template (REAT_DEFAULT.xls) for analysis, and for preparation of pages 2, 3, and 4 of the HPD Test Report (see Appendices I and II). For internal reports, pages 5 and 6 of the HPD Test Report are not normally generated. Once the data are entered, the file is stored with a new name (XXXXXX.xls) corresponding to the Test ID#. The spreadsheet is printed out and the individual attenuation values for each subject, at each frequency, for each fitting, are checked against the audiogram cards by having one person read the data to the technician who created the file.

This means and standard deviations are then entered into a Word file (XXXXXX.doc) to create page 1 of the HPD Test Report (see Description of the HPD Test Report), and into the Hearing Protection Data Analysis (HPDA) data base (also found on a local area network, see below) for comparison to analyses to other E+AARCAL, as well as out-of-house data.

The HPDA files are backed up on average ZIP PC750 Disks semi-monthly, and backed up off-site every two months. Hard copies of pages 1 – 4 and 7, of the HPD Test Report, along with the HPD Test Administration Form, are filed by Test ID# in the Acoustical Laboratory file cabinet.

### STATISTICAL PROCEDURES

The following sections of S3.19 and S12.6 direct the experimenter to discard certain outlier data:

S3.19, 3.2.3 – ... In reporting the results, listeners for whom an adequate fit cannot be obtained should be noted, but should not be included in the evaluation.

S12.6 (Method A), 8.1 ... – a subject shall be disregarded if she/he cannot obtain a good fit with the test product. Subjects not excluded by this criterion, who satisfy the other requirements of this

3M00005023

3M Confidential - Attorneys Eyes Only

E+AAR 91-41-HP                                                           Page - 15

standard, shall not be dismissed for attaining small amounts of attenuation, nor for being unable to obtain a subjectively assessed noise-blocking seal in the presence of the fitting noise as described in clause 8.2.

S12.6 (Method B), 9.1 ... – There shall be no subject selection criteria besides those specified in clauses 4, 5.1, to 5.4, and 6.1.1 to 9.1.3. With the exception of illness or physical inability to participate on the day of the test, no subjects shall be rejected for any reasons other than failure to meet the specified requirements.

Unfortunately, neither S3.19 nor Method A provides specific guidance on how rejection is to be accomplished. Method B, however, is more clear, since virtually no rejection is prohibited. However, that requirement is currently under review with the S12/WG11 committee.

Experience at E+AARCAL suggests that an objective method of removing outliers from REAT data is necessary in order to provide internal consistency and comparability between test results. Beginning in 1980, we chose to utilize objective statistical tests instead of relying solely on the bias of judgment of the Laboratory Director (E+AAR 80-17/HP). The current procedures, somewhat modified since that time, reflect the same general practices that we have found useful during the intervening years.

The most recent revisions to the statistical rejection procedures (subchapters) to version 2.0 of this report occurred in the summer of 1992 as a result of experience gained testing a poorly-designed compressory team earplug. The data and associated statistical analyses were included in an E+AAR Technical Report 92-x25/HP.

For S3.19 or Method A testing, statistical tests and determination of the need for reject or replacement of subjects occurs at the conclusion of all attenuation tests on all subjects. The complete set of data (normally 10 subjects x 3 fittings or 30 subjects x 2 evaluations per subject) is then analyzed for outliers using the Dixon Criterion (Natrella, 1966, Chapter 17). The statistical tests consist of comparing both the range of each subjects attenuation values, as well as his/her mean attenuation value across replications, to the values of the other subjects in the test. The exact procedures and formulae for conducting the statistical tests are presented in Appendix V. Selected portions of Natrella's Chapter 17 are reproduced in Appendix VI.

The final test report (see Appendices I and II) will note any rejections, the reasons for them, and their effects on the computation of the NRR. The audiogram cards which contain the actual rejected data are retained in the card files together with the accepted data.

### DESCRIPTION OF THE HPD TEST REPORT

The HPD Test Report that describes the results of an S3.19 or S12.6 attenuation test consists of a cover sheet and additional pages:

• Cover Sheet
• Page 1: Summary Data
• Page 2: Individual Subject Data
• Page 3: Outlier Test for Extreme Ranges
• Page 4: Outlier Test for Extreme Means

[CID File0175]

3M00005024

00019-2016-CID133-014635

## Page - 16

E-A-R-Fit 3.1-41-HP

- Page 5, Computation of the NRR
- Page 6, Age, Gender, and Anthropometric Data
- Page 7, Graph of the individual subject and mean data, and photo of test device
- Page 8 (Method B only), exact copies of the HPD usage instructions provided to the subjects

The NRR is computed per the requirements of EPA (1979), and reported to a precision of 0.1 dB. The NRR(SF) for Method B herein is computed per the recommendations of the National Hearing Conservation Association (NHCA) Task Force on Hearing Protector Effectiveness (Berger and Royster, 1996), and is also reported to a precision of 0.1 dB. As noted on page 5 of the Test Report, labeled NRRs are to be rounded to whole numbers with values ending in 0.5 rounded down to the next lower integer. Additionally, the Canadian Class is reported for S3.19 testing and the Canadian Grade is reported as S12.6 Method B testing (CSA, 2002).

### GENERAL UNCERTAINTY OF MEASUREMENT

The measurement of real-ear attenuation at threshold (REAT) is an insertion-loss (IL) type of procedure, i.e. the quantity that is observed is the difference between two measurements taken at the same point, with and without the hearing protector in place. In this case measured at the listener's eardrum with and without the hearing protector in place. As noted on page 5 of the first disclosed or tensing elements are the hair cells in the cochlea. As such the general uncertainty of measurement (GUM) is primarily based upon issues pertaining to subjective responses.

The calibration procedures involved in REAT measurements are intended to assure that an appropriate signal is being presented to the listener, but the calibration itself has no effect on measurement uncertainty. If the signal presented for the threshold measurements is distorted, or has decreased uncertainty masked by room motion, this will cause an inaccurate estimate of the measurand. However, since REAT is a difference measurement, errors of this type will be present in both the occluded and unoccluded precision. As such, the only variable gremlins to an appropriate uncertainty, i.e. will have no effect on observed in the compiled standard deviations (SDs) over the 10- or 20-subject test panels used for the REAT measurements.

ANSI S3.19 provides no indications of GUM, but the newer standard, S12.6-1997 includes an Annex C that speaks to precision. In that Annex variability both within and between subjects, is identified as that arising from:

1. uncertainty in the measurement of the subject's unoccluded and occluded thresholds,
2. variations in the protectors from time to time and laboratory to laboratory,
3. differences in the anatomy of the subject,
4. differences in the acoustic test environments and test equipment from facility to facility.

Within the E-A-R-CAL Laboratory experience suggests that reproducibility in terms of the NRR is approximately ± 2.5 to 3 dB, based on our 22 years of testing (E-A-R 31-41-HP).

## Page - 17

E-A-R-Fit 3.1-41-HP

The standard does not permit out the various uncertainties, but does go on to provide an estimate of the overall GUM of about ± 3 dB for each octave-band frequency at an α of 0.05.

The related ISO standard (4869-1:1990) does some indication of the contributions of uncertainty for a similar, though not identical procedure to S3.19 or S12.6-1997 Methods A and B. Values of repeatability (for internal test conditions), and for measurements under identical test conditions, reproducibility (for setup group variations but otherwise under identical test conditions), vary by hearing protector type, frequency, laboratory, etc. The reproducibility values across laboratories are reported as ± 2 to ± 3.25 dB for earmuffs and ± 3.25 to ± 4 dB for earplugs, depending upon test frequency.

### COMPLAINT RESOLUTION PROCEDURES

If a client questions the data in a test report, the original audiogram cards will be rechecked against the data on page 2 of the HPD Test Report. The computations in the report will be re-verified, the Laboratory Director will review the technician responsible to determine any special problems or errors which may have transpired during testing. In the event samples will be reassessed for anomalies, and, if available, E-A-R-CAL data on similar products will be checked and statistically compared to the test under examination to see if the results appear in error.

If the foregoing procedures indicate that the data are, or may be in error, the device will be retested at no expense to the client using the same subjects (if available) that participated in the initial test. A second test report will be notified, which will include the revised data as well as mention of the initial results and why they were suspect. A record will be retained with the revised report of the initial errors, their causes, and corrective actions. Additionally, a record will be retained in a separately marked folder labeled Corrective Action, located in the file cabinet of the Laboratory Director in conjunction with the Technical Director, E-A-R Hearing Products. Their decision will be final.

If the client is not displeased with the results, s/he may at his or her own cost, contract for additional testing. The client may not only specify the exclusion of particular subjects who were utilized in the prior, allegedly questionable test, but they may stipulate the use of an entirely different panel of listeners.

Any complaints regarding administrative issues, such as delivery times, return of samples, labeling of reports, etc., will be received and evaluated and if appropriate, the applicable sections of this manual will be modified to help assure the complaint does not reoccur.

### REQUIREMENTS FOR REVIEWS, AUDITS, AND CORRECTIVE ACTION

This manual shall be reviewed by the Laboratory Director and all E-A-R-CAL staff each September in an effort to refresh personnel on all operating precepts, to check the document for required changes and updates, and to assure the ongoing suitability and effectiveness of the quality system. Each year, the date of actual review shall be recorded, with signatures, on a form kept with staff training records.

CID File0176

3M Confidential - Attorneys Eyes Only
3M00005025

3M Confidential - Attorneys Eyes Only
3M00005026

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

E•A•R CAL 9(1-4)HP

Page - 18

(revision.doc)  Whenever this document (E•A•R 9(1e1) is revised, all E•A•R·CAL staff shall review the relevant sections and so indicate by signature in the training records.

During this annual review, attention shall be directed towards the results of recent internal audits, corrective and preventive actions, NVLAP assessments, and any complaints that have been received. Besides the annual reviews, management reviews shall be conducted if nonconformities are observed, when audits detect problems, if significant customer complaints are reported, or following staff or substantial instrumentation changes. All findings shall be documented in the Acoustical Laboratory files.

## Audit Requirements

The functions of the E•A•R·CAL laboratory shall be independently audited by an Aearo Company Quality Specialist on a biennial basis, in the alternate years from those selected by NVLAP for their on-site assessments. The internal audits, initiated at the request of the Laboratory Director, shall assure compliance with the procedures that this manual as well as the General Operations Checklist in Appendix B of NIST Handbook 150-8. Test methods, practices, and calibration procedures shall also be reviewed in conjunction with the Laboratory Director to ascertain compliance. The Quality Specialist shall document his or her findings in a report to the Laboratory Director who will take corrective actions, including written confirmation, within 45 days. Records of audits and any associated corrective actions are retained in the Acoustical Laboratory file drawers.

Internal audits may also be triggered if substantial issues of nonconformance with the Policy Manual arise, in order to examine the overall integrity of the quality policy system.

An additional aspect of the biennial audit will be the conduct in the fall of the year of four complete REAT tests using reference sample HPDs. The results are evaluated to prior data and evaluated by the criteria described in report E•A•R 9(1-4)HP.

In addition to the biennial audit function, the Laboratory Director shall check on an ongoing basis the results of all tests conducted by the acoustic technician(s), as well as periodically reviewing the techniques, test practices and calibration procedures. Such reviews will be documented in the training records. For those activities conducted by a junior technician or apprentice trainee, the Acoustic Technician shall review all materials prior to submitting them to the Laboratory Director.

## Corrective Action Procedures

Whenever discrepancies are noted between actions and specified procedures, or errors are detected in compliance or calibrations, this shall be called to the immediate attention of the Laboratory Director for an analysis of the root cause so that corrective action can be initiated. This will include reviewing as needed, and correction of all existing inaccurate documentation. In the case of error on previously issued test reports, the device will be retested if necessary, at no expense to the client, using the same subjects (if available) that participated in the initial test. A corrected test report will be issued, which will include the revised data, as well as mention of the initial results and why they were changed. Additionally, a record will be retained in a separately marked folder labeled Corrective Actions, located in the Acoustical Laboratory file drawers.

---

E•A•R CAL 9(1-4)HP

Page - 19

## USE OF THE NVLAP LOGO

The NVLAP logo and E•A•R·CAL logo will appear on the cover page and page 1 of all HPD Test Reports, and on all E•A•R·CAL technical reports concerning attenuation via REAT or other acoustical procedures. However, when the procedures utilized to generate those data are not in strict conformance with both the provisions of this manual, and with either §3.19 or §17.6, the following statement will be included at the beginning of the report: "This report contains data from tests which are not covered by the NVLAP accreditation."

When HPD reports are based upon E•A•R·CAL Experimenter-Supervised Fit or client-customized fitting procedures, the NVLAP logo will be used, but the above disclaimer must also appear, since of the five fitting procedures described in this report (Training Procedure, Fitting by the HPD, only EPA/Subject-fit, and Method A and B of §17.6 comply fully with standardized procedures covered by the accreditation.

If all test practices are in strict conformance with the accreditation with the exception of the number of subjects and replications (for example, 15 x 2 or 20 x 1 instead of 10 x 3 or 20 x 2), the following statement will be included: "The NVLAP accreditation by ANSI S3.19 or S12.6 if applicable calls for at least XX subjects tested X times each. The data in this report are based upon XX subjects tested only X times each."

When testing is contracted by outside clients, and the procedures required to complete those tests do not strictly conform with the accreditation as stated in the first paragraph of this section, the client will be notified in advance.

Internal E•A•R·CAL reports will generally only consist of five (or S3.19) or six pages (Metric B). I will be prepared without a cover page and pages 5, 6. However, when appropriate the NVLAP logo will still appear on page 1 of those reports along with the note that results for the samples and suspects tested, and that the report may not to be used to claim product endorsement by NVLAP, or any other agency of the U.S. Government. If the reports are later sent out of house, the missing pages will be added, if requested, before distribution.

## RECORD RETENTION

All records of calibration, testing and training, including completed test reports, shall be retained a minimum of seven years from the date they are entered into the files. Also see sections on Data Calibration, and Handling the Data.

## REVISIONS TO THIS MANUAL AND RETIREMENT OF OBSOLETE DOCUMENTS

## Document History

The original version of this manual which was reviewed by the NVLAP assessor, Mr. Rich Pepper, during his initial on-site visit of 11/20/91, was Version 1.1. A modified version (2.0), incorporating his suggestions was finalized subsequent to his inspection and became E•A•R·CAL policy as of December 1, 1991. The initial version of E•A•R·CAL Laboratory was granted in a letter dated December 3, 1991.

3M Confidential - Attorneys' Eyes Only

3MX0005027

3M Confidential - Attorneys' Eyes Only

3MX0005028

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

EAAR 91-41HP

Page - 20

Version 3.0 was prepared in January, 1994. It was reviewed and finalized as revision 3.1, subsequent to EARCAL Laboratory's second on-site assessment, conducted by Dr. Howard Kingsbury on the coldest day ever recorded in Indianapolis history (1/19/94, -33°).

Version 4.0 was prepared subsequent to the issue of revised NVLAP requirements that reflected numerous ISO 9000-like procedures. That version was reviewed by an internal auditor (Steve Todd) who was not a member of the EARCAL Laboratory and the finalized document was completed as version 4.1, dated February, 1996. Principal changes in Version 4 consisted of:

- Inclusion of a Quality Policy Statement.
- Inclusion of audit procedures.
- Inclusion of statement regarding review of new work to see if appropriate facilities are available for the project.
- A statement regarding restriction on use of reference standard equipment.
- Reference to ANSI draft document S12.6-199X in the section Fitting the HPD
- Specification of record retention requirements

Version 4.2 was prepared in August 1998, subsequent to EARCAL Laboratory's third on-site assessment, conducted by Mr. Rich Peppin. Changes were incorporated as a result of suggestions by Mr. Peppin, principally covering clarification of issues of confidentiality, procedures for auditing requirements and corrective actions, and extending regular calibration intervals for certain equipment to two years instead of annually. Additionally, the indication of the change of name from Cabot Safety Corporation to Aearo Company was included, as well as a reference to the new data base program used for tracking equipment calibration, Microsoft Access.

Version 5.0 was prepared in January 1999 prior to an on-site assessment scheduled for early February of that year. That version was reviewed primarily to conform to the new ISO/IEC 17025 (1999) requirement. Changes in this version were:

- Modification to EARCAL Laboratory's third on-site assessment with ANSI S12.6-1997 which superseded S12.6-1984
- Change of reference to reflect substitution of the reference B&K 4144/218 microphone
- Reference to the use of Excel instead of Quattro Pro as the spreadsheet of choice.
- Addition of a new Appendix II so that examples of both S3.19 and S12.6 reports could be illustrated.

Version 6.0 was prepared in June 2001, subsequent to EARCAL Laboratory's fifth on-site assessment, which was conducted by Mr. Jeff Schmidt and supervised by the NVLAP Acoustics Program Manager, Carroll Brandenburg. EARCAL was one of the first laboratories assessed to the 2001 edition of NIST Handbook 150, modified to conform with the new ISO/IEC 17025:1999, which was finalized May 30, 2001, two weeks prior to the assessment. Changes in Version 6.0 were primarily made to the new 17025-type requirement, and able to reflect new internal reporting requirements to the laboratory, and drafts culminating in EARCAL's subject selection and training policies. This version underwent various modifications in the scope or Contents so that the completeness of the document could be confirmed.

- Additional page numbering added in the side of Contents so that the completeness of the document could be confirmed.

EAAR 91-41HP

Page - 21

- Complaint procedures further specified to indicate that any complaints are kept on file and a root cause analysis will be implemented to identify the source of the problems
- A section was added on the general uncertainty of the measurements
- The statement about non-endorsement by NVLAP of product names, which was moved from the report cover page (which is not always distributed) to the first page of the actual report
- The management flow chart was updated to indicate the main line of front which extends up through marketing instead of through product development and manufacturing
- A procedure on dealing with holdout costs and
- The requirements for a particular distribution of earcanal sizes was made optional instead of mandatory
- New most stringent procedures were specified for subject selection and training, for the listener panel
- The requirement for an ENT examination of subjects, once admitted to the panel was deleted, since in our 25 years of testing experience no problems that would have benefited from such a procedure have occurred.

Version 7.0 was printed in July 2003, prior to EARCAL Laboratory's sixth on-site assessment, which was conducted by Mr. Rich Peppin, subsequent to that audit. The principal changes consisted of:

- External calibration intervals on the laboratory's primary acoustical units (B&K calibrator, microphone, and preamplifier) were extended to two years, at the suggestion of Mr. Peppin, in recognition of the regular internal checks that are conducted and the documented long-term stability of the devices in question.
- Provision of an expanded organization chart to more clearly indicate the relationship of the EARCAL facility to the other parts of Aearo Company was added
- Elimination of the requirement to miniaturize the band (once of semi-insert HPDs and earmuffs 10 this, subsequent to testing.
- Expanded descriptions of conditions under which management reviews and internal audits are conducted.
- Addition of the computed CSA Grade or Class, as appropriate, to the test report.
- Addition of an extra page to test reports consisting of a graphical presentation of the individual-subject earmean data, and a digital photograph of on the test device

### Revisions and Retirement of Obsolete Documents

Revisions to this manual and the other NVLAP-related documents are the responsibility of the Laboratory Director. The practices and policies will be reviewed on an ongoing basis, and will receive special attention at the time of biennial installation, when equipment is replaced or upgraded, and in conjunction with the periodic NVLAP audits. Collection of obsolete documents will be supervised by the Laboratory Director. The documents will be disposed of, except in the case of this manual (see next paragraph).

Subsequent versions of this report will be indicated by a change of version number and date of issue. A single copy of prior versions will be retained in the "Archival Department Technical Reports file.

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0178

3M Confidential - Attorneys Eyes Only

3M00005029

3M00005030

FOR 'CIAL USE ONLY – LAW ENFORCEMENT SENS...

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

3M00005031

3M Confidential - Attorneys' Eyes Only

3M00005032

E-A-R 91-41HP

Page - 22

REFERENCES

1. ASA (1975). "Method for the measurement of real-ear protection of hearing protectors and physical attenuation of earmuffs," Acoustical Society of America, Standard ASA S12-19-1975 (ANSI S3.19-1974), New York, NY

2. ANSI (1997). "Methods for measuring the real-ear attenuation of hearing protectors, Am. Natl. Stds. Inst. S12.6-1997, New York, NY

3. Berger, E. H. (1989). "Outlier rejection criteria for REAT testing," E-A-R Tech. Rept. 86-17-HP, Indpls, IN

4. Berger, E. H. and Kieper, R. W. (1989). "Manual for calibration of the Aearo Company E-A-R/CAL™ Acoustical Laboratory re ANSI S3.19-1974 and ANSI S12.6-1997," E-A-R Tech. Rept. 89-33-HP, Indpls, IN

5. Berger, E. H. and Kieper, R. W. (1996a). "Procedures for calibration of Oaxson-Stecker 170dB and Marco 30 audiometers," E-A-R Tech. Rept. 91-17-HP, Indpls, IN

6. Berger, E. H. and Kieper, R. W. (1996b). "Reliability of REAT measurements conducted in the E-A-R/CAL Laboratory," E-A-R Tech. Rept. 91-44-HP, Indpls, IN

7. Berger, E. H. and Kieper, R. W. (1996). "Procedures for calibration of Bruel & Kjaer 4144/4134 microphones and 4230/4231 calibrators," E-A-R Tech. Rept. 92-05-HP, Indpls, IN

8. Berger, E. H. (1986). "Methods of measuring the attenuation of hearing protection devices," J. Acoust. Soc. Am., Indpls, IN

9. Berger, E. H., Lindgren, F. and Kieper, R. W. (1983). "Establishing the 'true' laboratory NRR - An experimenter's dilemma," E-A-R Tech. Rept. 82-05-HP, Indpls, IN

10. CSA (2002). "Hearing protection devices - performance selection care, and use," Canadian Standards Assoc., Z94.2-02, Rexdale, Ontario.

11. Farres, J. R., Murphy, W. J., Harris, D. A., Johnson, J. L., Shaw, P. B. (2001, in submission). "Attenuation field methods for measuring hearing protector performance," Am. Ind. Hyg. J

12. Nehrela, M. G. (1989). "Experimental Statistics," National Bureau of Stds. Handbook 91, Washington, DC

13. EPA (1979). "Noise labeling requirements for hearing protectors," Environmental Protection Agency, Fed Regul 44(190), 40CFR Part 211, 56126-56147

14. ISO (1990). "Acoustics - hearing protectors - Part 1 Subjective method for the measurement of sound attenuation," International Organization for Standardization (ISO 4869-1 1990), Switzerland

15. Kieper, R. W. and Berger, E. H. (1989). "Comparison of earmuff band force measured using the head worn..." E-A-R Tech. Rept. 89-01-HP, Indpls, IN

16. White, V. R., Ackerman, D. F., and Epson, C. D. (2001). "NVLAP Procedures and General Requirements," U.S. Dept of Commerce, Natl. Inst. of Stds. and Technology, NIST Handbook 150, Washington, DC

Table II - HPD Test Administration Form [E-A-R 91-41HP; 6/11/01]

Test ID#: _____    Device: (Mfg., Model, Type): _____

Start date: _____    Source of samples: _____    Date received: _____

End date: _____    Test type: _____    Lot or NSN: _____    Temp: _____

Comments: _____    RH: _____

| | | | | | |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |

FOR ... CIAL USE ONLY – LAW ENFORCEMENT SENS ...

00019-2016-CID133-014635

**Table III - Preferred distribution of earcanal sizes for panels of hearing protector test subjects when testing to ANSI S3.19-1974 or to ANSI S12.6-1997 Method A.**

| No. of Subjects | Canal Sizes XS and S | Canal Size M | Canal Sizes L and XL |
|---|---|---|---|
| 10 | 2 | 3 | 2 |
| 15 or 16 | 4 | 5 | 4 |
| 20 | 5 | 6 | 5 |
| 24 | 6 | 7 | 6 |

NOTES

1. Values shown in table are minimum number of subjects for each category. Abbreviations are XS (extra small), S (small), M (medium), L (large), and XL (extra large).

2. Both of the following requirements also apply:

$$M \geq XS + S$$
$$M > XL + L$$

3. To apply the above table, subjects must be characterized as having a single earcanal size. When earcanal sizes are bilaterally different it has no effect unless the divergence crosses the boundaries between the three columns. For those cases the following guidelines apply:

S and M = S      M and L = L
S+ and M = M     M+ and L = L
S+ and M+ = M    M+ and L+ = L

3M Confidential - Attorneys' Eyes Only

3MO0005033

3M Confidential - Attorneys' Eyes Only

3MO0005034

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



Figure 1: Organization chart demonstrating relationship of E-A-R/CAL Acoustical Laboratory to Aearo Company

3M Confidential - Attorneys' Eyes Only

3MO0005035

3M Confidential - Attorneys' Eyes Only

3MO0005036

APPENDIX I

Sample ANSI S3.19 Test Report for an earmuff

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

 CID File0181

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

**APPENDIX II**
Sample ANSI S12.6 Test Report for an earplug

**APPENDIX III**
Complete Equipment List for ANSI S3.19/S12.6 Test Procedures

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3M00005037

3M00005038

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential - Attorneys' Eyes Only

3M00005039 Only

3M00005040

3M Confidential - Attorneys' Eyes Only

# APPENDIX IV

## Procedures for Recording Anatomical Measurements and Related Data

### Earcanal Sizing

The Aearo Company EARGAGE™ Ear Insert Fitting Device which consists of 5 plastic spheres denoted as extra small (XS), small (S), medium (M), large (L), and extra large (XL), is used for sizing earcanals. The diameters of the spheres are 7.7, 8.4, 9.1, 10.4, and 11.4 mm respectively.

Although the gauge has only 5 explicit sizes, there are 11 earcanal sizes that may be assigned with the following procedure. They are the five sphere sizes (XS, S, M, L, and XL), the five in-between larger sizes (XS+, S+, M+, L+, and XL+) and one extra negative size (XS-).

Choose a sphere which appears to be a little small for the earcanal being measured. Pull the prong outward and squeeze to assist in placing the gauge in the earcanal opening until the tab of the gauge touches the floor of the concha. Release the prong and observe if all of the earcanal opening conforms to the sphere. Then pump the gauge in the earcanal with a slight, gentle movement of about 1–2 mm. Ask the subject if s/he feels a suction or pressure. Move up a gauge size until the subject feels suction, increasing a fully inserted sphere. The sphere accommodating these requirements represents the size of the earcanal.

If suction can only be achieved with a partial insertion, recheck the next smaller size to confirm. The assigned size will then either be the smaller size (if suction is achieved) or the between (+) size (if suction can still only be achieved with a partial insertion of the size which is too large for a full insertion. For example, if the Large sphere is required for suction, but only the Medium sphere can be fully inserted, the assigned size is M+.

### Measuring Head and Pinna Dimensions

All dimensions illustrated in Figure III-1 are to be measured in millimeters.

- Bitragion breadth is measured with a caliper as illustrated in Figure III-2. Caliper points should just barely indent the flesh.
- Head height is measured with right angle and straight edge.
- Ear protrusion is measured with straight edge.
- Ear breadth and length are measured with caliper as illustrated in Figure III-3.

### Additional Questions on the Audiogram Card

Other information, including the subject's date of birth, age at time of test, gender, and race are also recorded. Additionally, the technician asks the subject to characterize her/his previous experience in using hearing protectors as:

- NONE:      HPDs worn < closely;
- OCCASIONAL:    HPDs worn < twice/month or 5 times/yr;
- REGULAR:    HPDs worn more than occasionally;
- EXPERIENCED: Knowledge of HPDs exceeding that gained by simple subjection within a HCP, such as a researcher, technician, or experimenter.

After inspecting the subject's eardrums using an otoscope, the technician estimates to the nearest 25% increment (0%, 25%, 50%, 75%, 100%) the percentage to which this wax occludes the lumen of the earcanal and records that number for the respective ear.

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File 0183

P1079.184

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

Figure IV-1 – Illustration of the anatomical measurements of the head and pinna that are recorded by E-A-RCAL Laboratory.






Bitragion breadth - The breadth of the head as measured from the superior base of the right tragus to the superior base of the left tragus.

Head height - The distance from the superior base of the tragus to the top of the head.





Ear protrusion - The horizontal distance from the bony eminence directly behind the ear to the most lateral protrusion of the ear.

Ear breadth - The breadth of the ear measured perpendicular to its long axis.

Ear length - The maximum length of the ear as measured along the long axis.



Figure IV-3 – Caliper used for measuring ear breadth and length



Figure IV-2 – Caliper used for measuring bitragus breadth

3M Confidential - Attorneys' Eyes Only

3M00005041

3M Confidential - Attorneys' Eyes Only

3M00005042

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

# APPENDIX V
## Statistical Procedures for Rejecting Outlier Data

### PURPOSE AND OVERVIEW

The purpose of the following tests is to exclude aberrant results due to either an unusual inability of a subject to consistently fit an HPD (as measured by their range of attenuation values across the multiple usually times fittings of the device), or to the dissimilarity of his or her mean attenuation values with respect to the other subjects tested. The procedures are applied after all subjects (not less than 10) have been tested.

The following description assumes 10 subjects x 3 measurements per subject. To apply the statistics to other sample sizes, see Appendix VI.

All probability tests are conducted at the p<0.05 level using the Dixon Criterion (Natrella, 1966). First the data are reused for repeatability of data within subjects using a one-sided test [$r_{10}$ is looked up in Table A-14 (see Appendix V of this report)], and then tested for similarity of mean attenuation values across subjects using a two-sided test [$r_{10}$ is looked up in Table A-14].

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3M00005043

3M00005044

EXHIBIT 8
CID File0185

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENS    ∶

00019-2016-CID133-014635

## Statistical Test Procedures (June, 1992)

A1.  RANGE TEST.  Compute the individual range in attenuation values across the three measurements for each subject at each frequency.

A2.  A one-sided Dixon test is used to determine if any subject's value is aberrantly large.

At each frequency, arrange the individual range values in ascending order:

$$X_1, X_2 ... X_9, X_{10}$$

Calculate $r_{11} = (X_{10} - X_9)/(X_{10} - X_2)$

The value is considered an outlier if $r_{11} > 0.477^*$

A3.  A subject fails this test if his/her data are found to be outliers at two or more frequencies.

A4.  A subject who fails this test is retested.  If the same subject fails a second time, he/she is replaced with another subject.  For replay testing the replacement subject's canal sizes must be the same, or within one size of those of the rejected subject.

A5.  Whether or not the replacement data did a subsequent Range test, or cause the ranges of any of the other subjects to become outliers, no further rejections for aberrant ranges are permitted.  If the original, retest, and replacement data all fail the Range test, the data yielding the highest NRR shall be utilized for the final report.

A6.  At this point, the experimenter proceeds to phase two of the outlier testing (Step B1).

B1.  MEAN VALUE TEST.  Compute the average attenuation values across the three measurements for each subject at each frequency.

B2.  A two-sided Dixon test is used to determine if any subject's value is aberrantly small or large.

At each frequency, arrange the mean attenuation values in ascending order:

$$X_1, X_2 ... X_9, X_{10}$$

To test for a value that is too small, calculate $r_{11} = (X_2 - X_1)/(X_9 - X_1)$

To test for a value that is too large, calculate $r_{11} = (X_{10} - X_9)/(X_{10} - X_2)$

The values are considered outliers if $r_{11} > 0.55.^{**}$

B3.  A subject fails this test if his/her data are found to be outliers at two or more frequencies.

B4.  A subject who fails this test is retested.  If the same subject fails a second time, s/he is replaced with another subject per the canal-size criteria of A4, unless one subject has already been replaced by application of A4.  In that case, no further testing is conducted.

B5.  Whether or not the replacement subject fails a subsequent Mean Value test, or causes the mean values or ranges of any of the other subjects to become outliers, no further testing is permitted.  If the original and replacement data both fail the Mean Value test, the data yielding the highest NRR shall be utilized for the final report.

B6.  The results of all Range and Mean Value statistical test failures, and their effects on the NRR, are to be stated in the final report.

---

One-sided test of significance at p<0.05

$^{**}$ Two-sided test of significance at p<0.05

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE


CID File0186

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

APPENDIX VI

Excerpts from Natrella (1966), Chapter 17

APPENDIX VII

Detailed Description of ANSI S3.19 and S12.6 HPD Test Reports

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3MX00050A7

3MX00050A8

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## Detailed Description of ANSI S3.19-1974 HPD Test Report

- **Cover Sheet**
  Customer, products tested, reference information, and note about the acceptable use of data that are contained in a NVLAP report.

- **Page 1: Summary Data**
  Product brand name, device type, and manufacturer.
  Relevant test parameters including test date, test ID#, number of subjects and test samples, the computed NRR and CSA Class, band force for the test samples, band position, and the specific fitting procedure selected for the test.
  Mean attenuation and standard deviation values at the frequencies which were tested.
  Notes regarding statistical failures, including the results of the statistical tests and an indication of any subjects who were rejected or revised and the effect that had on the NRR.
  Notes indicating whether certain data in the report are not covered by the NVLAP accreditation.
  Note about non-endorsement of the product by NVLAP or any government agency.

- **Page 2: Individual Subject Data**
  Specific sample in Appendix I illustrates an exemplar test report. For sample reports, earcanal sizes and earplug sizes (for sized earplugs) replace head dimensions.
  Above table - Mean comfort rating and comments specific to key features of the particular test.
  Within table - Attenuation results for each trial on each subject, including each subject's comfort rating, head dimensions, and individually-computed NRRs (right column) using group standard deviations computed across subjects with each subject's trials averaged as one value.
  Last four rows of table - Mean values and associated standard deviations across all subjects and trials (sd(X0)), and across the average of each subject's multi-trial average values (sd(10)), for attenuation, comfort ratings, anatomical data, and individually-computed NRRs. Q-values are an intermediate step for computing NRRs with the lowest Q-value being the frequency most affecting the resultant value.
  Below table - NRRs computed from means and sd(30) values, with 2-standard deviation (2sd), *-standard deviation (1sd), and 0-standard deviation (0sd) corrections.
  Bottom of page - Band force for each sample for all devices possessing a headness band.

- **Page 3: Outlier Test for Extreme Ranges**
  EvA-RCAL Laboratory statistical tests as described in Appendices V and VI of EvA-AR 91-41HP.
  Values in table are range in attenuation for each subject at each frequency across the repeated trials.

- **Page 4: Outlier Test for Extreme Means**
  EvA-RCAL Laboratory statistical tests as described in Appendices V and VI of EvA-AR 91-41HP.
  Values in table are mean attenuation for each subject at each frequency across the repeated trials.

- **Page 5: Computation of the NRR**
  Illustration of computation of the NRR for data in the Test Report.
  See notes at bottom of table regarding computational accuracy and rounding errors between the various tables of a Test Report.

- **Page 6: Age, Gender, and Anatomical Data**

- **Page 7: Graph of Individual and Mean Attenuation and Digital Photo of the Test Device**
  Age, gender, and anatomical data for the subjects utilized in the particular test, as well as information on how these subjects were selected for participation.

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3MA00005049

3MA00005050

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

{EXHIBIT 2}

CID File0188

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## Detailed Description of ANSI S12.6-1997 NRD Test Report

- **Cover Sheet**
  Customer, products tested, reference information, and notes about the acceptable use of data that are contained in a NVLAP report

- **Page 1, Summary Data**
  Product brand name, device type, and manufacturer.
  Relevant test parameters including test date, test DR, number of subjects and test samples, the computed NRR, NRR(SF), and CSA Grade, band force for the test samples, band position, and the specific fitting procedure selected for the test.
  Mean attenuation and standard deviation values at the frequencies which were tested.
  Notes regarding statistical failures, including the results of the statistical tests and an indication of any subjects who were rejected or retested and the effect that has on the NRR.
  Notes indicating whether certain data in the report are not covered by the NVLAP accreditation.
  Note about non-endorsement of the product by NVLAP or any government agency.

- **Page 2, Individual Subject Data**
  Specific sample in Appendix iii illustrated an earplug test report. For semi-insert and earmuff reports, head dimensions replace earcanal and earplug inches.
  Above table - Mean coordinate rating and comments specific to key features of the particular test.
  Within table - Attenuation results for each trial on each subject, including each subject's comfort rating, head dimensions, and individually-computed NRRs (right column) using group standard deviations computed across subjects with each subject's trials averaged as one value.
  Last four rows of table - Mean values and associated standard deviations across all subjects and trials (std40) for plugs, std20) for muffs), and across the average of each subject's multi-trial average values (std(20) for plugs, std(10) for muffs), for attenuation, comfort ratings, anatomical data, and NRRs. G-values are an intermediate step for computing NRR with the lowest G-value being the frequency most affecting the resultant value.
  Below table - NRRs computed from means and std(10) values for earmuff or std(20) values for earplugs at bottom of table, with 2-standard deviation (Std), 1-standard deviation (1sd), and 0-standard deviation (0sd) corrections.
  Bottom of page - For semi-inserts and earmuffs, mean band force and standard deviation for the samples tested, along with temperature and relative humidity in which such tests were conducted

- **Page 3, Outlier Test for Extreme Ranges**
  E+A+RCAL Laboratory statistical tests as described in Appendices V and VI of E+A+R 91-41-HP.
  Values in table are range in attenuation for each subject at each frequency across the repeated trials

- **Page 4, Outlier Test for Extreme Means**
  E+A+RCAL Laboratory statistical tests as described in Appendices V and VI of E+A+R 91-41-HP.
  Values in table are mean attenuation for each subject at each frequency across the repeated trials

- **Page 5, Computation of the NRR**
  Illustration or computation of the NRR for data in the Test Report, along with discussion or computation of the NRR(SF).
  See notes at bottom of table regarding computational accuracy and rounding errors between the various tables of a Test Report.

- **Page 6, Age, Gender, and Anatomical Data**
  Age, gender, and anatomical data for the subjects utilized in the particular test, as well as information on how those subjects were selected for participation

- **Page 7, Graph of Individual and Mean Attenuation and Digital Photo of the Test Device**

- **Page 8, Specific Manufacturer-Provided Fitting Instructions Utilized for the Test**

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

EXHIBIT 2
CID File0189

3M Confidential - Attorneys' Eyes Only

3M00050053

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

Table II -

Table I - Representative listing of the E•A•R/CAL listener panel data file [Testsub.wk2]. Date of most recent audiogram and HLs from that audiogram are not shown.

Table I -

Figure 1 - Organization chart demonstrating relationship of E•A•R/CAL Acoustical Laboratory to Aearo Company

Figure 2 - Sample printouts of entries in Access data base: file on laboratory equipment (E•arcal97.mdb)

Figure 3 - Example sound-field audiogram card [Form 84-1(3P9-92]

Figure 4 - Example audiogram card for pure-tone audiometry (Chart No. 1703-9-105), including area on back of card (shown below card in this figure) for ancillary subject data

Figure 5 - E•A•R/CAL Laboratory comfort scale.

Figure III-1 - Representative portion of the listing in the HPDA data base

Figure III-2 - Sample record from the HPDA data base

FOR    CIAL USE ONLY – LAW ENFORCEMENT SENS    :

00019-2016-G1D133-014635

3M Confidential - Attorneys' Eyes Only

# How Folding the Flanges Back Affects REAT Results of the UltraFit Earplug End of the Combat Arms Plug

E-A-R 00-12HP

R. W. Kieper, B.S.
E. H. Berger, M.S.

AEARO Company
E-A-RCAL™ Laboratory
7911 Zionsville Road
Indianapolis, IN 46268-1657
phone: 317-692-1111
fax:     317-692-3116

July 10, 2000

Version 1.2

E-A-RCAL™ Laboratory is accredited by the National Institute of Standards and Technology, National Voluntary Laboratory Accreditation Program, for the measurement of attenuation of hearing protection devices as ANSI S3.19-1974 and ANSI S12.6-1997. Laboratory Code 100214-0.

## INTRODUCTION

The Combat Arms earplug was developed for the Army, so that it would fit into a carrying case. Because of this, the plug is shorter than any other UltraFit Plug plug. The purpose of this report is to document that the current length of the UltraFit Earplug end of the Combat Arms Plug is too short for proper insertion, and how changing the fitting technique affected the results of real-ear tests of this plug.

## DEVICE TESTED

The Combat Arms Plug consists of two UltraFit-type earplugs joined together with a hard, plastic stem (part no. 4048-1, see Figure 1). The two plugs were tested independently because they utilize different levels of noise reduction. The level-dependent plug (part no. 3036-N) is yellow and has a channel through the plug, into which a filter has been placed. The solid plug end (part no. 3069-N) is green and was evaluated in two separate REAT tests - 213015 and 213017. This plug is the linear earplug end of the Combat Arms Plug.

## TEST PROCEDURE

Both plugs followed the S3.19-1974, Experimenter-Fit protocol, so the plugs were tested three times each on subjects from the E-A-RCAL Laboratory test panel. After each fitting by the experimenter, prior to the experimental testing at each threshold, a listening noise was presented and the subject was allowed to adjust the plug for maximum noise reduction, if it is deemed necessary.

For test 213015, the plugs were fit according to the standard plug's fitting instructions, with no modification. Because the stem of the green, solid end of the plug is so short, it was difficult for the experimenter to insert the plug deeply into some subjects' earcanals, especially those subjects with medium and larger earcanals. Additionally, the geometry of the external opening sometimes prevented the deep plug insertion required for maximum attenuation values. When the solid plug was tied during the final test (-015), the basal edge of the third flange of the yellow, level-dependent plug sometimes pressed against the subject's external opening and folded up. When the inward pressure on the plug was released, the yellow plug's flanges tended to return to their original shape and this sometimes loosened the plug, often imperceptibly to the subject.

For test 213017, the yellow flanges of the level-dependent end of the plug were folded back prior to the green, solid plug being inserted into the subject's ears. The folded-back flanges and the hard plastic stem provided a long, stiff, quasi-stem for the experimenter to grasp and allowed for a deeper and more-consistent fit of the solid plugs for test 213017. When folded back in this way, the yellow flanges neither touched the subject nor compromised the fit of the solid earplug.

## RESULTS

Tables 1 and 2 are the individual Subject Data from tests 213015 and 213017. Figure 2 is a graph comparing the means and standard deviations obtained in these two tests. The initial test 213015 was dropped after eight subjects because the individual results were variable and the NRR was quite low (11). Ten subjects were tested for test 213017. The means from that test are from 0.6 to 4.5 dB higher at all test frequencies and the SDs are 0.6 to 4 dB lower than those of test 213015. The 2-cc NRR obtained from this test is 22 dB.

CiD File0191

3MC0005285

3MC0005286

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

**Table 1 - INDIVIDUAL SUBJECT DATA**

Test ID: 212915
Date: 1/25/00
Comments: Plugs are the green end of the Combat Arms Plug.

Device: Short-stemmed UltraFit Plug, part of Combat Arms Plug
Samples: 10
Position: NA
Contact: 3.1

**Table 2 - INDIVIDUAL SUBJECT DATA**

Test ID: 213017
Date: 5/9/00
Comments: Plugs are the green end of the Combat Arms Plug. The yellow flanges were folded outward to allow a deeper insertion of the green plug. GWG labeled the Extreme Range Test. He was:

Device: Short-stemmed UltraFit Plug, part of Combat Arms Plug
Samples: 10
Position: NA
Contact: 3.1

3M Confidential - Attorneys' Eyes Only

3MO0005287

3M Confidential - Attorneys' Eyes Only

3MO0005288

P1079.193

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE



Figure 1 – Combat Arms Ear Plug Assembly, Drawing 2041-3

3M00005289

3M Confidential - Attorneys' Eyes Only

### Figure 2 – Two Experimenter-Fit tests of the green, solid end of the Combat Arms Plug



E-A-R 00-12/HP

3M00005290

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0193

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## E-A-RCAL ATTENUATION TEST REPORT
### PER ANSI S3.19-1974

NVLAP
NVLAP Lab.
Code 100374-0

Page 1 of 4

| | |
|---|---|
| MANUFACTURER: | E-A-R/Aearo | |
| DEVICE: | Combat Arms Plug | |
| DEVICE TYPE: | ARC Plug | |
| | Premolded, Level-dependent Plug | |
| TEST DATE: | January 25, 2000 | TEST ID#: 213016 |
| SUBJECTS/SAMPLES: | 10/10 | NRR (per EPA-1979): -2.0 |
| BAND FORCE (N): | NA | |
| FITTING PROCEDURE: | EPA/Experimenter Fit | POSITION: NA |

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 4.7 | 4.0 |
| 250 | 4.2 | 4.3 |
| 500 | 6.0 | 5.0 |
| 1000 | 9.5 | 6.7 |
| 2000 | 16.7 | 4.9 |
| 3150 | 18.6 | 5.7 |
| 4000 | 16.3 | 5.8 |
| 6300 | 16.7 | 6.1 |
| 8000 | 17.2 | 6.8 |

Performed by: Ronald W. Kieper, Sr. Acoustic Technician

Reviewed by: Elliott H. Berger, Manager, Acoustical Engineering

Comments: See report #213017 for results of UltraFit end of plug.

This report pertains only to the samples and subjects tested. It may not be used to claim product endorsement by NVLAP or any other agency of the U.S. Government.

---

### INDIVIDUAL SUBJECT DATA

Test ID: 213016
Date: 1/25/00
Comments:

Device: Combat Arms Plug
Samples: 10
Position: NA

Comfort: 2.6

Page 2 of 4

| Subj. | Trial | 125 | 250 | 1/3 Octave-Band Frequency 500 1000 2000 3150 4000 6300 8000 | 125 Cont. | Canal Size | NRR* |
|---|---|---|---|---|---|---|---|

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File P1079.194

3M Confidential

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## DIXON'S OUTLIER TEST: EXTREME RANGES

Test ID: 2130016  
Device: Combat Arms Plug  
Page 3 of 4

Range in attenuation in dB across trials  
1/3 Octave-Band Frequency

| Subj | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 |
|------|-----|-----|-----|------|------|------|------|------|------|
| KJC | 4 | 2 | 4 | 2 | 1 | 3 | 2 | 4 | 3 |
| MKF | 1 | 4 | 2 | 2 | 1 | 5 | 1 | 3 | 5 |
| GWG | 6 | 4 | 10 | 2 | 18 | 9 | 14 | 7 | 13 |
| BAK | 6 | 3 | 8 | 4 | 2 | 5 | 8 | 4 | 6 |
| RTM | 1 | 7 | 11 | 7 | 1 | 7 | 7 | 6 | 2 |
| DLP | 3 | 3 | 3 | 6 | 6 | 2 | 2 | 10 | 10 |
| TLS | 6 | 2 | 3 | 3 | 7 | 3 | 14 | 14 | 11 |
| TRS | 3 | 11 | 9 | 17 | 6 | 9 | 12 | 9 | 17 |
| MV | 3 | 6 | 7 | 3 | 3 | 6 | 4 | 2 | 7 |
| JHW | 6 | 5 | 11 | 5 | 1 | 4 | 5 | 4 | 6 |
| Mean | 3.9 | 4.7 | 6.8 | 6.8 | 4.3 | 4.9 | 5.8 | 6.3 | 8.0 |
| Max. | 6 | 11 | 11 | 17 | 18 | 9 | 14 | 14 | 17 |
| r | 0.000 | 0.444 | 0.000 | 0.375 | 0.500 | 0.333 | 0.167 | 0.304 | 0.286 |

Range in attenuation in dB across trials  
Extreme value rejected if r > 0.477.  One-sided test of significance at p<0.05.  
Rejected values are shaded.

## DIXON'S OUTLIER TEST: EXTREME MEANS

Test ID: 2130016  
Device: Combat Arms Plug  
Page 4 of 4

Mean attenuation in dB across trials  
1/3 Octave-Band Frequency

| Subj | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 |
|------|-----|-----|-----|------|------|------|------|------|------|
| KJC | 3.7 | 5.3 | 9.0 | 17.0 | 20.7 | 23.7 | 23.0 | 16.0 | 14.3 |
| MKF | 2.7 | 5.3 | 11.7 | 17.0 | 22.3 | 29.0 | 25.3 | 16.3 | 14.0 |
| GWG | 0.7 | 0.3 | 3.0 | 7.3 | 15.3 | 17.3 | 14.0 | 16.3 | 16.3 |
| BAK | 5.7 | 4.3 | 4.0 | 10.3 | 16.3 | 17.7 | 17.3 | 27.3 | 29.0 |
| RTM | 2.3 | -2.3 | 0.3 | 1.7 | 13.3 | 13.3 | 11.7 | 8.7 | 10.0 |
| DLP | 5.7 | 6.7 | 10.0 | 13.3 | 23.0 | 22.0 | 19.0 | 20.7 | 22.0 |
| TLS | 4.3 | 3.0 | 3.0 | 1.3 | 10.7 | 13.7 | 13.0 | 13.0 | 13.7 |
| TRS | 3.0 | 4.3 | 3.0 | 6.7 | 11.3 | 12.0 | 11.0 | 11.3 | 13.7 |
| MV | 11.7 | 11.7 | 10.0 | 13.0 | 18.7 | 21.7 | 18.0 | 22.0 | 22.0 |
| JHW | 5.0 | 3.0 | 6.3 | 7.7 | 17.3 | 15.3 | 14.0 | 15.0 | 18.7 |
| Mean | 4.7 | 4.2 | 6.0 | 9.5 | 16.7 | 18.6 | 16.3 | 16.7 | 17.2 |
| Min. | 0.7 | -2.3 | 0.3 | 1.3 | 10.7 | 12.0 | 10.0 | 8.7 | 10.0 |
| Max. | 14.0 | 11.7 | 11.7 | 17.0 | 23.0 | 29.0 | 25.3 | 27.3 | 29.0 |
| Low r | 0.383 | 0.298 | 0.278 | 0.061 | 0.057 | 0.134 | 0.077 | 0.280 | 0.194 |
| High r | 0.383 | 0.441 | 0.192 | 0.387 | 0.340 | 0.163 | 0.333 | 0.260 | 0.426 |

Extreme value rejected if r > 0.551.  Two-sided test of significance at p<0.05.  
Rejected values are shaded.

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE



3M Confidential    3MOO005063    3MOO005064

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

NVLAP Lab
Code 100374-0

**E-A-R CAL ATTENUATION TEST REPORT**
**PER ANSI S3.19-1974**

Page 1 of 4

| | |
|---|---|
| DEVICE: | UltraFit end of the Combat Arms Plug |
| ARC Plug | |
| DEVICE TYPE: | Premolded Earplug |
| MANUFACTURER: | E-A-R / Aearo |
| TEST DATE: | May 9, 2000 |
| SUBJECTS/SAMPLES: | 10/10 |
| BAND FORCE (N): | NA |
| FITTING PROCEDURE: | EPA/Experimenter Fit |

TEST ID#: 213017

NRR (per EPA-1979): 21.7

CSA CLASS: AL

POSITION: NA

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 32.7 | 5.9 |
| 250 | 31.8 | 6.1 |
| 500 | 33.0 | 6.1 |
| 1000 | 33.0 | 6.5 |
| 2000 | 34.5 | 5.5 |
| 3150 | 34.5 | 4.1 |
| 4000 | 37.3 | 5.3 |
| 6300 | 38.9 | 6.1 |
| 8000 | 43.8 | 6.7 |
| | 43.3 | 6.9 |

Performed by: _Ronald W. Kieper_    Reviewed by: _Elliott H. Berger_

Ronald W. Kieper
Sr. Acoustic Technician

Elliott H. Berger
Manager, Acoustical Engineering

Comments: GWG failed the Extreme Range Test at 125 and 500 Hz. He was released.
The original NRR was 20.7. See report 213016 for test of the Combat Arms
end of the plug.

This report pertains only to the samples and subjects tested. It may not be used to claim product endorsement by NVLAP, or any other agency of the U.S. Government.

3M Confidential

3M00005565

**INDIVIDUAL SUBJECT DATA**

Test ID: 213017
Date: 5/9/00

Device: UltraFit Earplug end of the Combat Arms Plug
Samples: 10       Position: NA       3:1
Comments: Plugs are the green end of the Combat Arms Plug. The yellow flange's were folded outward
to allow a deeper insertion of the green plug. GWG failed the Extreme Range Test. He was
released. The original NRR was 21.

| Subj | Trial | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 | Cap Size | NRR* Individual 2nd NRR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACC | 1 | 33 | 33 | 34 | 34 | 44 | 46 | 45 | 44 | 33 | S/S+ | 26.6 |
| | 2 | 32 | 32 | 40 | 41 | 44 | 44 | 40 | 45 | 28 | | |
| GWG | 1 | 41 | 34 | 32 | 38 | 39 | 45 | 48 | 44 | 31 | M/M+ | |
| | 2 | 41 | 42 | 40 | 37 | 39 | 48 | 49 | 45 | 37 | | |
| | 3 | 42 | 41 | 37 | 38 | 41 | 47 | 49 | 48 | 31 | | 32.1 |
| LTH | 1 | 33 | 27 | 35 | 33 | 33 | 38 | 50 | 48 | 31 | XS/XS | |
| | 2 | 31 | 27 | 26 | 30 | 28 | 38 | 50 | 50 | 38 | | |
| | 3 | 35 | 29 | 38 | 30 | 35 | 41 | 48 | 48 | 35 | | 21.8 |
| BAK | 1 | 38 | 36 | 37 | 39 | 37 | 34 | 40 | 35 | XL/XL | |
| | 2 | 41 | 38 | 38 | 30 | 30 | 34 | 46 | 40 | 33 | | |
| | 3 | 35 | 33 | 34 | 30 | 33 | 38 | 46 | 41 | 32 | | 24.6 |
| RTM | 1 | 30 | 30 | 35 | 29 | 40 | 30 | 34 | 40 | 33 | L/M+ | |
| | 2 | 30 | 28 | 33 | 31 | 29 | 28 | 27 | 45 | 31 | | |
| | 3 | 22 | 25 | 27 | 27 | 27 | 31 | 39 | 42 | 21 | | 17.6 |
| EXP | 1 | 35 | 38 | 39 | 39 | 33 | 32 | 39 | 34 | 34 | L+/L+ | |
| | 2 | 41 | 36 | 40 | 40 | 42 | 42 | 43 | 54 | 38 | | |
| | 3 | 38 | 38 | 37 | 39 | 41 | 42 | 43 | 53 | 42 | | 30.2 |
| IEAS | 1 | 33 | 30 | 33 | 35 | 33 | 34 | 42 | 46 | 41 | M/M+ | |
| | 2 | 28 | 28 | 30 | 30 | 31 | 38 | 39 | 48 | 40 | | |
| | 3 | 33 | 32 | 30 | 33 | 35 | 40 | 39 | 42 | 34 | | 25.0 |
| TLS | 1 | 35 | 32 | 32 | 32 | 37 | 40 | 46 | 50 | 47 | M+/M | |
| | 2 | 36 | 32 | 32 | 33 | 36 | 40 | 45 | 44 | 44 | | |
| | 3 | 34 | 33 | 34 | 41 | 41 | 39 | 42 | 31 | 3 | | 19.6 |
| XKS | 1 | 23 | 20 | 21 | 24 | 25 | 35 | 35 | 34 | 28 | M/M+ | |
| | 2 | 32 | 23 | 24 | 23 | 31 | 38 | 31 | 23 | 1 | | |
| | 3 | 34 | 34 | 33 | 34 | 44 | 40 | 48 | 33 | 18 | 2 | |
| DLW | 1 | 36 | 35 | 41 | 35 | 38 | 40 | 45 | 34 | 41 | S/XS+ | |
| | 2 | 34 | 32 | 33 | 29 | 43 | 43 | 39 | 52 | 23 | | |
| | 3 | 38 | 35 | 33 | 36 | 41 | 41 | 47 | 45 | 37 | | 28.0 |
| Mean (±3SD) | | 32.7 | 31.8 | 33.0 | 33.0 | 34.5 | 37.3 | 38.9 | 43.8 | 43.3 | | 24.4 |
| ±4(10) | | 5.9 | 5.3 | 6.0 | 5.5 | 4.1 | 5.3 | 6.7 | 6.9 | 52.1 | 3.1 | |
| O-value | | 36.9 | 28.1 | 23.2 | 21.0 | 25.0 | 25.7 | 31.0 | 32.8 | 64.1 | 6.2 | 4.6 |
| NRR | (2kd) = | | 21.7 (1sd) = | | | 27.3 (0sd) = | | | 32.8 | | |

NRR* Individual 2nd NRR

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

3M Confidential        3M00005566

CID File 0196    EXHIBIT 8

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## DIXON'S OUTLIER TEST: EXTREME RANGES

Test ID: 213017

Device: UltraFit Earplug end of the Contact Arms Plug

Page 3 of 4

Range in attenuation in dB across trials

1/3 Octave-Band Frequency

| Subj | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 |
|---|---|---|---|---|---|---|---|---|---|
| KJC | 0 | 5 | 4 | 7 | 2 | 4 | 4 | 1 | |
| GWG | 6 | 5 | 4 | 1 | 5 | 5 | 5 | 2 | |
| LTH | 5 | 3 | 6 | 9 | 4 | 9 | 12 | 15 | |
| BAK | 5 | 3 | 3 | 11 | 1 | 3 | 7 | 4 | |
| RTM | 8 | 17 | 9 | 2 | 11 | | 13 | 12 | |
| DLP | 6 | 3 | 3 | 3 | 9 | 6 | 9 | 10 | |
| EAS | 8 | 11 | 9 | 15 | 6 | 4 | 3 | 3 | |
| TLS | 3 | 10 | 12 | 15 | 1 | 8 | 6 | 2 | |
| KKS | 5 | 4 | 5 | 4 | 4 | 4 | 6 | 6 | |
| DLW | 2 | 4 | 5 | 12 | 2 | 2 | 6 | 6 | |
| Mean | 4.8 | 8.4 | 8.3 | 5.9 | 5.2 | 5.6 | 6.8 | 5.8 | 5.9 |
| Max | 8 | 17 | 12 | 15 | 12 | 18 | 13 | 15 | 13 |
| Low r | 0.000 | 0.429 | 0.333 | 0.308 | 0.091 | | 0.111 | 0.231 | 0.400 |

Extreme value rejected if r > 0.477. One-sided test of significance at p<0.05.

## DIXON'S OUTLIER TEST: EXTREME MEANS

Test ID: 213017

Device: UltraFit Earplug end of the Contact Arms Plug

Page 4 of 4

Mean attenuation in dB across trials

1/3 Octave-Band Frequency

| Subj | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 |
|---|---|---|---|---|---|---|---|---|---|
| KJC | 32.0 | 33.3 | 35.7 | 31.3 | 31.3 | 43.3 | 46.0 | 45.7 | 44.3 |
| GWG | 39.0 | 40.0 | 38.3 | 36.7 | 36.0 | 38.3 | 45.0 | 49.0 | 47.7 |
| LTH | 32.0 | 28.7 | 30.0 | 29.7 | 32.0 | 33.3 | 39.0 | 44.7 | 43.7 |
| BAK | 34.7 | 34.7 | 34.7 | 33.0 | 38.7 | 38.3 | 31.7 | 46.7 | 42.3 |
| RTM | 25.3 | 27.3 | 26.0 | 27.7 | 33.3 | 38.0 | 33.3 | 32.7 | 35.0 |
| DLP | 38.7 | 37.7 | 40.7 | 40.0 | 40.3 | 34.3 | 37.0 | 51.0 | 52.3 |
| EAS | 29.7 | 29.3 | 30.3 | 32.0 | 35.0 | 39.3 | 38.0 | 34.7 | 40.3 |
| TLS | 33.7 | 30.7 | 31.3 | 31.3 | 33.3 | 40.3 | 42.0 | 46.0 | 41.0 |
| KKS | 22.7 | 22.0 | 21.3 | 23.3 | 30.3 | 33.7 | 34.7 | 34.3 | 32.3 |
| DLW | 35.0 | 34.7 | 39.0 | 35.3 | 35.0 | 42.3 | 45.7 | 47.3 | 51.9 |
| Mean | 32.7 | 31.8 | 33.0 | 32.0 | 34.5 | 37.3 | 38.9 | 43.8 | 43.3 |
| Min | 22.7 | 22.0 | 21.3 | 23.3 | 30.3 | 30.3 | 31.7 | 32.7 | 32.3 |
| Max | 39.0 | 40.0 | 40.7 | 40.0 | 40.3 | 43.3 | 46.0 | 51.0 | 52.3 |
| Low r | 0.165 | 0.340 | 0.370 | 0.325 | 0.120 | 0.250 | 0.119 | 0.162 | 0.140 |
| Prob | 0.090 | 0.184 | 0.185 | 0.270 | 0.185 | 0.100 | 0.026 | 0.120 | 0.053 |

Extreme value rejected if r > 0.551. Two-sided test of significance at p<0.05.

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

EXHIBIT CID File 0197

3M Confidential

3M Confidential

3M00005367

3M00005368

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential

"Durig, Benjamin (Portland)"
<Benjamin.Durig@a.gov>

To    <doug.ohlin@mmm.com>
cc
bcc
Subject RE: Combat Arms Earplugs

History:    ⇄ This message has been replied to.

06/03/2009 02:42 PM

Hey, Doug,

Hope all is well. Can you tell me when the CAEP was first developed, and when it was re-developed to the model that is being sold today? Thank you for all of your help.

Benjamin

From: doug.ohlin@mmm.com [mailto:doug.ohlin@mmm.com]
Sent: Wednesday, June 24, 2009 7:02 AM
To: Durig, Benjamin (Portland)
Cc: doug.moyes@mmm.com
Subject: Re: Combat Arms Earplugs

Benjamin

The noninear (level dependent) mode of the Combat Arms Earplug attenuates impulse noise by means of acoustic impedance. See the 1935 article in the attachment for a detailed explanation. When the impulse noise encounters a narrow orifice impedance (acoustic friction) is created. The greater the sound pressure of the impulse, the more impedance is created.

The fourth generation of the CAE which will be coming out shortly has an NRR of 23 and 7. NNR's are the result of threshold testing of 10 human subjects on three occasions with and without a hearing protector under the provisions of ANSI S12.6-1974. Authority is found in the EPA Noise Control Act of 1972 and the OSHA Noise amendment.

Note that the non-linear mode was designed to improve speech communication during quiet, not in steady state noise. If you are going to evaluate the earplug for its ability to enhance speech communication over conventional hearing protection, it should be in relative quiet. For soldiers in a dismounted mode firing a weapon, conventional hearing protection gets in the way when it is needed the most. It only takes a few hours from an M-16 or a TTS that could become a permanent hearing loss. The Combat Arms Plug was designed for the soldier when firing his weapon, but allow him to communicate and maintain situational awareness during the relative quiet between firings. The plug is not totally transparent in the non-linear mode. There is some attenuation at the lower sound levels, but not anywhere near as much as a conventional hearing protector. Hope this helps.

Doug

-----"Durig, Benjamin (Portland)" <Benjamin.Durig@a.gov> wrote: -----

To: <doug.ohlin@mmm.com>
From: "Durig, Benjamin (Portland)" <Benjamin.Durig@a.gov>
Date: 06/23/2009 04:30PM
Subject: Combat Arms Earplugs

Doug,

My name is Benjamin Durig, and I am a summer research intern at the NCRAR. I received your contact information from my advisor, Dr. Sarah McDaniel. We are currently in the process of beginning a study focused on the Combat Arms Earplugs and Speech Perception in Noise; in other words, "How effective is communication/how audible are important sounds in the field while wearing the CAE?"

I hope I am not bothering you, but I do have a few questions I was hoping you could help me with:

1)   The non-linear plug (or the side for "impulse noise"... I understand that there is a filter in this plug that allows low-level sounds through but protects are compresses impulse noises starting at 110 dBP ... HOW does it do this? And/or can you point me toward some literature that explains this?

3M00005437    3M Confidential    3M00005438

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

(EXHIBIT 3)
CID File0198

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential

3M00005439

21.   My understanding is that the linear plug will provide a constant NRR of 21 dB and the non-linear plug will provide a constant NRR of 7 dB. Can you explain to me how these NRRs were computed? How was the wearer positioned in relationship to the speakers when the attenuation what measured (facing a single speaker? Sitting in between two speakers at an equal distance facing forward?) and was the attenuation measured binaurally?

Any of your knowledge would be helpful. Thank you for your time. Look forward to hearing from you.

Sincerely,

Benjamin

**Benjamin A. Davig, Au.D. Student**
NIH-T35 Summer Research Assistant
National Center for Rehabilitative Auditory Research
3710 SW US Veterans Hospital Road
Portland Oregon 97207
(503) 220-8262 ext. 51424

EXHIBIT 199

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

3M Confidential

**3M Personal Safety Division**
E-A-A-RCAL Lab, 7911 Zionsville Rd. | Indianapolis, IN 46268-1650
Office: 317.692.3031 | Mobile: 317.752.0614 | Fax: 866.428.3942
elliott.berger@mmm.com | jin.com/hearingprotection

From:    Jason Jones
To:      Larry Dick
Cc:      Jason Jones/US-Corporate/DMUS@3M-Corporate, Daniel
Subject: Re: Lawrence Livermore NL questions on CAE
Date:    07/08/2014 08:43:13 AM

Larry, I can't answer most of your questions etc. ...

Larry,

I can't answer most of your questions below. Ted will need to weigh in here. I have also copied Elliott on this. He has done a lot of research on passive, non-linear earplugs

My non-technical, marketing-based comments for you are the following:

My non-technical, marketing-based comments for you are the following:

**3M**

**Jason Jones** | US Marketing Manager – Hearing Solutions

Ted or Elliott - please jump in. thanks.

From:    Larry Dick
To:      Jason and Ted –  Before responding (it was not...
Cc:
Subject: Lawrence Livermore NL questions on CAE
Date:    07/07/2014 11:33:43 PM

Jason and Ted –

Before responding (I was not at the meeting, Larry is a distributor rep) wanted to run this by you. I asked that CAE/ARC still a bit of a mystery to me.

Thanks

**3M**

**Larry Dick, COHC** | Account Executive, Hearing Conservation & Detection Solutions
Personal Safety Division
Office: 714.966.5547 | Fax: 651.733.8061
LDick@mmm.com | www.3M.com/PPESafety

----- Forwarded by Larry Dick/OFC/HR50/MMUS on 07/07/2014 00:11 PM -----

From:
To:

**3M Confidential**                           **3M Confidential**

3MX00005531                    3MX00005532

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

Cc: Tab.smith@mmm.com* <tab.smith@mmm.com>, "larry.bethen@SuppleareuSolutions.com", "ida@mmm.com", "idfd@mmm.com"
Date: 07/06/2014 06:26 PM
Subject: RE: 3M/S&S Follow Up

Eric, Bill and Larry,

It was a great meeting with all of you the other day. I look forward to working with all of you.

Thank you for the information. I am very excited to get my hands on the technical proof that the 3M Combat Arms plugs are effective up to 190 dB, even though they only have an NRR of 2. We want to issue these to our protective force, but can't at the moment with the low NRR. We have a 8 hour TWA exposures upwards of 111 dBA. We currently use the foam plug and muffs for double protection.

Looking forward to our next discussion and the information about the Combat Arms plugs.

Thanks in advance!

Ryan

Ryan Kamerzeli, CIH
Lawrence Livermore National Laboratory
Worker Safety & Health
925 424 4709

From: ewalther@mmm.com [mailto:ewalther@mmm.com]
Sent: Sunday, July 06, 2014 6:27 PM
To: Gates, Peter A.; Kamerzeli, Ryan G.
Cc: bill.smith@mmm.com; larry.bothen@SuppleareuSolutions.com; idfd@mmm.com
Subject: 3M/S&S Follow Up

Peter, Ryan,

Thank you for taking the time to meet with Bill, Larry and myself yesterday. We are looking forward to assisting you with your PPE consultation project and the information you shared with us yesterday will help us better partner with you moving forward. I also wanted to follow up on a few items we discussed during our visit.

1. CC2 3M's hearing specialist Larry Dick on this e-mail. Larry has a wealth of knowledge and will do a tremendous resource for you in regards to any hearing related questions you may have. Larry has some literature on the Combat Arms ear plugs and he can answer some of questions Ryan had regarding the NRR ratings that we published.

2. I attached a PDF on the upcoming hearing conservation seminar in San Jose on September 30th. You can send some people from your facility to this seminar in San Jose or Larry can set up a time to conduct an on site hearing conservation training.

I will follow up with you shortly regarding your Breath Easy papers.

Have a great holiday weekend!

Let me know if you have any other questions,

3M
Eric Walther | Account Representative
Personal Safety Division
3M Center, 0235-02-W-20 | St. Paul, MN, 55144-1000
Mobile: 510 368 2757
ewalther@mmm.com | www.3M.com | www.3M.com/PPESafety

3M Confidential          3MO0005533          3M Confidential          3MO0005534



FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

**E-A-R/CAL ATTENUATION TEST REPORT PER ANSI S3.19-1974**

Page 1 of 5

DEVICE: Combat Arms Plug

DEVICE TYPE: ARC Plug

MANUFACTURER: E-A-R/Aearo

TEST DATE: January 25, 2000    TEST ID#: 213016

SUBJECTS/SAMPLES: 10/10    NRR (per EPA-1979): -2.0

BAND FORCE (N): NA

FITTING PROCEDURE: EPA/Experimenter Fit    POSITION: NA

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 4.7 | 4.0 |
| 250 | 4.2 | 4.0 |
| 500 | 6.0 | 4.3 |
| 1000 | 9.5 | 5.0 |
| 2000 | 16.7 | 8.7 |
| 3150 | 18.6 | 4.9 |
| 4000 | 16.3 | 5.7 |
| 6300 | 16.7 | 5.8 |
| 8000 | 17.2 | 6.1 |
| | | 8.8 |

Comments: See report #213017 for results of UltraFit end of plug.

Performed by: Ronald W. Kieper, Sr. Acoustic Technician

Reviewed by: Elliott H. Berger, Manager, Acoustical Engineering

This report pertains only to the samples tested. It may not be reproduced by NVLAP, or any other agency of the U.S. Government.

3M Confidential - Attorneys Eyes Only

3M00006947

INDIVIDUAL SUBJECT DATA

Test ID: 213016
Date: 1/25/00
Comments:

Device: Combat Arms Plug
Samples: 10    Position: NA    Comfort:

1/3 Octave-Band Frequency

Page 2 of 5

3M Confidential - Attorneys Eyes Only

3M00006948

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

(EXHIBIT 7)

CID File0202



3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3M00006949

3M00006950

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0203

(EXHIBIT ___ )

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



## Individual and Group Means
## Combat-Arms Plug [213016]

The yellow end of the plug was tested.

c:\myfiles\...\213016.xls.Graph

→KJC  →MKF  →GWG  →BAK  →RTM  →DLP  →TLS  →TRS  →MV  →JMW  →Mean

Page 6 of 5

E-A-R CAL ATTENUATION TEST REPORT
PER ANSI S3.19-1974

NVLAP Lab
Code 100374-0

**DEVICE:** UltraFit end of the Combat Arms Plug
ARC Plug

**DEVICE TYPE:** Premolded Earplugs

**MANUFACTURER:** E-A-R / Aearo

**TEST DATE:** May 9, 2000

**SUBJECTS/SAMPLES:** 10/10

**BAND FORCE (N):** NA

**FITTING PROCEDURE:** EPA/Experimenter Fit

**TEST ID#:** 213017

**NRR (per EPA-1979):** 21.7

**CSA CLASS:** AL

**POSITION:** NA

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 32.7 | 5.9 |
| 250 | 31.8 | 6.1 |
| 500 | 33.0 | 8.5 |
| 1000 | 32.0 | 5.5 |
| 2000 | 34.5 | 4.1 |
| 3150 | 37.3 | 5.3 |
| 4000 | 36.9 | 6.1 |
| 6300 | 43.8 | 6.7 |
| 8000 | 43.3 | 6.9 |

**Performed by:** Ronald W. Kieper
Sr. Acoustic Technician

**Reviewed by:** Elliott H. Berger
Manager, Acoustical Engineering

**Comments:** GWG failed the Extreme Range Test at 125 and 500 Hz. He was retested. The original NRR was 20.7. See report 213016 for test of the Combat Arms end of the plug.

[This report pertains only to the samples tested and subjects listed. It may not be used to claim product endorsement by NVLAP or any other agency of the U.S. Government.]

3M00006951

3M00006952

3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## E·A·RCAL ATTENUATION TEST REPORT
### PER ANSI S3.19-1974

Page 1 of 4

| | |
|---|---|
| DEVICE: | UltraFit Earplug end of the Combat Arms Plug |
| DEVICE TYPE: | Premolded earplug |
| MANUFACTURER | E·A·R/Aearo Company |
| TEST DATE: | May 9, 2000 | TEST ID#: 213017 |
| SUBJECTS/SAMPLES: | 10/10 | NRR (per EPA-1979): 21.7 |
| BAND FORCE (N): | NA | POSITION: NA |
| FITTING PROCEDURE: | EPA/Experimenter Fit |

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 32.7 | 5.9 |
| 250 | 31.8 | 6.1 |
| 500 | 33.0 | 6.5 |
| 1000 | 32.0 | 5.5 |
| 2000 | 34.5 | 4.1 |
| 3150 | 37.3 | 5.3 |
| 4000 | 38.9 | 6.1 |
| 6300 | 43.8 | 6.7 |
| 8000 | 43.3 | 6.9 |

Performed by: _Ronald W. Kieper_ (signature)
Ronald W. Kieper
Sr. Acoustic Technician

Reviewed by: _Elliott H. Berger_ (signature)
Elliott H. Berger
Manager, Acoustical Engineering

Comments: GWG failed the Extreme Range test at 125 (27) and 500 Hz (21); he was retested. The original NRR was 20.7 dB.

INDIVIDUAL SUBJECT DATA

Test ID: 213017
Device: UltraFit Earplug end of the Combat Arms Plug
Date: 5.9/00
Comfort: 3;
Subjwer: 10
Position: NA

Comments: Plugs are in the green end of the Combat Arms Plug. The yellow flanges were folded outward to allow a deeper insertion of the green plug. GWG failed the Extreme Range Test. He was retested the original NRR was 21.

| Subj | Trial | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 | 125 Conf | Canal Size | NRR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KJC | 1 | 32 | 32 | 35 | 34 | 32 | 46 | 45 | 44 | 33 | 4 | S/S+ | 28.9 |
| | 2 | 32 | 30 | 32 | 30 | 33 | 44 | 46 | 44 | 33 | | | |
| | 3 | 34 | 35 | 34 | 33 | 30 | 45 | 46 | 44 | 32 | | | |
| GWG | 1 | 41 | 41 | 37 | 39 | 41 | 46 | 48 | 44 | 35 | 4 | M/M+ | 32.1 |
| | 2 | 35 | 39 | 37 | 37 | 34 | 42 | 50 | 48 | 37 | | | |
| | 3 | 35 | 37 | 37 | 34 | 37 | 38 | 52 | 53 | 31 | | | |
| JFH | 1 | 30 | 30 | 28 | 30 | 34 | 37 | 38 | 39 | 55 | 4 | X/S+X/S | 21.9 |
| | 2 | 31 | 27 | 27 | 28 | 28 | 35 | 35 | 39 | 29 | | | |
| | 3 | 35 | 29 | 30 | 30 | 30 | 26 | 35 | 39 | 29 | | | |
| BKK | 1 | 36 | 33 | 36 | 36 | 36 | 44 | 48 | 42 | 36 | 4 | XL/XL | 24.6 |
| | 2 | 41 | 33 | 36 | 37 | 34 | 38 | 40 | 42 | 35 | | | |
| | 3 | 39 | 33 | 35 | 37 | 35 | 38 | 39 | 45 | 36 | | | |
| RTM | 1 | 30 | 37 | 38 | 39 | 40 | 42 | 45 | 42 | 33 | 2 | L/M+ | 17.8 |
| | 2 | 24 | 23 | 28 | 27 | 31 | 37 | 40 | 31 | 21 | | | |
| | 3 | 22 | 24 | 26 | 25 | 28 | 27 | 24 | 24 | 31 | | | |
| OLP | 1 | 40 | 38 | 41 | 39 | 36 | 39 | 51 | 50 | 42 | 2 | L+/L+ | 30.2 |
| | 2 | 35 | 36 | 42 | 38 | 38 | 39 | 45 | 54 | 38 | | | |
| | 3 | 41 | 38 | 42 | 39 | 39 | 38 | 44 | 36 | | | | |
| EAS | 1 | 35 | 31 | 28 | 29 | 34 | 39 | 41 | 42 | 35 | 4 | M/M+ | 25.0 |
| | 2 | 31 | 27 | 32 | 33 | 32 | 40 | 39 | 40 | 31 | | | |
| | 3 | 32 | 30 | 32 | 32 | 40 | 39 | 39 | 39 | 34 | | | |
| TLS | 1 | 35 | 32 | 35 | 34 | 35 | 37 | 45 | 46 | 45 | 4 | M+/M | 19.8 |
| | 2 | 32 | 30 | 34 | 33 | 36 | 41 | 40 | 45 | 45 | | | |
| | 3 | 34 | 31 | 32 | 32 | 40 | 39 | 39 | 45 | 35 | | | |
| KKS | 1 | 25 | 20 | 21 | 22 | 30 | 36 | 40 | 40 | 28 | 1 | SX/S+ | 20.0 |
| | 2 | 29 | 23 | 23 | 30 | 30 | 31 | 35 | 45 | 25 | | | |
| | 3 | 23 | 23 | 24 | 24 | 30 | 35 | 35 | 43 | 20 | | | |
| DLW | 1 | 34 | 40 | 37 | 39 | 43 | 43 | 42 | 54 | 41 | 1 | M/M | 26.0 |
| | 2 | 35 | 38 | 36 | 35 | 41 | 41 | 47 | 48 | 37 | | | |
| | 3 | 35 | 36 | 36 | 35 | 43 | 42 | 46 | 48 | 37 | | | |

| | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 | NRR |
|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 32.7 | 31.8 | 33.0 | 32.0 | 34.5 | 38.9 | 43.8 | 43.3 | 32.1 | 24.4 |
| SD(45.5) | 5.9 | 6.1 | 6.5 | 5.5 | 5.3 | 6.1 | 6.7 | 5.5 | | --- |
| SD(19) | 5.6 | 6.0 | 5.2 | 6.1 | 4.3 | 5.3 | 6.1 | 6.2 | 2 | --- |
| D-Value | 36.9 | 28.1 | 23.2 | 21.0 | 25.0 | 25.7 | 8.1 | 8.5 | 31.5 | 4.5 |

NRR = Individual 2xo NRR

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

(EXHIBIT 8)

3M00000953

3M00000954

3M Confidential - Attorneys' Eyes Only

CID File 0205

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

## DIXON'S OUTLIER TEST: EXTREME RANGES

Test ID: 213017

Device: LittleFit Earplug end of the Combat Arms Plug

Range in attenuation in dB across trials

Page 3 of 4

| Subj | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 5000 | 8000 |
|---|---|---|---|---|---|---|---|---|---|
| KJC | 0 | 5 | 7 | 7 | 4 | 4 | 5 | 1 | |
| GWG | 6 | 5 | 5 | 1 | 1 | 5 | 2 | 1 | |
| JTH | 5 | 5 | 6 | 4 | 8 | 3 | 8 | 5 | |
| BAK | 5 | 3 | 3 | 6 | 3 | 4 | 4 | 3 | |
| RTM | 8 | 17 | 9 | 2 | 11 | 1 | 4 | 4 | 5 |
| DLP | 9 | 4 | 9 | 3 | 9 | 6 | 6 | 6 | 6 |
| EAS | 3 | 11 | 12 | 8 | 2 | 8 | 4 | 3 | |
| TLS | 3 | 10 | 8 | 2 | 6 | 4 | 3 | 3 | |
| KKS | 5 | 3 | 4 | 15 | 1 | 5 | 6 | 2 | |
| DLW | 2 | 4 | 5 | 12 | 8 | 2 | 6 | 3 | 3 |
| Max | 8 | 17 | 12 | 15 | 11 | 8 | 8 | 6 | |
| Min | 4 | 6.4 | 8.3 | 5.9 | 5.2 | 6.8 | 5.9 | 5.9 | |

One-sided test of significance at p<0.05

3M00006955

## DIXON'S OUTLIER TEST: EXTREME MEANS

Test ID: 213017

Device: LittleFit Earplug end of the Combat Arms Plug

Mean attenuation in dB across trials

Page 4 of 4

| Subj | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 5000 | 8000 |
|---|---|---|---|---|---|---|---|---|---|
| KJC | 32.0 | 33.0 | 35.7 | 31.3 | 31.3 | 43.3 | 46.0 | 45.7 | |
| GWG | 39.0 | 40.0 | 39.3 | 38.7 | 38.0 | 31.3 | 45.0 | 47.7 | |
| JTH | 32.0 | 28.7 | 30.0 | 29.7 | 32.0 | 33.3 | 39.0 | 49.0 | |
| BAK | 38.0 | 34.7 | 34.7 | 35.0 | 34.7 | 30.3 | 39.0 | 44.7 | |
| RTM | 25.3 | 27.3 | 28.0 | 27.7 | 33.3 | 38.0 | 31.7 | 42.3 | |
| DLP | 38.7 | 37.7 | 40.7 | 40.0 | 40.3 | 34.3 | 37.0 | 55.0 | |
| EAS | 29.7 | 29.3 | 30.3 | 32.0 | 35.0 | 39.3 | 38.0 | 51.0 | |
| TLS | 33.7 | 30.7 | 31.3 | 31.3 | 33.3 | 40.3 | 42.0 | 46.0 | |
| KKS | 22.7 | 22.0 | 21.3 | 23.3 | 30.3 | 33.7 | 34.7 | 34.3 | |
| DLW | 35.0 | 34.7 | 38.0 | 35.3 | 35.0 | 42.3 | 45.7 | 47.3 | |

Two-sided test of significance at p<0.05

3M00006956

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE



3M Confidential - Attorneys' Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



### Individual and Group Means [213017]
### UltraFit Earplug end of the Combat Arms Plug

c:\_Myfilest ...\213017.xls:Graph

8/7/00

### Short-stemmed UltaFit Plug

3M Confidential - Attorneys' Eyes Only

3M Confidential - Attorneys' Eyes Only

3M00006957

3M00006956



FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-OID133-014635

**Table II - HPD Test Administration Form** (EAR8149B-1 (5/99))

3M Confidential - Attorneys' Eyes Only

3M00006959

3M00006960

## E-A-RCAL ATTENUATION TEST REPORT
### PER ANSI S3.19-1974

NVLAP LAB Code 100374-0

| DEVICE: | Combat Arms Plug |
| DEVICE TYPE: | Premolded Earplugs |
| MANUFACTURER: | E-A-R/Aearo Technologies |
| TEST DATE: | April 20, 2006 | TEST ID#: 215012 |
| SUBJECTS/SAMPLES: | 10/2 | NRR (per EPA-1978): 5.1 |
| BAND FORCE (N): | NA | CSA CLASS: C |
| FITTING PROCEDURE: | EPA/Experimenter Fit | POSITION: NA |

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 3.6 | 3.8 |
| 250 | 4.2 | 3.2 |
| 500 | 9.3 | 2.8 |
| 1000 | 15.8 | 3.4 |
| 2000 | 20.9 | 4.7 |
| 3150 | 24.6 | 2.8 |
| 4000 | 21.5 | 4.4 |
| 6300 | 21.4 | 7.2 |
| 8000 | 20.8 | 6.5 |

Comments: See 215013 for results of the New C-A Plug on the same subjects. EAK failed the High Extreme Means Test at 4- (2X) and 8.3-kHz (3B); he was not retested.

Performed by: Ronald W. Kieper, Sr. Acoustic Technician

Reviewed by: Elliott H. Berger, Manager, Acoustical Engineering

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

(EXHIBIT ____)

LDP100208



FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

NVLAP Lab
Code 100374-0

# E-A-RCAL ATTENUATION TEST REPORT
## PER ANSI S3.19-1974

Page 1 of 3

DEVICE: Combat Arms Plug

DEVICE TYPE: Premolded Earplugs

MANUFACTURER: E-A-R/Aearo Technologies

TEST DATE: April 20, 2006    TEST ID#: 216012

SUBJECTS/SAMPLES: 10/2    NRR (per EPA-1979): 5.1

BAND FORCE (N): NA    CSA CLASS: C

FITTING PROCEDURE: EPA/Experimenter Fit    POSITION: NA

| Test Frequency (Hz) | Mean Attenuation (dB) | Standard Deviation (dB) |
|---|---|---|
| 125 | 3.6 | 3.8 |
| 250 | 4.2 | 3.8 |
| 500 | 9.3 | 3.2 |
| 1000 | 15.8 | 2.8 |
| 2000 | 20.9 | 3.4 |
| 3150 | 24.6 | 4.7 |
| 4000 | 21.5 | 2.8 |
| 6300 | 21.4 | 4.4 |
| 8000 | 20.8 | 7.2 |
|  |  | 8.5 |

Comments: See 216013 for results of the New C-A Plug on the same subjects.
High Extreme Mean Test at 4- (33) and 6.3-khz (39); He was not retested.

Performed by: Ronald W. Kieper    Reviewed by: Elliott H. Berger
Sr. Acoustic Technician    Manager, Acoustical Engineering

3M Confidential - Attorneys' Eyes Only

3MD00009960

This report pertains only to the samples and subjects tested. It may not be used to claim product endorsement by NVLAP or any other agency of the U.S. Government.

---

INDIVIDUAL SUBJECT DATA

Page 2 of 3

Test ID 216012
Date: 4/20/2006
Comments: See 216013 for results of the New C-A Plug on the same subjects.
8AK fells the Extreme High Mean Test at 4- and 6.3-khz. He was not retested.

Device: Combat Arms Plug
Samples: 10/2    Position: NA
Comfort: 1.9

3M Confidential - Attorneys' Eyes Only

3MD00008961

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0289

EXHIBIT 2

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

**DIXON'S OUTLIER TEST: EXTREME RANGES**

Test ID: 215012　　Device: Combat Arms Plug

Range in attenuation in dB across trials
1/3 Octave-Band Frequency

Page 3 of 5

| Subj. | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 |
|---|---|---|---|---|---|---|---|---|---|
| AACh | 1.9 | 1.4 | 3.7 | 1.9 | 2.0 | 1.0 | 3.0 | 1.4 | 3.7 |
| DKG | 5.4 | 3.1 | 1.6 | 6.3 | 6.3 | 1.4 | 2.4 | 1.7 | 11.1 |
| JG | 10.8 | 5.8 | 3.5 | 4.9 | 3.7 | 3.3 | 1.4 | 6.8 | 1.7 |
| FOJ | 5.0 | 7.4 | 8.4 | 10.1 | 4.9 | 7.5 | 5.8 | 5.4 | 2.2 |
| BAK | 5.3 | 6.5 | 3.1 | 2.6 | 5.0 | 4.9 | 2.8 | 7.9 | 16.6 |
| TLS | 1.8 | 7.7 | 6.1 | 4.2 | 9.3 | 4.1 | 2.6 | 8.2 | 18.0 |
| KMS | 4.4 | 4.3 | 2.5 | 5.6 | 5.3 | 6.1 | 4.1 | 3.8 | 6.9 |
| GES | 2.9 | 1.8 | 2.0 | 0.7 | 1.6 | 2.4 | 3.7 | 3.8 | 2.8 |
| RJW | 3.8 | 2.1 | 2.8 | 2.8 | 0.9 | 4.1 | 1.8 | 6.4 | 12.3 |
| KJZ | 2.5 | 4.4 | 4.3 | 4.0 | 2.1 | 1.6 | 1.8 | 3.6 | |
| Mean | 4.4 | 4.5 | 3.8 | 4.0 | 3.8 | 3.8 | 3.2 | 4.7 | 16.0 |
| Max | 10.8 | 7.7 | 8.4 | 10.1 | 9.3 | 7.5 | 5.8 | 8.2 | 7.7 |
| Min | 0.036 | 0.052 | 0.350 | 0.547 | 0.364 | 0.235 | 0.309 | 0.056 | 0.040 |

Extreme value rejected if r > 0.477. One-sided test of significance at p < 0.05.
Rejected values are shaded.

3M Confidential - Attorneys' Eyes Only

3M00006902

---

**DIXON'S OUTLIER TEST: EXTREME MEANS**

Test ID: 215012　　Device: Combat Arms Plug

Range in attenuation in dB across trials
1/3 Octave-Band Frequency

Page 4 of 5

| Subj. | 125 | 250 | 500 | 1000 | 2000 | 3150 | 4000 | 6300 | 8000 |
|---|---|---|---|---|---|---|---|---|---|
| AACh | -0.7 | 1.0 | 7.7 | 16.2 | 21.1 | 27.0 | 23.9 | 15.5 | 16.9 |
| DKG | 1.9 | 6.8 | 14.6 | 26.0 | 26.0 | 24.2 | 17.7 | 22.4 | |
| JG | 9.1 | 9.0 | 12.8 | 17.1 | 21.2 | 20.5 | 20.7 | 18.1 | 22.0 |
| FOJ | 5.1 | 5.3 | 8.9 | 10.8 | 13.2 | 23.4 | 17.5 | 23.3 | 22.5 |
| BAK | 7.3 | 5.4 | 14.9 | 18.9 | 18.9 | 23.0 | 31.7 | 33.0 | 34.7 |
| TLS | 4.7 | 4.8 | 7.8 | 12.9 | 22.9 | 23.0 | 19.2 | 26.1 | 31.0 |
| KMS | 4.8 | 3.8 | 8.5 | 17.3 | 21.3 | 24.4 | 18.1 | 19.2 | 17.6 |
| GES | 1.1 | 1.3 | 6.3 | 16.4 | 21.3 | 24.5 | 22.0 | 17.3 | 9.5 |
| RJW | 1.9 | 2.8 | 14.0 | 21.1 | 27.6 | 23.7 | 17.9 | 17.1 | |
| KJZ | 0.5 | 1.9 | 7.5 | 15.1 | 28.8 | 25.0 | 21.1 | 17.5 | 13.3 |
| Mean | 3.6 | 4.2 | 9.3 | 15.8 | 20.9 | 24.6 | 21.5 | 21.4 | 20.8 |
| Max | 9.1 | 9.0 | 14.0 | 28.8 | 13.2 | 20.5 | 17.5 | 15.5 | 9.5 |
| Min | -0.7 | 1.0 | 7.5 | 21.1 | 28.6 | 27.6 | 31.7 | 39.0 | 34.7 |
| Low r | 0.144 | 0.056 | 0.022 | 0.277 | 0.357 | 0.035 | 0.566 | 0.056 | 0.377 |
| High r | 0.224 | 0.314 | 0.169 | 0.327 | 0.224 | 0.276 | 0.038 | 0.056 | 0.173 |

Extreme value rejected if r > 0.551. Two-sided test of significance at p < 0.05.
Rejected values are shaded.

3M Confidential - Attorneys' Eyes Only

3M00006903

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

EXHIBIT

CID File0210

3M Confidential - Attorney's Eyes Only

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635



**Combat Arms Plug [215012]**
**Individual and Group Means**

215012 Combat Arms.xls

Page 5 of 5

—■— AACh   —□— DKG   —✳— JG   —◇— FDJ   —△— BAK   —✕— TLS   —✳— KMS   —●— GES   —◇— RJW   —✕— KJZ   —●— Mean

3M00009864

3M00009865

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

CID File0211

{EXHIBIT_____}

OCIJ-16-CIO133-014635

For Official Use Only-Law Enforcement Sensitive



**INSPECTOR GENERAL**
**DEPARTMENT OF DEFENSE**
DEFENSE CRIMINAL INVESTIGATIVE SERVICE
CHARLESTON POST OF DUTY
1 POSTON ROAD, SUITE 103
CHARLESTON, SC 29407

**2016001951-20CS-E2**                                                      **September 26, 2016**

**3M COMPANY**

## THE INFORMATION CONTAINED HEREIN WAS PARTIALLY DERIVED FROM A QUI TAM COMPLAINT THAT REMAINS UNDER SEAL BY ORDER OF THE U.S. DRISTRICT COURT. DISSEMINATION IS RESTRICTED.

**INTERVIEW OF ALBERT GATICA:** On September 13, 2016, the Reporting Agent (RA) and Special Agent (SA) Jennifer Coleman, U.S. Army Criminal Investigation Command (USACID) interviewed Albert Gatica, Defense Logistics Agency (DLA) Troop Support at the DLA office located at 700 Robbins Avenue, Philadelphia, PA. Also present during the interview were: Assistant United States Attorneys (AUSA) Fran Trapp and Stan Ragsdale, District of South Carolina Civil Division; Brandie Weddle, U.S. Department of Justice, Washington, D.C. Civil Division; DLA Troop Support Procurement Fraud Attorneys Michael Delaney and Lillian Weiss. After being advised of the identity of the interviewing agents and the purpose of the interview, Gatica provided substantially the following information.

Gatica, DOB: July 30, 1966, SSN: XXX-XX-7200, currently resides at 491 Paxon Hollow Road, Broomall, PA, telephone number (610) 506-6642. He began his employment with the Defense Supply Center, the predecessor of DLA Troop Support, in 1991 in the Clothing and Textiles Division. In 1994, he was promoted to Supervisor of the Medical Division. In this capacity, Gatica was the procurement supervisor for medical equipment and oversaw the purchase of Code 6515 Medical and Surgical Instruments, Equipment, and Supplies, such as earplugs and sutures, for Department of Defense (DoD) deployers and combaters. Gatica explained that the Medical Division would receive orders from the field and while some products were stocked at DLA depots, others could be directly purchased from vendors.

With regard to the dual-ended Combat Arms Earplugs (CAE) manufactured by Aearo/3M, Gatica concurred with agents that the process for procuring the CAE began in or around the year 2000, but he could not specifically recall the date. He suspected the CAE may have been a Commercial Item Description (CID) product, which allows for open competition. Gatica stated that he believed the CAE were developed by Aearo/3M and offered to the United States Military Hearing Conservation Group. Gatica continued that DLA may have gone direct with the Original Equipment Manufacturer (OEM), that is Aearo, for the procurement of the CAE. If that was the case, Gatica added that the OEM would have had to show that the CAE met the requirements of a CID, which would be documented in the contract folder. That said, DLA maintains contract folders for a seven year period, then sends them to a Federal repository. Gatica stated that such records may have already been destroyed due to age.

Gatica stated that he believed DLA received independent testing records for the CAE from Aearo/3M, and DLA had discussions with, and consulted with, Dr. Douglas Ohlin, Aberdeen Proving Grounds, that the product met military requirements and was what the military was seeking. He added that it seemed probable that Aearo developed the CAE in concert with the military, specifically Dr. Ohlin, but he (Gatica) was not certain.

CLASSIFICATION:

**FOR OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**
DCIS Form 1 MAY 2015

**WARNING**
The information in this document marked FOUO-LES is the property of the Department of Defense Inspector General and may be distributed within the Federal Government (and its contractors) to law enforcement, public safety and protection, and intelligence officials and individuals with a need to know. Distribution to other entities without prior DoD IG authorization is prohibited. Precautions shall be taken to ensure this information is stored and destroyed in a manner that precludes unauthorized access. Information bearing the FOUO-LES marking may not be used in legal proceedings without prior authorization from the originator. Recipients are prohibited from posting information marked FOUO-LES on a website or unclassified network.

CID File0212

**Exhibit**  9

For Offical Use Only-Law Enforcement Sensitive

0019-16-CI0133-04635

**2016001951-20CS-E2**

2

Gatica continued that as demand in the field for the CAE increased, DLA started stocking the CAE at DLA depots. But his involvement in the acquisition process for the CAE was limited as the value of the contract was not high enough to require direct supervisor involvement. Gatica stated Contract Officer Tom Sidor managed the contract and due to reorganization within DLA Troop Support, Brian Shott took over as the supervisor who managed the earplug product line.

With regard to the procurement process, Gatica explained that a DLA technician, ex. John Komada for the CAE, would receive notice of the availability of a product, including National Stock Number (NSN) and nomenclature, through procurement system channels. The item(s) would be listed as available and catalogued, and DLA would take action to source the product. Once the product is sourced, DLA can order the product for the field. When asked if DLA could identify which field components ordered the CAE, Gatica stated requisitions for the CAE would go through the Military Standard Requisitioning and Issue Procedures (MISTRIP), which would capture the customers' Department of Defense Activity Address Code (DoDAAC).

SA Coleman presented Gatica with an email chain, last date of July 12, 2006, in which Gatica is copied (see Attachment 1). Gatica reviewed the email and advised that it was documentation making a case for full and open procurement of the CAE versus sole sourcing.

Regarding notification of any issues with a product, Gatica stated that should a customer supply officer recognize an issue with a product, such as the item was not as expected, DLA would be notified and the supervisor over said product would have visibility of the complaint. However, once a product is deployed in the field, a soldier may notify his/her supervisor of an issue, but not DLA. Gatica stated that he has never heard any complaints regarding the CAE.

When asked by agents if DLA was provided with any instructions for the proper use and fitting of the CAE, Gatica believed instructions would have been included with each CAE.

Agents asked Gatica about 3M's discontinuation of the CAE. Gatica stated that Contracting Officer Marc Anthony was managing the long term contract for the CAE and may have more information. Gatica continued that for certain products, the Department of Defense must procure said products through "Mandatory Sources", that is Federal Prison Industries or an AbilityOne firm. He stated New Dynamics, an AbilityOne firm, made a deal with 3M to be the sole supplier of the CAE. Gatica believed it was getting close to invoking the option on the contract, either to continue or cancel, when New Dynamics notified DLA that 3M was no longer making the universally sized dual-ended CAE. Instead, 3M was offering a new product with three sizes: small, medium, large. New Dynamics asked DLA to consider modifying the existing contract to allow for the new product line as demand from the field for the universally sized dual-ended CAE had declined. New Dynamics told DLA that customers in the field were purchasing their own earplugs, as such it did not make sense for DLA to continue to procure the universally sized dual-ended CAE. DLA conducted a review of sales and determined that given the decline in sales, coupled with the option on the contract coming due, they would not exercise the contract option year.

Gatica stated that at some point, the CAE was procured through the Prime Vendor Program, which utilizes commercial distributors with an existing customer base and a national footprint. This allowed for easier procurement by the field customers and afforded a reduced price vice going through the contract process. Up until the discontinuation of the CAE, the Prime Vendors for the CAE would have been Owens & Minor and Cardinal. Gatica added that Steve Bolendorf was the Manager of the CAE prime vendor program.

CLASSIFICATION:

**FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE**
DCIS Form 1 MAY 2015

**WARNING**
The information in this document marked FOUO-LES is the property of the Department of Defense Inspector General and may be distributed within the Federal Government (and its contractors) to law enforcement, public safety and protection, and intelligence officials and individuals with a need to know. Distribution to other entities without prior DoD IG authorization is prohibited. Precautions shall be taken to ensure this information is stored and destroyed in a manner that precludes unauthorized access. Information bearing the FOUO-LES marking may not be used in legal proceedings without prior authorization from the originator. Recipients are prohibited from posting information marked FOUO-LES on a website or unclassified network.

CID File0213

**Exhibit** 9

For Offical Use Only-Law Enforcement Sensitive

0019-16-CID133-014635

**2016001951-20CS-E2**                                                                          3

SA Coleman showed Gatica documents labeled "ABASTRACT – SP-0200-R-06-4202 – PLUG, EAR, COMBAT ARMS, 50 PAIR NSN 6515 01 466 2710" (see Attachment 2). Gatica reviewed the document and advised that these documents list four companies and quotes for providing earplugs. DLA was to choose the lowest price/technically acceptable product, and Aearo offered the lowest price. According to Lillian Weiss, the three other bidders were all distributors for Aearo, as such she did not know why Aearo also bid on the proposal.

Agents asked Gatica what would have happened had he or DLA become aware that Aearo/3M's initial testing of the CAE was not as claimed. Gatica advised that it would have impacted DLA's decision to procure the product. If such information were brought to light after the procurement process, DLA would demand monies be returned and it would likely result in litigation. DLA would take such information very seriously as it affects the safety of service members.

Gatica recalled that prior to the CAE, foam earplugs manufactured and provided by Aearo were being used by the military. At some point, a Mandatory Source began providing a similar product which DLA was required to procure versus Aearo's product. However, the Mandatory Source's earplugs were scratchy and uncomfortable for the user. Dr. Ohlin expressed concern about going through Mandatory Sources for such a technical product. The earplugs, however, met attenuation specifications and DLA did not see a cause to discontinue procuring the product through a Mandatory Source. According to Gatica, Dr. Ohlin was upset that Aearo lost the sale of the foam earplugs and Gatica recalled discussions with Dr. Ohlin who stressed the importance of hearing protection and advised that hearing loss was the "Number 1" problem for veterans.

Gatica continued that following DLA procuring the foam earplugs through a Mandatory Source, Aearo revised their foam earplugs to include a colored ring in the center of the earplug, different from the color of the earplug, which allowed a customer's supervisor to determine if the earplug was being used properly. The DoD determined this was important and initially sought to procure the new foam earplugs from Aearo, since Mandatory Sources did not have such a product. However, a Mandatory Source developed a similar product which the DoD deemed to be just as good as Aearo's product. Eventually, 3M purchased Aearo and partnered with New Dynamics, an AbilityOne firm, and thus fit the requirement within the Mandatory Source program.

When agents asked for information reference Dr. Ohlin designing a carrying case for Aearo/3M's dual-ended CAE, Gatica stated he was not aware of this and could not offer any information.

Attachments:
1) Email chain starting with "Thomas, Allen C (DSCP), dated July 12, 2006
2) Lowest Price Technically Acceptable Final Proposal Revision and Original labeled "ABASTRACT – SP-0200-R-06-4202 – PLUG, EAR, COMBAT ARMS, 50 PAIR NSN 6515 01 466 2710", dated November 1, 2006 and September 5, 2006

Prepared by: SA Gilad D. Rosen, 20CS

ROSEN.GILAD.D.1284432548

Approved by: RAC Cynthia A. Bruce, 20RL

BRUCE.CYNTHIA.ALICE.1231457824

CLASSIFICATION:

**FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE**
DCIS Form 1 MAY 2015

**WARNING**
The information in this document marked FOUO-LES is the property of the Department of Defense Inspector General and may be distributed within the Federal Government (and its contractors) to law enforcement, public safety and protection, and intelligence officials and individuals with a need to know. Distribution to other entities without prior DoD IG authorization is prohibited. Precautions shall be taken to ensure this information is stored and destroyed in a manner that precludes unauthorized access. Information bearing the FOUO-LES marking may not be used in legal proceedings without prior authorization from the originator. Recipients are prohibited from posting information marked FOUO-LES on a website or unclassified network.

CID File0214

Offical Use Only-Law Enforcement Sensitive

**Thomas, Allen C (DSCP)**

| | |
|---|---|
| **From:** | Cosfol, Christos (DSCP) |
| **Sent:** | Wednesday, July 12, 2006 2:38 PM |
| **To:** | Sidor, Thomas (DSCP) |
| **Cc:** | Gatica, Al (DSCP); Thomas, Allen C (DSCP) |
| **Subject:** | RE: Command Acquisition Review Board presentations Thursday July 6th - 1330-1430 |

Tom,

Thank you for your response. Based on this, you may proceed with the acquisition.

Chris

| | |
|---|---|
| **From:** | Sidor, Thomas (DSCP) |
| **Sent:** | Tuesday, July 11, 2006 2:20 PM |
| **To:** | Cosfol, Christos (DSCP) |
| **Cc:** | Gatica, Al (DSCP); Thomas, Allen C (DSCP) |
| **Subject:** | RE: Command Acquisition Review Board presentations Thursday July 6th - 1330-1430 |

Hi Chris:

Here is an update on our efforts to answer the question about the potential suitability of the performance specification for the combat arms earplug to be manufactured by a competitor.

Our engineer, John Komada (who happens to be on vacation until this Friday) has already expressed the opinion that an interested potential competitor would find the MPID to be sufficient to design an earplug that would meet our desired performance.

Another earplug manufacturer who is cautiously optimistic is currently assessing the specifications to determine if he could produce an item with the desired outcomes. We recognize, however, that at this stage he has little motivation to pour a lot of resources into a project that is not directly tied to a guaranteed revenue stream.

We also are awaiting a response from the same inquiry to Dr. Ohlin, who is the head of the Hearing Conservation Board. As noted above, our engineer is not currently present to confirm that we believe that Dr. Ohlin has previously given his approval to the proposed content of the performance specification.

We would like to know if you would deem this interim response to be sufficient to give us the green light to proceed with our proposed full and open solicitation.

Thomas Sidor
Contracting Officer
DSCP-MSBAB-PQE
700 Robbins Avenue
Philadelphia, PA 19111
Thomas.Sidor@dla.mil
phone: 215-737-2490 DSN 444-2490
fax:  215-737-8150

**From:** Cosfol, Christos (DSCP)
**Sent:** Wednesday, July 05, 2006 4:49 PM
**To:** LeSure, Randle SFC (DSCP); Shields, Lisa (DSCP); Edwards, Ian A; Pirollo, Irene (DSCP); Williams, Carolyn F (DSCP); Allegro, Kathleen (DSCP); Shannon, Stella (DSCP); Marrone, Donna (DSCP); Turchi, Gina (DSCP); Danese, Mary Ann (DSCP)
**Cc:** Gardner, Lillian (DSCP); Thomas, Allen C (DSCP); Kershaw, Suzanne (DSCP); D'Avella, Anthony (DSCP); McClenahan, William (DSCP); Nguyen, Khue Kim Thi (DSCP); Sidor, Thomas (DSCP); Hauser, Joseph (DSCP);

1

Exhibit    CID File0215

OO9-16-CID133-0146 35

..fficial Use Only-Law Enforcement Sensitive

Branigan, Jayne (DSCP); Brooks, Gwen (DSCP); Burns, Anne Marie (DSCP); Carroll, Robert K (DSCP); Cunningham, Kristine (DSCP); Fuss, Stephanie (DSCP); Isaac, Brenda (DSCP); Kaminer, Lisa (DSCP); Kleinberg, Kathleen (DSCP); McKeever, Regina (DSCP); Moore, Anne K (DSCP); Patterson, Asheai (DSCP); Pelullo, Daniel (DSCP); Rudnick, Frederick (DSCP); Stackhouse, Rebecca (DSCP); Stackhouse, William (DSCP); Trucksess, Suzette (DSCP); Nguyen, Nathalie (DSCP); Bollendorf, Steven (DSCP)
**Subject:** RE: Command Acquisition Review Board presentations Thursday July 6th - 1330-1430

Updated ARB Notification to add an additional case.

| | |
|---|---|
| **From:** | Cosfol, Christos (DSCP) |
| **Sent:** | Wednesday, July 05, 2006 4:39 PM |
| **To:** | Cross, Jesse R BG (DSCP); Bernett, Steven SES (DSCP); Kenny, William (DSCP); Surrena, Marlene (DSCP); McCall, Michael (DSCP); Zebrowski, Paul (DSCP); Bellis, Brad CAPT (DSCP); McManus, Stephen (DSCP); Ford, Keith (DSCP); McCloskey, Robert (DSCP); DiDonato, Sally (DSCP); Dudek, Dennis (DSCP); Daley, Thomas (DSCP); D'Ambrosio, Anthony (DSCP); O'Connor, Anne (DSCP); McGonigle, Michael (DSCP); Tierney, Edward (DSCP); Polini, Geneva (DSCP) |
| **Subject:** | RE: Command Acquisition Review Board presentations Thursday July 6th - 1030-1130 |

To all,

Medical has asked for a late addition to the ARB.    Due to the Independence Day holiday and the fact that the next regularly scheduled ARB is on July 17th, if Command does not object I recommend that this be added to the Thursday ARB schedule.

Medical - Pharmaceutical Reverse Distribution Program

<< File: 05-R-1608 Acqusition Plan 06-26-06.doc >>    << File: 05-R-1608 Business Case Analysis.doc
>>

<< File: 05-R-1608 Contract Management Plan 6-27-06.doc >>   << File: ARB Acquisition Plan Briefing.doc >>

Revised Agenda is:

# Order of briefings will be as follows:

**Command ARB**
1. C&T -Women's Army Coat - PBM, SSDD, and CMP
2. Subsistence - 3rd C2 to extend Mid-Atlantic Zone 2 PV contract
3. Medical - Pharmaceutical Reverse Distribution Program
**CCO ARB**
3. Medical - Ear Plugs IAP & CMP

*Ear Plugs Arms 710*
*Combat Arms 01466*
*NSN 6515*
*DSCP-ARB*
*7/6/06*
*130 PM*

| | |
|---|---|
| **From:** | Cosfol, Christos (DSCP) |
| **Sent:** | Wednesday, July 05, 2006 1:48 PM |
| **To:** | Cross, Jesse R BG (DSCP); Bernett, Steven SES (DSCP); Kenny, William (DSCP); Surrena, Marlene (DSCP); McCall, Michael (DSCP); Zebrowski, Paul (DSCP); Bellis, Brad CAPT (DSCP); McManus, Stephen (DSCP); Ford, Keith (DSCP); McCloskey, Robert (DSCP); DiDonato, Sally (DSCP); Dudek, Dennis (DSCP); Daley, Thomas (DSCP); D'Ambrosio, Anthony (DSCP); O'Connor, Anne (DSCP); McGonigle, Michael (DSCP); Tierney, Edward (DSCP); Polini, Geneva (DSCP) |
| **Subject:** | Command Acquisition Review Board presentations Thursday July 6th - 1030-1130 |
| **Importance:** | High |

## PROCUREMENT SENSITIVE INFORMATION

To all,

The attached documents represent the cases that will be subject to either a Command Acquisition Review Board or a CCO ARB on **Thursday, July 6, 2006**.   The meeting will take place in the Command Conference Room in Bldg 36 from **1330-1430**.   All addressees* are to attend and the Supply Chains having cases briefed must ensure the cognizant Supplier Operations Division Chief is in attendance and the Contracting Officer is briefing their

2

For Offical Use Only-Law Enforcement Sensitive    0019-16-CID33-0146 35

acquisition.   Requests to have an individual other than the Contracting Officer present the briefing is subject to the Chair's approval at that time.

\*either DSO or DDSO
either Chief Counsel or Associate Counsel
either Comptroller or Deputy Comptroller

**In addition, the Supply Chains are responsible for recording minutes of the ARB proceedings for their respective case(s).   These minutes must be submitted to the Contract Review Division within 5 working days after the ARB.**

**In an effort to limit exposure of Source Selection or Procurement Sensitive documents, I have sent this e-mail with attachments only to actual members of the ARB or their deputies.   I will send a separate copy without attachments to the administrative assistants and/or secretaries for scheduling purposes.**

Thank you,

Chris

*Chris D. Cosfol*
Chief, Contract Review Division
Procurement Process Support Directorate
DSCP-BPP
Christos.Cosfol@dla.mil
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**Voice # 215-737-2760**
**FAX # 215-737-3651**

**Command ARB**

C&T - Women's Army Coat - PBM, SSDD, and CMP (on Command Watchlist)

<< File: PBM PNM PRICE ANALYSIS-2 (2)-new as of 6-22-06.doc >>  << File: CMP.doc >>  << File: SSDD 06-R-0046-2 (2)-new as of 6-22-06.doc >>

Subsistence - 3rd C2 to extend Mid-Atlantic Zone 2 PV contract

<< File: C2 MANZone 2.doc >>

**CCO ARB**

Medical - Ear Plugs IAP & CMP

<< File: Business Case Analysis Doc.doc >>  << File: Contract Mgmt Plan Doc  4Pgs.doc >>  << File: 6-R-4202  IAP-Rmrks&16Pt Memo 9pgs.pdf >>  << File: Cover Pg ARB Option-Action Doc 2nd Paul Z.doc >>

**Please also note the following regarding protection of Procurement Sensitive Information**

<< File: PROTECTING PROCUREMENT SENSITIVE INFORMATION.doc >>

**Order of briefings will be as follows:**

**Command ARB**

3

For Offical Use Only-Law Enforcement Sensitive    **Exhibit**    CID File0217

0019-16-CID133-014635

For Offical Use Only-Law Enforcement Sensitive

1. C&T -Women's Army Coat - PBM, SSDD, and CMP
2. Subsistence - 3rd C2 to extend Mid-Atlantic Zone 2 PV contract

**CCO ARB**

3. Medical - Ear Plugs IAP & CMP

**Exhibit** _____

CID File0218

0019-16-CID133-014635

For Offical Use Only-Law Enforcement Sensitive

FINAL PROPOSAL REVISION

**ABSTRACT - SPO200-R-06-4202 - PLUG, EAR, COMBAT ARMS, 50 PAIR**
NSN 6515 01 466 2710

PROCUREMENT: UNRESTRICTED, IQC LOWEST PRICE TECHNICALLY ACCEPTABLE.

| Base Period - 1 Year | Est Ann Qty: 15,000 / PG |
| Option Period - 1 Year | Est Ann Qty: 15,000 / PG |
| Option Period - 1 Year | Est Ann Qty: 15,000 / PG |

| # | Vendor | Price | Location |
|---|--------|-------|----------|
| 1. | Aearo Company   Lg Mfr<br>5457 W 79th St<br>Indianapolis, in 46268 | $255 - $300 / PG Base Period<br>$255 - $300 / PG Option Period<br>Total: ???? | Indianapolis, IN<br>Includes Markings |
| 2. | Kipper Tool Co   Sm Dir women-Owned<br>2375 Murphy Blvd<br>Gainesville, GA 30519 | $309.99 / PG Base Period<br>$309.99 / PG Option Period<br>Total: $9,299,700. | Indianapolis, IN<br>Markings included |
| 3. | A & A Glove & Safety Co<br>20 Richey Ave   (Sm Dir /SDB women owned)<br>Collingswood, NJ 08107 | $319. / PG Base Period<br>$319. / PG Option Period<br>Total: $9,570,000<br><br>(No change in Price) | Indianapolis, IN<br>Includes Markings |
| 4. | Royal Strategic Entrepreneur LLC   Sm Dir<br>410 East 42nd Avenue<br>Spokane, WA 99203 | $320.00 / PG Base Period<br>$320.50 / PG Option Period<br>Total: $9,607,500.<br><br>(No change in Price) | Indianapolis, IN<br>Includes Markings |

Allan Thomas
Contract Specialist
11/1/06 / Closing Date (Final Proposal Revision)

For Offical Use Only-Law Enforcement Sensitive

Exhibit

CID File0219

OO19-16-CID133-0146855

For Offical Use Only-Law Enforcement Sensitive

**ABSTRACT - SPO200-R-06-4202 - PLMG, EAR, COMBAT ARMS, 50 PAIR**
NSN 6515 01 466 2710

PROCUREMENT: UNRESTRICTED, IQC LOWEST PRICE TECHNICALLY ACCEPTABLE.
Base Period - 1 Year     Est Ann Qty: 15,000 / PG
Option Period - 1 Year   Est Ann Qty: 15,000 / PG

ORIGINAL

| | | |
|---|---|---|
| 1. Aearo Company   Lg Mfr<br>5457 w 79th St<br>Indianapolis, in 46268 | $300 / PG   Base Period<br>$300 / PG   Option Period<br>Total: $9,000,000. | Indianapolis, IN<br>Includes Markings |
| 2. Kipper Tool Co   Sm Dlr women-Owned<br>2375 Murphy Blvd<br>Gainesville, GA 30519 | $309.99 / PG   Base Period<br>$309.99 / PG   Option Period<br>Total: $9,299,700. | Indianapolis, IN<br>Markings included |
| 3. A & A Glove & Safety Co<br>20 Richey Ave<br>Collingswood, NJ 08107   [Sm Dlr /SDB women owned] | $319. / PG   Base Period<br>$319. / PG   Option Period<br>Total: $9,570,000 | Indianapolis, IN<br>Includes Markings |
| 4. Royal Strategic Entrepreneur LLC<br>410 East 42nd Avenue   Sm Dlr<br>Spokane, WA 99203 | $322.50. / PG   Base Period<br>$322.50. / PG   Option Period<br>Total: $9,750,000. | Indianapolis, IN<br>Includes Markings |

Allen Thomas
Contract Specialist
9/5/06 / Closing Date   (Original)

For Offical Use Only-Law Enforcement Sensitive

**Exhibit**

CID File0220

**Official Use Only-Law Enforcement Sensitive**                    *CA9-16-CID133-014635*



**INSPECTOR GENERAL**
**DEPARTMENT OF DEFENSE**
DEFENSE CRIMINAL INVESTIGATIVE SERVICE
CHARLESTON POST OF DUTY
1 POSTON ROAD, SUITE 103
CHARLESTON, SC 29407

2016001951-20CS-E2                                                    **September 27, 2016**

**3M COMPANY**

<u>**THE INFORMATION CONTAINED HEREIN WAS PARTIALLY DERIVED FROM A QUI TAM COMPLAINT THAT REMAINS UNDER SEAL BY ORDER OF THE U.S. DRISTRICT COURT. DISSEMINATION IS RESTRICTED.**</u>

<u>**INTERVIEW OF MARK ANTHONY**</u>: On September 13, 2016, the Reporting Agent (RA) and Special Agent (SA) Jennifer Coleman, U.S. Army Criminal Investigation Command (USACID) interviewed Mark Anthony, Defense Logistics Agency (DLA) Troop Support at the DLA office located at 700 Robbins Avenue, Philadelphia, PA. Also present during the interview were: Assistant United States Attorneys (AUSA) Fran Trapp and Stan Ragsdale, District of South Carolina Civil Division; Brandie Weddle, U.S. Department of Justice, Washington, D.C. Civil Division; DLA Troop Support Procurement Fraud Attorneys Michael Delaney and Lillian Weiss. After being advised of the identity of the interviewing agents and the purpose of the interview, Anthony provided substantially the following information.

Anthony, DOB: June 30, 1955, SSN: XXX-XX-2529, POB: Philadelphia, PA, currently resides at 44 Crab Apple Place, Newtown, PA, telephone number (215) 579-2554. He has been employed with the Department of Defense for thirty-three years, and has been in the Medical/Capital Equipment Division since 1984. Anthony stated he spent seven years with DRMS overseas and, approximately ten years ago, he spent time assigned to the Department of the Army in Bagdad, Iraq. Anthony is currently a Contracting Officer handling medical and surgical equipment.

With regard to the dual-ended Combat Arms Earplugs (CAE) manufactured by Aearo/3M, Anthony started overseeing the contract approximately one year ago. He had no involvement with the CAE until the contract option was ready to be exercised. Anthony advised that options were twenty month periods. When Anthony began overseeing the CAE contract, he conducted some research and recognized there was no demand for the CAE and there were no recent sales. No demand or sales, coupled with an increase in the price of the CAE, lead Anthony to determine that there were no projections for future demand.

With regard to 3M's notice of discontinuation of the dual-ended CAE, Anthony stated he recalled seeing an email about the discontinuation and having a conversation with Albert Gatica and John Komada. He recalled that the dual-ended CAE was a universally sized earplug and 3M switched to manufacturing earplugs sized small, medium, and large. These earplugs were being distributed through New Dynamics. Based on his conversations with Gatica and Kamata, and 3M changing to sized earplugs, it was decided that DLA would allow the contract option to lapse. Anthony further advised there were other contractual options for purchasing 3M's earplugs: Direct Vendor Deliver and Prime Vendor Program, which includes a Distribution and Pricing Agreement (DAPA). Given DLA's determination that there was no need to keep the CAE contract active, DLA notified 3M and New Dynamics. Anthony reported that there were no objections from 3M, New Dynamics or DLA's customers.

CLASSIFICATION:

**FOR OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**
DCIS Form 1 MAY 2015

**WARNING**
The information in this document marked FOUO-LES is the property of the Department of Defense Inspector General and may be distributed within the Federal Government (and its contractors) to law enforcement, public safety and protection, and intelligence entities (and individuals with a need to know. Distribution to other entities without prior DoD IG authorization is prohibited. Precautions shall be taken to ensure this information is stored and destroyed in a manner that precludes unauthorized access. Information bearing the FOUO-LES marking may not be used in legal proceedings without prior authorization from the originator. Recipients are prohibited from posting information marked FOUO-LES on a website or unclassified network

CID File0221

**Exhibit**

0019-16-CID133-CH635

*For Official Use Only-Law Enforcement Sensitive*

**2016001951-20CS-E2**

2

When asked if he was aware of any complaints regarding the dual-ended CAE, Anthony stated he never received any complaints.

Agents asked Anthony what would have happened had he or DLA become aware that Aearo/3M's initial testing of the CAE was not as claimed. Anthony advised that this would have been a major issue for him and DLA and DLA would not have awarded the contract.

Prepared by: SA Gilad D. Rosen, 20CS

ROSEN.GILAD.D.1
284432548

Approved by: RAC Cynthia A. Bruce, 20RL

BRUCE.CYNTHIA.ALICE.1231457824

CLASSIFICATION:

**FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE**
DCIS Form 1 MAY 2015

**WARNING**
The information in this document marked FOUO-LES is the property of the Department of Defense Inspector General and may be distributed within the Federal Government (and its contractors) to law enforcement, public safety and protection, and intelligence officials and individuals with a need to know. Distribution to other entities without prior DoD IG authorization is prohibited. Precautions shall be taken to ensure this information is stored and destroyed in a manner that precludes unauthorized access. Information bearing the FOUO-LES marking may not be used in legal proceedings without prior authorization from the originator. Recipients are prohibited from posting information marked FOUO-LES on a website or unclassified network.

CID File0222

**Exhibit** 

0019-16-f0133-014635

For Official Use Only-Law Enforcement Sensitive



**INSPECTOR GENERAL**
DEPARTMENT OF DEFENSE
DEFENSE CRIMINAL INVESTIGATIVE SERVICE
CHARLESTON POST OF DUTY
1 POSTON ROAD, SUITE 103
CHARLESTON, SC 29407

**2016001951-20CS-E2**                                    **September 28, 2016**

**3M COMPANY**

<u>**THE INFORMATION CONTAINED HEREIN WAS PARTIALLY DERIVED FROM A
QUI TAM COMPLAINT THAT REMAINS UNDER SEAL BY ORDER OF THE U.S.
DRISTRICT COURT. DISSEMINATION IS RESTRICTED.**</u>

**INTERVIEW OF JOHN KOMADA, JR.:** On September 13, 2016, the Reporting Agent (RA)
and Special Agent (SA) Jennifer Coleman, U.S. Army Criminal Investigation Command
(USACID) interviewed John M. Komada, Jr., Defense Logistics Agency (DLA) Troop Support
at the DLA office located at 700 Robbins Avenue, Philadelphia, PA. Also present during the
interview were: Assistant United States Attorneys (AUSA) Fran Trapp and Stan Ragsdale,
District of South Carolina Civil Division; Brandie Weddle, U.S. Department of Justice,
Washington, D.C. Civil Division; DLA Troop Support Procurement Fraud Attorneys Michael
Delaney and Lillian Weiss. After being advised of the identity of the interviewing agents and the
purpose of the interview, Komada provided substantially the following information.

Komada, DOB: September 30, 1959, SSN: XXX-XX-9628, POB: Philadelphia, PA, currently
resides at 5932 Hudson Road, Ben Salem, PA 19020, telephone number (215) 737-7469. He
began his employment with the DLA on October 23, 1983 as a Chemical Engineer. Currently,
Komada is a Product Specialist in the Medical Directorate. Is his capacity as a Product
Specialist, Komada is responsible for learning about the items for which he is assigned. Komada
learns how the products are made and used, writes procurement specifications including but not
limited to the product name, shelf life, and conducts marketing research.

With regard to the dual-ended Combat Arms Earplugs (CAE) manufactured by Aearo/3M,
Komada stated that in 2000, when the product was being developed, he was not assigned to the
CAE. His first involvement with the CAE was in 2003. Komada recalled that a co-worker named
Terune Gandhi was assigned the CAE and had asked Komada for assistance in obtaining
documentation reference foam earplugs. When Komada easily obtained the information, his
supervisor noticed the ease by which he obtained the documentation and assigned him the CAE.
Komada stated that Gandhi is no longer with DLA and may be residing in Absecon, NJ.

Komada stated that prior to his involvement with the CAE, the U.S. Army Center for Health
Promotion and Preventive Medicine (USACHPPM) was responsible for the procurement of
earplugs. He was confident in speculating that there were conversations between Dr. Ohlin and
Aearo about the development of earplugs for military applications based on the needs of the
military. Komada stated that the CAE started as a military application item only, but later Aearo
recognized that the CAE had commercial applications.

Agents asked Komada if he had ever heard of, or received any, complaints about the CAE.
Komada stated he never heard any quality related complaints but may have heard about issues
relating to the CAE sticking out too far and thus being uncomfortable to wear with a helmet.

CLASSIFICATION:

**FOR OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE**
DCIS Form 1 MAY 2015

**WARNING**
The information in this document marked FOUO-LES is the property of the Department of Defense Inspector
General and may be distributed within the Federal Government (and its contractors) to law enforcement,
public safety and protection, and intelligence officials and individuals with a need to know. Distribution to other
entities without prior DoD IG authorization is prohibited. Precautions shall be taken to ensure this information
is stored and destroyed in a manner that precludes unauthorized access. Information bearing the FOUO-LES
marking may not be used in legal proceedings without prior authorization from the originator. Recipients are
prohibited from posting information marked FOUO-LES on a website or unclassified network.

**Exhibit**                CID File0223

OO19-16-010133-014635

**2016001951-20CS-E2**                                                        2

Komada explained his understanding of how products enter the DLA system: Each military service has a Surgeon General who identifies needs of the service. These needs are entered into the Defense Medical Item Logistic System and are reviewed by the Defense Health Agency (DHA). If DHA concurs with the need(s) of the service(s), the requirement is forwarded to the DLA for procurement and is eventually entered into DLA's Defense Logistics Information Service database, based in Battle Creek, MI.

Regarding the CAE product specifications, Komada stated he relied on the Original Equipment Manufacturer's (OEM), that is Aearo's, reporting on the specifications. He added these specifications came to him from Aearo and Dr. Ohlin and he understood them to meet industry standards, such as ANSI S3.19-1974 which was superseded by ANSI/ASA S12.6-1997. Komada stated the old standard, ANSI S3.19-1974, was still used by the EPA and allowed for simpler testing using automated equipment. The newer standard required the use of fifteen individual test subjects, which Komada stated could be cumbersome to recruit and was more costly than the 1974 standard.

Komada presented agents with a Specification Sheet for the dual-ended CAE (see Attachment 1). He explained that he wrote the specifications and sent them to Aearo on or about January 22, 2003. Aearo returned the sheet on or about April 9, 2003 with strike-outs and modifications they wanted to see in the final Medical Procurement Item Description (MPID). Agents drew Komada's attention to Page 2 of the Specification Sheet which shows Komada listing ANSI/ASA S12.6-1997 as the requirement for the CAE and Aearo's modification identifying the CAE should meet the old 1974 specification. Komada recalled Aearo advising that the new standard would be too burdensome for them to meet. Komada told agents that he agreed to the old standard so as not to put Aearo in a position of "commercial impossibility", a position DoD is prohibited from placing on a company. Komada continued that requiring Aearo to meet the newer 1997 standard would have been difficult for Aearo to comply with given the cost factor associated with finding fifteen test subjects versus using an automated piece of equipment they already had access to. Komada continued that it happens quite often that industry and the Government work together to develop the requirements for a product. Komada continued that Aearo's version of the Specifications Sheet was the "final cut" and ultimately became the basis for the MPID Number 2, dated July 16, 2006 (see Attachment 2).

When asked by agents about the fitting instructions for the CAE, Komada stated he was not involved. He relied on Aearo to develop fitting instructions and provide them with the CAE.

Komada stated that once he completed the MPID Number 2, his role and involvement with the CAE ended. He had no visibility or involvement with 3M's discontinuation notice.

Komada recalled Division Chief (retired) Roslyn Rogers showing him an article regarding hearing loss if earplugs were not worn properly. However, the article referenced earplugs in general and did not specifically mention the CAE.

When asked by agents if he knew anything about Dr. Ohlin asking for a change to the CAE in order to fit a case he (Dr. Ohlin) developed. Komada stated that he was not aware of this. He did recall Dr. Ohlin recommending a modification to the original case by widening the bottom to better accommodate the existing CAE. Komada continued that Dr. Ohlin's recommendation was adopted and the new case was manufactured by CW Resources, New Britain, CT, an AbilityOne company.

Komada stated that Dr. Ohlin's primary concern was the safety of soldiers. After he left the Aberdeen Proving Grounds, Dr. Ohlin was hired by the U.S. Army as a consultant. Komada

**CLASSIFICATION:**

**FOR OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**
DCIS Form 1 MAY 2015

**WARNING**
The information in this document marked FOUO-LES is the property of the Department of Defense Inspector General and may be distributed within the Federal Government (and its contractors) to law enforcement, public safety and protection, and intelligence officials and individuals with a need to know. Distribution to other entities without prior DoD IG authorization is prohibited. Precautions shall be taken to ensure this information is stored and destroyed in a manner that precludes unauthorized access. Information bearing the FOUO-LES marking may not be used in legal proceedings without prior authorization from the originator. Recipients are prohibited from posting information marked FOUO-LES on a website or unclassified network.

**Exhibit**    CID File0224

For Official Use Only-Law Enforcement Sensitive

*CO19-16-C10133-C14635*

**2016001951-20CS-E2**                                        3

continued that Aearo as a company was altruistic and "really wanted to help troops." He said the company founder would help him (Komada) answer any questions he had. Komada believed Aeoro's founder had a professional relationship with Dr. Ohlin, but he was not aware of any personal relationship between the two.

Agents asked Komada what would have happened had he or DLA become aware that Aearo/3M's initial testing of the CAE was not as claimed or that the company(ies) falsified test procedures or results. Komada stated that would have been a serious concern for him and he would have notified his supervisor or Division Chief of the issue.

Attachments:
1) Specification Sheet No. 1 for National Stock Number 6515-01-466-2710, dated April 9, 2003
2) Medical Procurement Item Description Number 2 for National Stock Number 6515-01-466-2710, dated July 16, 2006

Prepared by: SA Gilad D. Rosen, 20CS

ROSEN.GILAD.D.1284    Digitally signed by ROSEN.GILAD.D.1284432548
432548                DN: c=US, o=U.S. Government, ou=DoD, ou=PKI,
                      ou=DODIG, cn=ROSEN.GILAD.D.1284432548
                      Date: 2016.10.07 10:12:07 -04'00'

Approved by: RAC Cynthia A. Bruce, 20RL

BRUCE.CYNTHIA.ALICE.12314    Digitally signed by BRUCE.CYNTHIA.ALICE.1231457824
57824                        DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=DODIG
                             cn=BRUCE.CYNTHIA.ALICE.1231457824
                             Date: 2016.10.07 11:36:01 -04'00'

CLASSIFICATION:

**FOR OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**
DCIS Form 1 MAY 2015

**WARNING**
The information in this document marked FOUO-LES is the property of the Department of Defense Inspector General and may be distributed within the Federal Government (and its contractors) to law enforcement, public safety and protection, and intelligence officials and individuals with a need to know. Distribution to other entities without prior DoD IG authorization is prohibited. Precautions shall be taken to ensure this information is stored and destroyed in a manner that precludes unauthorized access. Information bearing the FOUO-LES marking may not be used in legal proceedings without prior authorization from the originator. Recipients are prohibited from posting information marked FOUO-LES on a website or unclassified network.

CID File0225

Exhibit

P1079.226

CID-116-C10133.0463

For Offical Use Only-Law Enforcement Sensitive

| SPECIFICATION SHEET NO. 1 | | 9 April 200322 January 2003 |
|---|---|---|
| NATIONAL STOCK NO. | ITEM IDENTIFICATION: | |
| 6515-01-466-2710 | PLUG, EAR, Combat Arms, Double-Ended, 50 Pair. | |

This specification sheet covers a military-unique, double-ended earplug that is designed for use in chronically noisy environments and is designed to provide protection from the impulse noises created by military firearms while allowing the wearer to hear softer quieter sounds, such as voice commands, on the battlefield.

Shall be Aearo Corporation, part number 370-1000, or equal. "Equal" items shall possess the salient characteristics specified below.

**Salient Characteristics:**

General. Shall be a pair of double-ended, swept-back triple-flange style earplugs designed for double use as hearing protectors for military personnel working in chronically noisy environments and as hearing protectors designed to protect the user from impulse noises created by military firearms while allowing the user to clearly hear normal speech and other softer quieter sounds normally encountered in battle. The end designed for protection from chronic noises shall be gray camouflage green or another suitable dark color; the end designed for protection from impulse noises shall be yellow or another suitable bright color. The earplugs shall meet all requirements set forth in this document.

Sound Attenuation. At each frequency listed below, each end of the earplugs shall provide the level of sound attenuation specified below. Sound attenuation shall be measured in decibels (dB).

| Sound Attenuation of the "Camouflage Green" End of the Earplug: | | Sound Attenuation of the "Yellow" End of the Earplug: | |
|---|---|---|---|
| Sound Frequency, Hz | Minimum Mean Attenuation, dB | Sound Frequency, Hz | Minimum and Maximum Mean Attenuation, dB |
| 125 | 25 dB | 125 | 0 dB to 10 dB |
| 250 | 25 dB | 250 | 0 dB to 10 dB |
| 500 | 25 dB | 500 | 0 dB to 10 dB |
| 1000 | 25 dB | 1000 | 5 dB to 15 dB |
| 2000 | 30 dB | 2000 | 10 dB to 20 dB |
| 4000 | 35 dB | 4000 | 10 dB to 20 dB |
| 8000 | 40 dB | 8000 | 10 dB to 25 dB |

The "yellow" end of the earplug shall incorporate a passive technology that has been empirically shown to provide a level-dependent increase in attenuation above a sound pressure level of 115 dB.

1

Exhibit _____ CID File0226

0019-16-CID133-014635

For Offical Use Only-Law Enforcement Sensitive

SPECIFICATION SHEET NO. 1                    9 April 200322 January 2003

The sound attenuation of both ends of the earplugs shall be tested in accordance with
Method "B" of ANSI/ASA S12.6-1997ANSI S3.19-1974: "METHODS FOR MEASURING
THE REAL-EAR ATTENUATION OF HEARING PROTECTORS". A laboratory accredited in
accordance with the requirements of the U.S. Department of Commerce's National
Voluntary Laboratory Accreditation Program (NVLAP) shall perform the sound
attenuation testing.

Material. The earplugs shall be made of thermoplastic elastomeric polymer.
――――This material shall be non-allergenic and non-toxic.

Instructions. Detailed illustrated instructions explaining the proper use and handling
of the earplugs covered by this document shall be supplied with each pair of
earplugs. These instructions shall be printed on a separate piece of paper and placed
inside the immediate and unit container. As an alternate, these instructions may be
printed on the exterior of the immediate and unit container.

Workmanship. The earplugs shall be free from all defects that detract from their
appearance or impair their serviceability.

Instructions. Illustrated instructions explaining the proper use and handling of the
earplugs covered by this document shall be supplied with each pair of earplugs.
These instructions shall be printed on a separate piece of paper and placed inside the
immediate and unit container. As an alternate, these instructions may be printed on
the exterior of the immediate and unit container.

Unit. Package (PG). One package containing fifty (50) pairs of earplugs shall
constitute one unit. As a minimum, the unit package shall be marked with the
manufacturer's name, address and telephone number; the manufacturer's
commercial brand name; and the earplugs' NSN and Item Identification.Each pair of
earplugs in the unit shall be packaged separately
in a suitable reclosable paperboard container. The unit package shall be a
self-dispensing paperboard box that can be mounted on a wall or a bulkhead
(i.e., a wall inside a ship). As a minimum, the unit package shall be marked
with the manufacturer's name, address and telephone number; the manufacturer's
commercial brand name; and the earplugs' NSN and Item Identification.

**Quality Assurance Provisions:**

Responsibility for Inspection. Unless otherwise specified in the contract or purchase
order, the contractor is responsible for the performance of all inspection requirements
as specified herein. Except as otherwise specified in the contract or purchase order, the
contractor may use his own or any facilities suitable for the performance of the
inspection requirements specified herein, unless disapproved by the Government. The
Government reserves the right to perform any of the inspections set forth in the
specification where such inspections are deemed necessary to assure supplies and
services conform to prescribed requirements.

2

For Offical Use Only-Law Enforcement Sensitive

**Exhibit** _____   CID File0227

0019-16-00133-0146 35

r Offical Use Only-Law Enforcement Sensitive

---

| SPECIFICATION SHEET NO. 1 | 9 April 200322 January 2003 |

Inspection.  Inspection, as used herein, shall be defined as the examination and testing of an item. Examination shall be defined as unaided visual, auditory, tactile, or olfactory investigation.  Testing shall be defined as the use of laboratory equipment & procedures to determine various properties of an item.  Inspections shall be conducted to determine compliance with specification requirements.  Where feasible, the same sample shall be used for the determination of two or more inspection characteristics.  For inspection purposes, the unit of product shall be one pair of earplugs.

Sampling for Inspection.  Except for "Sound Attenuation", sampling for inspection shall be conducted in accordance with ANSI/ASQC Z1.4-1993.  A sampling shall be performed for each salient characteristic specified herein, except "Sound Attenuation".  For each sampling, except "Sound Attenuation", inspection level S-2 shall be used; the AQL (Acceptable Quality Level) shall be 1.0 percent.

Sampling for inspection shall be conducted in accordance with ANSI/ASQC Z1.4-1993. A sampling shall be performed for each salient characteristic specified herein.  For each sampling, inspection level S-2 shall be used; the AQL (Acceptable Quality Level) shall be 1.0 percent.Sampling for inspection of the sound attenuation of the level-dependent "yellow" end of the earplug shall be 100 percent.  It shall be verified using an acoustical impedance test.  Sampling for inspection of the sound attenuation of the camouflage green end of the earplug shall be conducted in accordance with ANSI/ASQC Z1.4-1993. Inspection level S-2 shall be used; the AQL (Acceptable Quality Level) shall be 1.0 percent.

Records.  Records of inspections performed by or for the contractor shall be maintained by the contractor and made available to the Government upon the Government's request, at any time, or from time to time, during the performance of the contract and for a period of three years after delivery of the supplies to which such records relate.

Contractor Certification.  The contractor shall certify that the products offered meets the salient characteristics of this description and conforms to the producer's own drawings, specifications, standards, and quality assurance practices. The Government reserves the right to require proof of such conformance prior to first delivery and thereafter as may be otherwise provided for under the provisions of the contract.

**Regulatory Requirements.**

Federal Food, Drug, and Cosmetic Act.  If the products covered by this document have been determined by the U.S. Food and Drug Administration to be under its jurisdiction, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/suppliers, with the requirements of the Federal Food, Drug, and Cosmetic Act, as amended, and regulations promulgated thereunder. In addition, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/suppliers, with all other applicable Federal, State, and local statutes, ordinances, and regulations.

Recovered Materials.  The offeror/contractor is encouraged to use recovered material in accordance with Federal Acquisition Regulation Subpart 23.4 to the maximum extent practical.

3

Exhibit  CID File0228

CCI 9-16-CID33 014635

For Offical Use Only-Law Enforcement Sensitive

| SPECIFICATION SHEET NO. 1 | 9 April 200322 January 2003 |
|---|---|

Preservation, packaging, packing, labeling, and marking.  Unless otherwise specified, preservation, packaging, and packing shall be to a degree of protection to preclude damage to containers and/or contents thereof under normal shipping conditions, handling, etc., involving shipment from the supply source to the receiving activity, plus reshipment from receiving activity, and shall conform to applicable carrier's rules and regulations. Intermediate and exterior package quantities and labeling and marking shall be as specified in the contract and/or order.

4

For Offical Use Only-Law Enforcement Sensitive

**Exhibit** CID File0229

0019-16-C0133-014635

For Offical Use Only-Law Enforcement Sensitive

PGC

| MEDICAL PROCUREMENT ITEM DESCRIPTION | NUMBER 2 | DATE 16 July 2006 |
|---|---|---|
| NATIONAL STOCK NO. | ITEM IDENTIFICATION | |
| 6515-01-466-2710 | PLUG, EAR, Combat Arms, Double-Ended, 50 pair | |

1. SCOPE.

1.1  This Medical Procurement Item Description covers military-unique, double-ended ear plugs suitable for use as hearing protectors for military personnel in chronically noisy environments.

1.2  Shall be Aearo Corporation's P/N 370-1000, or equal. "Equal" items shall possess the salient characteristics specified below.

2. SALIENT CHARACTERISTICS.

2.1  General.  Shall be double-ended, swept-back triple-flange style ear plugs.

2.1.1  Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.

2.1.2  The end designed for protection from chronic noises shall be camouflage green or another suitable dark color; the end designed for protection from impulse noises shall be yellow or another suitable bright color. The ear plugs shall meet all requirements as set forth herein.

2.2  Sound Attenuation.  At each frequency listed below, each end of the earplugs shall provide the level of sound attenuation as specified.  Sound attenuation shall be measured in decibels (dB).

| SOUND ATTENUATION OF THE CAMOUFLAGE GREEN END OF THE EAR PLUG | | SOUND ATTENUATION OF THE YELLOW END OF THE EAR PLUG | |
|---|---|---|---|
| Sound Frequency, Hz | Minimum Mean Attenuation, dB | Sound Frequency, Hz | Minimum and Maximum Mean Attenuation, dB |
| 125 | 25 dB | 125 | 0 dB to 10 dB |
| 250 | 25 dB | 250 | 0 dB to 10 dB |
| 500 | 25 dB | 500 | 0 dB to 10 dB |
| 1000 | 25 dB | 1000 | 5 dB to 15 dB |
| 2000 | 30 dB | 2000 | 10 dB to 20 dB |
| 4000 | 35 dB | 4000 | 10 dB to 20 dB |
| 8000 | 40 dB | 8000 | 10 dB to 25 dB |

Page 1 of 4 Pages

For Offical Use Only-Law Enforcement Sensitive

Exhibit
ID File0230

OO19-16-CID133-C14635

For Offical Use Only-Law Enforcement Sensitive

MPID #1 (6515-01-466-2710)

2.2.1  The yellow end of the earplug shall incorporate a passive non-linear technology that has been empirically shown to provide a level-dependant increase in sound attenuation above a sound pressure level of 115 dBP(peak). It shall also provide this protection at sound-pressure levels up to 190 dBP(peak), even after the user has been exposed to 100 free-field noise impulses of 190 dBP(peak), minimum.

2.2.2  The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19. A laboratory accredited in accordance with the requirements of the U.S. Department of Commerce's National Voluntary Laboratory Accreditation Program (NVLAP) shall perform the sound attenuation testing.

2.3  Material.  The ear plugs shall be made of thermoplastic elastomeric polymer. This material shall be non-allergenic and non-toxic.

2.4  Workmanship.  The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.

2.5  Instructions.  Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit. Instructions shall be legible and easy to read. Instructions shall be printed in permanent black or navy blue ink on a suitable sheet of paper which shall be placed inside the unit package prior to sealing. As an alternate, instructions may be printed on a suitable, clearly visible location on the unit container in permanent black or navy blue ink.

3.  REGULATORY REQUIREMENTS.

3.1  Federal Food, Drug and Cosmetic Act.  If the product covered by this document has been determined by the U. S. Food and Drug Administration to be under its jurisdiction, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/suppliers, with the requirements of the Federal Food, Drug and Cosmetic Act, as amended, and regulations promulgated thereunder. In addition, the offeror/contractor shall comply, and be responsible for compliance by its subcontractors/suppliers, with the requirements of all other applicable Federal, State and local statutes, ordinances, and regulations.

3.2  Recovered materials.  The offeror/contractor is encouraged to use recovered material in accordance with Federal Acquisition Regulation Subpart 23.4 to the maximum extent practical.

4.  QUALITY ASSURANCE PROVISIONS.

4.1  Responsibility for inspection.  Unless otherwise specified in the contract or purchase order, the contractor is responsible for the performance of all inspection requirements as specified herein. Except as otherwise specified in the contract or purchase order, the contractor may use his own or any facilities suitable for the performance of the inspection requirements specified herein, unless disapproved by the Government. The Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to assure supplies

For Offical Use Only-Law Enforcement Sensitive

**Exhibit** ___CID File0231___

0019-16-CID33-D14685

MPID #1 (6515-01-466-2710)

and services conform to prescribed requirements.

4.2  Inspection.  Inspection, as used herein, shall be defined as the examination and testing of an item. Examination shall be defined as unaided visual, auditory, tactile, or olfactory investigation. Testing shall be defined as the use of laboratory equipment and procedures to determine various properties of an item. Inspections shall be conducted to determine compliance with specification requirements. Where feasible, the same sample shall be used for the determination of two or more inspection characteristics. For inspection purposes, the unit of product shall be one pair of ear plugs.

4.3  Sampling for inspection.

4.3.1  For each specified salient characteristic, except "Sound Attenuation", sampling for inspection shall be conducted in accordance with ANSI/ASQ Z1.4. A sampling shall be performed for each salient characteristic. Inspection level S-2 shall be used; acceptable quality level (AQL) shall be 1.0 percent.

4.3.2  Sound attenuation.  Sampling for inspection of sound attenuation of the level-dependent yellow end shall be 100 percent, and shall be verified using an acoustical impedance test. Sampling for inspection of the sound attenuation of the camouflage green end shall be conducted in accordance with ANSI/ASQ Z1.4. Inspection level S-2 shall be used; the AQL shall be 1.0 percent.

4.4  Records.  Records of inspections performed by or for the contractor shall be maintained by the contractor and made available to the Government upon the Government's request, at any time, or from time to time, during the performance of the contract and for a period of three years after delivery of the supplies to which such records relate.

4.5  Contractor certification.  The contractor shall certify that the product offered meets the salient characteristics of this document and conforms to the producer's own drawings, specifications, standards, and quality assurance practices. The Government reserves the right to require proof of such conformance prior to first delivery and thereafter as may be otherwise provided for under the provisions of the contract.

5.  PACKAGING.

5.1  Preservation.  Preservation shall be military.

5.1  Unit.  Package (PG).  One package containing 50 pairs of ear plugs, as specified, constitutes one unit. Unit package shall be any suitable sealed commercial container capable of protecting the contents from damage, and shall be designed to permit easy dispensing of the ear plugs. Illustrated instructions for use, as specified in para. 2.5, shall be supplied with each unit.

5.1.2  Intermediate package.  Intermediate package may be supplied at the option of the contractor.

Page 3 of 4 Pages

**Exhibit** _____

CID File0232

OO19-16-CLO133-OILE35

For Offical Use Only-Law Enforcement Sensitive

MPID #1 (6515-01-466-2710)

5.2 Packing.  Packing shall be level B.

5.2.1 Exterior (shipping) container.  Quantities of units to be supplied in the exterior (shipping) container shall be at the option of the contractor. Units shall be packed in an exterior container designed for a type 2 load and conforming to ASTM D 5118, class domestic. Closure shall be as specified in ASTM D 1974, closure method 1E.

5.2.3 Unitization.  Material shall be unitized as specified in the contract or order.

5.3 Marking.

5.3.1 Unit.  Each unit shall be marked as specified in Medical Marking Standard No. 1 for military material. In addition, markings shall include the item identification, and the manufacturer's name, address and telephone number.

5.3.3 Intermediate package (if supplied), exterior (shipping) container and unitized load.  Each intermediate package (if supplied), exterior (shipping) container and unitized load shall be marked as specified in Medical Marking Standard No. 1.

6. NOTES.

6.1 Quantities of units to be supplied in the intermediate package (if supplied) and exterior (shipping) shall be provided to Defense Supply Center Philadelphia, ATTN: DSCP-MSBA (Packaging)

6.2 Source of documents.

6.2.1 The Federal Food, Drug and Cosmetic Act is available from the Food and Drug Administration, Washington, DC 20204.

6.2.2 ASTM Standards are available from ASTM International, 100 Barr Harbor Drive, West Conshohocken, PA 19428-2959.

6.2.3 ANSI/ASQC Standards are available from American Society for Quality Control, P. O. Box 3005, 611 E. Wisconsin Avenue, Milwaukee, WI 53201-4606.

6.2.4 Medical Marking Standard No. 1 is available from Defense Supply Center Philadelphia, ATTN: DSCP-MSBA (L. Connors), Bldg 6A South, 700 Robbins Avenue, Philadelphia, PA 19111-5092, email Loretta.Connors@dla.mil.

Page 4 of 4 Pages

For Offical Use Only-Law Enforcement Sensitive

Exhibit  CID File0233

| AGENT'S INVESTIGATION REPORT<br>*CID Regulation 195-1*<br>**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | ROI NUMBER<br>0019-16-CID133-014635 |
|---|---|
| | PAGE 1 OF 4 PAGES |

DETAILS

**Chuck JOKEL, Noise Control Engineer, US Army Public Health Center, Army Hearing Program, Aberdeen Proving Ground, MD**

**LTC Martin "Marty" ROBINETTE, Division Chief, US Army Public Health Center, Army Hearing Program, Aberdeen Proving Ground, MD**

**Ms. Connie EANES-KEENE, Secretary for LTC ROBINETTE and former secretary for Dr. OHLIN, US Army Public Health Center, Army Hearing Program, Aberdeen Proving Ground, MD**

On 29 November 2016, the reporting agent interviewed Mr. JOKEL and LTC ROBINETTE at their office on Aberdeen Proving Ground. Also present were Assistant United States Attorney Stan RAGSDALE, Civil Division, District of South Carolina, Columbia, SC and Ms. Brandie WEDDLE, US Department of Justice, Civil Division, Washington, DC. Mr. JOKEL and LTC ROBINETTE were interviewed about their knowledge of the Dual Ended Combat Arms Earplugs, National Stock Number 6515-01-466-2710 (CAE).

Dr. Doug OHLIN, former Program Manager for the Army Hearing Program, was in charge of the approve/disapprove list for earplugs. If Dr. OHLIN liked the earplug then the product was placed on the list and if he did not like the earplug then the product was not placed on the list. Dr. OHLIN was in charge of the program for approximately 25 years and controlled the list.

The foam earplug was on the Javits Wagner O'Day (JWOD) Act list and therefore had to be procured from companies on that list. For example SoundGuard. In the field soldiers were not wearing foam earplugs made by JWOD companies and LTC ROBINETTE would tell them they weren't authorized to wear earplugs from anyone except those specified companies. LTC ROBINETTE advised that it was difficult because the earplugs worked just fine. Department of the Army (DA) Pamphlet 40-501, Army Hearing Conservation had a list of approved companies list in the back of the pamphlet.

AGENT'S COMMENT: JWOD, now operating as the US AbilityOne Commission, is an act that requires the Federal Government to procure products from "qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled in accordance with the regulations of the [Commission]."

Dr. OHLIN never wrote any of his standards for approving/disapproving hearing protection down. He would circulate emails and say here is what he is looking at. Dr. OHLIN was generally looking at things like attenuation, comfort, and whether the earplugs were allergenic. Dr. OHLIN would wear the product for a while and determine if the products were up to his standard. Dr. OHLIN would share some things about what he found, however, it was entirely his decision. One of his reasons was that he wanted to keep the list small so that it was manageable (single, triple, and quad flanges).

When Majorie GRANTHAM (held position prior to LTC ROBINETTE) took over, she began formalizing the process for hearing protection.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE<br>*Jennifer Coleman* | DATE<br>29 November 2016 | EXHIBIT |

CID FORM 94
(Automated)      **FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE**   CID File0234
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 2 OF 4 PAGES |

DETAILS

Dr. OHLIN had close relations with the developers from the ISL in France, which had developed filters for non-linear earplugs (no constant attenuation). There is no standardized test for this type of earplug so they relied on the data from ISL (higher the noise the better the attenuation).

At some point LTC ROBINETTE and Mr. JOKEL were informed that Dr. OHLIN was interested in promoting the level-dependent attenuation device. They did not hear this information from Dr. OHLIN, but from someone else. The Infantry has the highest level of hearing loss in the military. When the CAE arrived it removed the "catch 22," which was to either wear hearing protection and not be able to hear or to not wear the hearing protection so that you could hear quieter sounds, but lose hearing if there were, for example, close gunfire or explosions. Dr. OHLIN worked extensively with EAR (now 3M) at the time to get the CAE up and running. They were aware of some issues with the CAE cord being fire retardant. However, both Mr. JOKEL and LTC ROBINETTE were unaware if Dr. OHLIN picked out EAR in particular for the CAE.

Neither Mr. JOKEL nor LTC ROBINETTE were aware of a relationship between the French inventor and EAR. However, they did know that Dr. OHLIN worked with EAR and knew the technical people for ISL.

The yellow foam earplug from EAR was much better than any other earplug but because the foam earplug was on the JWOD list they had to purchase from SoundGuard. EAR foam earplug had better attenuation.

The JWOD Act forced the military to purchase from particular vendors and as such it was frustrating for the military because these products had quality issues.

Neither Mr. JOKEL nor LTC ROBINETTE believed that Dr. OHLIN was "married" to the idea of the CAE, but they also don't recall any other competitors. Both Mr. JOKEL and LTC ROBINETTE believed that it was not Dr. OHLIN's job to create competition.

There were some conversations with the NSN, but if a new company came up with a product that wasn't different or better than the CAE then there would be no new NSN. They did recall a company named Moldex but offered no further information about the company.

The Program Executive Office (PEO) Soldier will determine if there is a need for a product in the field. If there is a need in the field for some type of hearing product then they will come to the Noise Control Program. Every product comes through one of the PEO Soldier product lines and PEO Soldier is part of the acquisition process and are aware of competition issues. Since approximately 2012 PEO Soldier began defining the requirements for all hearing (after consulting the Noise Control Program).

The old standard for hearing protection was the Real Ear Attenuation at Threshold (REAT) method. This method was for continuous noise with earplugs (closed) and without earplugs (open) for people in a normal environment.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| *jc* | 29 November 2016 | 1 2 |

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 3 OF 4 PAGES |

DETAILS

The current standard (1997) involves the use of mannequins for continuous or impulse noise. On the inside of the mannequin's ear is a microphone sensing the noises.

Both Mr. JOKEL and LTC ROBINETTE agreed there was no standard for impulse noise. The US Government was aware of the CAE's Noise Reduction Rating (NRR) of zero. Although a negative 2 would actually amplify sounds neither Mr. JOKEL nor LTC ROBINETTE believed that an earplug would actually make sounds louder. However, they did believe there was some attenuation in the CAE's, but one would want no attenuation. Another issue they noted was that the CAE stuck out further than other earplugs which could get in the way.

Because the CAE stuck out further there were certain places you did not want the earplug to touch. Because if the earplug touched one part of the ear (the Tragus) it could push out of the ear. So their office recommended that personnel flip the first flange back so that this would not occur. LTC ROBINETTE advised that chewing gum could work out the earplug but believes that a person would be able to sense that. Neither Mr. JOKEL nor LTC ROBINETTE recalled where they heard that the flange needed to be pulled back.

At this point in the interview Bates Number 3M00005285-5290, Test Report dated 10 July 2000, was shown to both Mr. JOKEL and LTC ROBINETTE. After reviewing they advised that the test report demonstrates that there were differences based on the way the earplug was inserted and that the fit of the earplug is critical.

> The first test was experimenter fit and the second test was for subject fit. If the biggest flange is inserted into the ear canal then that person received better attenuation and fit.

> There was a different NRR based on which fit (experimenter versus subject) was used. Both Mr. JOKEL and LTC ROBINETTE advised that the US Government required experimenter fit, however, they did not see which fit was required mentioned in the contract shown to them. In the experimenter fit the person conducting the test fits the earplug, whereas in subject fit the test subject inserts the earplug into their ear.

> Both Mr. JOKEL and LTC ROBINETTE agreed that the US Government should know that there were differences in the NRR with all of the tests. The manufacturer needs to be on the level with the US Government so that they (the military) can take appropriate remediation steps for the service members, including advising soldiers on the proper way to fit the earplugs.

Next Mr. JOKEL and LTC ROBINETTE were shown Bates number 3M0006669 (a Memorandum) as well as Bates number 3M0006632. After reviewing the data they advised that there was a correction to the test results of the mannequin to make it more like a human test. In this information, 3M was recognizing some issue with which test to use, but chose the least accurate data. The third octaband (getting the mean of the data) was a comparison of apples and oranges as it didn't take into account the spike.

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| | 29 November 2016 | |

CID FORM 94
(Automated)

| AGENT'S INVESTIGATION REPORT<br>CID Regulation 195-1<br>FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | ROI NUMBER<br>0019-16-CID133-014635 |
|---|---|
| | PAGE 4 OF 4 PAGES |

DETAILS

Mr. JOKEL and LTC ROBINETTE agreed that the US Government would have still procured this item because it was better than nothing. However, 3M should have leveled with them about the data so that they could inform the wearer of any issues, so they could have made informed decisions.

Mr. JOKEL and LTC ROBINETTE said that the "imperceptible loosening" of the earplug has unknown consequences. Per the test results the flanges should always be pulled back. Again, the manufacturer should have informed the military of this problem, so that the military could advised the solders of the slippage problem. The manufacturer's failure to inform the military made a difference in how the military dealt with the soldiers. Because of the manufacturer's failure to inform, the US Government doesn't know what it is really receiving. If they (the US Government) would have known of the slippage issue, they would have insisted on the instructions saying the same (flanges must always be folded back). They said that there was no practical way that soldiers could determine the size of their ear canals (small, medium, large, etc.).

Next Mr. JOKEL and LTC ROBINETTE were shown Bates numbers 3M00010538-10569. They advised this was not ANSI compliant mannequin and was done to compare different versions of earplugs. This was used to assist in figuring out what they needed for a particular environment.

Neither Mr. JOKEL nor LTC ROBINETTE were aware if the CAE version 2 was discontinued.

Neither Mr. JOKEL nor LTC ROBINETTE were aware of why Dr. OHLIN left. They thought it tacky they he went to work so quickly for 3M after leaving the US Government but did not recall the time frame. They believed he was given a good monetary reason.

Neither Mr. JOKEL nor LTC ROBINETTE were aware of the reason why GRANTHAM was told not to talk to Dr. OHLIN when he called requesting information about contracts. However, LTC ROBINETTE recalled when he first began he was told by Ms. Tina ALLEN, Chief of Resource Management that when a vendor calls that he was to direct them to the Deputy Chief of Staff for Procurement.

After Dr. OHLIN left, Eric FALLON took over and when FALLON left (and went to work for 3M) then GRANTHAM took over and when she left (Permanent Change of Station to Texas and subsequently retired from US Army) LTC ROBINETTE took over the position. Over the years it changed names from Program Manager to what it is now Division Chief.

Mr. JOKEL made a clarification regarding ANSI S12.9 (1997) standard. Mr. JOKEL believed there were two standards to it and the 1974 standard but he wanted to verify and would double check that information.

Ms. EANES-KEENE was interviewed and stated that she was unaware of why Dr. OHLIN left and did not know the time frame between when he left employment for the US Government and started working for 3M.
/////////////////////////////////////////////////////LAST ENTRY//////////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE<br>*Jc* | DATE<br>29 November 2016 | EXHIBIT<br>12 |

CID FORM 94
(Automated)

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| *CID Regulation 195-1* | 0019-16-CID133-014635 |
| **FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | PAGE 1 OF 2 PAGES |

DETAILS

**Commander Joel BEALER, Deputy Director of Safety and Occupation Health, Bureau of Medicine and Surgery, 7700 Arlington Blvd, Falls Church, VA 22042**

On 26 April 2017, the reporting agent along with Assistant United States Attorney Stan RAGSDALE, District of South Carolina, Columbia, SC and Brandie WEDDLE, US Department of Justice, Civil Frauds Section, Washington, DC interviewed CDR BEALER at his office.

CDR BEALER advised that the Combat Arms Earplugs (CAE) was not commonly purchased by the US Navy, however, it was purchased by the US Marine Corps. CDR BEALER stated that the CAE was issued to the Marines while they were in theater, however, he does not know if the Marines actually used these earplugs.

CDR BEALER stated that he was familiar with the studies where the US Navy requested the US Air Force to conduct. CDR BEALER stated that all earplugs went through the Air Force Laboratory in Dayton, OH through their (US Navy's) own internal scrutiny. CDR BEALER stated that they would not have tested for imperceptible slippage nor the NRR just the performance of the plug. CDR BEALER stated that this was because all of their testing was conducted on a KEMAR, which was basically a dummy with holes for ears. Therefore the testing would never have noted or looked at slippage.

The KEMAR mannequin is a mean representation. Basically not meant to fit or work on everyone just the majority of service members (approximately 85%). CDR BEALER stated that all vendors knew that one size would not fit everyone.

CDR BEALER stated that the fitting instructions were the same for all personnel. Even though the US Air Force tested them at the time, they didn't test for Noise Reduction Rating (NRR) or slippage. However, if they were made aware of these issues, it would have changed the way the testing was handled.

CDR BEALER stated that service members were given a choice of hearing protection which was mission dependent. In other words, someone in the Navy Seals would need different hearing protection than a regular sailor or service member. Once the choices were given (could be anywhere from 2 to 20 choices) then the service member was free to select. CDR BEALER stated that at the time (for the regular service member) the CAE version 2 was the preferred earplug.

CDR BEALER stated that Dr Douglas OHLIN, former Audiologist was pro soldier and wanted to make sure the service member had the best hearing protection for their need. Dr OHLIN was not afraid to tell the truth and was always for "his guys" (referring to the service members). Dr OHLIN would tell someone if their product did not work properly.

CDR BEALER stated that if he had been made aware of the issue (imperceptible slippage) with the earplugs then he would have had an obligation to tell everyone in the military. The Department of Defense Acquisition, Technology & Logistics (DOD AT&L) mandates this in their regulations. Dr OHLIN would have been under

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE | DATE | EXHIBIT |
| *Jennifer Coleman* | 3 May 2017 | 13 |

CID FORM 94
(Automated)

| AGENT'S INVESTIGATION REPORT<br>*CID Regulation 195-1*<br>**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | ROI NUMBER<br>0019-16-CID133-014635 |
|---|---|
| | PAGE 2 OF 2 PAGES |

DETAILS

similar obligations (i.e. MHS). These regulations spells out the US Government Audiologist's obligation to the DOD.

CDR BEALER said he worked with Dr OHLIN for 14 months and his experience with Dr OHLIN was that he (OHLIN) was very blunt and no "BS." Dr OHLIN always put the service member first and it would shock CDR BEALER if someone ever said that Dr OHLIN was aware of this problem and never told anyone else. In his experience, Dr OHLIN would have stood up for the service member.

CDR BEALER stated he heard at one time that the stem needed to be shorter in order to fit under the Kevlar but he never heard anything about the case being the reason a shorter stem was needed.

CDR BEALER did not know how Dr OHLIN came to work for 3M, but believed he was probably sought after by several vendors. CDR BEALER stated it was not uncommon for the head audiologist to go to work for the vendors after they retired or left their position. CDR BEALER stated that LTC FALLON (NFI) left and is now with 3M.

CDR BEALER stated that 3M owed it to the military to tell them of any potential problems. CDR BEALER never heard Dr OHLIN say 3M's CAE, version 2 had any issues (i.e. slippage or NRR). CDR BEALER believed that if Dr OHLIN was informed about these issues he would have called a meeting of everyone to see how they could fix the problem. Dr OHLIN would meet with everyone once a quarter and would fly people in for conversations about problems. CDR BEALER believed Dr OHLIN's theory was that it was better to get into screaming matches (not necessarily with OHLIN doing the screaming) in those quarterly meetings than anywhere else. That way the problem could be fixed with everyone involved. This never occurred with the CAE, therefore CDR BEALER believed that Dr OHLIN was never told of any issues with the CAE, version 2.

CDR BEALER gave an example of a time when the services had to purchase from the disabled company for the foam earplugs. However, the foam earplugs were very different. Each earplug would be a different size and texture from the previous one. As such, Dr OHLIN ensure that other contractors were available to ensure the US Government got what it needed.

CDR BEALER reviewed the instructions and stated that 3M needed to define what was considered a large ear canal.

CDR BEALER stated that if there was a problem now that the Logistic Command (LOGCOM) would be the first to know.

CDR BEALER was shown a copy of page 8 of the 3M presentation and asked to review the comments on the email strand. CDR BEALER stated that the comments were not unique and this would have been common as Dr OHLIN was interested in these earplugs. It was Dr OHLIN's job not a special relationship.
//////////////////////////////////////////////////LAST ENTRY//////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE | DATE<br>3 May 2017 | EXHIBIT<br>3 |

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | PAGE 1 OF 2 PAGES |

DETAILS

**Mr. Brian HOBBS, Supervisory Audiologist, Occupational Audiology Division, Navy and Marine Corps Public Health Center, 620 John Paul Jones Circle, Portsmouth, VA**

On 27 April 2017, the reporting agent along with Assistant United States Attorney (AUSA) Stan RAGSDALE, US Attorney's Office (USAO), District of South Carolina, Columbia, SC and Brandie WEDDLE, US Department of Justice (DOJ), Civil Frauds Section, Washington, DC interviewed Mr. HOBBS at his office.

Mr. HOBBS stated that he was involved in a test report conducted by the US Air Force on the Combat Arms Earplugs, version 2 (CAE) as well as other hearing protections (both earplugs and muffs) from various vendors. Mr. HOBBS stated that the purpose of the test was to obtain the latest and greatest from the vendors and compare them to each other.

The initial funding for this particular test came from the US Marine Corps. The test evaluated a lot of hearing protection devices (e.g. tactical headsets, muffs with commo, regular headsets and earplugs). The testing evaluated continuous noise as well as impulse noise. The continuous noise tests were conducted on human subjects using the ANSI 12.6 standard and the impulse noise tests were conducted on the KEMAR mannequins. These tests were also conducted to determine speech intelligibility with radio, and face to face localization. Mr. HOBBS explained that localization was the ability to know which direction the noise was coming from.

Mr. HOBBS stated that there were no guidelines provided to the US Air Force Laboratory as they were a known quantity and knew how to test hearing protection.

Mr. HOBBS stated that the testing was not for efficacy and they did not look at the Noise Reduction Ratings (NRR) on the packages. Additionally, they would not have asked for the vendors testing reports because this was a comparison against others in the market. Vendors were supplied one opportunity to provide their latest and greatest hearing protection for these tests.

Mr. HOBBS stated that the testing utilized well trained subjects who were able to provide consistent results. The data that backs up the report would be maintained at the USAF Laboratory located at Wright Patterson AFB, Dayton, Ohio. Additionally, these reports were with a -2 standard deviation as they trying to get hearing protection that worked on 96% of service members.

Mr. HOBBS stated that he was not made aware of any problems with the CAE nor was he would he have told anyone to fold back the opposite end for testing. Mr. HOBBS would not feel comfortable providing those instructions as he would not know what the outcome of folding the flanges back versus leaving them unfolded.

When informed that the instructions suggested to fold the flanges back for extremely large ear canals he questioned the definition of a large ear canal (i.e. if large was the circumference or depth).

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION | |
|---|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
| SIGNATURE _Jennifer Coleman_ | DATE 3 May 2017 | EXHIBIT 14 |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE    CID File0240

Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

| AGENT'S INVESTIGATION REPORT<br>*CID Regulation 195-1*<br>**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | ROI NUMBER<br>0019-16-CID133-014635 |
|---|---|
| | PAGE 2 OF 2 PAGES |

DETAILS

Mr. HOBBS stated that if the earplugs were not seated properly then they would shoot out of the mannequins head during the explosive testing for impulse noise. Mr. HOBBS stated that by virtue of the CAE design that the CAEs could pop out of the ears.

Mr. HOBBS stated that 3M should have told the US Government about the slippage issues with the CAE. Mr. HOBBS stated that the US Government would not have found out any of the issues regarding slippage through their own tests nor were they looking for that issue during the test.

Mr. HOBBS stated he was not familiar with the Dixon Outlier test.

The CAE testing was done independently however during the tests that were conducted the CAE was paired with another 3M hearing muff to compare to the other hearing protection.
////////////////////////////////////////////////////LAST ENTRY///////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE | DATE<br>3 May 2017 | EXHIBIT<br>14 |

CID FORM 94
(Automated)

| AGENT'S INVESTIGATION REPORT<br>*CID Regulation 195-1*<br>**FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | ROI NUMBER<br>**0019-16-CID133-014635** |
|---|---|
| | PAGE 1 OF 1 PAGES |

DETAILS

**Leeann Domanico; DOB:** ▮▮▮▮▮▮ **; Last 4:** ▮▮ **; Address:** ▮▮▮▮▮▮▮▮▮▮ **; Current Job: GS-13, US Army Public Health Center, Army Hearing Program, Aberdeen Proving Ground, MD**

On 7 Nov 2017, the reporting agent coordinated with Ms. Domanico who advised that she worked with Dr. Doug OHLIN, former Aberdeen Proving Ground employee from 1991-2007 (approximately). Ms. Domanico stated that she only heard chit chat over the years regarding the Combat Arms Earplug (CAE). However, she never heard about any problems associated with the CAE. During that timeframe (2000) her job was focused on being a functional manager. A functional manager was the in between person for the end user and the higher ups (bridged the gaps).

Ms. Domanico stated that Dr. Ohlin was an advocate for the soldier and hearing protection was "his baby." Ms. Domanico stated that she was not aware of any problems associated with the CAE nor did she know about Dr. Ohlin being aware of any such problems. If Dr. Ohlin had been aware, he would have ensured that 3M would have corrected the problem.

Ms. Domanico stated that she did not know about Dr. Ohlin working for 3M. Ms. Domanico stated that, to her knowledge, Dr. Ohlin left the US Government because it was time to leave and things within the government were changing and additional components were being added. It was a natural time for him to leave.
//////////////////////////////////////////////////LAST ENTRY///////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER<br>SA Jennifer L. COLEMAN, 5967 | ORGANIZATION<br>ATLANTA FRAUD RESIDENT AGENCY, USACIDC | |
|---|---|---|
| SIGNATURE<br>COLEMAN.JENNIFER.LYNN.<br>1117271788 | DATE<br>**17 November 2017** | EXHIBIT |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1 | 0019-16-CID133-014635 |
| **FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE** | PAGE 1 OF 1 PAGES |

DETAILS

**Eileen Resta; DOB:** ███████**; Last 4:** ███**, Address:** ████████████████**; Current Job: GS-13, Health Information Specialist, US Army Public Health Center, Army Hearing Program, Aberdeen Proving Ground, MD**

On 7 Nov 2017, the reporting agent coordinated with Ms. Resta who advised that she worked with Dr. Doug OHLIN, former Aberdeen Proving Ground. Ms. Resta stated that in 2000 she was a part time contractor and was not involved in the Combat Arms Earplugs (CAE). Ms. Resta stated she was not aware of any problems associated with the CAE. Ms. Resta stated that if Dr. Ohlin had been aware of any issues he would have investigated them. Ms. Resta did not have anything further to provide.
/////////////////////////////////////////////////LAST ENTRY/////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION |
|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC |

| SIGNATURE | DATE | EXHIBIT |
|---|---|---|
| COLEMAN.JENNIFER.LYNN.1 117271788 | 17 November 2017 | |

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE
Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

CID File0243

F(   FFICIAL USE ONLY – LAW ENFORCEMENT SE,   VE

*00019-2016-CID133-014635*

## SETTLEMENT AGREEMENT

This Settlement Agreement (Agreement) is entered into among the United States

of America, acting through the United States Department of Justice and on behalf of the

Defense Logistics Agency (DLA) (collectively the "United States"), 3M Company ("3M"

or "Defendant"), and Moldex-Metric, Inc. ("Moldex" or "Relator") (hereafter collectively

referred to as "the Parties"), through their authorized representatives.

## RECITALS

A.    3M Company is a for-profit corporation headquartered in St. Paul,

Minnesota, that manufactures and sells worker safety products. As relevant here, 3M

manufactured and caused to be sold to the United States a hearing protection device

known as the Combat Arms Earplug (Version 2) (the "CAEv2"). The CAEv2 was first

developed and sold by Aearo Technologies, Inc. ("Aearo"), a company which 3M

acquired in 2008.

B.    On May 12, 2016, Moldex filed a *qui tam* action in the United States

District Court for the District of South Carolina captioned *United States ex rel. Moldex-*

*Metric, Inc. v. 3M Company*, 3:16-cv-01533-MBS, pursuant to the *qui tam* provisions of

the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action"). Relator alleges that the

CAEv2 had a design defect which could cause the earplug to imperceptibly loosen in

users' ears, thereby rendering the earplugs useless or less effective; that the testing

methodology employed by 3M did not comply with required and/or accepted standards;

and, that the Noise Reduction Rating (NRR) listed on the CAEv2 packaging materials

and instructions did not accurately reflect the true characteristics of the CAEv2. Relator

further alleges that 3M and/or its affiliated companies knowingly sold the CAEv2 to the

*FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE*

CID File0244

EXHIBIT 17

FO    FFICIAL USE ONLY – LAW ENFORCEMENT SE.    IVE

*00019-2016-CID133-014635*

United States military without first disclosing the design defect, flawed testing, and inaccurate NRR rating, which resulted in the submission of false claims.

      C.      The United States contends that it has certain civil claims against 3M arising from the submission or causing the submission of claims for reimbursement for sales of the CAEv2 to the United States military from January 2006 through December 2015. Prior to delivering the CAEv2 to the United States, the United States alleges that 3M, and its predecessor Aearo, knew that the CAEv2 was too short for proper insertion in users' ears and, therefore, did not perform as well in certain individuals. Additionally, the United States alleges that 3M did not disclose this information to the United States and delivered the CAEv2 to the United States knowing that the product contained defects that impaired the CAEv2's serviceability. That conduct is referred to below as the Covered Conduct.

      D.      3M expressly denies the allegations in the Covered Conduct and all of the allegations in the *qui tam* complaint. This Settlement Agreement is neither an admission of liability by 3M, nor a concession by the United States that its claims are not well founded.

      E.      Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs.

      To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

2

*FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE*

CID File0245

FC   FFICIAL USE ONLY – LAW ENFORCEMENT SEI    VE

*00019-2016-CID133-014635*

## TERMS AND CONDITIONS

1.      3M shall pay to the United States Nine Million One Hundred Thousand Dollars ($9,100,000.00) (Settlement Amount), of which Four Million Five Hundred Sixty Thousand Dollars ($4,560,000.00) is restitution.  The Settlement Amount shall be paid within seven days of the Effective Date of this Agreement, as the term is defined in Paragraph 23 below.  The Settlement Amount shall be paid to the United States by electronic funds transfer pursuant to written instructions to be provided by the Civil Division of the United States Department of Justice no later than the Effective Date of this Agreement.  Notwithstanding any provision of this Agreement, interest on any unpaid balance of the Settlement Amount shall accrue at a rate of twelve percent per annum, compounded daily beginning on the eighth day after the Effective Date of this Agreement, on the remaining unpaid balance.

2.      Conditioned upon the United States receiving the Settlement Amount from 3M and as soon as feasible after receipt, the United States shall pay One Million Nine Hundred and Eleven Thousand Dollars ($1,911,000) to Relator by electronic funds transfer.

3.      3M further agrees to pay the Relator the agreed upon amount of $645,000.00 for attorneys' fees, expenses and other legal costs (the "Relator's Costs").  3M agrees to pay the Relator's Costs no later than 14 days from the Effective Date of this Agreement by electronic funds transfer pursuant to written instructions to be provided by Relator no later than the Effective Date of this Agreement.

4.      Subject to the exceptions in Paragraph 6 (concerning excluded claims) below, and conditioned upon 3M's full payment of the Settlement Amount, the United

3

States releases 3M, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; and the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, or any other statutory provision creating a cause of action for civil damages or civil penalties that the Civil Division of the Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part O, Subpart I, § 0.45(d) or common law theories of breach of contract, payment by mistake, unjust enrichment, and fraud.

5.    Subject to the exceptions in Paragraph 6 below, and conditioned upon 3M's full payment of the Settlement Amount and full payment of the Relator's Costs, Relator, for itself and for its successors, attorneys, agents, and assigns, releases 3M, together with its current and former parent corporations; current and former directors, officers, agents and employees; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them (collectively the "Releasees") from all of the following claims:

(a)    Any and all claims, whether disclosed or undisclosed, which Relator has asserted, could have asserted, or may assert now or in the future against the Releasees arising out of or in any way connected with the Civil Action, the Covered Conduct, and the Relator's investigation and prosecution thereof, including but not limited to any civil monetary claim the Relator or the United States has or may have under the False Claims

4

P1079.248

FC   FFICIAL USE ONLY – LAW ENFORCEMENT SEr   VE

*00019-2016-CID133-014635*

Act, 31 U.S.C. §§ 3729-3733; any claim for attorneys' fees, expenses or costs under 31 U.S.C. § 3730(d); any other statute creating a cause of action for civil damages or penalties, or any common law theories, including but not limited to breach of contract, payment by mistake, unjust enrichment and fraud.

6.    Notwithstanding the releases given in Paragraphs 4 and 5 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

a.    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.    Any criminal liability;

c.    Except as explicitly stated in the Agreement, any administrative liability, including the suspension and debarment rights of any federal agency;

d.    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.    Any liability based upon obligations created by this Agreement;

f.    Any liability for failure to deliver goods or services due;

g.    Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

7.    Relator and its successors, attorneys, agents, and assigns shall not object to this Agreement and agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon Relator's receipt of the payment described in Paragraph 2, Relator and

5

EXHIBIT    CID File0248

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

its successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

8.    3M waives and shall not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

9.    3M fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that 3M has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

10.    3M, for itself and for its successors, attorneys, agents, and assigns, releases Relator, together with its current and former parent corporations; current and former directors, officers, agents and employees; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former corporate owners; and the corporate successors and assigns of any of them (collectively the "Moldex Releasees") from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that 3M has asserted, could have asserted, or may assert now or in the

*FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE*

CID_File0249

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

future against the Moldex Releasees arising out of or in any way connected with the Civil

Action, the Covered Conduct, and the Relator's investigation and prosecution thereof,

including but not limited to any cause of action for civil damages or penalties, or any

common law theories, including but not limited to breach of contract, payment by

mistake, unjust enrichment and fraud.

11.    a.    Unallowable Costs Defined: All costs (as defined in the Federal

Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of 3M, and its

present or former officers, directors, employees, shareholders, and agents in connection

with:

    (1)    the matters covered by this Agreement;

    (2)    the United States' audit(s) and civil investigation(s) of the

          matters covered by this Agreement;

    (3)    3M's investigation, defense, and corrective actions

          undertaken in response to the United States' audit(s) and

          civil investigation(s) in connection with the matters

          covered by this Agreement (including attorney's fees);

    (4)    the negotiation and performance of this Agreement;

    (5)    the payment 3M makes to the United States pursuant to this

          Agreement and any payments that 3M may make to

          Relator, including costs and attorney's fees,

are unallowable costs for government contracting purposes (hereinafter referred to as

Unallowable Costs).

7

CID File0250

FC   FFICIAL USE ONLY – LAW ENFORCEMENT SE;    IVE

*00019-2016-CID133-014635*

      b.     Future Treatment of Unallowable Costs:  These Unallowable Costs will be separately determined and accounted for by 3M, and 3M shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

      c.     Treatment of Unallowable Costs Previously Submitted for Payment:  Within 90 days of the Effective Date of this Agreement, 3M shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by 3M or any of its subsidiaries or affiliates from the United States.  3M agrees that the United States, at a minimum, shall be entitled to recoup from 3M any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment.  The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine 3M's books and records and to disagree with any calculations submitted by 3M or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by 3M, or the effect of any such Unallowable Costs on the amount of such payments.

      12.     This Agreement is intended to be for the benefit of the Parties only.

      13.     Upon receipt of the payment described in Paragraph 1, above, the Parties shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant to Rule 41(a)(1).

      14.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

      15.     Each party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

8

CID File0251

EXHIBIT

FO    FFICIAL USE ONLY – LAW ENFORCEMENT SE    IVE

*00019-2016-CID133-014635*

16.    This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of South Carolina. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

17.    This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

18.    The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below. The Relator represents that it has discussed this Agreement with its counsel prior to signing.

19.    This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

20.    This Agreement is binding on 3M's successors, transferees, heirs, and assigns.

21.    This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

22.    All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

23.    This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

9

P1079.253

FC    FICIAL USE ONLY – LAW ENFORCEMENT SE      VE

*00019-2016-CID133-014635*

THE UNITED STATES OF AMERICA

DATED: *7-23-18* BY: _____

Brandie N. Weddle
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice

DATED: _____ BY: _____

Stan Ragsdale
Brook Andrews
Assistant United States Attorneys
District of South Carolina

3M COMPANY - DEFENDANT

DATED: _____ BY: _____

3M COMPANY
Mojdeh Poul
Executive Vice President – Safety & Graphics Business
Group

DATED: _____ BY: _____

Courtney Enloe
Associate General Counsel
3M Legal Affairs

MOLDEX-METRIC - RELATOR

DATED: _____ BY: _____

MOLDEX-METRIC
Mark Magidson
President and CEO

10

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

THE UNITED STATES OF AMERICA

DATED: _____ BY: _____
                        Brandie N. Weddle
                        Trial Attorney
                        Commercial Litigation Branch
                        Civil Division
                        United States Department of Justice

DATED: 7-23-18 BY: _____
                        Stan Ragsdale
                        Brook Andrews
                        Assistant United States Attorneys
                        District of South Carolina

3M COMPANY - DEFENDANT

DATED: _____ BY: _____
                        3M COMPANY
                        Mojdeh Poul
                        Executive Vice President – Safety & Graphics Business
                        Group

DATED: _____ BY: _____
                        Courtney Enloe
                        Associate General Counsel
                        3M Legal Affairs

MOLDEX-METRIC - RELATOR

DATED: _____ BY: _____
                        MOLDEX-METRIC
                        Mark Magidson
                        President and CEO

10

CID File0254

F(   FFICIAL USE ONLY – LAW ENFORCEMENT SE      'VE

*00019-2016-CID133-014635*

THE UNITED STATES OF AMERICA

DATED: _____ BY: _____
                        Brandie N. Weddle
                        Trial Attorney
                        Commercial Litigation Branch
                        Civil Division
                        United States Department of Justice

DATED: _____ BY: _____
                        Stan Ragsdale
                        Brook Andrews
                        Assistant United States Attorneys
                        District of South Carolina

3M COMPANY - DEFENDANT

DATED: 7/23/18 BY: _____
                        3M COMPANY
                        Mojdeh Poul
                        Executive Vice President – Safety & Graphics Business
                        Group

DATED: 7/23/18 BY: _____
                        Courtney Enloe
                        Associate General Counsel
                        3M Legal Affairs

MOLDEX-METRIC - RELATOR

DATED: _____ BY: _____
                        MOLDEX-METRIC
                        Mark Magidson
                        President and CEO

10



P1079.256

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

*00019-2016-CID133-014635*

THE UNITED STATES OF AMERICA

DATED: _____ BY: _____
                        Brandie N. Weddle
                        Trial Attorney
                        Commercial Litigation Branch
                        Civil Division
                        United States Department of Justice

DATED: _____ BY: _____
                        Stan Ragsdale
                        Brook Andrews
                        Assistant United States Attorneys
                        District of South Carolina

3M COMPANY - DEFENDANT

DATED: _____ BY: _____
                        3M COMPANY
                        Mojdeh Poul
                        Executive Vice President – Safety & Graphics Business
                        Group

DATED: _____ BY: _____
                        Courtney Enloe
                        Associate General Counsel
                        3M Legal Affairs

MOLDEX-METRIC - RELATOR

DATED: 7-20-18 BY: _____
                        MOLDEX-METRIC
                        Mark Magidson
                        President and CEO

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE    EXHIBIT _____    CID File0256

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

00019-2016-CID133-014635

DATED: 7/20/2018 BY: _____

Counsel for MOLDEX-METRIC
Sam S. Sheldon
Quinn Emanuel Urquhart & Sullivan LLP
777 6th Street, NW
Washington DC 20001

11

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE


CID_File0257

3:16-cv-01533-DCC *~~~LED* Date Filed 07/26/18  Entry ~~~mber 24    Page 1 of 1

*FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE*

*00019-2016-CID133-014635*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### COLUMBIA DIVISION

| | |
|---|---|
| United States of America, *ex rel.*<br>Moldex-Metric, Inc.,<br><br>       Plaintiffs,<br><br>       v.<br><br>3M Company<br><br>       Defendant. | Civ. No.: 3:16-cv-01533-DCC |

### ORDER OF DISMISSAL

Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure and the False Claims Act, 31 U.S.C.§ 3730(b)(1), the United States and Relator Moldex-Metric, Inc. ("Relator"), filed a Joint Stipulation of Dismissal in this civil action. Upon due consideration of the Stipulation, the United States' Notice of Intervention, and the other matters of record in this action,

**IT IS HEREBY ORDERED** that:

    a.  The claims against Defendant by the Relator are dismissed with prejudice;

    b.  The claims against Defendant described as Covered Conduct, pursuant to and consistent with the terms and conditions of the settlement agreement are dismissed with prejudice as to the United States; and

    c.  The Relator's Complaint and related filings (ECF No. 1), the United States' Notice of Election to Intervene (ECF No. 20), the Joint Stipulation of Dismissal (ECF No. 21), and this Order be unsealed;

**IT IS SO ORDERED.**

This 26th day, July 2018

                          s/Donald C. Coggins, Jr.
                          Donald C. Coggins, Jr.
                          United States District Judge

| AGENT'S INVESTIGATION REPORT | ROI NUMBER |
|---|---|
| CID Regulation 195-1<br>FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE | 0019-16-CID133-014635 |
| | PAGE 1 OF 1 PAGES |

DETAILS

On 29 November 2018, this office was notified by MAJ Cameron Edlefson, Attorney-Advisor, Procurement Fraud Division Office of the Judge Advocate advising that after reviewing 3M's response to their questions they have decided not to take any further action again 3M.

//////////////////////////////////////////////////LAST ENTRY//////////////////////////////////////////////////////////

| TYPED AGENT'S NAME AND SEQUENCE NUMBER | ORGANIZATION |
|---|---|
| SA Jennifer L. COLEMAN, 5967 | ATLANTA FRAUD RESIDENT AGENCY, USACIDC |

| SIGNATURE  COLEMAN.JENNIFER Digitally signed by<br>COLEMAN.JENNIFER.LYNN.1117271788<br>.LYNN.1117271788 Date: 2018.11.29 14:51:08 -05'00' | DATE<br>29 November 2018 | EXHIBIT<br>19 |
|---|---|---|

CID FORM 94
(Automated)

FOR OFFICIAL USE ONLY – LAW ENFORCEMENT SENSITIVE

Protective Marking is Excluded From
Automatic Termination (Para 13, AR 34-16)

CID File0259

# DISCLOSURE ACCOUNTING RECORD

Case Number: 0019-2016-CID123-016135

| INDIVIDUAL OR BUSINESS NAME RELEASED | REQUESTOR'S NAME | REQUESTOR'S ORGANIZATION/ADDRESS | NATURE AND PURPOSE OF DISCLOSURE | INDIVIDUAL'S CONSENT | | DATE OF DISCLOSURE |
|---|---|---|---|---|---|---|
| | | | | YES | NO-NOT REQUIRED | |
| Entire File | USAO-SC | USAO-Columbia, SC | Investigation | ☐ | ☒ | 17 May 16 |
| Entire File | DOJ-Civil | DOJ-Washington DC | Investigation | ☐ | ☒ | 17 May 16 |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |
| | | | | ☐ | ☐ | |

The Prescribing Directive is CIDR 195-1
For Official Use Only — Law Enforcement Sensitive

CIDF 118-E-R
1 Aug 14

CID File0260

(EXHIBIT 20 )